IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

---

SINGLE STICK, INC.                                )
2046 W Rose Garden Lane                           )
Phoenix, Arizona  85027                           )
                                                  )
      Plaintiff                               )
                                                  )    Case No.
v.                                                )
                                                  )
MICHAEL JOHANNS, Secretary of Agriculture,        )
and the UNITED STATES DEPARTMENT OF               )
AGRICULTURE                                       )
1400 Pennsylvania Avenue, S.W.                    )
Stop 0506                                         )
Room 3621-S                                       )
Washington, D.C.  20250-0506                      )
                                                  )
      Defendants                              )

---

## COMPLAINT
(For Declaratory and Injunctive Relief)

### Introduction

1.      This suit for declaratory judgment and injunctive relief asks the Court to compel defendants to comply with the Fair and Equitable Tobacco Reform Act (the "Reform Act"), 7 U.S.C. §518d et seq. (Exhibit 1), and the Information Quality Act, 44 U.S.C. §3516, note, and applicable Office of Management and Budget and agency information quality guidelines (collectively the "IQA") (Exhibit 2).

2.      The defendants have violated the Reform Act, and frustrated Congressional intent, by a) unlawfully demanding plaintiff, a cigar manufacturer, pay unauthorized and improper Tobacco Transition Payment Program (the "Payment Program") "assessments" that could exceed $25 million during the next ten years,  b)

unlawfully assessing plaintiff's "small" cigars at the rate of $1.68 - $1.82 per pound of tobacco removed, while assessing "large" cigars at the rate of $0.08 - $0.25 per pound of tobacco removed, and c) unlawfully over-estimating plaintiff's market share, contrary to all competent record evidence.

3.      Additionally, the defendants have violated the IQA, and frustrated plaintiff's statutory and due process rights, by a) failing to correct incorrect disseminated information, and make available statistical data used to develop defendants' estimate of the domestic cigar market's size as required by the IQA, b) totally failing to respond to, or even acknowledge, plaintiff's IQA petition and request for reconsideration, and c) depriving plaintiff of the information it needed to obtain a full and fair hearing for its appeal of the defendants' assessments.

4.      This matter should be remanded with instructions to the defendants to comply with the Reform Act, to appropriately assess plaintiff, and to correct and/or disclose data and information, all in accordance with law.

**Parties**

5.      Plaintiff Single Stick, Inc. ("Single Stick") manufactures and sells primarily "small" cigars, defined by law as cigars weighing less than three pounds per thousand "sticks" or units.   Single Stick is a cigar manufacturer or importer for purposes of the Reform Act, and is subject to Payment Program assessment.

6.      Defendant Johanns is the Secretary of Agriculture.  He is sued in his official capacity.

7.      The Department of Agriculture ("DOA") is an agency of the United

States, and includes the Commodity Credit Corporation ("CCC") and the Farm Service

Agency ("FSA") which administer the Payment Program.

### Jurisdiction, Venue and Relief

8.      7 U.S.C. §518d(j)(1) and 28 U.S.C. §1331 confer subject matter

jurisdiction.

9.      7 U.S.C. §518d(j)(3), 5 U.S.C. §§701 - 706 and 28 U.S.C. §§1361, 2201,

and 2202 authorize the Court to grant the requested relief.

10.     7 U.S.C. §518d(j)(1), 28 U.S.C. §1391(e), and 5 U.S.C. §703 provide the

Court is a proper venue for this action.

11.     The defendants' actions and legal determinations in this case are reviewed

de novo.

### Facts

12.     The Reform Act, passed in 2004, launched a ten-year phase-out of

Depression-era tobacco price support programs, and established the Payment Program to

compensate affected domestic tobacco farmers through ten equal installment payments,

made during fiscal years 2005-2014.

13.     The Congress funded the Payment Program through "assessments" - or

taxes - on tobacco manufacturers and importers.  It divided the domestic tobacco market

into six major "classes" - cigars, cigarettes, chewing tobacco, pipe tobacco, snuff, and

"roll your own" tobacco - and allocated each class a defined percentage portion of the

total Payment Program obligation, which it calculated by multiplying net tobacco

removed by the maximum excise tax per product (i.e. another measure of volume).

Cigarette manufacturers and importers were assessed 96.331% of the total Payment Program, cigar manufacturers and importers (such as Single Stick) were assessed 2.783%, and the balance was distributed among the remaining four tobacco classes.

14.     The DOA distinguished between large and small cigars when it calculated initial class assessments, allocating large cigars 2.727% and small cigars 0.056% of the Payment Program obligation, respectively.  (Exhibit 3).  The DOA then combined them into one class for "cigars" at 2.783%.

15.     Although the DOA was charged with calculating and collecting Payment Program assessments for and from each tobacco manufacturer and importer, Congress set clear statutory guidelines to govern the process.

16.     To ensure equity, and guarantee that manufacturers and importers were fairly assessed, the Reform Act, in 7 U.S.C. § 518d(e), required pro rata assessment within each class, and prohibited assessments that exceeded a class member's actual share of removed volume - meaning the volume of tobacco taken from factories or internal revenue bond, from customs custody, or that was smuggled or unlawfully imported into the U.S. by all class members.

17.     As to the cigar class, however, the DOA misapplied the law and frustrated Congressional intent.

18.     Historically, cigars have been taxed and regulated by the federal government - acting through the Alcohol and Tobacco Tax and Trade Bureau (TTB) - based on the volume of tobacco contained in each unit.  A single large cigar can contain as much or more tobacco than a twenty count package of small cigars. Thus, TTB has divided the cigar market into two basic categories: small cigars, defined as less than three

pounds of tobacco per thousand sticks, and large cigars.   Large cigars account for more than 95% of the removed volume of cigar tobacco in the U.S. market.

19.     Failing to recognize a small cigar removed but a fraction of the volume of tobacco removed in a large cigar, the DOA never measured, and its cigar class assessments were not based on, gross domestic volume.  Instead, ignoring the Reform Act's plain language, and despite having ready access to removed volume data, the DOA assessed Single Stick based solely on an incomplete and statistically indefensible estimate of domestic cigar market share that the DOA obtained by dividing the number of cigars Single Stick sold ("stick count") by the total number of cigars sold in the United States.

20.     The DOA, through CCC, assessed Single Stick:  a) $339,719.00 for the period October 2004 - December 2004, based on an alleged market share of 4.81% (invoice no. CR05100007); b) $455,374.00 for the period January 2005 - March 2005, based on an alleged cigar market share of 6.45% (invoice no. CR05200005), and c) $1,152,530.00 for the period April 2005-June 2005, based on an alleged cigar market share of 7.78% (invoice no. CR050300004) (Exhibit 4).

21.     The DOA violated the Reform Act by assessing Single Stick far in excess of its pro rata share of the removed volume of cigar tobacco.  For example, Single Stick's average market share between December 2004 and June 2005 was 0.79%, measured by excise taxes paid on the volume of tobacco removed, not the 6.83% calculated by CCC. (Exhibit 5).

22.    Furthermore, the DOA arbitrarily and capriciously assessed Single Stick $1.68 - $1.82 per pound of tobacco removed for small cigars, while assessing tobacco used for large cigars at the rate of only $0.08 - $0.25 per pound removed. (Exhibit 6).

23.    Finally, the DOA substantially overstated Single Stick's "stick count" market share, and improperly inflated Single Stick's Payment Program obligation.

24.    Single Stick timely appealed the CCC assessments.

25.    While its appeal was pending, Single Stick attempted to verify the CCC's estimated cigar market "stick count."  Lacking access to the CCC's primary data sources and unable to independently test or verify the CCC's estimate of market share, yet requiring this information to be able to fully and fairly pursue its appeal, Single Stick requested raw data and full identification of all CCC data sources.

26.    On September 13, 2005, Single Stick sent the DOA a Freedom of Information Act Request.  This Request was denied on October 24, 2005 because the DOA claimed its data sources were specifically exempted from FOIA disclosure. (Exhibit 7).

27.    Also on September 13, 2005, Single Stick sent the DOA an IQA Petition seeking information correction and data source disclosure.  The DOA did not respond to the Petition. On December 20, 2005, Single Stick filed a Request for Reconsideration. Again, the DOA failed to respond.  (Exhibit 8).

28.    The DOA's failure to acknowledge, much less respond to, Single Stick's IQA Petition or its Request for Reconsideration constituted effective denial and final agency action.

29.     Due to the DOA's total disregard for Single Stick's informational rights, Single Stick was unable to evaluate, much less challenge, the agency's market share estimate. Consequently, Single Stick's statutory and due process rights to a full and fair hearing were violated.

30.     Single Stick's appeal was heard by an administrative law judge on November 17, 2005. Single Stick argued, *inter alia*, that the DOA had violated the Reform Act and wrongly estimated market share.

31.     Single Stick submitted A.C. Nielsen "point of sale" survey data demonstrating the DOA over-estimated its market share by several orders of magnitude. Single Stick also submitted uncontroverted evidence that the A.C. Nielsen survey is recognized as the most accurate commercially available measure of market share, and is relied on by industry executives to make advertising, product, distribution, and other critical business decisions.

32.     According to A.C. Nielsen, Single Stick's total market share between October, 2004 and October, 2005 was approximately 1.05% - 2.5%. The DOA's unverified market share estimate was between 4.81% and 7.78% for the identical time-period.

33.     During the hearing, the defendants failed to introduce any independent evidence into the record demonstrating its market share estimate was complete or accurate, or that it included a statistically defensible estimate of the number of cigars smuggled or unlawfully imported into the United States.

34.     The DOA decided Single Stick's appeal on February 8, 2006. The appeal was denied in part and granted in part. (Exhibit 9). The DOA acknowledged Single

Stick "may be philosophically well founded" to argue the inequity of assessing small cigars as if each stick contained the same volume of tobacco as contained in a large cigar. However, the DOA ruled against Single Stick, erroneously asserting Congress had mandated such an outcome.

35.    The DOA also affirmed Single Stick's appeal claim that it was paying more than its proportional share "to the extent CCC will perform a recalculation and reconciliation of the (2005) assessments." This recalculation and reconciliation was slated to occur due to the CCC's admitted failure to meet Reform Act requirements when it issued the initial round of assessments. Nevertheless, the DOA erroneously concluded that recalculation had to be based solely on data submitted to the CCC, or to the Departments of Homeland Security or Treasury, ignoring 7 U.S.C. §518d(a)(2)'s requirement that all removed tobacco, including cigars smuggled or unlawfully imported into the United States, be used to calculate market share.

36.    The DOA stated Single Stick's FOIA request was "outside the scope of this review as it pertains to the appeal of the [Payment Program] assessment." However, the DOA erroneously determined that Single Stick had failed to demonstrate that denial of its FOIA request had interfered with its due process or otherwise caused harm. Furthermore, the DOA erroneously ruled that "The fact that [Single Stick] was unable to obtain, review, and scrutinize the underlying data used [by CCC] to calculate market shares does not mean [Single Stick's] assertions are well-founded nor does it render [CCC's] data incorrect." Contrary to the record, it determined "[Single Stick] has made no sustainable argument that the data relied on by CCC was incorrect or used improperly…"

8

37.    The DOA never mentioned Single Stick's IQA Petition or Request for Reconsideration.

38.    On or about March 1, 2006, Single Stick received recalculated assessments.  The DOA:  a) raised Single Stick's estimated market share for October-December 2004 from 4.81% to 5.32%, and increased the assessment due to $351,007.23, b) raised Single Stick's estimated market share for January - March 2005 from 6.45% to 7.15%, and increased the assessment due to $472,017.47, and c) maintained Single Stick's estimated market share for April - June 2005 at 7.78%, but reduced the assessment demanded to $1,135,353.46. (Exhibit 10).

39.    The DOA contradicted the Reform Act's plain language and Congressional intent by assessing solely based on an incomplete stick count, and thereby harmed and disproportionately burdened Single Stick and other similarly situated small cigar manufacturers and importers.

40.    The DOA over-assessed Single Stick $1,715,910.70 between October 2004 and June 2005.  As of December 2005, the amount unlawfully demanded by DOA from Single Stick totaled approximately $2,947,000.00.  Based on this data, and barring relief from this Court, Single Stick estimates it could be illegally assessed over $25 million during the life of the Payment Program.

41.    Furthermore, although large cigars account for approximately 95% of the total removed volume of cigar tobacco, small cigar manufacturers and importers, including Single Stick, are presently paying over 30% of the total cigar market assessment.  The small cigar market is inelastic, so the DOA's disproportionately high

assessments cannot be passed through to customers, placing the business viability of some small cigar manufacturers and importers at risk.

## Cause of Action

Count 1:        The Administrative Procedure Act

42.    Single Stick repeats paragraphs 1 - 41.

43.    Single Stick is aggrieved for the purposes of 7 U.S.C. § 718d(j)(1), has suffered legal wrong and is adversely affected and aggrieved by the DOA's final agency action for the purposes of 5 U.S.C. § 702.

44.    The DOA's actions, as described in this complaint, were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, without observance of procedure required by law, unsupported by substantial evidence on the record of an agency hearing provided by statute, and unwarranted by the facts in that:

a)    The defendants, in excess of statutory authority, short of statutory right, and in abuse of its discretion, violated the Reform Act by, *inter alia*: (i) assessing Single Stick in excess of its pro rata share of the removed volume of cigar tobacco contrary to 7 U.S.C. § 625(e)(2), (ii) assessing Single Stick without regard for its share of gross domestic volume contrary to 7 U.S.C. §518d(e)(1), (iii) calculating Single Stick's volume of domestic sales based solely on data submitted to the CCC, or possibly to the Departments of Homeland Security and Treasury contrary to 7 U.S.C. §518d(g)(2), ignoring 7 U.S.C. §518d(a)(2)'s requirement that all removed tobacco, including cigars smuggled or unlawfully

imported into the United States, be accounted for when calculating market share, and (iv) applying 7 U.S.C. §518d(g)(3), which states the "volumes of domestic sales shall be measured by --(A) in the case of cigarettes and cigars, the number of cigarettes and cigars" without first correcting for the disparity in gross domestic volume between small and large cigars.

b)    The defendants arbitrarily and capriciously abused their discretion, and, in excess of statutory authority, over-estimated Single Stick's market share.

c)    The defendants, in excess of statutory authority and without legal right, violated the IQA by failing to correct influential information disseminated in violation of statutory, OMB, and agency guidelines, and/or to make available data and data sources Single Stick needed and requested to test and reproduce the DOA's estimate of market share.

d)    The defendants, in violation of statutory limitations and without observance of procedures required by law, refused to respond or otherwise acknowledge Single Stick's IQA Petition and Request for Reconsideration.

e)    The defendants, contrary to constitutional authority and without statutory right, wrongfully violated Single Stick's statutory appeal and/or its due process rights by failing to make available sufficient information for Single Stick to effectively, fully, and fairly exercise those rights.

f)    The defendants' denial of Single Stick's appeal was contrary to the evidence, and its determinations therein were unsupported by the substantial evidence on the record of an agency hearing provided by statute.

g)       The defendants wrongfully discriminated against Single Stick and

others similarly situated, without rational basis and contrary to the Reform Act

and the small cigar manufacturers' and importers' constitutional rights, by

ignoring the Reform Act's plain language and imposing a disproportionate share

of the cigar class assessment on small cigar manufacturers and importers.

### Relief Requested

WHEREFORE, Single Stick requests the following relief:

A.       This Court should hold unlawful and set aside the defendants' illegal over-

assessments of Single Stick and remand with instructions to the DOA that it (i) assess

Single Stick in accordance with its pro rata share of the removed volume of cigar tobacco

in accordance with 7 U.S.C. § 625(e)(2), (ii) assess Single Stick based solely on its share

of gross domestic volume in accordance with 7 U.S.C. §518d(e)(1), (iii) calculate Single

Stick's volume of domestic sales based solely on data that complies with 7 U.S.C.

§518d(a)(2) and accounts for all removed tobacco, including cigars smuggled or

unlawfully imported into the United States when calculating market share, and/or (iv)

assess Single Stick by applying 7 U.S.C. §518d(g)(3), which states the "volumes of

domestic sales shall be measured by --(A) in the case of cigarettes and cigars, the number

of cigarettes and cigars" after first correcting for the disparity in gross domestic volume

between small and large cigars based on gross domestic volume, as specified in the

Reform Act.

B.       This Court should declare the defendants have violated the Reform Act

and IQA, and issue a mandatory, permanent injunction requiring compliance therewith.

C.    This Court should order the defendants to comply with the IQA and otherwise appropriately respond to Single Stick's IQA Petition.

D.    This Court should award Single Stick the costs of the litigation, including such attorney fees as may be allowed by law.

E.    This Court should award such other and further relief as it deems just.


Respectfully submitted,
SINGLE STICK


Reed D. Rubinstein
Donald Stein
Greenberg Traurig LLP
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
(202) 331-3100

wdc-fs1\279449v01\3/14/06

**EXHIBIT 1**

```
-CITE-
    7 USC CHAPTER 21C - TOBACCO REFORM                    01/03/05


-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM


-HEAD-
                    CHAPTER 21C - TOBACCO REFORM



-MISC1-
        SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                        PRODUCERS OF TOBACCO
    Sec.
    518.        Definitions.
    518a.       Contract payments to tobacco quota holders.
    518b.       Contract payments for producers of quota tobacco.
    518c.       Administration.
    518d.       Use of assessments as source of funds for payments.
    518e.       Tobacco Trust Fund.
    518f.       Limitation on total expenditures.

                 SUBCHAPTER II - IMPLEMENTATION AND TRANSITION
    519.        Treatment of tobacco loan pool stocks and outstanding
                 loan costs.
    519a.       Regulations.

-End-



-CITE-
    7 USC SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO
          QUOTA HOLDERS AND PRODUCERS OF TOBACCO          01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO


-HEAD-
        SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                        PRODUCERS OF TOBACCO

-End-



-CITE-
    7 USC Sec. 518                                        01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518. Definitions
```

-STATUTE-
     In this subchapter and subchapter II:
     (1) Agricultural Act of 1949
       The term "Agricultural Act of 1949" means the Agricultural Act
     of 1949 (7 U.S.C. 1421 et seq.), as in effect on the day before
     October 22, 2004.
     (2) Agricultural Adjustment Act of 1938
       The term "Agricultural Adjustment Act of 1938" means the
     Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.), as
     in effect on the day before October 22, 2004.
     (3) Considered planted
       The term "considered planted" means tobacco that was planted,
     but failed to be produced as a result of a natural disaster, as
     determined by the Secretary.
     (4) Contract
       The term "contract" means a contract entered into under section
     518a or 518b of this title.
     (5) Contract payment
       The term "contract payment" means a payment made under section
     518a or 518b of this title pursuant to a contract.
     (6) Producer of quota tobacco
       The term "producer of quota tobacco" means an owner, operator,
     landlord, tenant, or sharecropper that shared in the risk of
     producing tobacco on a farm where tobacco was produced or
     considered planted pursuant to a tobacco farm poundage quota or
     farm acreage allotment established under part I of subtitle B of
     title III of the Agricultural Adjustment Act of 1938 (7 U.S.C.
     1311 et seq.).
     (7) Quota tobacco
       The term 'quota tobacco'(!1) means a kind of tobacco that is
     subject to a farm marketing quota or farm acreage allotment for
     the 2004 tobacco marketing year under a marketing quota or
     allotment program established under part I of subtitle B of title
     III of the Agricultural Adjustment Act of 1938 (7 U.S.C. 1311 et
     seq.).

     (8) Tobacco
       The term "tobacco" means each of the following kinds of
     tobacco:
         (A) Flue-cured tobacco, comprising types 11, 12, 13, and 14.
         (B) Fire-cured tobacco, comprising types 22 and 23.
         (C) Dark air-cured tobacco, comprising types 35 and 36.
         (D) Virginia sun-cured tobacco, comprising type 37.
         (E) Virginia fire-cured tobacco, comprising type 21.
         (F) Burley tobacco, comprising type 31.
         (G) Cigar-filler and cigar-binder tobacco, comprising types
       42, 43, 44, 53, 54, and 55.
     (9) Tobacco quota holder
       The term "tobacco quota holder" means a person that was an
     owner of a farm, as of October 22, 2004, for which a basic
     tobacco farm marketing quota or farm acreage allotment for quota
     tobacco was established for the 2004 tobacco marketing year.
     (10) Tobacco Trust Fund
       The term "Tobacco Trust Fund" means the Tobacco Trust Fund
     established under section 518e of this title.
     (11) Secretary
       The term "Secretary" means the Secretary of Agriculture.

 -SOURCE-

```
(Pub. L. 108-357, title VI, Sec. 621, Oct. 22, 2004, 118 Stat.
1524.)
```

-REFTEXT-

                           REFERENCES IN TEXT
    The Agricultural Act of 1949, referred to in par. (1), is act
Oct. 31, 1949, ch. 792, 63 Stat. 1051, as amended, which is
classified principally to chapter 35A (Sec. 1421 et seq.) of this
title. For complete classification of this Act to the Code, see
Short Title note set out under section 1421 of this title and
Tables.
    The Agricultural Adjustment Act of 1938, referred to in pars.
(2), (6), and (7), is act Feb. 16, 1938, ch. 30, 52 Stat. 31, as
amended, which is classified principally to chapter 35 (Sec. 1281
et seq.) of this title. Part I of subtitle B of title III of the
Act was classified to subpart I (Sec. 1311 et seq.) of part B of
subchapter II of chapter 35 of this title prior to repeal by Pub.
L. 108-357, title VI, Sec. 611(a), Oct. 22, 2004, 118 Stat. 1522.
For complete classification of this Act to the Code, see section
1281 of this title and Tables.


-MISC1-

                           EFFECTIVE DATE
    Pub. L. 108-357, title VI, Sec. 643, Oct. 22, 2004, 118 Stat.
1536, provided that: "This title [see Short Title note below] and
the amendments made by this title shall apply to the 2005 and
subsequent crops of each kind of tobacco."

                            SHORT TITLE
    Pub. L. 108-357, title VI, Sec. 601, Oct. 22, 2004, 118 Stat.
1521, provided that: "This title [enacting this chapter, amending
sections 609, 1282, 1301, 1303, 1314h, 1361, 1371, 1373, 1375,
1378, 1379, 1428, 1433c-1, and 1441 of this title and section 714c
of Title 15, Commerce and Trade, repealing sections 511r, 515 to
515k, 625, 1311 to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to
1314j, 1315, 1316, 1445, 1445-1, and 1445-2 of this title, enacting
provisions set out as notes under this section and section 515 of
this title, and repealing provisions set out as a note under
section 1314c of this title] may be cited as the 'Fair and
Equitable Tobacco Reform Act of 2004'."

-FOOTNOTE-
    (!1) So in original.


-End-



-CITE-
    7 USC Sec. 518a                                      01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                   PRODUCERS OF TOBACCO

-HEAD-

Sec. 518a. Contract payments to tobacco quota holders

-STATUTE-
  (a) Contract offered
    The Secretary shall offer to enter into a contract with each
  tobacco quota holder under which the tobacco quota holder shall be
  entitled to receive payments under this section in exchange for the
  termination of tobacco marketing quotas and related price support
  under the amendments made by sections 611 and 612.(!1) The contract
  payments shall constitute full and fair consideration for the
  termination of such tobacco marketing quotas and related price
  support.

  (b) Eligibility
    To be eligible to enter into a contract to receive a contract
  payment under this section, a person shall submit to the Secretary
  an application containing such information as the Secretary may
  require to demonstrate to the satisfaction of the Secretary that
  the person is a tobacco quota holder. The application shall be
  submitted within such time, in such form, and in such manner as the
  Secretary may require.
  (c) Base quota level
    (1) Establishment
      The Secretary shall establish a base quota level applicable to
    each tobacco quota holder identified under subsection (b).
    (2) Poundage quotas
      Subject to adjustment under subsection (d), for each kind of
    tobacco for which the marketing quota is expressed in pounds, the
    base quota level for each tobacco quota holder shall be equal to
    the basic quota for quota tobacco established for the 2002
    tobacco marketing year under a marketing quota program
    established under part I of subtitle B of title III of the
    Agriculture (!2) Adjustment Act of 1938 [7 U.S.C. 1311 et seq.]
    on the farm owned by the tobacco quota holder.

    (3) Marketing quotas other than poundage quotas
      Subject to adjustment under subsection (d), for each kind of
    tobacco for which there is marketing quota or allotment on an
    acreage basis, the base quota level for each tobacco quota holder
    shall be the quantity equal to the product obtained by
    multiplying -
        (A) the basic tobacco farm marketing quota or allotment for
      the 2002 marketing year established by the Secretary for quota
      tobacco owned by the tobacco quota holder; by
        (B) the average production yield, per acre, for the period
      covering the 2001, 2002, and 2003 crop years for that kind of
      tobacco in the county in which the quota tobacco is located.
  (d) Treatment of certain contracts and agreements
    (1) Effect of purchase contract
      If there was an agreement for the purchase of all or part of a
    farm described in subsection (c) as of October 22, 2004, and the
    parties to the sale are unable to agree to the disposition of
    eligibility for contract payments, the Secretary, taking into
    account any transfer of quota that has been agreed to, shall
    provide for the equitable division of the contract payments among
    the parties by adjusting the determination of who is the tobacco
    quota holder with respect to particular pounds or allotment of
    the quota.
    (2) Effect of agreement for permanent quota transfer
      If the Secretary determines that there was in existence, as of

the day before October 22, 2004, an agreement for the permanent
transfer of quota, but that the transfer was not completed by
that date, the Secretary shall consider the tobacco quota holder
to be the party to the agreement that, as of that date, was the
owner of the farm to which the quota was to be transferred.
(e) Contract payments
  (1) Calculation of total payment amount
   The total amount of contract payments to which an eligible
tobacco quota holder is entitled under this section, with respect
to a kind of tobacco, shall be equal to the product obtained by
multiplying -
     (A) $7.00 per pound; by
     (B) the base quota level of the tobacco quota holder
   determined under subsection (c) with respect to that kind of
   tobacco.
  (2) Annual payment
   During each of fiscal years 2005 through 2014, the Secretary
shall make a contract payment under this section to each eligible
tobacco quota holder, with respect to a kind of tobacco, in an
amount equal to  1/10  of the amount determined under paragraph
  (1) for the tobacco quota holder for that kind of tobacco.
(f) Death of tobacco quota holder
   If a tobacco quota holder who is entitled to contract payments
under this section dies and is survived by a spouse or one or more
dependents, the right to receive the payments shall transfer to the
surviving spouse or, if there is no surviving spouse, to the estate
of the tobacco quota holder.


-SOURCE-
   (Pub. L. 108-357, title VI, Sec. 622, Oct. 22, 2004, 118 Stat.
   1525.)


-REFTEXT-
                    REFERENCES IN TEXT
   Sections 611 and 612, referred to in subsec. (a), are sections
611 and 612 of Pub. L. 108-357, which amended sections 609, 1282,
1301, 1303, 1361, 1371, 1373, 1375, 1378, 1379, 1428, 1433c-1, and
1441 of this title and section 714c of Title 15, Commerce and
Trade, repealed sections 511r, 515 to 515k, 625, 1311 to 1314,
1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315, 1316, 1445,
1445-1, and 1445-2 of this title, and repealed provisions set out
as a note under section 1314c of this title.
   Part I of subtitle B of title III of the Agricultural Adjustment
Act of 1938, referred to in subsec. (c)(2), was classified to
subpart I (Sec. 1311 et seq.) of part B of subchapter II of chapter
35 of this title prior to repeal by Pub. L. 108-357, title VI, Sec.
611(a), Oct. 22, 2004, 118 Stat. 1522. For complete classification
of this Act to the Code, see section 1281 of this title and Tables.


-FOOTNOTE-
   (!1) See References in Text note below.

   (!2) So in original. Probably should be "Agricultural".


-End-


-CITE-

-EXPCITE-
     TITLE 7 - AGRICULTURE
     CHAPTER 21C - TOBACCO REFORM
     SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                   PRODUCERS OF TOBACCO

-HEAD-
     Sec. 518b. Contract payments for producers of quota tobacco

-STATUTE-
     (a) Contract offered
       The Secretary shall offer to enter into a contract with each
     producer of quota tobacco under which the producer of quota tobacco
     shall be entitled to receive payments under this section in
     exchange for the termination of tobacco marketing quotas and
     related price support under the amendments made by sections 611 and
     612.(!1) The contract payments shall constitute full and fair
     consideration for the termination of such tobacco marketing quotas
     and related price support.

     (b) Eligibility
       (1) Application and determination
         To be eligible to enter into a contract to receive a contract
       payment under this section, a person shall submit to the
       Secretary an application containing such information as the
       Secretary may require to demonstrate to the satisfaction of the
       Secretary that the person is a producer of quota tobacco. The
       application shall be submitted within such time, in such form,
       and in such manner as the Secretary may require.
       (2) Effect of multiple producers for same quota tobacco
         If, on the basis of the applications submitted under paragraph
       (1) or other information, the Secretary determines that two or
       more persons are a producer of the same quota tobacco, the
       Secretary shall provide for an equitable distribution among the
       persons of the contract payments made under this section with
       respect to that quota tobacco, based on relative share of such
       persons in the risk of producing the quota tobacco and such other
       factors as the Secretary considers appropriate.
     (c) Base quota level
       (1) Establishment
         The Secretary shall establish a base quota level applicable to
       each producer of quota tobacco, as determined under this
       subsection.
       (2) Flue-cured and burley tobacco
         In the case of Flue-cured tobacco (types 11, 12, 13, and 14)
       and Burley tobacco (type 31), the base quota level for each
       producer of quota tobacco shall be equal to the effective tobacco
       marketing quota (irrespective of disaster lease and transfers)
       under part I of subtitle B of title III of the Agriculture (!2)
       Adjustment Act of 1938 [7 U.S.C. 1311 et seq.] for the 2002
       marketing year for quota tobacco produced on the farm.

       (3) Other kinds of tobacco
         In the case of each kind of tobacco (other than tobacco covered
       by paragraph (2)), for the purpose of calculating a contract
       payment to a producer of quota tobacco, the base quota level for
       the producer of quota tobacco shall be the quantity obtained by
       multiplying -

(A) the basic tobacco farm acreage allotment for the 2002
marketing year established by the Secretary for quota tobacco
produced on the farm; by
(B) the average annual yield, per acre, of quota tobacco
produced on the farm for the period covering the 2001, 2002,
and 2003 crop years.
(d) Contract payments
(1) Calculation of total payment amount
Subject to subsection (b)(2), the total amount of contract
payments to which an eligible producer of quota tobacco is
entitled under this section, with respect to a kind of tobacco,
shall be equal to the product obtained by multiplying -
(A) subject to paragraph (2), $3.00 per pound; by
(B) the base quota level of the producer of quota tobacco
determined under subsection (c) with respect to that kind of
tobacco.
(2) Annual payment
During each of fiscal years 2005 through 2014, the Secretary
shall make a contract payment under this section to each eligible
producer of tobacco, with respect to a kind of tobacco, in an
amount equal to 1/10 of the amount determined under paragraph
(1) for the producer for that kind of tobacco.
(3) Variable payment rates
The rate for payments to a producer of quota tobacco under
paragraph (1)(A) shall be equal to -
(A) in the case of a producer of quota tobacco that produced
quota tobacco marketed, or considered planted, under a
marketing quota in all three of the 2002, 2003, or 2004 tobacco
marketing years, the rate prescribed under paragraph (1)(A);
(B) in the case of a producer of quota tobacco that produced
quota tobacco marketed, or considered planted, under a
marketing quota in only two of those tobacco marketing years,
2/3 of the rate prescribed under paragraph (1)(A);
(C) in the case of a producer of quota tobacco that produced
quota tobacco marketed, or considered planted, under a
marketing quota in only one of those tobacco marketing years,
1/3 of the rate prescribed under paragraph (1)(A).
(e) Death of tobacco producer
If a producer of quota tobacco who is entitled to contract
payments under this section dies and is survived by a spouse or one
or more dependents, the right to receive the contract payments
shall transfer to the surviving spouse or, if there is no surviving
spouse, to the estate of the producer.

-SOURCE-
(Pub. L. 108-357, title VI, Sec. 623, Oct. 22, 2004, 118 Stat.
1527.)

-REFTEXT-
                    REFERENCES IN TEXT
Sections 611 and 612, referred to in subsec. (a), are sections
611 and 612 of Pub. L. 108-357, which amended sections 609, 1282,
1301, 1303, 1361, 1371, 1373, 1375, 1378, 1379, 1428, 1433c-1, and
1441 of this title and section 714c of Title 15, Commerce and
Trade, repealed sections 511r, 515, 515a to 515k, 625, 1311 to
1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315, 1316,
1445, 1445-1, and 1445-2 of this title, and repealed provisions set
out as a note under section 1314c of this title.
Part I of subtitle B of title III of the Agricultural Adjustment
Act of 1938, referred to in subsec. (c)(2), was classified to

```
      subpart I (Sec. 1311 et seq.) of part B of subchapter II of chapter
      35 of this title prior to repeal by Pub. L. 108-357, title VI, Sec.
      611(a), Oct. 22, 2004, 118 Stat. 1522. For complete classification
      of this Act to the Code, see section 1281 of this title and Tables.

 -FOOTNOTE-
      (!1) See References in Text note below.

      (!2) So in original. Probably should be "Agricultural".


 -End-



 -CITE-
      7 USC Sec. 518c                                         01/03/05

 -EXPCITE-
      TITLE 7 - AGRICULTURE
      CHAPTER 21C - TOBACCO REFORM
      SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                     PRODUCERS OF TOBACCO

 -HEAD-
      Sec. 518c. Administration

 -STATUTE-
      (a) Time for payment of contract payments
       Contract payments required to be made for a fiscal year shall be
      made by the Secretary as soon as practicable.
      (b) Use of county committees to resolve disputes
       Any dispute regarding the eligibility of a person to enter into a
      contract or to receive contract payments, and any dispute regarding
      the amount of a contract payment, may be appealed to the county
      committee established under section 590h of title 16 for the county
      or other area in which the farming operation of the person is
      located.
      (c) Role of National Appeals Division
       Any adverse determination of a county committee under subsection
      (b) may be appealed to the National Appeals Division established
      under subtitle H of the Department of Agriculture Reorganization
      Act of 1994 (7 U.S.C. 6991 et seq.).
      (d) Use of financial institutions
       The Secretary may use a financial institution to manage assets,
      make contract payments, and otherwise carry out this title.(!1)

      (e) Payment to financial institutions
       The Secretary shall permit a tobacco quota holder or producer of
      quota tobacco entitled to contract payments to assign to a
      financial institution the right to receive the contract payments.
      Upon receiving notification of the assignment, the Secretary shall
      make subsequent contract payments for the tobacco quota holder or
      producer of quota tobacco directly to the financial institution
      designated by the tobacco quota holder or producer of quota
      tobacco. The Secretary shall make information available to tobacco
      quota holders and producers of quota tobacco regarding their
      ability to elect to have the Secretary make payments directly to a
      financial institution under this subsection so that they may obtain
      a lump sum or other payment.
```

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 624, Oct. 22, 2004, 118 Stat.
    1528.)

-REFTEXT-
                        REFERENCES IN TEXT
    The Department of Agriculture Reorganization Act of 1994,
referred to in subsec. (c), is title II of Pub. L. 103-354, Oct.
13, 1994, 108 Stat. 3209, as amended. Subtitle H of the Act is
classified principally to subchapter VIII (Sec. 6991 et seq.) of
chapter 98 of this title. For complete classification of this Act
to the Code, see Tables.
    This title, referred to in subsec. (d), means title VI of Pub. L.
108-357, which enacted this chapter, amended sections 609, 1282,
1301, 1303, 1314h, 1361, 1371, 1373, 1375, 1378, 1379, 1428,
1433c-1, and 1441 of this title and section 714c of Title 15,
Commerce and Trade, repealed sections 511r, 515 to 515k, 625, 1311
to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315,
1316, 1445, 1445-1, and 1445-2 of this title, enacted provisions
set out as notes under sections 515 and 518 of this title, and
repealed provisions set out as a note under section 1314c of this
title. For complete classification of title VI to the Code, see
Short Title note set out under section 518 of this title and
Tables.

        -FOOTNOTE-


    (!1) See References in Text note below.


-End-



-CITE-
    7 USC Sec. 518d                                     01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518d. Use of assessments as source of funds for payments

-STATUTE-
    (a) Definitions
      In this section:
      (1) Base period
        The term "base period'(!1) means the one-year period ending the
      June 30 before the beginning of a fiscal year.

      (2) Gross domestic volume
        The term "gross domestic volume" means the volume of tobacco
      products -
          (A) removed (as defined by section 5702 of title 26); and
          (B) not exempt from tax under chapter 52 of title 26 at the

time of their removal under that chapter or the Harmonized
Tariff Schedule of the United States.
  (3) Market share
    The term "market share" means the share of each manufacturer or
importer of a class of tobacco product (expressed as a decimal to
the fourth place) of the total volume of domestic sales of the
class of tobacco product during the base period for a fiscal year
for an assessment under this section.
(b) Quarterly assessments
  (1) Imposition of assessment
    The Secretary, acting through the Commodity Credit Corporation,
shall impose quarterly assessments during each of fiscal years
2005 through 2014, calculated in accordance with this section, on
each tobacco product manufacturer and tobacco product importer
that sells tobacco products in domestic commerce in the United
States during that fiscal year.
  (2) Amounts
    Beginning with the calendar quarter ending on December 31 of
each of fiscal years 2005 through 2014, the assessment payments
over each four-calendar quarter period shall be sufficient to
cover -
      (A) the contract payments made under sections 518a and 518b
    of this title during that period; and
      (B) other expenditures from the Tobacco Trust Fund made
    during the base quarter periods corresponding to the four
    calendar quarters of that period.
  (3) Deposit
    Assessments collected under this section shall be deposited in
the Tobacco Trust Fund.
(c) Assessments for classes of tobacco products
  (1) Initial allocation
    The percentage of the total amount required by subsection (b)
to be assessed against, and paid by, the manufacturers and
importers of each class of tobacco product in fiscal year 2005
shall be as follows:
      (A) For cigarette manufacturers and importers, 96.331
    percent.
      (B) For cigar manufacturers and importers, 2.783 percent.
      (C) For snuff manufacturers and importers, 0.539 percent.
      (D) For roll-your-own tobacco manufacturers and importers,
    0.171 percent.
      (E) For chewing tobacco manufacturers and importers, 0.111
    percent.
      (F) For pipe tobacco manufacturers and importers, 0.066
    percent.
  (2) Subsequent allocations
    For subsequent fiscal years, the Secretary shall periodically
adjust the percentage of the total amount required under
subsection (b) to be assessed against, and paid by, the
manufacturers and importers of each class of tobacco product
specified in paragraph (1) to reflect changes in the share of
gross domestic volume held by that class of tobacco product.
  (3) Effect of insufficient amounts
    If the Secretary determines that the assessment imposed under
subsection (b) will result in insufficient amounts to carry out
this subchapter during a fiscal year, the Secretary shall assess
such additional amounts as the Secretary determines to be
necessary to carry out this subchapter during that fiscal year.
The additional amount shall be allocated to manufacturers and
importers of each class of tobacco product specified in paragraph

(1) in the same manner and based on the same percentages applicable under paragraph (1) or (2) for that fiscal year.

(d) Notification and timing of assessments

(1) Notification of assessments

The Secretary shall provide each manufacturer or importer subject to an assessment under subsection (b) with written notice setting forth the amount to be assessed against the manufacturer or importer for each quarterly payment period. The notice for a quarterly period shall be provided not later than 30 days before the date payment is due under paragraph (3).

(2) Content

The notice shall include the following information with respect to the quarterly period used by the Secretary in calculating the amount:

(A) The total combined assessment for all manufacturers and importers of tobacco products.

(B) The total assessment with respect to the class of tobacco products manufactured or imported by the manufacturer or importer.

(C) Any adjustments to the percentage allocations among the classes of tobacco products made pursuant to paragraph (2) or (3) of subsection (c).

(D) The volume of gross sales of the applicable class of tobacco product treated as made by the manufacturer or importer for purposes of calculating the manufacturer's or importer's market share under subsection (f).

(E) The total volume of gross sales of the applicable class of tobacco product that the Secretary treated as made by all manufacturers and importers for purposes of calculating the manufacturer's or importer's market share under subsection (f).

(F) The manufacturer's or importer's market share of the applicable class of tobacco product, as determined by the Secretary under subsection (f).

(G) The market share, as determined by the Secretary under subsection (f), of each other manufacturer and importer, for each applicable class of tobacco product.

(3) Timing of assessment payments

(A) Collection date

Assessments shall be collected at the end of each calendar year quarter, except that the Secretary shall ensure that the final assessment due under this section is collected not later than September 30, 2014.

(B) Base period quarter

The assessment for a calendar year quarter shall correspond to the base period quarter that ended at the end of the preceding calendar year quarter.

(e) Allocation of assessment within each class of tobacco product

(1) Pro rata basis

The assessment for each class of tobacco product specified in subsection (c)(1) shall be allocated on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume.

(2) Limitation

No manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume.

(f) Allocation of total assessments by market share

The amount of the assessment for each class of tobacco product specified in subsection (c)(1) to be paid by each manufacturer or importer of that class of tobacco product shall be determined for

each quarterly payment period by multiplying -
    (1) the market share of the manufacturer or importer, as
calculated with respect to that payment period, of the class of
tobacco product; by
    (2) the total amount of the assessment for that quarterly
payment period under subsection (c), for the class of tobacco
product.
(g) Determination of volume of domestic sales
  (1) In general
    The calculation of the volume of domestic sales of a class of
tobacco product by a manufacturer or importer, and by all
manufacturers and importers as a group, shall be made by the
Secretary based on information provided by the manufacturers and
importers pursuant to subsection (h), as well as any other
relevant information provided to or obtained by the Secretary.
  (2) Gross domestic volume
    The volume of domestic sales shall be calculated based on gross
domestic volume.
  (3) Measurement
    For purposes of the calculations under this subsection and the
certifications under subsection (h) by the Secretary, the volumes
of domestic sales shall be measured by -
      (A) in the case of cigarettes and cigars, the number of
cigarettes and cigars; and
      (B) in the case of the other classes of tobacco products
specified in subsection (c)(1), in terms of number of pounds,
or fraction thereof, of those products.
(h) Measurement of volume of domestic sales
  (1) Submission of information
    Each manufacturer and importer of tobacco products shall submit
to the Secretary a certified copy of each of the returns or forms
described by paragraph (2) that are required to be filed with a
Federal agency on the same date that those returns or forms are
filed, or required to be filed, with the agency.
  (2) Returns and forms
    The returns and forms described by this paragraph are those
returns and forms that relate to -
      (A) the removal of tobacco products into domestic commerce
(as defined by section 5702 of title 26); and
      (B) the payment of the taxes imposed under charter (!2) 52 of
title 26, including AFT Form 5000.24 and United States Customs
Form 7501 under currently applicable regulations.

  (3) Effect of failure to provide required information
    Any person that knowingly fails to provide information required
under this subsection or that provides false information under
this subsection shall be subject to the penalties described in
section 1003 of title 18. The Secretary may also assess against
the person a civil penalty in an amount not to exceed two percent
of the value of the kind of tobacco products manufactured or
imported by the person during the fiscal year in which the
violation occurred, as determined by the Secretary.
(i) Challenge to assessment
  (1) Appeal to Secretary
    A manufacturer or importer subject to this section may contest
an assessment imposed on the manufacturer or importer under this
section by notifying the Secretary, not later than 30 business
days after receiving the assessment notification required by
subsection (d), that the manufacturer or importer intends to
contest the assessment.

(2) Information
   Not later than 180 days after October 22, 2004, the Secretary
shall establish by regulation a procedure under which a
manufacturer or importer contesting an assessment under this
subsection may present information to the Secretary to
demonstrate that the assessment applicable to the manufacturer or
importer is incorrect. In challenging the assessment, the
manufacturer or importer may use any information that is
available, including third party data on industry or individual
company sales volumes.
(3) Revision
   If a manufacturer or importer establishes that the initial
determination of the amount of an assessment is incorrect, the
Secretary shall revise the amount of the assessment so that the
manufacturer or importer is required to pay only the amount
correctly determined.
(4) Time for review
   Not later than 30 days after receiving notice from a
manufacturer or importer under paragraph (1), the Secretary shall
-
      (A) decide whether the information provided to the Secretary
   under paragraph (2), and any other information that the
   Secretary determines is appropriate, is sufficient to establish
   that the original assessment was incorrect; and
      (B) make any revisions necessary to ensure that each
   manufacturer and importer pays only its correct pro rata share
   of total gross domestic volume from all sources.
(5) Immediate payment of undisputed amounts
   The regulations promulgated by the Secretary under paragraph
(2) shall provide for the immediate payment by a manufacturer or
importer challenging an assessment of that portion of the
assessment that is not in dispute. The manufacturer and importer
may place into escrow, in accordance with such regulations, only
the portion of the assessment being challenged in good faith
pending final determination of the claim.
(j) Judicial review
   (1) In general
   Any manufacturer or importer aggrieved by a determination of
the Secretary with respect to the amount of any assessment may
seek review of the determination in the United States District
Court for the District of Columbia or for the district in which
the manufacturer or importer resides or has its principal place
of business at any time following exhaustion of the
administrative remedies available under subsection (i).
(2) Time limits
   Administrative remedies shall be deemed exhausted if no
decision by the Secretary is made within the time limits
established under subsection (i)(4).
(3) Excessive assessments
   The court shall restrain collection of the excessive portion of
any assessment or order a refund of excessive assessments already
paid, along with interest calculated at the rate prescribed in
section 3717 of title 31, if it finds that the Secretary's
determination is not supported by a preponderance of the
information available to the Secretary.
(k) Termination date
   The authority provided by this section to impose assessments
terminates on September 30, 2014.

-SOURCE-

(Pub. L. 108-357, title VI, Sec. 625, Oct. 22, 2004, 118 Stat.
1529.)

-REFTEXT-
                        REFERENCES IN TEXT
     The Harmonized Tariff Schedule of the United States, referred to
in subsec. (a)(2)(B), is not set out in the Code. See Publication
of Harmonized Tariff Schedule note set out under section 1202 of
Title 19, Customs Duties.

-FOOTNOTE-
     (!1) So in original.

     (!2) So in original. Probably should be "chapter".


-End-



-CITE-
     7 USC Sec. 518e                                          01/03/05

-EXPCITE-
     TITLE 7 - AGRICULTURE
     CHAPTER 21C - TOBACCO REFORM
     SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                       PRODUCERS OF TOBACCO

-HEAD-
     Sec. 518e. Tobacco Trust Fund

-STATUTE-
     (a) Establishment
     There is established in the Commodity Credit Corporation a
revolving trust fund, to be known as the "Tobacco Trust Fund",
which shall be used in carrying out this subchapter. The Tobacco
Trust Fund shall consist of the following:
          (1) Assessments collected under section 518d of this title.
          (2) Such amounts as are necessary from the Commodity Credit
     Corporation.
          (3) Any interest earned on investment of amounts in the Tobacco
     Trust Fund under subsection (c).
     (b) Expenditures
     (1) Authorized expenditures
     Subject to paragraph (2), and notwithstanding any other
provision of law, the Secretary shall use amounts in the Tobacco
Trust Fund, in such amounts as the Secretary determines are
necessary -
          (A) to make payments under sections 518a and 518b of this
     title;
          (B) to provide reimbursement under section 519(c) of this
     title;
          (C) to reimburse the Commodity Credit Corporation for costs
     incurred by the Commodity Credit Corporation under paragraph
     (2); and
          (D) to make payments to financial institutions to satisfy
     contractual obligations under section 518a or 518b of this
     title.
     (2) Expenditures by Commodity Credit Corporation

Notwithstanding any other provision of law, the Secretary shall use the funds, facilities, and authorities of the Commodity Credit Corporation to make payments described in paragraph (1). Not later than January 1, 2015, the Secretary shall use amounts in the Tobacco Trust Fund to fully reimburse, with interest, the Commodity Credit Corporation for all funds of the Commodity Credit Corporation expended under the authority of this paragraph. Administrative costs incurred by the Secretary or the Commodity Credit Corporation to carry out this title (!1) may not be paid using amounts in the Tobacco Trust Fund.

(c) Investment of amounts
  (1) In general
    The Commodity Credit Corporation shall invest such portion of the amounts in the Tobacco Trust Fund as are not, in the judgment of the Commodity Credit Corporation, required to meet current expenditures.
  (2) Interest-bearing obligations
    Investments may be made only in interest-bearing obligations of the United States.
  (3) Acquisition of obligations
    For the purpose of investments under paragraph (1), obligations may be acquired -
      (A) on original issue at the issue price; or
      (B) by purchase of outstanding obligations at the market price.
  (4) Sale of obligations
    Any obligation acquired by the Tobacco Trust Fund may be sold by the Commodity Credit Corporation at the market price.
  (5) Credits to Fund
    The interest on, and the proceeds from the sale or redemption of, any obligations held in the Tobacco Trust Fund shall be credited to and form a part of the Fund.

-SOURCE-
  (Pub. L. 108-357, title VI, Sec. 626, Oct. 22, 2004, 118 Stat. 1533.)

-REFTEXT-
                    REFERENCES IN TEXT
    This title, referred to in subsec. (b)(2), means title VI of Pub. L. 108-357, which enacted this chapter, amended sections 609, 1282, 1301, 1303, 1314h, 1361, 1371, 1373, 1375, 1378, 1379, 1428, 1433c-1, and 1441 of this title and section 714c of Title 15, Commerce and Trade, repealed sections 511r, 515 to 515k, 625, 1311 to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315, 1316, 1445, 1445-1, and 1445-2 of this title, enacted provisions set out as notes under sections 515 and 518 of this title, and repealed provisions set out as a note under section 1314c of this title. For complete classification of title VI to the Code, see Short Title note set out under section 518 of this title and Tables.

-FOOTNOTE-
  (!1) See References in Text note below.


-End-

```
-CITE-
    7 USC Sec. 518f                                        01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                   PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518f. Limitation on total expenditures

-STATUTE-
    The total amount expended by the Secretary from the Tobacco Trust
    Fund to make payments under sections 518a and 518b of this title
    and for the other authorized purposes of the Fund shall not exceed
    $10,140,000,000.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 627, Oct. 22, 2004, 118 Stat.
    1534.)

-End-



-CITE-
    7 USC SUBCHAPTER II - IMPLEMENTATION AND TRANSITION      01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-HEAD-
                SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-End-



-CITE-
    7 USC Sec. 519                                          01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-HEAD-
    Sec. 519. Treatment of tobacco loan pool stocks and outstanding
      loan costs

-STATUTE-
    (a) Disposal of stocks
    To provide for the orderly disposition of quota tobacco held by
    an association that has entered into a loan agreement with the
    Commodity Credit Corporation under section 106A or 106B of the
    Agricultural Act of 1949 (7 U.S.C. 1445-1, 1445-2) (referred to in
    this section as an "association"), loan pool stocks for each kind
```

of tobacco held by the association shall be disposed of in
accordance with this section.
(b) Disposal by associations
    For each kind of tobacco held by an association, the association
shall be responsible for the disposal of a specific quantity of the
loan pool stocks for that kind of tobacco held by the association.
The quantity transferred to the association for disposal shall be
equal to the quantity determined by dividing -
        (1) the amount of funds held by the association in the No Net
    Cost Tobacco Fund and the No Net Cost Tobacco Account established
    under sections 106A and 106B of the Agricultural Act of 1949 (7
    U.S.C. 1445-1, 1445-2) for the kind of tobacco; by
        (2) the average list price per pound for the kind of tobacco,
    as determined by the Secretary.
(c) Disposal of remainder by Commodity Credit Corporation
    (1) Disposal
    Any loan pool stocks of a kind of tobacco of an association
    that are not transferred to the association under subsection (b)
    for disposal shall be disposed of by Commodity Credit Corporation
    in a manner determined by the Secretary.
    (2) Reimbursement
    As required by section 518e(b)(1)(B) of this title, the
    Secretary shall transfer from the Tobacco Trust Fund to the No
    Net Cost Tobacco Fund or the No Net Cost Tobacco Account of an
    association established under section 106A or 106B of the
    Agricultural Act of 1949 (7 U.S.C. 1445-1, 1445-2) such amounts
    as the Secretary determines will be adequate to reimburse the
    Commodity Credit Corporation for any net losses that the
    Corporation may sustain under its loan agreements with the
    association.
(d) Transfer of remaining no net cost funds
    Any funds in the No Net Cost Tobacco Fund or the No Net Cost
Tobacco Account of an association established under sections 106A
and 106B of the Agricultural Act of 1949 (7 U.S.C. 1445-1, 1445-2)
that remain after the application of subsections (b) and (c) shall
be transferred to the association for distribution to producers of
quota tobacco in accordance with a plan approved by the Secretary.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 641, Oct. 22, 2004, 118 Stat.
    1534.)

-REFTEXT-
                    REFERENCES IN TEXT
        Sections 106A and 106B of the Agricultural Act of 1949, referred
    to in text, were classified to sections 1445-1 and 1445-2,
    respectively, of this title prior to repeal by Pub. L. 108-357,
    title VI, Sec. 612(a), Oct. 22, 2004, 118 Stat. 1523.

-End-

-CITE-
    7 USC Sec. 519a                                      01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

```
-HEAD-
    Sec. 519a. Regulations

-STATUTE-
    (a) In general
    The Secretary may promulgate such regulations as are necessary to
implement this title (!1) and the amendments made by this
title.(!1)

    (b) Procedure
    The promulgation of the regulations and administration of this
title (!1) and the amendments made by this title (!1) shall be made
without regard to -
        (1) the notice and comment provisions of section 553 of title
    5;
        (2) the Statement of Policy of the Secretary of Agriculture
    effective July 24, 1971 (36 Fed. Reg. 13804), relating to notices
    of proposed rulemaking and public participation in rulemaking;
    and
        (3) chapter 35 of title 44 (commonly known as the "Paperwork
    Reduction Act").
    (c) Congressional review of agency rulemaking
    In carrying out this section, the Secretary shall use the
authority provided under section 808 of title 5.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 642, Oct. 22, 2004, 118 Stat.
1535.)

-REFTEXT-
                        REFERENCES IN TEXT
    This title, referred to in subsecs. (a) and (b), means title VI
of Pub. L. 108-357, which enacted this chapter, amended sections
609, 1282, 1301, 1303, 1314h, 1361, 1371, 1373, 1375, 1378, 1379,
1428, 1433c-1, and 1441 of this title and section 714c of Title 15,
Commerce and Trade, repealed sections 511r, 515 to 515k, 625, 1311
to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315,
1316, 1445, 1445-1, and 1445-2 of this title, enacted provisions
set out as notes under sections 515 and 518 of this title, and
repealed provisions set out as a note under section 1314c of this
title. For complete classification of title VI to the Code, see
Short Title note set out under section 518 of this title and
Tables.

-FOOTNOTE-
    (!1) See References in Text note below.


-End-
```

**EXHIBIT 2**

From the U.S. Code Online via GPO Access
[wais.access.gpo.gov]
[Laws in effect as of January 24, 2002]
[Document not affected by Public Laws enacted between
  January 24, 2002 and December 19, 2002]
[CITE: **44USC3516**]


                TITLE 44--PUBLIC PRINTING AND DOCUMENTS

          CHAPTER 35--COORDINATION OF FEDERAL INFORMATION POLICY

              SUBCHAPTER I--FEDERAL INFORMATION POLICY

Sec. 3516. Rules and regulations

    The Director shall promulgate rules, regulations, or procedures
necessary to exercise the authority provided by this subchapter.

(Added Pub. L. 104-13, Sec. 2, May 22, 1995, 109 Stat. 182; amended Pub.
L. 106-398, Sec. 1 [[div. A], title X, Sec. 1064(b)], Oct. 30, 2000, 114
Stat. 1654, 1654A-275.)


                           Prior Provisions

    A prior section 3516, added Pub. L. 96-511, Sec. 2(a), Dec. 11,
1980, 94 Stat. 2824, related to rules and regulations prior to the
general amendment of this chapter by Pub. L. 104-13.


                             Amendments

    2000--Pub. L. 106-398 substituted ``subchapter'' for ``chapter''.


                   Effective Date of 2000 Amendment

    Amendment by Pub. L. 106-398 effective 30 days after Oct. 30, 2000,
see section 1 [[div. A], title X, Sec. 1065] of Pub. L. 106-398, set out
as an Effective Date note under section 3531 of this title.


                   Policy and Procedural Guidelines

    Pub. L. 106-554, Sec. 1(a)(3) [title V, Sec. 515], Dec. 21, 2000,
114 Stat. 2763, 2763A-153, provided that:
    ``(a) In General.--The Director of the Office of Management and
Budget shall, by not later than September 30, 2001, and with public and
Federal agency involvement, issue guidelines under sections 3504(d)(1)
and 3516 of title 44, United States Code, that provide policy and
procedural guidance to Federal agencies for ensuring and maximizing the
quality, objectivity, utility, and integrity of information (including
statistical information) disseminated by Federal agencies in fulfillment
of the purposes and provisions of chapter 35 of title 44, United States
Code, commonly referred to as the Paperwork Reduction Act.
    ``(b) Content of Guidelines.--The guidelines under subsection (a)
shall--
    ``(1) apply to the sharing by Federal agencies of, and access
  to, information disseminated by Federal agencies; and

``(2) require that each Federal agency to which the guidelines apply--

``(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

``(B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

``(C) report periodically to the Director--

``(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and

``(ii) how such complaints were handled by the agency.''



Friday,
February 22, 2002

Part IX

# Office of Management and Budget

Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Notice; Republication

## OFFICE OF MANAGEMENT AND BUDGET

### Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication

**Editorial Note:** Due to numerous errors, this document is being reprinted in its entirety. It was originally printed in the **Federal Register** on Thursday, January 3, 2002 at 67 FR 369–378 and was corrected on Tuesday, February 5, 2002 at 67 FR 5365.

**AGENCY:** Office of Management and Budget, Executive Office of the President.

**ACTION:** Final guidelines.

**SUMMARY:** These final guidelines implement section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106–554; H.R. 5658). Section 515 directs the Office of Management and Budget (OMB) to issue government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies." By October 1, 2002, agencies must issue their own implementing guidelines that include "administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency" that does not comply with the OMB guidelines. These final guidelines also reflect the changes OMB made to the guidelines issued September 28, 2001, as a result of receiving additional comment on the "capable of being substantially reproduced" standard (paragraphs V.3.B, V.9, and V.10), which OMB previously issued on September 28, 2001, on an interim final basis.

**DATES:** *Effective Date:* January 3, 2002.

**FOR FURTHER INFORMATION CONTACT:** Brooke J. Dickson, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503. Telephone (202) 395–3785 or by e-mail to informationquality@omb.eop.gov.

**SUPPLEMENTARY INFORMATION:** In section 515(a) of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106–554; H.R. 5658), Congress directed the Office of Management and Budget (OMB) to issue, by September 30, 2001, government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies * * *" Section 515(b) goes on to state that the OMB guidelines shall:

"(1) apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and

"(2) require that each Federal agency to which the guidelines apply—

"(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

"(B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

"(C) report periodically to the Director—

"(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency and;

"(ii) how such complaints were handled by the agency."

Proposed guidelines were published in the **Federal Register** on June 28, 2001 (66 FR 34489). Final guidelines were published in the **Federal Register** on September 28, 2001 (66 FR 49718). The Supplementary Information to the final guidelines published in September 2001 provides background, the underlying principles OMB followed in issuing the final guidelines, and statements of intent concerning detailed provisions in the final guidelines.

In the final guidelines published in September 2001, OMB also requested additional comment on the "capable of being substantially reproduced" standard and the related definition of "influential scientific or statistical information" (paragraphs V.3.B, V.9, and V.10), which were issued on an interim final basis. The final guidelines published today discuss the public comments OMB received, the OMB response, and amendments to the final guidelines published in September 2001.

In developing agency-specific guidelines, agencies should refer both to the Supplementary Information to the final guidelines published in the **Federal Register** on September 28, 2001 (66 FR 49718), and also to the Supplementary Information published today. We stress that the three "Underlying Principles" that OMB followed in drafting the guidelines that we published on September 28, 2001 (66 FR 49719), are also applicable to the amended guidelines that we publish today.

In accordance with section 515, OMB has designed the guidelines to help agencies ensure and maximize the quality, utility, objectivity and integrity of the information that they disseminate (meaning to share with, or give access to, the public). It is crucial that information Federal agencies disseminate meets these guidelines. In this respect, the fact that the Internet enables agencies to communicate information quickly and easily to a wide audience not only offers great benefits to society, but also increases the potential harm that can result from the dissemination of information that does not meet basic information quality guidelines. Recognizing the wide variety of information Federal agencies disseminate and the wide variety of dissemination practices that agencies have, OMB developed the guidelines with several principles in mind.

First, OMB designed the guidelines to apply to a wide variety of government information dissemination activities that may range in importance and scope. OMB also designed the guidelines to be generic enough to fit all media, be they printed, electronic, or in other form. OMB sought to avoid the problems that would be inherent in developing detailed, prescriptive, "one-size-fits-all" government-wide guidelines that would artificially require different types of dissemination activities to be treated in the same manner. Through this flexibility, each agency will be able to incorporate the requirements of these OMB guidelines into the agency's own information resource management and administrative practices.

Second, OMB designed the guidelines so that agencies will meet basic information quality standards. Given the administrative mechanisms required by section 515 as well as the standards set forth in the Paperwork Reduction Act, it is clear that agencies should not disseminate substantive information that does not meet a basic level of quality. We recognize that some government information may need to meet higher or more specific information quality standards than those that would apply to other types of government information. The more important the information, the higher the quality standards to which it should be held, for example, in those situations involving "influential scientific, financial, or statistical information" (a phrase defined in these guidelines). The guidelines recognize, however, that

information quality comes at a cost. Accordingly, the agencies should weigh the costs (for example, including costs attributable to agency processing effort, respondent burden, maintenance of needed privacy, and assurances of suitable confidentiality) and the benefits of higher information quality in the development of information, and the level of quality to which the information disseminated will be held.

Third, OMB designed the guidelines so that agencies can apply them in a common-sense and workable manner. It is important that these guidelines do not impose unnecessary administrative burdens that would inhibit agencies from continuing to take advantage of the Internet and other technologies to disseminate information that can be of great benefit and value to the public. In this regard, OMB encourages agencies to incorporate the standards and procedures required by these guidelines into their existing information resources management and administrative practices rather than create new and potentially duplicative or contradictory processes. The primary example of this is that the guidelines recognize that, in accordance with OMB Circular A–130, agencies already have in place well-established information quality standards and administrative mechanisms that allow persons to seek and obtain correction of information that is maintained and disseminated by the agency. Under the OMB guidelines, agencies need only ensure that their own guidelines are consistent with these OMB guidelines, and then ensure that their administrative mechanisms satisfy the standards and procedural requirements in the new agency guidelines. Similarly, agencies may rely on their implementation of the Federal Government's computer security laws (formerly, the Computer Security Act, and now the computer security provisions of the Paperwork Reduction Act) to establish appropriate security safeguards for ensuring the "integrity" of the information that the agencies disseminate.

In addition, in response to concerns expressed by some of the agencies, we want to emphasize that OMB recognizes that Federal agencies provide a wide variety of data and information. Accordingly, OMB understands that the guidelines discussed below cannot be implemented in the same way by each agency. In some cases, for example, the data disseminated by an agency are not collected by that agency; rather, the information the agency must provide in a timely manner is compiled from a variety of sources that are constantly updated and revised and may be confidential. In such cases, while agencies' implementation of the guidelines may differ, the essence of the guidelines will apply. That is, these agencies must make their methods transparent by providing documentation, ensure quality by reviewing the underlying methods used in developing the data and consulting (as appropriate) with experts and users, and keep users informed about corrections and revisions.

## Summary of OMB Guidelines

These guidelines apply to Federal agencies subject to the Paperwork Reduction Act (44 U.S.C. chapter 35). Agencies are directed to develop information resources management procedures for reviewing and substantiating (by documentation or other means selected by the agency) the quality (including the objectivity, utility, and integrity) of information before it is disseminated. In addition, agencies are to establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, correction of information disseminated by the agency that does not comply with the OMB or agency guidelines. Consistent with the underlying principles described above, these guidelines stress the importance of having agencies apply these standards and develop their administrative mechanisms so they can be implemented in a common sense and workable manner. Moreover, agencies must apply these standards flexibly, and in a manner appropriate to the nature and timeliness of the information to be disseminated, and incorporate them into existing agency information resources management and administrative practices.

Section 515 denotes four substantive terms regarding information disseminated by Federal agencies: quality, utility, objectivity, and integrity. It is not always clear how each substantive term relates—or how the four terms in aggregate relate—to the widely divergent types of information that agencies disseminate. The guidelines provide definitions that attempt to establish a clear meaning so that both the agency and the public can readily judge whether a particular type of information to be disseminated does or does not meet these attributes.

In the guidelines, OMB defines "quality" as the encompassing term, of which "utility," "objectivity," and "integrity" are the constituents. "Utility" refers to the usefulness of the information to the intended users. "Objectivity" focuses on whether the disseminated information is being presented in an accurate, clear, complete, and unbiased manner, and as a matter of substance, is accurate, reliable, and unbiased. "Integrity" refers to security—the protection of information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification. OMB modeled the definitions of "information," "government information," "information dissemination product," and "dissemination" on the longstanding definitions of those terms in OMB Circular A–130, but tailored them to fit into the context of these guidelines.

In addition, Section 515 imposes two reporting requirements on the agencies. The first report, to be promulgated no later than October 1, 2002, must provide the agency's information quality guidelines that describe administrative mechanisms allowing affected persons to seek and obtain, where appropriate, correction of disseminated information that does not comply with the OMB and agency guidelines. The second report is an annual fiscal year report to OMB (to be first submitted on January 1, 2004) providing information (both quantitative and qualitative, where appropriate) on the number, nature, and resolution of complaints received by the agency regarding its perceived or confirmed failure to comply with these OMB and agency guidelines.

## Public Comments and OMB Response

*Applicability of Guidelines.* Some comments raised concerns about the applicability of these guidelines, particularly in the context of scientific research conducted by Federally employed scientists or Federal grantees who publish and communicate their research findings in the same manner as their academic colleagues. OMB believes that information generated and disseminated in these contexts is not covered by these guidelines unless the agency represents the information as, or uses the information in support of, an official position of the agency.

As a general matter, these guidelines apply to "information" that is "disseminated" by agencies subject to the Paperwork Reduction Act (44 U.S.C. 3502(1)). See paragraphs II, V.5 and V.8. The definitions of "information" and "dissemination" establish the scope of the applicability of these guidelines. "Information" means "any communication or representation of knowledge such as facts or data * * *" This definition of information in paragraph V.5 does "not include opinions, where the agency's presentation makes it clear that what is

being offered is someone's opinion rather than fact or the agency's views."

"Dissemination" is defined to mean "agency initiated or sponsored distribution of information to the public." As used in paragraph V.8, "agency INITIATED * * * distribution of information to the public" refers to information that the agency disseminates, e.g., a risk assessment prepared by the agency to inform the agency's formulation of possible regulatory or other action. In addition, if an agency, as an institution, disseminates information prepared by an outside party in a manner that reasonably suggests that the agency agrees with the information, this appearance of having the information represent agency views makes agency dissemination of the information subject to these guidelines. By contrast, an agency does not "initiate" the dissemination of information when a Federally employed scientist or Federal grantee or contractor publishes and communicates his or her research findings in the same manner as his or her academic colleagues, even if the Federal agency retains ownership or other intellectual property rights because the Federal government paid for the research. To avoid confusion regarding whether the agency agrees with the information (and is therefore disseminating it through the employee or grantee), the researcher should include an appropriate disclaimer in the publication or speech to the effect that the "views are mine, and do not necessarily reflect the view" of the agency.

Similarly, as used in paragraph V.8., "agency * * * SPONSORED distribution of information to the public" refers to situations where an agency has directed a third-party to disseminate information, or where the agency has the authority to review and approve the information before release. Therefore, for example, if an agency through a procurement contract or a grant provides for a person to conduct research, and then the agency directs the person to disseminate the results (or the agency reviews and approves the results before they may be disseminated), then the agency has "sponsored" the dissemination of this information. By contrast, if the agency simply provides funding to support research, and it the researcher (not the agency) who decides whether to disseminate the results and—if the results are to be released—who determines the content and presentation of the dissemination, then the agency has not "sponsored" the dissemination even though it has funded the research

and even if the Federal agency retains ownership or other intellectual property rights because the Federal government paid for the research. To avoid confusion regarding whether the agency is sponsoring the dissemination, the researcher should include an appropriate disclaimer in the publication or speech to the effect that the "views are mine, and do not necessarily reflect the view" of the agency. On the other hand, subsequent agency dissemination of such information requires that the information adhere to the agency's information quality guidelines. In sum, these guidelines govern an agency's dissemination of information, but generally do not govern a third-party's dissemination of information (the exception being where the agency is essentially using the third-party to disseminate information on the agency's behalf). Agencies, particularly those that fund scientific research, are encouraged to clarify the applicability of these guidelines to the various types of information they and their employees and grantees disseminate.

Paragraph V.8 also states that the definition of "dissemination" does not include "* * * distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes." The exemption from the definition of "dissemination" for "adjudicative processes" is intended to exclude, from the scope of these guidelines, the findings and determinations that an agency makes in the course of adjudications involving specific parties. There are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions. These guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal.

*The Presumption Favoring Peer-Reviewed Information.* As a general matter, in the scientific and research context, we regard technical information that has been subjected to formal, independent, external peer review as presumptively objective. As the guidelines state in paragraph V.3.b.i: "If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity." An example of a formal, independent, external peer review is the review process used by scientific journals.

Most comments approved of the prominent role that peer review plays in the OMB guidelines. Some comments contended that peer review was not accepted as a universal standard that incorporates an established, practiced, and sufficient level of objectivity. Other comments stated that the guidelines would be better clarified by making peer review one of several factors that an agency should consider in assessing the objectivity (and quality in general) of original research. In addition, several comments noted that peer review does not establish whether analytic results are capable of being substantially reproduced. In light of the comments, the final guidelines in new paragraph V.3.b.i qualify the presumption in favor of peer-reviewed information as follows: "However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance."

We believe that transparency is important for peer review, and these guidelines set minimum standards for the transparency of agency-sponsored peer review. As we state in new paragraph V.3.b.i: "If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity. However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance. If agency-sponsored peer review is employed to help satisfy the objectivity standard, the review process employed shall meet the general criteria for competent and credible peer review recommended by OMB–OIRA to the President's Management Council (9/20/01) (http://www.whitehouse.gov/omb/inforeg/oira_review-process.html), namely, 'that (a) peer reviewers be selected primarily on the basis of necessary technical expertise, (b) peer reviewers be expected to disclose to agencies prior technical/policy positions they may have taken on the issues at hand, (c) peer reviewers be expected to disclose to agencies their sources of personal and institutional funding (private or public sector), and (d) peer reviews be conducted in an open and rigorous manner.'"

The importance of these general criteria for competent and credible peer review has been supported by a number of expert bodies. For example, "the work of fully competent peer-review panels can be undermined by allegations of conflict of interest and bias. Therefore, the best interests of the Board are served by effective policies and procedures regarding potential conflicts of interest, impartiality, and panel balance." (*EPA's Science Advisory*

*Board Panels: Improved Policies and Procedures Needed to Ensure Independence and Balance,* GAO–01–536, General Accounting Office, Washington, DC, June 2001, page 19.) As another example, "risk analyses should be peer-reviewed and accessible—both physically and intellectually—so that decision-makers at all levels will be able to respond critically to risk characterizations. The intensity of the peer reviews should be commensurate with the significance of the risk or its management implications." (*Setting Priorities, Getting Results: A New Direction for EPA,* Summary Report, National Academy of Public Administration, Washington, DC, April 1995, page 23.)

These criteria for peer reviewers are generally consistent with the practices now followed by the National Research Council of the National Academy of Sciences. In considering these criteria for peer reviewers, we note that there are many types of peer reviews and that agency guidelines concerning the use of peer review should tailor the rigor of peer review to the importance of the information involved. More generally, agencies should define their peer-review standards in appropriate ways, given the nature and importance of the information they disseminate.

*Is Journal Peer Review Always Sufficient?* Some comments argued that journal peer review should be adequate to demonstrate quality, even for influential information that can be expected to have major effects on public policy. OMB believes that this position overstates the effectiveness of journal peer review as a quality-control mechanism.

Although journal peer review is clearly valuable, there are cases where flawed science has been published in respected journals. For example, the NIH Office of Research Integrity recently reported the following case regarding environmental health research:

"Based on the report of an investigation conducted by [XX] University, dated July 16, 1999, and additional analysis conducted by ORI in its oversight review, the US Public Health Service found that Dr. [X] engaged in scientific misconduct. Dr. [X] committed scientific misconduct by intentionally falsifying the research results published in the journal SCIENCE and by providing falsified and fabricated materials to investigating officials at [XX] University in response to a request for original data to support the research results and conclusions report in the SCIENCE paper. In addition, PHS finds that there is no original data or other corroborating evidence to support the research results and conclusions reported in the SCIENCE paper as a whole." (66 FR 52137, October 12, 2001).

Although such cases of falsification are presumably rare, there is a significant scholarly literature documenting quality problems with articles published in peer-reviewed research. "In a [peer-reviewed] meta-analysis that surprised many—and some doubt—researchers found little evidence that peer review actually improves the quality of research papers." (*See, e.g., Science,* Vol. 293, page 2187 (September 21, 2001.)) In part for this reason, many agencies have already adopted peer review and science advisory practices that go beyond journal peer review. *See, e.g.,* Sheila Jasanoff, *The Fifth Branch: Science Advisers as Policy Makers,* Cambridge, MA, Harvard University Press, 1990; Mark R. Powell, *Science at EPA: Information in the Regulatory Process.* Resources for the Future, Washington, DC., 1999, pages 138–139; 151–153; *Implementation of the Environmental Protection Agency's Peer Review Program: An SAB Evaluation of Three Reviews,* EPA–SAB–RSAC–01–009, A Review of the Research Strategies Advisory Committee (RSAC) of the EPA Science Advisory Board (SAB), Washington, DC., September 26, 2001. For information likely to have an important public policy or private sector impact, OMB believes that additional quality checks beyond peer review are appropriate.

*Definition of "Influential".* OMB guidelines apply stricter quality standards to the dissemination of information that is considered "influential." Comments noted that the breadth of the definition of "influential" in interim final paragraph V.9 requires much speculation on the part of agencies.

We believe that this criticism has merit and have therefore narrowed the definition. In this narrower definition, "influential," when used in the phrase "influential scientific, financial, or statistical information," is amended to mean that "the agency can reasonably determine that dissemination of the information will have or does have a clear and substantial impact on important public policies or important private sector decisions." The intent of the new phrase "clear and substantial" is to reduce the need for speculation on the part of agencies. We added the present tense—"or does have"—to this narrower definition because on occasion, an information dissemination may occur simultaneously with a particular policy change. In response to a public comment, we added an explicit reference to "financial" information as consistent with our original intent.

Given the differences in the many Federal agencies covered by these guidelines, and the differences in the nature of the information they disseminate, we also believe it will be helpful if agencies elaborate on this definition of "influential" in the context of their missions and duties, with due consideration of the nature of the information they disseminate. As we state in amended paragraph V.9, "Each agency is authorized to define 'influential' in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible."

*Reproducibility.* As we state in new paragraph V.3.b.ii: "If an agency is responsible for disseminating influential scientific, financial, or statistical information, agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties." OMB believes that a reproducibility standard is practical and appropriate for information that is considered "influential", as defined in paragraph V.9—that "will have or does have a clear and substantial impact on important public policies or important private sector decisions." The reproducibility standard applicable to influential scientific, financial, or statistical information is intended to ensure that information disseminated by agencies is sufficiently transparent in terms of data and methods of analysis that it would be feasible for a replication to be conducted. The fact that the use of original and supporting data and analytic results have been deemed "defensible" by peer-review procedures does not necessarily imply that the results are transparent and replicable.

*Reproducibility of Original and Supporting Data.* Several of the comments objected to the exclusion of original and supporting data from the reproducibility requirements. Comments instead suggested that OMB should apply the reproducibility standard to original data, and that OMB should provide flexibility to the agencies in determining what constitutes "original and supporting" data. OMB agrees and asks that agencies consider, in developing their own guidelines, which categories of original and supporting data should be subject to the reproducibility standard and which should not. To help in resolving this issue, we also ask agencies to consult directly with relevant scientific and technical communities on the feasibility of having the selected categories of original and supporting data subject to the reproducibility standard. Agencies are encouraged to address ethical, feasibility, and confidentiality issues

with care. As we state in new paragraph V.3.b.ii.A, "Agencies may identify, in consultation with the relevant scientific and technical communities, those particular types of data that can practicably be subjected to a reproducibility requirement, given ethical, feasibility, or confidentiality constraints." Further, as we state in our expanded definition of "reproducibility" in paragraph V.10, "If agencies apply the reproducibility test to specific types of original or supporting data, the associated guidelines shall provide relevant definitions of reproducibility (e.g., standards for replication of laboratory data)." OMB urges caution in the treatment of original and supporting data because it may often be impractical or even impermissible or unethical to apply the reproducibility standard to such data. For example, it may not be ethical to repeat a "negative" (ineffective) clinical (therapeutic) experiment and it may not be feasible to replicate the radiation exposures studied after the Chernobyl accident. When agencies submit their draft agency guidelines for OMB review, agencies should include a description of the extent to which the reproducibility standard is applicable and reflect consultations with relevant scientific and technical communities that were used in developing guidelines related to applicability of the reproducibility standard to original and supporting data.

It is also important to emphasize that the reproducibility standard does not apply to all original and supporting data disseminated by agencies. As we state in new paragraph V.3.b.ii.A, "With regard to original and supporting data related [to influential scientific, financial, or statistical information], agency guidelines shall not require that all disseminated data be subjected to a reproducibility requirement." In addition, we encourage agencies to address how greater transparency can be achieved regarding original and supporting data. As we also state in new paragraph V.3.b.ii.A, "It is understood that reproducibility of data is an indication of transparency about research design and methods and thus a replication exercise (i.e., a new experiment, test, or sample) shall not be required prior to each dissemination." Agency guidelines need to achieve a high degree of transparency about data even when reproducibility is not required.

*Reproducibility of Analytic Results.* Many public comments were critical of the reproducibility standard and expressed concern that agencies would

be required to reproduce each analytical result before it is disseminated. While several comments commended OMB for establishing an appropriate balance in the "capable of being substantially reproduced" standard, others considered this standard to be inherently subjective. There were also comments that suggested the standard would cause more burden for agencies.

It is not OMB's intent that each agency must reproduce each analytical result before it is disseminated. The purpose of the reproducibility standard is to cultivate a consistent agency commitment to transparency about how analytic results are generated: the specific data used, the various assumptions employed, the specific analytic methods applied, and the statistical procedures employed. If sufficient transparency is achieved on each of these matters, then an analytic result should meet the "capable of being substantially reproduced" standard.

While there is much variation in types of analytic results, OMB believes that reproducibility is a practical standard to apply to most types of analytic results. As we state in new paragraph V.3.b.ii.B, "With regard to analytic results related [to influential scientific, financial, or statistical information], agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public. These transparency standards apply to agency analysis of data from a single study as well as to analyses that combine information from multiple studies." We elaborate upon this principle in our expanded definition of "reproducibility" in paragraph V.10: "With respect to analytic results, 'capable of being substantially reproduced' means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error."

Even in a situation where the original and supporting data are protected by confidentiality concerns, or the analytic computer models or other research methods may be kept confidential to protect intellectual property, it may still be feasible to have the analytic results subject to the reproducibility standard. For example, a qualified party, operating under the same confidentiality protections as the original analysts, may be asked to use the same data, computer model or statistical methods to replicate the analytic results reported in the original study. See, e.g., "Reanalysis of the

Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality," A Special Report of the Health Effects Institute's Particle Epidemiology Reanalysis Project, Cambridge, MA, 2000.

The primary benefit of public transparency is not necessarily that errors in analytic results will be detected, although error correction is clearly valuable. The more important benefit of transparency is that the public will be able to assess how much an agency's analytic result hinges on the specific analytic choices made by the agency. Concreteness about analytic choices allows, for example, the implications of alternative technical choices to be readily assessed. This type of sensitivity analysis is widely regarded as an essential feature of high-quality analysis, yet sensitivity analysis cannot be undertaken by outside parties unless a high degree of transparency is achieved. The OMB guidelines do not compel such sensitivity analysis as a necessary dimension of quality, but the transparency achieved by reproducibility will allow the public to undertake sensitivity studies of interest.

We acknowledge that confidentiality concerns will sometimes preclude public access as an approach to reproducibility. In response to public comment, we have clarified that such concerns do include interests in "intellectual property." To ensure that the OMB guidelines have sufficient flexibility with regard to analytic transparency, OMB has, in new paragraph V.3.b.ii.B.i, provided agencies an alternative approach for classes or types of analytic results that cannot practically be subject to the reproducibility standard. "[In those situations involving influential scientific, financial, or statistical information * * * ] making the data and methods publicly available will assist in determining whether analytic results are reproducible. However, the objectivity standard does not override other compelling interests such as privacy, trade secrets, intellectual property, and other confidentiality protections." Specifically, in cases where reproducibility will not occur due to other compelling interests, we expect agencies (1) to perform robustness checks appropriate to the importance of the information involved, e.g., determining whether a specific statistic is sensitive to the choice of analytic method, and, accompanying the information disseminated, to document their efforts to assure the needed robustness in information quality, and (2) address in their guidelines the

degree to which they anticipate the opportunity for reproducibility to be limited by the confidentiality of underlying data. As we state in new paragraph V.3.b.ii.B.*ii*, "In situations where public access to data and methods will not occur due to other compelling interests, agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken. Agency guidelines shall, however, in all cases, require a disclosure of the specific data sources that have been used and the specific quantitative methods and assumptions that have been employed."

Given the differences in the many Federal agencies covered by these guidelines, and the differences in robustness checks and the level of detail for documentation thereof that might be appropriate for different agencies, we also believe it will be helpful if agencies elaborate on these matters in the context of their missions and duties, with due consideration of the nature of the information they disseminate. As we state in new paragraph V.3.b.ii.B.ii, "Each agency is authorized to define the type of robustness checks, and the level of detail for documentation thereof, in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible."

We leave the determination of the appropriate degree of rigor to the discretion of agencies and the relevant scientific and technical communities that work with the agencies. We do, however, establish a general standard for the appropriate degree of rigor in our expanded definition of "reproducibility" in paragraph V.10: "'Reproducibility' means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased)." OMB will review each agency's treatment of this issue when reviewing the agency guidelines as a whole.

Comments also expressed concerns regarding interim final paragraph V.3.B.iii, "making the data and models publicly available will assist in determining whether analytic results are capable of being substantially reproduced," and whether it could be interpreted to constitute public dissemination of these materials, rendering moot the reproducibility test. (For the equivalent provision, see new paragraph V.3.b.ii.B.*i*.) The OMB guidelines do not require agencies to reproduce each disseminated analytic result by independent reanalysis. Thus,

public dissemination of data and models *per se* does not mean that the analytic result has been reproduced. It means only that the result should be CAPABLE of being reproduced. The transparency associated with this capability of reproduction is what the OMB guidelines are designed to achieve.

We also want to build on a general observation that we made in our final guidelines published in September 2001. In those guidelines we stated: "... in those situations involving influential scientific[, financial,] or statistical information, the substantial reproducibility standard is added as a quality standard above and beyond some peer review quality standards" (66 FR 49722 (September 28, 2001)). A hypothetical example may serve to illustrate this point. Assume that two Federal agencies initiated or sponsored the dissemination of five scientific studies after October 1, 2002 (see paragraph III.4) that were, before dissemination, subjected to formal, independent, external peer review, i.e., that met the presumptive standard for "objectivity" under paragraph V.3.b.i. Further assume, at the time of dissemination, that neither agency reasonably expected that the dissemination of any of these studies would have "a clear and substantial impact" on important public policies, *i.e.*, that these studies were not considered "influential" under paragraph V.9, and thus not subject to the reproducibility standards in paragraphs V.3.b.ii.A or B. Then assume, two years later, in 2005, that one of the agencies decides to issue an important and far-reaching regulation based clearly and substantially on the agency's evaluation of the analytic results set forth in these five studies and that such agency reliance on these five studies as published in the agency's notice of proposed rulemaking would constitute dissemination of these five studies. These guidelines would require the rulemaking agency, prior to publishing the notice of proposed rulemaking, to evaluate these five studies to determine if the analytic results stated therein would meet the "capable of being substantially reproduced" standards in paragraph V.3.b.ii.B and, if necessary, related standards governing original and supporting data in paragraph V.3.b.ii.A. If the agency were to decide that any of the five studies would not meet the reproducibility standard, the agency may still rely on them but only if they satisfy the transparency standard and— as applicable—the disclosure of

robustness checks required by these guidelines. Otherwise, the agency should not disseminate any of the studies that did not meet the applicable standards in the guidelines at the time it publishes the notice of proposed rulemaking.

Some comments suggested that OMB consider replacing the reproducibility standard with a standard concerning "confirmation" of results for influential scientific and statistical information. Although we encourage agencies to consider "confirmation" as a relevant standard—at least in some cases—for assessing the objectivity of original and supporting data, we believe that "confirmation" is too stringent a standard to apply to analytic results. Often the regulatory impact analysis prepared by an agency for a major rule, for example, will be the only formal analysis of an important subject. It would be unlikely that the results of the regulatory impact analysis had already been confirmed by other analyses. The "capable of being substantially reproduced" standard is less stringent than a "confirmation" standard because it simply requires that an agency's analysis be sufficiently transparent that another qualified party could replicate it through reanalysis.

*Health, Safety, and Environmental Information.* We note, in the scientific context, that in 1996 the Congress, for health decisions under the Safe Drinking Water Act, adopted a basic standard of quality for the use of science in agency decisionmaking. Under 42 U.S.C. 300g–1(b)(3)(A), an agency is directed, "to the degree that an Agency action is based on science," to use "(i) the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices; and (ii) data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data)."

We further note that in the 1996 amendments to the Safe Drinking Water Act, Congress adopted a basic quality standard for the dissemination of public information about risks of adverse health effects. Under 42 U.S.C. 300g–1(b)(3)(B), the agency is directed, "to ensure that the presentation of information [risk] effects is comprehensive, informative, and understandable." The agency is further directed, "in a document made available to the public in support of a regulation [to] specify, to the extent practicable— (i) each population addressed by any estimate [of applicable risk effects]; (ii) the expected risk or central estimate of

risk for the specific populations [affected]; (iii) each appropriate upper-bound or lower-bound estimate of risk; (iv) each significant uncertainty identified in the process of the assessment of [risk] effects and the studies that would assist in resolving the uncertainty; and (v) peer-reviewed studies known to the [agency] that support, are directly relevant to, or fail to support any estimate of [risk] effects and the methodology used to reconcile inconsistencies in the scientific data.''

As suggested in several comments, we have included these congressional standards directly in new paragraph V.3.b.ii.C, and made them applicable to the information disseminated by all the agencies subject to these guidelines: "With regard to analysis of risks to human health, safety and the environment maintained or disseminated by the agencies, agencies shall either adopt or adapt the quality principles applied by Congress to risk information used and disseminated pursuant to the Safe Drinking Water Act Amendments of 1996 (42 U.S.C. 300g–1(b)(3)(A) & (B))." The word "adapt" is intended to provide agencies flexibility in applying these principles to various types of risk assessment.

Comments also argued that the continued flow of vital information from agencies responsible for disseminating health and medical information to medical providers, patients, and the public may be disrupted due to these peer review and reproducibility standards. OMB responded by adding to new paragraph V.3.b.ii.C: "Agencies responsible for dissemination of vital health and medical information shall interpret the reproducibility and peer-review standards in a manner appropriate to assuring the timely flow of vital information from agencies to medical providers, patients, health agencies, and the public. Information quality standards may be waived temporarily by agencies under urgent situations (*e.g.,* imminent threats to public health or homeland security) in accordance with the latitude specified in agency-specific guidelines."

*Administrative Correction Mechanisms.* In addition to commenting on the substantive standards in these guidelines, many of the comments noted that the OMB guidelines on the administrative correction of information do not specify a time period in which the agency investigation and response must be made. OMB has added the following new paragraph III.3.i to direct agencies to specify appropriate time periods in which the investigation and response need to be made. "Agencies shall specify appropriate time periods

for agency decisions on whether and how to correct the information, and agencies shall notify the affected persons of the corrections made.''

Several comments stated that the OMB guidelines needed to direct agencies to consider incorporating an administrative appeal process into their administrative mechanisms for the correction of information. OMB agreed, and added the following new paragraph III.3.ii: "If the person who requested the correction does not agree with the agency's decision (including the corrective action, if any), the person may file for reconsideration within the agency. The agency shall establish an administrative appeal process to review the agency's initial decision, and specify appropriate time limits in which to resolve such requests for reconsideration." Recognizing that many agencies already have a process in place to respond to public concerns, it is not necessarily OMB's intent to require these agencies to establish a new or different process. Rather, our intent is to ensure that agency guidelines specify an objective administrative appeal process that, upon furthercomplaint by the affected person, reviews an agency's decision to disagree with the correction request. An objective process will ensure that the office that originally disseminates the information does not have responsibility for both the initial response and resolution of a disagreement. In addition, the agency guidelines should specify that if the agency believes other agencies may have an interest in the resolution of any administrative appeal, the agency should consult with those other agencies about their possible interest.

Overall, OMB does not envision administrative mechanisms that would burden agencies with frivolous claims. Instead, the correction process should serve to address the genuine and valid needs of the agency and its constituents without disrupting agency processes. Agencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved, and explain such practices in their annual fiscal year reports to OMB.

OMB's issuance of these final guidelines is the beginning of an evolutionary process that will include draft agency guidelines, public comment, final agency guidelines, development of experience with OMB and agency guidelines, and continued refinement of both OMB and agency guidelines. Just as OMB requested

public comment before issuing these final guidelines, OMB will refine these guidelines as experience develops and further public comment is obtained.

Dated: December 21, 2001.

**John D. Graham,**

*Administrator, Office of Information and Regulatory Affairs.*

## Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies

### I. OMB Responsibilities

Section 515 of the Treasury and General Government Appropriations Act for FY2001 (Public Law 106–554) directs the Office of Management and Budget to issue government-wide guidelines that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by Federal agencies.

### II. Agency Responsibilities

Section 515 directs agencies subject to the Paperwork Reduction Act (44 U.S.C. 3502(1)) to—

1. Issue their own information quality guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by the agency no later than one year after the date of issuance of the OMB guidelines;

2. Establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with these OMB guidelines; and

3. Report to the Director of OMB the number and nature of complaints received by the agency regarding agency compliance with these OMB guidelines concerning the quality, objectivity, utility, and integrity of information and how such complaints were resolved.

### III. Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies

1. Overall, agencies shall adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal and should take appropriate steps to incorporate information quality criteria into agency information dissemination practices. Quality is to be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated. Agencies shall adopt

**Federal Register** / Vol. 67, No. 36 / Friday, February 22, 2002 / Notices    **8459**

specific standards of quality that are appropriate for the various categories of information they disseminate.

2. As a matter of good and effective agency information resources management, agencies shall develop a process for reviewing the quality (including the objectivity, utility, and integrity) of information before it is disseminated. Agencies shall treat information quality as integral to every step of an agency's development of information, including creation, collection, maintenance, and dissemination. This process shall enable the agency to substantiate the quality of the information it has disseminated through documentation or other means appropriate to the information.

3. To facilitate public review, agencies shall establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines. These administrative mechanisms shall be flexible, appropriate to the nature and timeliness of the disseminated information, and incorporated into agency information resources management and administrative practices.

i. Agencies shall specify appropriate time periods for agency decisions on whether and how to correct the information, and agencies shall notify the affected persons of the corrections made.

ii. If the person who requested the correction does not agree with the agency's decision (including the corrective action, if any), the person may file for reconsideration within the agency. The agency shall establish an administrative appeal process to review the agency's initial decision, and specify appropriate time limits in which to resolve such requests for reconsideration.

4. The agency's pre-dissemination review, under paragraph III.2, shall apply to information that the agency first disseminates on or after October 1, 2002. The agency's administrative mechanisms, under paragraph III.3., shall apply to information that the agency disseminates on or after October 1, 2002, regardless of when the agency first disseminated the information.

### IV. Agency Reporting Requirements

1. Agencies must designate the Chief Information Officer or another official to be responsible for agency compliance with these guidelines.

2. The agency shall respond to complaints in a manner appropriate to the nature and extent of the complaint. Examples of appropriate responses include personal contacts via letter or telephone, form letters, press releases or mass mailings that correct a widely disseminated error or address a frequently raised complaint.

3. Each agency must prepare a draft report, no later than April 1, 2002, providing the agency's information quality guidelines and explaining how such guidelines will ensure and maximize the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by the agency. This report must also detail the administrative mechanisms developed by that agency to allow affected persons to seek and obtain appropriate correction of information maintained and disseminated by the agency that does not comply with the OMB or the agency guidelines.

4. The agency must publish a notice of availability of this draft report in the **Federal Register**, and post this report on the agency's website, to provide an opportunity for public comment.

5. Upon consideration of public comment and after appropriate revision, the agency must submit this draft report to OMB for review regarding consistency with these OMB guidelines no later than July 1, 2002. Upon completion of that OMB review and completion of this report, agencies must publish notice of the availability of this report in its final form in the **Federal Register**, and post this report on the agency's web site no later than October 1, 2002.

6. On an annual fiscal-year basis, each agency must submit a report to the Director of OMB providing information (both quantitative and qualitative, where appropriate) on the number and nature of complaints received by the agency regarding agency compliance with these OMB guidelines and how such complaints were resolved. Agencies must submit these reports no later than January 1 of each following year, with the first report due January 1, 2004.

### V. Definitions

1. "Quality" is an encompassing term comprising utility, objectivity, and integrity. Therefore, the guidelines sometimes refer to these four statutory terms, collectively, as "quality."

2. "Utility" refers to the usefulness of the information to its intended users, including the public. In assessing the usefulness of information that the agency disseminates to the public, the agency needs to consider the uses of the information not only from the perspective of the agency but also from the perspective of the public. As a result, when transparency of information is relevant for assessing the information's usefulness from the public's perspective, the agency must take care to ensure that transparency has been addressed in its review of the information.

3. "Objectivity" involves two distinct elements, presentation and substance.

a. "Objectivity" includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner. This involves whether the information is presented within a proper context. Sometimes, in disseminating certain types of information to the public, other information must also be disseminated in order to ensure an accurate, clear, complete, and unbiased presentation. Also, the agency needs to identify the sources of the disseminated information (to the extent possible, consistent with confidentiality protections) and, in a scientific, financial, or statistical context, the supporting data and models, so that the public can assess for itself whether there may be some reason to question the objectivity of the sources. Where appropriate, data should have full, accurate, transparent documentation, and error sources affecting data quality should be identified and disclosed to users.

b. In addition, "objectivity" involves a focus on ensuring accurate, reliable, and unbiased information. In a scientific, financial, or statistical context, the original and supporting data shall be generated, and the analytic results shall be developed, using sound statistical and research methods.

i. If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity. However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance. If agency-sponsored peer review is employed to help satisfy the objectivity standard, the review process employed shall meet the general criteria for competent and credible peer review recommended by OMB–OIRA to the President's Management Council (9/20/01) (http://www.whitehouse.gov/omb/inforeg/oira_review-process.html), namely, "that (a) peer reviewers be selected primarily on the basis of necessary technical expertise, (b) peer reviewers be expected to disclose to agencies prior technical/policy positions they may have taken on the issues at hand, (c) peer reviewers be expected to disclose to agencies their sources of personal and

institutional funding (private or public sector), and (d) peer reviews be conducted in an open and rigorous manner.''

ii. If an agency is responsible for disseminating influential scientific, financial, or statistical information, agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties.

A. With regard to original and supporting data related thereto, agency guidelines shall not require that all disseminated data be subjected to a reproducibility requirement. Agencies may identify, in consultation with the relevant scientific and technical communities, those particular types of data that can practicable be subjected to a reproducibility requirement, given ethical, feasibility, or confidentiality constraints. It is understood that reproducibility of data is an indication of transparency about research design and methods and thus a replication exercise (i.e., a new experiment, test, or sample) shall not be required prior to each dissemination.

B. With regard to analytic results related thereto, agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public. These transparency standards apply to agency analysis of data from a single study as well as to analyses that combine information from multiple studies.

i. Making the data and methods publicly available will assist in determining whether analytic results are reproducible. However, the objectivity standard does not override other compelling interests such as privacy, trade secrets, intellectual property, and other confidentiality protections.

ii. In situations where public access to data and methods will not occur due to other compelling interests, agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken. Agency guidelines shall, however, in all cases, require a disclosure of the specific data sources that have been used and the specific quantitative methods and assumptions that have been employed. Each agency is authorized to define the type of robustness checks, and the level of

detail for documentation thereof, in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible.

C. With regard to analysis of risks to human health, safety and the environment maintained or disseminated by the agencies, agencies shall either adopt or adapt the quality principles applied by Congress to risk information used and disseminated pursuant to the Safe Drinking Water Act Amendments of 1996 (42 U.S.C. 300g–1(b)(3)(A) & (B)). Agencies responsible for dissemination of vital health and medical information shall interpret the reproducibility and peer-review standards in a manner appropriate to assuring the timely flow of vital information from agencies to medical providers, patients, health agencies, and the public. Information quality standards may be waived temporarily by agencies under urgent situations (e.g., imminent threats to public health or homeland security) in accordance with the latitude specified in agency-specific guidelines.

4. ''Integrity'' refers to the security of information—protection of the information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification.

5. ''Information'' means any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition includes information that an agency disseminates from a web page, but does not include the provision of hyperlinks to information that others disseminate. This definition does not include opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views.

6. ''Government information'' means information created, collected, processed, disseminated, or disposed of by or for the Federal Government.

7. ''Information dissemination product'' means any books, paper, map, machine-readable material, audiovisual production, or other documentary material, regardless of physical form or characteristic, an agency disseminates to the public. This definition includes any electronic document, CD–ROM, or web page.

8. ''Dissemination'' means agency initiated or sponsored distribution of

information to the public (see 5 CFR 1320.3(d) (definition of ''Conduct or Sponsor'')). Dissemination does not include distribution limited to government employees or agency contractors or grantees; intra- or inter-agency use or sharing of government information; and responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or other similar law. This definition also does not include distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes.

9. ''Influential'', when used in the phrase ''influential scientific, financial, or statistical information'', means that the agency can reasonably determine that dissemination of the information will have or does have a clear and substantial impact on important public policies or important private sector decisions. Each agency is authorized to define ''influential'' in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible.

10. ''Reproducibility'' means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased). If agencies apply the reproducibility test to specific types of original or supporting data, the associated guidelines shall provide relevant definitions of reproducibility (e.g., standards for replication of laboratory data). With respect to analytic results, ''capable of being substantially reproduced'' means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error.

[FR Doc. 02–59 Filed 1–2–02; 1:36 pm]
BILLING CODE 3110–01–M

**Editorial Note:** Due to numerous errors, this document is being reprinted in its entirety. It was originally printed in the **Federal Register** on Thursday, January 3, 2002 at 67 FR 369–378 and was corrected on Tuesday, February 5, 2002 at 67 FR 5365.

[FR Doc. R2–59 Filed 2–21–02; 8:45 am]
BILLING CODE 1505–01–D

You are here: Home / Quality of Information Guidelines

# USDA Quality of Information Guidelines

## General Requirements

These general information quality guidelines apply to all types of information disseminated by USDA agencies and offices.

- USDA will strive to ensure and maximize the quality, objectivity, utility, and integrity of the information that its agencies and offices disseminate to the public.
- USDA agencies and offices will adopt a basic standard of quality (including objectivity, utility, and integrity) and take appropriate steps to incorporate information quality criteria into their information dissemination practices.
- USDA agencies and offices will review the quality (including objectivity, utility, and integrity) of information before it is disseminated to ensure that it complies with the standards set forth in these Guidelines.
- USDA agencies and offices will treat information quality as integral to every step in their development of information, including creation, collection, maintenance, and dissemination.
- In accordance with OMB guidance, when collecting information that requires OMB clearance under the Paperwork Reduction Act, USDA agencies and offices will demonstrate in the clearance package submitted to OMB that the information collection would result in information that will comply with OMB and USDA information quality guidelines.

The following information quality criteria comprise the general quality standards that USDA agencies and offices will follow in developing and reviewing information and disseminating it to the public.

### Objectivity

- USDA agencies and offices will strive to ensure that the information they disseminate is substantively accurate, reliable, and unbiased and presented in an accurate, clear, complete, and unbiased manner.
- To the extent possible, consistent with confidentiality protections, USDA agencies and offices will identify the source of the information so that the public can assess whether the information is objective.

### Utility

- USDA agencies and offices will assess the usefulness of the information they disseminate to its intended users, including the public.
- When transparency of information is relevant for assessing the information's usefulness from the public's perspective, USDA agencies and offices will ensure that transparency is addressed in their review of the information prior to its dissemination.
- USDA agencies and offices will ensure that disseminated information is accessible to all persons pursuant to the requirements of Section 508 of the Rehabilitation Act.

**Integrity**

- USDA agencies and offices will protect information they maintain from unauthorized access or revision to ensure that disseminated information is not compromised through corruption or falsification.
- USDA agencies and offices will secure their information resources by implementing the programs and policies required by the Government Information Security Reform Act.
- USDA agencies and offices will maintain the integrity of confidential information and comply with the statutory requirements to protect the information it gathers and disseminates.  These include: The Privacy Act of 1974, as amended; The Paperwork Reduction Act of 1995; The Computer Security Act of 1987; The Freedom of Information Act; and OMB Circulars A-123, A-127, and A-130.

http://www.ocio.usda.gov/qi_guide/index.html
Last Modified: 04/20/2006

You are here: Home / Quality of Information Guidelines / Correction of Information

# USDA Quality of Information Guidelines

## Correction of Information

### Background

USDA has developed administrative mechanisms to allow affected persons to seek and obtain correction of information disseminated by USDA on or after October 1, 2002, regardless of when the information was first disseminated, that they believe does not comply with OMB or USDA Information Quality Guidelines. Requestors seeking a correction should follow the procedure described below.

The USDA Information Quality Guidelines correction mechanisms are not intended to imply any rights of individuals to request amendment of their own records beyond those permitted by the Privacy Act of 1974 or other organization specific laws.

### Consult with the Contact Persons Listed in USDA Reports and Products Before Filing a Formal Request for Correction

Most USDA publications, reports, and data files include the names, telephone numbers, and/or e-mail addresses of knowledgeable staff who can assist users in understanding the information presented there and in determining whether, in fact, there is an error that warrants action via the formal correction process. Users of USDA information may want to consult first with the USDA contact person listed in the product before filing a formal request for correction. If no specific contact person is listed, users should contact the agency.

### Where to Submit a Formal Request for Correction

Formal requests for correction of USDA information must be submitted by letter, fax, or e-mail to the Information Quality Official(s) of the USDA agency or office that disseminated the information (henceforth in these procedures, the term "USDA agency" shall mean "USDA agency or office"). For requests for correction concerning information on which USDA seeks public comment, submit the correction request during the comment period.

### Information That Should Be Submitted to the Appropriate USDA Agency with a Request for Correction

Requests for correction of information should include the following elements:

- Statement that the Request for Correction of Information is Submitted Under USDA's Information Quality Guidelines
- Requestor Contact Information
  The name, mailing address, telephone number, fax number (if any), e-mail address (if any), and organizational affiliation (if any) of the person requesting the correction.
- Description of Information to Correct
  The name of the USDA publication, report, or data product; the date of issuance or other identifying

information such as the URL of the web page; and a detailed description that clearly identifies the specific information contained in that publication, report, or data product for which a correction is being sought.

- Explanation of Noncompliance with OMB and/or USDA Information Quality Guidelines
  An explanation that describes how the information fails to meet either the OMB or USDA Information Quality Guidelines.

- Explanation of the Effect of the Alleged Error
  An explanation that describes the requestor's use of the information in question and how the requestor is affected by the alleged error.

- Recommendation and Justification for How the Information Should Be Corrected
  The requestor should state specifically how the information should be corrected and explain why the corrections should be made. A request for correction that is specific and provides evidence to support the need for correction is likely to be more persuasive than a request that is general, unfocused, or that simply indicates disagreement with the information in question.

This guidance for the content of requests for correction of information is not intended to constitute a set of legally binding requirements. However, USDA may be unable to process, in a timely fashion or at all, requests that omit one or more of the requested elements. Requestors bear the "burden of proof" with respect to the necessity for correction as well as with respect to the type of correction they seek. USDA will base its decision on the merits of the information provided by the requestor.

## USDA Review Of The Request For Correction

The request for correction will be processed by the USDA agency that disseminated the information or information product in question. Based on the explanation and evidence submitted with the request for correction, the USDA agency will conduct a review of the information being challenged, the processes that were used to create and disseminate the information, and the conformity of the information and those processes with both OMB's and USDA's Information Quality Guidelines.

After it has completed its review, the USDA agency will determine whether a correction is warranted, and, if so, what corrective action it will take. USDA agencies are not required to change, or in any way alter, the content or status of information simply because a request for correction has been made. If duplicative requests for correction are received, USDA agencies will consolidate them into one request for response. USDA agencies will dismiss requests for correction of information that is not subject to USDA's Information Quality Guidelines, requests that are frivolous or made in bad faith, and requests that refer to issues that have been the subject of prior complaints and have been resolved.

In determining whether to respond to a request for correction, the USDA agency also will consider whether the information or the request for correction is stale. If the USDA agency did not disseminate, or continue to disseminate, this information recently (i.e., within one year of the request), or it does not have a continuing significant impact on the agency's projects or policy decisions or on important private sector decisions, the USDA agency may regard the information as stale for purposes of

responding to the correction request.

## USDA Response To The Request For Correction

After the responsible USDA agency has made its final determination pertaining to a request for correction of information, that agency will respond to the requestor in writing by letter, e-mail, or fax, normally within 60 calendar days of receipt. The response will explain the findings and the actions the agency will take (if any) in response to the complaint.

If the request requires more than 60 calendar days to resolve, the agency will inform the complainant within that time period that more time is required, and the reasons for the delay, and an estimated decision date.

## Requests For Correction Concerning Information On Which USDA Has Sought Public Comment

Information on which USDA has sought public comment includes, but is not limited to:

- notices of proposed rulemaking (NPRM);
- advance notices of proposed rulemaking;
- studies cited in an NPRM;
- regulatory evaluations or cost-benefit analyses pertaining to a NPRM;
- environmental assessments,
- environmental impact statements, and other documents prepared under the National Environmental Policy Act (NEPA);
- land and resource management plans and other documents prepared under the National Forest Management Act (NFMA); and
- notices of availability and requests for comment on risk assessments.

Requests for correction of information shall be made during the comment period for that action and, the agency's response will normally be incorporated in the next document it issues concerning the matter. For example, if a request for correction of information pertains to a document referenced in a NPRM, the response would normally be provided in the final rule document.

In cases where the agency disseminates a study, analysis, or other information prior to the final agency action or information product, requests for correction will be considered prior to the final agency action or information product in those cases where the agency has determined that an earlier response would not unduly delay issuance of the agency action or information product and the complainant has shown a reasonable likelihood of suffering actual harm from the agency's dissemination if the agency does not resolve the complaint prior to the final agency action or information product.

## Opportunity To Request Reconsideration Of USDA's Decision

If the requestor disagrees with the USDA agency's denial of the request or with the corrective action the agency intends to take, the requestor may file a Request for Reconsideration with the

USDA agency. The USDA agency that processed the request for correction will provide instructions in its final determination communication to the requestor for the procedure to request reconsideration of USDA's decision.

In cases where the agency disseminates a study, analysis, or other information prior to the final agency action or information product, requests for correction will be considered prior to the final agency action or information product in those cases where the agency has determined that an earlier response would not unduly delay issuance of the agency action or information product and the complainant has shown a reasonable likelihood of suffering actual harm from the agency's dissemination if the agency does not resolve the complaint prior to the final agency action or information product.

## Procedure for Requesting Reconsideration of USDA's Decision

Persons who wish to file a Request for Reconsideration should submit the request by letter, fax, or e-mail to the Reconsideration Official identified in the final determination of the request for correction that the requestor receives from USDA. For requests for reconsideration that involve *influential* scientific, financial, or statistical information, or regulatory information, USDA will designate a panel of officials to perform this function. Typically, such a panel would include a Reconsideration Official from the USDA agency that made the initial determination and two from other USDA agencies.

Persons requesting reconsideration should submit written material to support their case for reconsideration, as well as a copy of the information originally submitted to support the request for correction and a copy of USDA's response. Requests for Reconsideration must be filed with the appropriate designated Reconsideration Official (postmarked, shipped by an overnight delivery service, faxed, or sent by e-mail) within 45 days after the date that the USDA agency transmitted its decision on the original request for correction. Requests for Reconsideration that are filed after the 45-day deadline may be denied as untimely.

If the Request for Reconsideration involves information on which USDA has sought public comment and the USDA agency has an existing process for handling requests for the reconsideration of the final rule or similar regulatory action, the agency will use that process. Otherwise, the Request for Reconsideration will be handled in the same manner as requests to reconsider information concerning matters on which USDA has not sought public comment.

## USDA Review of the Request for Reconsideration

The Reconsideration Official (or panel) will ensure that the initial agency review of the Request for Correction was conducted with due diligence. The Reconsideration Official (or panel) will review the material submitted in support of the Request for Reconsideration, the material submitted with the original request for correction, and the USDA agency's response to the original correction request and all additional relevant documentation, and then arrive at a decision regarding the Request for Reconsideration.

## USDA Response to the Request for Reconsideration

After the Reconsideration Official (or panel) has made his or her
(or its) decision pertaining to a Request for Reconsideration, the
Official will respond to the requestor by letter, e-mail, or fax. The
response will explain the Reconsideration Official's (or panel's)
decision and the actions the USDA agency that disseminated the
information will take (if any) in response to the Request for
Reconsideration. USDA agencies will respond to all requests for
appeals within 60 calendar days of receipt. If the request
requires more than 60 calendar days to resolve, the agency will
inform the complainant that more time is required and indicate
the reason why and an estimated decision date.

## Public Disclosure of Requests for Correction of Information Disseminated by USDA and Requests for Reconsideration of USDA Decisions

Each USDA agency will establish an information quality page on
its Web site on which it will post requests for corrections of
information, requests for reconsideration, and actions taken by
the agency in response to such requests. The information quality
page will include information on who requested the correction,
the nature of the request, any specific corrections made, the
reason they were made, and any appropriate supporting
documents.

## Privacy Act Statement

USDA is authorized to obtain certain information under Section
515 of the Treasury and General Government Appropriations Act
for Fiscal Year 2001 (Public Law No. 106-554, codified at 44
U.S.C. 3516, note). Information is needed by USDA to process
the request for correction and allow USDA to reply accordingly.
This information is needed by USDA to respond to the requestor
and initiate follow-up contact with the requestor if required.
Requestors should not send USDA their Social Security Number.
Requestors are advised that they do not have to furnish the
information but failure to do so may prevent their request from
being processed. The information requestors furnish is almost
never used for any purpose other than to process and respond to
their request. However, USDA may disclose information to a
congressional office in response to an inquiry made on behalf of
the requestor, to the Department of Justice, a court, other
tribunal when the information is relevant and necessary to
litigation, or to a contractor or another Federal agency to help
accomplish a function related to this process.

http://www.ocio.usda.gov/qi_guide/corrections.html

**EXHIBIT 3**

**Calculation of Tobacco Transition Payment Program Assessments for Each Class of Tobacco Under Section 625c(c)**

| Class of tobacco | Domestic (# or lbs)[1] | Imports (# or lbs)[1] | Total quantity (# or lbs)[1] | Maximum tax rate | Estimated taxes (total quantity times tax rate) | Allocation by class (percent)[2] |
|---|---|---|---|---|---|---|
| **2003 Calendar year (for fiscal year 2005)** | | | | | | |
| Cigarettes: small (#) | 377,241,580,953 | 23,085,086,000 | 400,326,666,953 | $19.50/thou | $7,806,370,006 | 96.331 |
| Cigarettes: large (#) | 0 | 0 | 0 | $40.95/thou | $0 | 0 |
| Cigars: small (#) | 2,301,972,488 | 172,369,000 | 2,474,341,488 | $1.828/thou | $4,523,096 | 0.056 |
| Cigars: large (#) | 4,018,523,214 | 514,566,000 | 4,533,089,214 | $48.75/thou | $220,988,099 | 2.727 |
| Cigars: total (#) | 6,320,495,702 | 686,935,000 | 7,007,430,702 | | 225,511,195 | 2.7830 |
| Snuff (lbs) | 74,700,715 | 8,369 | 74,709,084 | $0.585/lb | $43,704,814 | 0.539 |
| Chewing tobacco (lbs) | 45,906,067 | 174,399 | 46,080,466 | $0.195/lb | $8,985,691 | 0.111 |
| Pipe tobacco (lbs) | 4,155,205 | 698,086 | 4,853,291 | $1.0969/lb | $5,323,575 | 0.066 |
| Roll your own (lbs) | 11,353,137 | 1,254,008 | 12,607,145 | $1.0969/lb | $13,828,777 | 0.171 |
| Total | | | | | $8,103,724,058 | 100.0010 |
| **2004 Calendar year (for fiscal year 2006)** | | | | | | |
| Cigarettes: small (#) | 374,982,049,606 | 22,677,777,000 | 397,659,826,606 | $19.50/thou | $7,754,366,619 | 95.9987 |
| Cigarettes: large (#) | 0 | 0 | 0 | $40.95/thou | $0 | 0.0000 |
| Cigars: small (#) | 2,701,646,262 | 215,443,000 | 2,917,089,262 | $1.828/thou | $5,332,439 | 0.0660 |
| Cigars: large (#) | 4,319,157,701 | 615,596,000 | 4,934,753,701 | $48.75/thou | $240,569,243 | 2.9782 |
| Cigars: total (#) | 7,020,803,963 | 831,039,000 | 7,851,842,963 | | 245,901,682 | 3.0442 |
| Snuff (lbs) | 77,983,437 | 16,833 | 78,000,270 | $0.585/lb | $45,630,158 | 0.5648 |
| Chewing tobacco (lbs) | 42,911,709 | 208,894 | 43,120,603 | $0.195/lb | $8,408,518 | 0.1040 |
| Pipe tobacco (lbs) | 3,904,810 | 794,487 | 4,699,297 | $1.0969/lb | $5,154,659 | 0.0638 |
| Roll your own (lbs) | 15,792,082 | 720,658 | 16,512,740 | $1.0969/lb | $18,112,825 | 0.2242 |
| Total | | | | | $8,077,574,460 | 99.9997 |

[1] Source: Alcohol and Tobacco Tax and Trade Bureau, National Revenue Center, Report Symbol TTB S 5200-12-2003 (August 19, 2004) and TTB S 5200-12-2004 (March 23, 2005), www.ttb.gov/tobacco/stats/index.htm. [2] Allocation for cigarettes and cigars product classes equals sum of percentage for "small" and "large" types, respectively.

| Tobacco products [11]: | JAN-DEC2004 Excise Tax Paid DOMESTIC | TAXES $ from Imports | 2004 Excise Taxes Paid Domestic and Imported |
|---|---|---|---|
| Domestic [11]............................................ | $ 7,533,669 | | |
| Cigarettes [11]............................................ | $ 7,313,510 | $ 442,217 | $ 7,755,727 |
| Cigars [11]............................................ | $ 175,187 | $ 34,631 | $ 209,818 |
| SMALL............................................ | $ 4,939 | $ 394 | $ 5,333 |
| LARGE............................................ | $ 170,248 | $ 34,237 | $ 204,485 |
| Papers/tubes [11]............................................ | $ 1,322 | | |
| Chewing tobacco and snuff [11]............................................ | $ 53,957 | $ 51 | $ 54,008 |
| Pipe/roll-your-own tobacco [11]............................................ | $ 18,307 | $ 1,662 | $ 19,969 |
| Floor stocks............................................ | $ - | | |
| Imported (various) less papers and tubes............................................ | $ 478,560 | $ 478,560 | $ 8,039,521 |

**EXHIBIT 4**



# USDA

## COMMODITY CREDIT CORPORATION

**BILL TO:**
SINGLE STICK, INC.
Attention: JOHN WERTHEIM
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

**Taxpayer Identification Number** 86-0736454          **Statement Date:** May 26, 2005

**Invoice Number:** CR05100007          **Payment Due Date:** June 30, 2005

## AMOUNT DUE:  $   339,719

Remit in U.S. Funds

### CLASS: Cigars

| Gross Excise Taxes Paid October 2004-December 2004 | | | Assessment March 1, 2005 | | |
|---|---|---|---|---|---|
| Total Volume by Class of Tobacco | Your Company's Volume | Your Company's Share (1) | Volume of Gross Sales of Assessed Companies | Your Company's Share (2) | Your Company's Assessment (3) |
| 1,897,187,915 | 91,272,623 | .0481 | 1,895,445,704 | .048153647 | $  339,719 |

(1) Rounded to 4 decimal places as required by 7 U.S.C. 518-519a.
(2) Excludes companies with market shares less than .0001
(3) Share of assessment (.048153647) multiplied by national quarterly assessment for class of tobacco ($ 7,054,905)

### National Quarterly Assessment for October 2004-December 2004

| Tobacco Class | Cigarettes | Cigars | Snuff | Roll Your Own | Chewing Tobacco | Pipe Tobacco | Total |
|---|---|---|---|---|---|---|---|
| Percent | 96.331 | 2.783 | 0.539 | 0.171 | 0.111 | 0.066 | 100.001 |
| Assessment | $244,199,085 | $7,054,905 | $1,366,365 | $433,485 | $281,385 | $167,310 | $253,502,535 |

## REMIT $   339,719 by 3:00 p.m. EASTERN TIME 06/30/2005 ONLINE AT WWW.PAY.GOV

- To use WWW.PAY.GOV, you must provide Commodity Credit Corporation (CCC) with the name, email address and telephone number of the person responsible for remitting the assessment.

- If you have not previously provided contact information, submit company contact information, to tobacco.assessments@usda.gov.

- WWW.PAY.GOV will send you a username and password to the secure website.

- If you experience problems with WWW.PAY.GOV while remitting your company's payment, contact the website's help desk at (216) 579-2112 or toll free at (800) 624-1373.

Companies without access to the internet must contact the Director of the Tobacco Division at (202) 720-7413 or by fax at (202) 720-1288 to establish an alternative method of payment. For additional information, contact Jane Reed at 202-720-6782, or email her at tobacco.assessment@usda.gov.

continued on reverse

**AUTHORITY:** You ~ ~ being assessed pursuant to 7 U.S.C. 5 ~ ~ 519 a.

**PROMPT CREDITING OF PAYMENTS:** Payments will be credited to your account on the day you submit payment, if submitted by 3:00 p.m. Eastern Time.

**IN CASE OF A DISPUTE OR QUESTION ABOUT YOUR STATEMENT** –

The information used to compute your assessment is derived from the data you submitted. If you dispute any part of this bill, please complete and sign this form, along with supporting documentation and fax it to CCC, Attention: Tobacco Division at 202-720-1288. You may also write to CCC at 1400 Independence Avenue, SW, STOP 0514, Washington, DC 20250-0514. YOUR WRITTEN INFORMATION MUST BE RECEIVED NO LATER THAN 30 DAYS FROM THE DATE OF THIS LETTER.

Company Name _SINGLE STICK, INC_     Invoice Number: CR05100007
Assessment Period _Oct 04_ to _Dec 04_     TTB Permit Number _TP-AZ-4_
Tobacco Class _CIGAR_     Volume _91,277,673_ Amount $ _339,779_

1. _____ I certify that the gross domestic volume listed above was not removed (as defined by section 5702 of the Internal Revenue Code of 1986); or was exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202) by my company.

2. _____ I certify that the tobacco class listed above was not removed (as defined by section 5702 of the Internal Revenue Code of 1986); or was exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202) by my company.

3. _X_ Other: please explain

_SEE ATTACHED._

Signature: _James C. Hlim_     Date: _6/29/05_
                                                  (mm/dd/yyyy)
Title: _Secretary + Legal Counsel_



# USDA

## COMMODITY CREDIT CORPORATION

**BILL TO:**
SINGLE STICK, INC.
Attention: JOHN WERTHEIM
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

**Taxpayer Identification Number** 86-0736454

**Invoice Number:** CR05200005

**Statement Date:** May 26, 2005

**Payment Due Date:** June 30, 2005

# AMOUNT DUE: $ 455,374
Remit in U.S. Funds

## CLASS: Cigars

| Gross Excise Taxes Paid January 2005-March 2005 | | | Assessment June 1, 2005 | | |
|---|---|---|---|---|---|
| Total Volume by Class of Tobacco | Your Company's Volume | Your Company's Share (1) | Volume of Gross Sales of Assessed Companies | Your Company's Share (2) | Your Company's Assessment (3) |
| 2,056,728,869 | 132,669,360 | .0645 | 2,055,388,574 | .064547094 | $ 455,374 |

(1) Rounded to 4 decimal places as required by 7 U.S.C. 518-519a.
(2) Excludes companies with market shares less than .0001
(3) Share of assessment (.064547094) multiplied by national quarterly assessment for class of tobacco ($ 7,054,905)

### National Quarterly Assessment for January 2005-March 2005

| Tobacco Class | Cigarettes | Cigars | Snuff | Roll Your Own | Chewing Tobacco | Pipe Tobacco | Total |
|---|---|---|---|---|---|---|---|
| Percent | 96.331 | 2.783 | 0.539 | 0.171 | 0.111 | 0.066 | 100.001 |
| Assessment | $244,199,085 | $7,054,905 | $1,366,365 | $433,485 | $281,385 | $167,310 | $253,502,535 |

## REMIT $ 455,374 by 3:00 p.m. EASTERN TIME 06/30/2005 ONLINE AT WWW.PAY.GOV

- To use WWW.PAY.GOV, you must provide Commodity Credit Corporation (CCC) with the name, email address and telephone number of the person responsible for remitting the assessment.
- If you have not previously provided contact information, submit company contact information, to tobacco.assessments@usda.gov.
- WWW.PAY.GOV will send you a username and password to the secure website.
- If you experience problems with WWW.PAY.GOV while remitting your company's payment, contact the website's help desk at (216) 579-2112 or toll free at (800) 624-1373.

Companies without access to the internet must contact the Director of the Tobacco Division at (202) 720-7413 or by fax at (202) 720-1288 to establish an alternative method of payment. For additional information, contact Jane Reed at 202-720-6782, or email her at tobacco.assessment@usda.gov .

continued on reverse

**AUTHORITY**: You are being assessed pursuant to 7 U.S.C. 510 – 519 a.

**PROMPT CREDITING OF PAYMENTS:** Payments will be credited to your account on the day you submit payment, if submitted by 3:00 p.m. Eastern Time.

**IN CASE OF A DISPUTE OR QUESTION ABOUT YOUR STATEMENT** –

The information used to compute your assessment is derived from the data you submitted. If you dispute any part of this bill, please complete and sign this form, along with supporting documentation and fax it to CCC, Attention: Tobacco Division at 202-720-1288. You may also write to CCC at 1400 Independence Avenue, SW, STOP 0514, Washington, DC 20250-0514. YOUR WRITTEN INFORMATION MUST BE RECEIVED NO LATER THAN 30 DAYS FROM THE DATE OF THIS LETTER.

Company Name *SINGLE STICK, INC*    Invoice Number: CR05200005
Assessment Period *JAN 05* to *MAR 05*    TTB Permit Number *FP-AZ-4*
Tobacco Class *CIGAR*    Volume _____    Amount $ *455,374*

1. _____ I certify that the gross domestic volume listed above was not removed (as defined by section 5702 of the Internal Revenue Code of 1986); or was exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202) by my company.

2. _____ I certify that the tobacco class listed above was not removed (as defined by section 5702 of the Internal Revenue Code of 1986); or was exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202) by my company.

3. _X___ Other: please explain

*SEE ATTACHED*

Signature: _____    Date: *6/29/05*
    (mm/dd/yyyy)
Title: *SECRETARY & LEGAL COUNSEL*



# USDA

## COMMODITY CREDIT CORPORATION (CCC)

SINGLE STICK INC
Attention: JOHN WERTHEIM
W 2046 ROSE GARDEN LN
PHOENIX, AZ 21031

**Taxpayer Identification Number:** 86-0736454
**Invoice Number:** CR05300004

**Invoice Date:** September 1, 2005
**Payment Due Date:** September 30, 2005

## AMOUNT DUE:  $ 1,152,530

### CLASS: Cigars

| Total Volume by Class of Tobacco (1) | Your Company's Total | Your Company's Share (2) | Volume of Gross Removals by Assessed Companies (3) | Your Company's Share (3) | Your Company's Assessment (4) |
|---|---|---|---|---|---|
| 2,074,030,716 | 161,407,980 | .0778 | 2,072,463,641 | .077882177 | $ 1,152,530 |

(1) Total gross taxes paid by all companies that reported to CCC for this class of tobacco.
(2) Rounded to 4 decimal places as required by 7 U.S.C. 518-519a.
(3) Excludes those companies with a market share of less than .0001.
(4) Share of assessment (.077882177) multiplied by national quarterly assessment for class of tobacco ($ 14,798,382).

**REMIT $ 1,152,530 in U.S. funds by 3:00 p.m. EST 09/30/2005 ONLINE AT WWW.PAY.GOV.**
Any payment submitted by 3:00 p.m. EST will be credited that day. Instructions for paying this invoice online at www.pay.gov can be found on the Tobacco Information web site at www.fsa.usda.gov/tobacco. If your company does not have internet access and you have not already arranged for an alternative payment method, contact George Sakacs at (703) 305-1300 to make payment arrangements. For additional information, contact Jane Reed at (202) 720-6782 or by email at jane.reed@wdc.usda.gov.

**NATIONAL ASSESSMENT INFORMATION:** This assessment is pursuant to 7 U.S.C. 518 – 519 a.

### National Quarterly Assessment for April 2005-June 2005

| | | | | | | |
|---|---|---|---|---|---|---|
| Percent | 96.331 | 2.783 | 0.539 | 0.171 | 0.111 | 0.066 | 100.001 |
| Assessment | $512,032,475 | $14,798,382 | $2,866,090 | $909,279 | $590,234 | $350,950 | $531,747,409 |

(1) This total includes one-fortieth of the estimated $9.6 billion in contract payments; $287,210,591 in CCC loan losses; and $4,531,501 for payments to a financial institution to help carry out this program. This total, $531,742,092, is then apportioned to each tobacco class using the above percentages.

> **FY 2005 ADJUSTMENT.** In February 2006 CCC will issue revised quarterly invoices for FY 2005 which will reflect corrections of errors; additions and/or deletions of information from manufacturers/importers who filed late reports or who should not have been assessed; actual quota holder and producer contract payments; and any other necessary adjustments.

continued on reverse

**EXHIBIT 5**

**Single Stick, Inc.**
**USDA Tobacco Buyout**
**Cigars**
**2005**

| Date | Excise Taxes SSI | Excise Taxes All Cigars | Taxes Market SSI Share % | USDA Cigar $ Share Buyout | Excise Tax Assessment | Assessment Sticks SSI | All Cigars Total Sticks | Stick Market SSI Share % | Stick Count Assessment | Difference Sticks vs. Taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cigars** | | | | | | | | | | |
| Oct | $ 84,947 | | | | | 33,186,540 | | | | |
| Nov | $ 82,007 | | | | | 26,789,428 | | | | |
| Dec | $ 91,804 | | | | | 27,628,655 | | | | |
| Total 4th Quarter 2004 | $ 258,757 | $ 43,404,165 | 0.60% | $ 7,054,905 | $ 42,058.33 | 91,272,623 | 1,715,979,965 | 6.45% | $ 351,007.23 | $ 308,948.90 |
| | | | | | | | | | | |
| Jan | $ 89,205 | | | | | 36,152,764 | | | | |
| Feb | $ 131,495 | | | | | 41,584,223 | | | | |
| Mar | $ 128,953 | | | | | 56,756,373 | | | | |
| Total 1st Quarter 2005 | $ 349,652 | $ 44,544,822 | 0.78% | $ 7,054,905 | $ 55,377.13 | 134,493,360 | 1,879,868,452 | 6.45% | $ 472,017.47 | $ 416,640.34 |
| | | | | | | | | | | |
| Apr | $ 154,609 | | | | | 51,337,021 | | | | |
| May | $ 153,317 | | | | | 40,412,468 | | | | |
| Jun | $ 161,999 | | | | | 69,658,491 | | | | |
| Total 2nd Quarter 2005 | $ 469,925 | $ 47,948,984 | 0.98% | $ 14,798,382 | $ 145,031.99 | 161,407,980 | 2,075,055,728 | 7.79% | $1,135,353.46 | $ 990,321.47 |
| | | | | | | | | | | |
| Jul | $ 177,480 | | | | | 71,923,087 | | | | |
| Aug | $ 122,362 | | | | | 67,978,978 | | | | |
| Sep | $ 130,310 | | | | | 72,394,694 | | | | |
| Total 3rd Quarter 2005 | $ 430,153 | $ 46,612,867 | 0.92% | $ 6,860,856 | $ 63,313.31 | 212,296,759 | 2,130,343,010 | 9.98% | $ 669,082.11 | $ 605,768.80 |
| | | | | | | | | | | |
| Oct | $ 112,897 | | | | | 65,527,788 | | | | |
| Nov | $ 111,031 | | | | | 60,738,951 | | | | |
| Dec | $ 112,829 | | | | | 61,722,791 | | | | |
| Total 4th Quarter 2005 | $ 336,757 | $ 44,452,515 | 0.76% | $ 7,436,923 | $ 56,339.59 | 187,989,530 | 2,048,372,684 | 9.18% | $ 682,516.18 | $ 626,176.59 |
| | | | | | | | | | | |
| Year-to-Date | $ 1,845,245 | $ 226,963,353 | 0.81% | $ 43,205,971 | $ 362,120.35 | 787,460,252 | 9,849,619,839 | 7.99% | $3,309,976.45 | $2,947,856.10 |

**EXHIBIT 6**

## Comparison of USDA Tobacco Transition Payment Program Assessments on Large Cigars Versus Small Cigars

| | LARGE CIGARS | | | | | LITTLE CIGARS | |
|---|---|---|---|---|---|---|---|
| | Punch Rare Corojo | Hoyo Excalibur | Partagas Black Label Maximo | Macanudo Portofino | Macanudo Prince Phillip | Smokers Choice 100 mm 85mm | Smokers Choice 85mm |
| No. of Sticks | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Tobacco Weight (Grams) | 21.19 | 24.6 | 16.67 | 7.86 | 20.55 | 1.18 | 1.09 |
| Wholesale Price | 2.38 | 3.95 | 3.76 | 3.81 | 4.63 | 0.0265 | 0.0265 |
| Retail Price | 7.69 | 6.29 | 5.50 | 5.35 | 6.35 | 0.0595 | 0.0595 |
| Fed. Excise Tax | 0.04875 | 0.04875 | 0.04875 | 0.04875 | 0.04875 | 0.001828 | 0.001828 |
| USDA Assess. (1) (per stick) | 0.00438 | 0.00438 | 0.00438 | 0.00438 | 0.00438 | 0.00438 | 0.00438 |
| USDA Assess. (per gram) | 0.000211 | 0.00018 | 0.00026 | 0.00056 | 0.00021 | 0.00371 | 0.00402 |
| USDA Assess. (% of Excise Tax) | 8.98% | 8.98% | 8.98% | 8.98% | 8.98% | 41.7% | 41.7% |
| USDA Assess. (% of Retail Price) | 0.057% | 0.069% | 0.080% | 0.082% | 0.069% | 7.36% | 7.36% |

(1) Based on average assessment per stick for assessments dated 3/1/05, 6/1/05, 9/1/05 and 12/1/05.

**EXHIBIT 7**





OCT 2 6 2004

FSA FOIA/PA 2005-0267

OCT 2 4 2005

**United States Department of Agriculture**

**Farm and Foreign Agricultural Services**

**Farm Service Agency**

**Office of External Affairs**

**Freedom of Information & Privacy Act (FOIA/PA) Unit**

**1400 Independence Avenue, SW Stop 0506 Room 3621-S Washington, DC 20250-0506**

Reed D. Rubenstein, Esquire
Greenberg Traurig
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006

Dear Mr. Rubenstein:

This responds to your Freedom of Information/Privacy Act (FOIA/PA) request dated September 13, 2005, to the United States Department of Agriculture (USDA), Farm Service Agency (FSA).   The FSA FOIA/PA Office received a copy of your request on September 20, 2005.

You requested information concerning the following:

1.  Calculation of total volume, company volume, gross sales statistics, and market share used to determine Commodity Credit Corporation Tobacco Transition Program quarterly fee cigar company assessments for the following quarters:  October, December 2004, January, March 2005 and April, June 2005.

2.  Data sources used to develop and verify total volume, company volume, gross sales statistics, and market share used to determine CCC TTPP quarterly fee cigar company assessments for the following quarters:  October, December 2004, January, March 2005 and April, June 2005.

3.  The basis or rationale for USDA's exclusion of sales by companies that failed to report sales data as required under § 625(e) of the American Jobs Creation Act of 2004 (Pub. L 108-357), codified at 7 U.S.C. § 518d, from its calculation of the assessable market share of companies that compiled therewith.

We have determined that the fee for processing your request will be $20.00.  There were three hours of clerical search and 1 hour of non-clerical search.  Per the FOIA, the first two hours of search are free, and two hours of search at the clerical level (2.50 per quarter hour), which totals $20.00.

We have one document responsive to your request which consists of twenty two (22) pages and they are being withheld in full pursuant to Exemption 3 of the FOIA in conjunction with Internal Revenue Code of 1986.  Exemption 3 protects material that is specifically exempted from disclosure by Statute.  This data is subject to the provisions of 26 U.S.C. 6103.  The provisions prohibits disclosure of tax information to any party whose duties do not require access, and further provides that the data must be kept in a secure place.  Civil and criminal penalties for unauthorized disclosure are enumerated at 26 U.S.C. 7213.

Mr. Reed D. Rubenstein
Page 2


For information concerning data sources used to develop and verify total volume, etc., and the basis or rationale for USDA's exclusion of sales by companies that failed to report sales data as required may be found on our website at: http://www.fsa.usda.gov/tobacco.

You may appeal this determination within 45 days of receipt of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." The address is:

<div style="margin-left:2em">

Administrator
United States Department of Agriculture
Farm Service Agency, Stop Code 0501
1400 Independence Avenue, SW
Washington, DC 20250-0501

</div>

Sincerely,

J. Burton Eller
Director
Office of External Affairs

**EXHIBIT 8**

# Greenberg
# Traurig

**Reed D. Rubinstein**
Tel. 202.533.2314
Fax 202.331.3101
rubinsteinr@gtlaw.com

December 20, 2005

**VIA FEDERAL EXPRESS AND CERTIFIED MAIL**
Quality of Information Officer
USDA/FSA, Room 3086-South
1400 Independence Ave., S.W.
Washington, DC 20250

**Re:    Request For Reconsideration of Information Quality Act Disclosure and
         Correction/CCC Tobacco Transition Payment Program Information**

Dear Sir/Madam:

   Attached is a Request for Reconsideration of our Petition under the Information
Quality Act, Section 515 of Public Law 106-554, 44 U.S.C. § 3516, note, and the
information quality guidelines issued by the Office of Management and Budget, 67 Fed.
Reg. 8459-60 (Feb. 22, 2002) (the "OMB Guidelines"), and the United States Department of
Agriculture (USDA) (the "USDA Guidelines")(*http://www.ocio.usda.gov/qi_guide*)
(collectively the "IQA") sent certified mail and dated September 13, 2005 (Exhibit 1).

   According to the USDA Guidelines, the USDA's response to our request was due on
or before November 13, 2005.  We assume USDA's failure to respond constitutes a denial of
the September 13, 2005 request.  Therefore, we submit this request for reconsideration.

   Please contact me if you have any questions

                                          Sincerely,

                                          Reed D. Rubinstein

RDR:jmj
Enclosure

<div align="right">

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

www.gtlaw.com

</div>



**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

O F F I C I A L   U S E

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Reciept Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 4.87 | |

*Sent To*
Quality of Information Officer
*Street, Apt. No.; or PO Box No.* 1400 Independence Ave. SW
*City, State, ZIP+4*
Washington, DC  20250

PS Form 3800, June 2002        See Reverse for Instructions

7004 0550 0000 9127 8314

Exhibit

1

# Greenberg Traurig

Reed D. Rubinstein
Tel. 202.533.2314
Fax 202.331.3101
rubinsteinr@gtlaw.com

September 13, 2005

**VIA CERTIFIED MAIL**
Quality of Information Officer
USDA/FSA, Room 3086-South
1400 Independence Ave., S.W.
Washington, DC 20250

Re:    **Request For Information Quality Act Disclosure and Correction/CCC Tobacco Transition Payment Program Information**

Dear Sir/Madam:

    This is a Petition under the Information Quality Act, Section 515 of Public Law 106-554, 44 U.S.C. § 3516, note, and the information quality guidelines issued by the Office of Management and Budget, 67 Fed. Reg. 8459-60 (Feb. 22, 2002) (the "OMB Guidelines"), and the United States Department of Agriculture (USDA) (the "USDA Guidelines") (*http://www.ocio.usda.gov/qi_guide*)(collectively the "IQA").

I.    REQUESTOR CONTACT INFORMATION.

Requestor is Single Stick, Inc., c/o Greenberg Traurig LLP, 800 Connecticut Avenue N.W., Suite 500, Washington, D.C., 20006, attn: Donald Stein, Esq. and Reed Rubinstein, Esq. Requestor's counsel may be reached at 202-331-3100, or steind@gtlaw.com and rubinsteinr@gtlaw.com.

II.    DESCRIPTION OF INFORMATION TO CORRECT.

Requestor seeks correction of influential statistical and financial information, specifically, information regarding market share, total volume, company volume, and gross sales statistics (collectively the "disseminated information"), disseminated by USDA through quarterly Tobacco Transition Payment Program (TTPP) assessments to the cigar industry.

III.    EXPLANATION OF NON-COMPLIANCE.

Section 625(e) of the America Job Creation Act of 2004 (Pub. L. 108-357) (the "Act") , codified at 7 U.S.C. § 518d, prohibits TTPP assessments "in excess of the manufacturer's or importer's share of domestic volume." In the preamble to the final rule promulgated as 7 C.F.R. Part 1463, USDA stated that it would use information obtained from the Department

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

www.gtlaw.com

Chief Information Officer
September 13, 2005
Page 2

_____

of the Treasury and from the Department of Homeland Security to calculate "share of domestic volume." 70 Fed. Reg. 7007-8 (February 10, 2005). However, based on a verbal conversation with USDA personnel, it appears USDA calculated "domestic volume" (market share) based solely on "reported" volume; that is, the total sales volume voluntarily reported by companies complying with § 625(h) disclosure requirements. Consequently, when USDA calculated and disseminated the influential statistical and financial information, it intentionally excluded sales by at least 349 companies from the analysis. Furthermore, USDA has never formally disclosed its data sources, methods, or data verification measures, thereby preventing Requestor and others from reproducing and verifying the disseminated information.

In December, 2000, the Congress enacted IQA, requiring government information to meet quality standards, providing "affected persons" with the right to seek and obtain correction of disseminated information, and directing agencies to provide those persons with an administrative mechanism that could be used to obtain the requisite relief. IQA provides:

> (a) IN GENERAL – [OMB] shall…issue guidelines…that shall provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies….

> (b) CONTENT OF GUIDELINES – The guidelines under subsection (a) shall - -

> (1)    apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and

> (2)    require that each Federal agency to which the guidelines apply-

> (A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information(including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

> (B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a)

IQA was enacted to ensure government information is objective and supported by statistically sound data, and that the public has meaningful access to the data and methodological information needed to test and reproduce the disseminated information. *See* 67 Fed. Reg. at 8455-57. The law recognizes that the public's capacity to test the objectivity and reproducibility

Chief Information Officer
September 13, 2005
Page 3

of government information depends entirely upon the quality of an agency's disclosure of data sources and methods. *See* 67 Fed. Reg. at 8455-58. IQA requires source and method transparency, thereby deterring reliance on flawed calculations or inaccurate statistics, and encouraging sound decision-making. Correction and disclosure are the remedy for an agency's dissemination of inaccurate information, or its failure to provide enough information for the public to test the soundness of its methods or the reproducibility of its conclusions.

The USDA Guidelines specifically require USDA agencies and offices to collect and create information using only sound statistical methods that are consistent with generally accepted professional and industry standards. When compiling and using statistical or financial information from administrative data files and records or original sources, USDA requires the use of only the most reliable data and the most reliable data sources available, and directs that the data be validated against other information where practicable. The USDA Guidelines further require the transparent documentation of data sources, methods, and sources of error when disseminating original or supporting statistical or financial data. In analyzing and reporting statistical or financial information, USDA agencies and offices must use sound analytical techniques, and provide a clear explanation of data sources, methodologies used, and assumptions made.

The disseminated information that is the subject of this Petition is "influential" as a matter of law. *See* 67 Fed. Reg. 8452, 8460 (February 22, 2002). Consequently, the USDA Guidelines specifically direct USDA agencies and offices to provide "a high degree of transparency about data and methods to facilitate its reproducibility by qualified third parties." Reproducibility means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. The USDA Guidelines provide further: "In all cases, USDA agencies and offices must disclose the specific data sources, quantitative methods, and assumptions used in the analysis."

The disseminated information does not comply with the IQA in that:

- The specific data sources, quantitative methods, and assumptions used by USDA have not been disclosed.
- Transparent documentation of data sources, methods, and sources of error have not been provided.
- USDA apparently did not validate the accuracy of the disseminated information against other information as required. In any event, its data verification methods and results have not been disclosed.
- Requestor lacks the data needed for it to attempt to reproduce USDA's statistical conclusions.

Chief Information Officer
September 13, 2005
Page 4

- USDA's estimation of assessable market share was not consistent with sound statistical methods, nor with generally accepted professional and industry standards.
- Commercial survey data based on actual sales suggests that USDA has over-estimated Requestor's market share by four to six orders of magnitude. Upon information and belief, USDA has over-estimated other companies' market share as well.

## IV.    EXPLANATION OF THE EFFECT OF THE ERROR

The disseminated information has been used by USDA to calculate and impose TTPP assessments on the cigar industry. However, because the underlying data is erroneous, the disseminated information, and the TTPP assessments based on that information, are also erroneous. Due to USDA's failure to comply with the IQA, some companies have suffered substantial economic harm, while others have obtained an undeserved economic windfall.

Requestor has been substantially and adversely affected by USDA's failure to comply with the IQA. Requestor has been assessed at a rate four to six times higher than can be justified by the sound financial and statistical data. Consequently, it is threatened with losses that could exceed one million dollars. Furthermore, USDA's failure to disclose the specific data sources, quantitative methods, and assumptions it used to generate the influential information has effectively prevented Requestor from even attempting to reproduce USDA's statistical results. As a result, it cannot fully assess its own legal obligations.

## V.    RECOMMENDATIONS AND JUSTIFICATION FOR HOW INFORMATION SHOULD BE CORRECTED.

Requestor recommends the following:

1.    USDA should disclose all specific data sources, quantitative methods, and assumptions it has used in generating the assessments, as required by law. Only if this information is disclosed can Requestor and others test and reproduce the agency's statistical and financial conclusions, and respond appropriately to the TTPP assessments.

2.    Industry market share calculations should be based on actual market share data only. The USDA Guidelines mandated the use of sound statistical methods in accordance with generally accepted professional and industry standards. Instead, USDA knowingly disseminated inaccurate influential information. It knew it had over-estimated Requestor's market share by failing to develop a statistical model that would compensate for missing reported sales data. The agency's failure to do so was not a "sound statistical method," nor consistent with "generally accepted professional and industry standards" as required by law.

Chief Information Officer
September 13, 2005
Page 5

_____

3.    USDA should suspend all TTPP assessments pending IQA compliance.
      Alternatively, it should immediately disclose all operative data sources, methods,
      and data validation results, proceed to recalculate the assessments, and issue
      credits and refunds, as appropriate, as soon as possible.

Please contact me if you have any questions.

                                        Sincerely,

                                        Reed D. Rubinstein

RDR:jmj

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

# OFFICIAL USE

| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

7004 0550 0000 9127 8291

Sent To
Quality of Information Officer
Street, Apt. No.; or PO Box No.
USDA/FSA, Room 3086-South
City, State, ZIP+4
1400 Independence Ave. SW
Washington, DC 20250

PS Form 3800, June 2002                    See Reverse for Instructions

**McGruder-Jackson, Jean (AdmAst-DC-LT)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Wednesday, December 21, 2005 12:12 PM |
| **To:** | McGruder-Jackson, Jean (AdmAst-DC-LT) |
| **Subject:** | FedEx Shipment 790753555114 Delivered |

*This tracking update has been requested by:*

*Name:  'not provided by requestor'*

*E-mail:  'not provided by requestor'*

*Our records indicate that the following shipment has been delivered:*

| | |
|---|---|
| *Tracking number:* | *790753555114* |
| *Reference:* | *58435.011800/rdr* |
| *Ship (P/U) date:* | *Dec 21, 2005* |
| *Delivery date:* | *Dec 21, 2005 11:12 AM* |
| *Sign for by:* | *R.VAUGHN* |
| *Delivered to:* | *Receptionist/Front Desk* |
| *Service type:* | *FedEx Priority Overnight* |
| *Packaging type:* | *FedEx Envelope* |
| *Number of pieces:* | *1* |
| *Weight:* | *0.5 LB* |

*Shipper Information*                    *Recipient Information*
*Reed D. Rubinstein*                    *Quality of Information Officer QUIi*
*Greenberg Traurig LLP*                    *USDA/FSA, Room 3086-South*
*800 Connecticut Avenue, N.W.*            *1400 Independence Avenue, S.W.*
*Suite 500*                        *Washington*
*Washington*                        *DC*
*DC*                            *US*
*US*                            *20250*
*20006*

*Special handling/Services:*
*Deliver Weekday*

*Please do not respond to this message. This email was sent from an unattended mailbox. This report was
generated at approximately 10:33 AM  CST on 12/21/2005.*

*To learn more about FedEx Express, please visit our website at fedex.com.*

*All weights are estimated.*

*To track the status of this shipment online, please use the following:*

https://www.fedex.com/fedexiv/us/findit/nrp.jsp?tracknumbers=790753555114
&language=en&opco=FX&clientype=ivpodalrt

This tracking update has been sent to you by FedEx on the behalf of the Requestor noted above. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update. For tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

**EXHIBIT 9**

**USDA**

FEB - 8 2006

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service
Agency

1400 Independence
Ave, SW
Stop 0570
Washington, DC
20250-0570

Reed D. Rubinstein, Attorney at Law
Greenberg Taurig, LLP
Suite 500
800 Connecticut Avenue, NW
Washington, D.C.  20006

Dear Mr. Rubinstein:

On November 17, 2005, a hearing was convened regarding Single Stick, Inc.'s, (Appellant) Tobacco Transition Payment Program (TTPP) disputed first and second quarter Fiscal Year 2005 assessments.  This is the final administrative determination with regard to this appeal.

**Background:**

The Fair and Equitable Tobacco Reform Act of 2004 (the 2004 Act) effectively ended the tobacco marketing quota and price support loan programs.  The TTPP was introduced in a final rule published in the Federal Register on February 10, 2005, and amended on April 4, 2005,  (7 CFR §1463) to provide a mechanism to effect the provisions of the 2004 Act.

The TTPP provides for payments over a 10-year period to eligible tobacco quota holders and producers to assist in a transition from Federally regulated tobacco programs.  Funding for these payments is derived from quarterly assessments levied against certain tobacco manufacturers and importers of tobacco products that are placed in a trust fund and distributed by the Commodity Credit Corporation (CCC).  The 2004 Act requires the total quarterly assessment for all manufacturers and importers to be sufficient to cover the contract payments and other expenditures from the trust fund during that period.  These expenses include, but are not limited to, losses sustained by CCC under its loan agreements with the tobacco loan associations during the corresponding quarterly period.

The 2004 Act categorizes tobacco companies into six separate and distinct classes and requires manufacturers and importers of each of those classes to pay a specific percentage of the total quarterly assessment.  For Fiscal Year 2005, the percentages are as follows:

1. Cigarette manufacturers and importers - 96.331 percent

2. Cigar manufacturers and importers - 2.783 percent

3. Snuff manufacturers and importers - 0.539 percent

4. Roll-your-own tobacco manufacturers and importers - 0.171 percent

Page 1 of  11

USDA is an Equal Opportunity Employer

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

5.  Chewing tobacco manufacturers and importers - 0.111 percent

6.  Pipe tobacco manufacturers and importers - 0.066 percent

For subsequent fiscal years, CCC has discretionary authority to adjust those percentages to reflect changes in the share of gross domestic volume held by that class of tobacco product.

Once the total quarterly assessment by class of tobacco manufacturer or importer is established, individual tobacco manufacturers and importers are assessed based on their respective individual market share of the gross domestic volume of tobacco placed in the market for each specific class of tobacco manufacturer or importer. The 2004 Act specifies that market share will be expressed as a decimal to the fourth place.
The 2004 Act defines "Gross Domestic Volume" as the volume of tobacco products removed (as defined by Section 5702 of the Internal Revenue Code of 1986, including ATF 5000.24 and United States Customs form 7501 under currently applicable regulations) and not exempt from tax (Chapter 52 of the Internal Revenue Code of 1986) at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

With respect to the six categories previously listed, excluding cigars, CCC determines a tobacco manufacturer's or importer's market share by simply dividing the amount of excise taxes it reported it paid for a specific class of tobacco by the total excise taxes paid by all manufacturers and importers for that specific class of tobacco during the previous fiscal year quarter. CCC then multiplies that market share by the total quarterly assessment for that specific class of tobacco to arrive at the assessment amount.

With regard to cigars, excise taxes paid are not used in computing the assessment associated with cigars because excise taxes paid are not consistent between large cigars and small cigars. The 2004 Act does not differentiate between large cigars and small cigars and Section 625(g)(3)(A) requires that assessments associated with cigars be computed on a per-stick basis. As a result, CCC computes a cigar manufacturer's or importer's market share based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in commerce. Then, as with other classes of tobacco, CCC multiplies each manufacturer's or importer's market share by the total quarterly assessment for cigars to arrive at the assessment amount.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

**Appellant's Position:**

Appellant challenges that CCC incorrectly classified small cigars in the same category as large cigars and unfairly assessed small cigars at the same rate as large cigars. Appellant challenges that the total amount of excise taxes paid by tobacco manufacturers and importers in a specific class of tobacco is incorrect insofar as the number does not include companies that did not report or did not pay the required excise taxes. Appellant argues that CCC's interpretation of the expression of market share unlawfully excluded small tobacco manufacturers and importers from TTPP assessment. Appellant contends that CCC used unreliable removal data when computing TTPP assessments which resulted in an overstatement of Appellant's market share. As a result, Appellant believes that the computation of the assessment is in error and Appellant is paying more than its proportional share of the TTPP assessment. Appellant challenges that CCC improperly incorporated tobacco loan pool stock liquidation losses into the third quarter Fiscal Year 2005 TTPP assessment which Appellant believes should have been amortized over the ten years of the TTPP. Appellant challenges that CCC erroneously included ineligible administrative expenses and related services in quarterly TTPP assessment amounts. Appellant believes that CCC's decisions regarding TTPP assessments are arbitrary, capricious, and contrary to the 2004; Act, therefore, Appellant believes it is entitled to relief.

**Issues:**

Did CCC incorrectly classify small cigars in the same class as large cigars and assess small cigars at the same rate as large cigars?

When computing TTPP assessments, did CCC erroneously fail to include tobacco companies that did not report production placed into commerce and excise tax information thereby causing Appellant to pay more than its proportional share of the total TTPP assessment?

Is CCC's computation of TTPP assessments predicated on accurate excise tax and tobacco product removal data and is that data available to the public?

Did CCC unlawfully exempt small manufacturers and importers from TTPP assessment?

Is CCC's decision to not retroactively charge tobacco companies that were previously considered *di minimus* and exempt from TTPP assessment, but would now owe a TTPP assessment as a result of the policy change regarding the expression of market share, factually correct and in accordance with the 2004 Act?

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

Did CCC erroneously include expenses for TTPP program outreach and related services in the total third quarter Fiscal Year 2005 TTPP assessment?

Did CCC improperly include tobacco loan pool losses in corresponding quarterly TTPP assessments rather than amortize these losses over the remaining years of TTPP?

**Analysis:**

**Did CCC incorrectly classify small cigars in the same class as large cigars and assess small cigars at the same rate as large cigars?**

Appellant pointed out that it takes many small cigars to equal the volume of one large cigar and argued that it is not equitable to assess small cigars at the same rate as large cigars. That argument may be philosophically well founded; however, it is not consistent with the statutory requirements regarding the computation of a tobacco company's "market share" and corresponding TTPP assessments.

Specifically, Section 625(c)(1) of the 2004 Act establishes the percentage of the total assessment amount that is attributable to each of the six separate and distinct classes of tobacco. Section 625(c)(1)(B) of the 2004 Act clearly does not differentiate between large cigars and small cigars nor does it establish separate classes for large and small cigars. Section 625(g)(3)(A) further requires the volume of domestic sales associated with cigars to be measured on a per-stick basis. Therefore, CCC correctly computed cigar manufacturers' or importers' market shares based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in domestic commerce, without regard to the size of the cigars as the law requires.

**When computing TTPP assessments, did CCC erroneously fail to include tobacco companies that did not report production placed into commerce and excise tax information thereby causing Appellant to pay more than its proportional share of the total TTPP assessment?**

Appellant's assertion that CCC did not include (in the total excise taxes paid) tobacco companies that failed to report production placed into commerce and excise tax information (non-reporting companies) when computing TTPP assessments is factually correct. CCC determined Appellant's market share by dividing Appellant's excise taxes by the total excise taxes paid by tobacco companies that did report production placed into commerce and excise tax information (reporting companies), not all tobacco companies.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

Because CCC did not include all tobacco companies in the total excise taxes paid, Appellant asserts that its market share was artificially inflated which caused its assessment amounts to be greater than Appellants proportional share of the TTPP assessment; these facts lend support to Appellant's argument that it is paying an amount greater than its proportional share of the total assessment. Appellant's position is further supported by Section 625(e)(2) of the 2004 Act, which limits a tobacco company's share of the TTPP assessment to its proportional share of domestic volume for each class of tobacco.

With regard to cigarettes, CCC does possess excise tax information for non-reporting cigarette tobacco companies that will allow CCC to accurately assess those non-reporting companies. CCC has determined to grant this portion of this appeal. Accordingly, CCC has determined that a reconciliation of cigarette manufacturers or importers Fiscal Year 2005 quarterly assessments is appropriate. CCC will redetermine each cigarette manufacturer or importer's 2005 Fiscal Year quarterly market shares and corresponding assessments. Specifically, the calculations will include previously omitted excise taxes paid by non-reporting companies in the total excise taxes paid by tobacco companies. In February 2006, affected cigarette tobacco companies will receive an invoice showing any Fiscal Year 2005 TTPP assessment adjustments. Any overpayments will be credited (including applicable interest).

With regard to cigars, information that CCC possesses regarding non-reporting cigar manufacturers or importers is again excise tax information. However, because cigar manufacturers' or importers' market share is computed on a per-stick basis and excise tax rates are not consistent between large cigars and small cigars, CCC is unable to use this information to accurately compute a non-reporting cigar manufacturer's or importer's market share. Unlike cigarettes, CCC has no access to any other non-reporting cigar tobacco company production information, nor has Appellant provided such data, that would allow CCC to accurately ascertain the number of cigars manufactured by non-reporting companies. As a result, CCC has no way to compute an accurate assessment amount with regard to non-reporting cigar companies and, therefore, cannot include the non-reporting companies in the assessment calculation.

Cigar tobacco companies that failed to report production and excise tax information, likewise, failed to pay a TTPP assessment. Including these companies in the TTPP assessment calculation would result in "insufficient amounts" in the Tobacco Trust Fund available to deliver the program and cover TTPP outlays. Section 625(c)(3) of the 2004 Act directs CCC to recover "insufficient amounts" and gives CCC broad latitude to increase assessment amounts to cover such shortages in the process of carrying out the program.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

Notwithstanding this point, CCC realizes that because additional cigar tobacco companies subject to the TTPP assessment have been found and have now reported and paid assessments after the fact, CCC has determined to partially grant this appeal with regard to cigars. Specifically, CCC has determined that a reconciliation of cigar manufacturers or importers Fiscal Year 2005 quarterly assessments to include these additional monies is appropriate. In February 2006, affected cigar tobacco companies will receive an invoice showing any Fiscal Year 2005 assessment adjustments. Any overpayments will be credited (including applicable interest).

**Is CCC's computation of TTPP assessments predicated on accurate excise tax and tobacco product removal data and is that data available to the public?**

Appellant contends that its market share is overstated because CCC used incorrect data in the computation of market shares. Appellant presented A.C. Nielsen marketing data to support its contention. Appellant believes that A.C. Nielsen sales data is more reliable than excise tax and removal data that CCC obtained, and is the only verifiable and testable market share evidence that should be used in the computation of tobacco companies market shares. Appellant's argument is not persuasive. A.C. Nielsen market data is across the counter "sales" data. Market shares (for TTPP purposes) are computed based on tobacco product "removal" data. Sales data and removal data are not (and will not be) synonymous. Section 625(g) and Section 625(h) of the 2004 Act specify that the volume of domestic sales used in calculating the TTPP assessment shall be made by CCC based on information provided by the manufacturers and importers (specifically, Federal excise tax information and removal data) as well as any other relevant information provided to or obtained by CCC. CCC worked closely with the U.S. Department of Homeland Security and the U.S. Department of the Treasury to establish a complete list of all tobacco manufacturers and importers that are subject to excise tax. Each of those companies was contacted and required to provide verifiable excise tax and tobacco product removal data which was used to compute Appellant's market share and subsequent TTPP assessment. The 2004 Act delegates the authority to CCC to determine what is the most reliable information available to compute the most accurate TTPP. In this case, CCC determined that Federal excise tax information and removal data was the most accurate. I find that the data used and the methodology applied in CCC's computation of market shares complies with the provisions of the 2004 Act.

Appellant also contends that CCC violated Appellant's due process rights by refusing to make available to the public the underlying data that CCC used to calculate market shares. Appellant requested the data and CCC's data sources through a Freedom of Information Act (FOIA) request. CCC denied Appellant's request pursuant to Exemption 3 of FOIA in conjunction with the Internal Revenue Code of 1986. Exemption 3 protects material that is specifically exempted from disclosure by Statute.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

This data is subject to the provisions of 26 U.S.C. 6103, which prohibits the disclosure of tax information to any party whose duties do not require access (CR App0228). The merits of the denial of Appellant's FOIA request are outside the scope of this review as it pertains to the appeal of the TTPP assessment. I do point out, however, that Appellant has failed to show that denial of Appellant's FOIA request has interfered with Appellant's due process rights or otherwise caused Appellant harm.

Appellant's burden to show error on the part of CCC is not satisfied, mitigated, or lessened as a result of Appellant's inability to produce documents or evidence that would substantiate Appellant's position. The fact that Appellant was unable to obtain, review, and scrutinize the underlying data used to calculate market shares does not mean Appellant's assertions are well founded nor does it render that data incorrect. Appellant has made no sustainable argument that the data relied on by CCC was incorrect or used improperly in the calculation of tobacco company's market shares; therefore, I must deny Appellant's appeal with regard to this issue.

### Did CCC unlawfully exempt small manufacturers and importers from TTPP assessment?

Section 625(a)(3) of the 2004 Act specifies that a manufacturer's or importer's market share shall be "expressed as a decimal to the fourth place." Limiting the market share expressed as a decimal to the fourth place was previously interpreted by CCC to mean that in order to be subject to an assessment, a tobacco manufacturer or importer would have to have a calculated market share of .0001 or greater. Considering these facts, any manufacturer or importer with a market share of .000050 or greater would be subject to the TTPP assessment because generally applicable rules of rounding[1] would require CCC to consider the market share as .0001. Any market share of .000049 or less would be considered .0000 (zero) or, in other words, *di minimus*.

---

[1]

CCC regulations found at 7 CFR §1405.2 (attached) set forth the generally applicable rules of fractions (rules of rounding) used in this case. These regulations adopt, by reference, regulations issued by the Farm Service Agency found at 7 CFR §718.5 (attached) that provide applicable rules of rounding for mathematical calculations. Specifically, the regulations require that all mathematical calculations be carried out to two decimal places beyond the number of decimal places required by the regulations governing each program. In rounding fractional digits of 49 or less beyond the required number of decimal places (in this case 4 places) shall be dropped. If the fractional digits beyond the required number of decimal places are 50 or more, the figure at the last required decimal place shall be increased by "1".

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

The manner in which "market share" should be viewed (when determining whether a tobacco manufacturer or importer is subject to the assessment) has been the subject of several administrative appeals.  Various tobacco companies have asserted that CCC should interpret "market share" to mean each manufacturer's and importer's "percentage share" expressed as a whole number percentage rounded and carried to the fourth decimal place rather than expressed as a decimal rounded and carried to the fourth decimal place.  For example, using that interpretation, a company could have a 17.4996 percent or .174996 market share instead of CCC's current expression of the same market share as 17.50 percent or .1750 market share.  The determination whether a tobacco company is subject to the assessment would be based on market share expressed to the sixth decimal place (where previously the measure was four decimal places).  If the market share of an entity is equal to or .000001, the entity would be subject to assessment.   It is CCC's position that either interpretation is possible under Section 625(b)(3) of the 2004 Act.

After evaluating information submitted by several tobacco companies during the course of administrative hearings, CCC has determined that (for Fiscal Year 2006 and future years) expressing market share as a whole number percentage rounded and carried to the fourth decimal place provides a more accurate representation of an individual tobacco company's market share.  This policy change will impact a number of sizable manufacturers or importers that previously were considered to have a *di minimus* market share and, therefore, were exempt from assessment.  Including these additional companies will effectively reduce the burden on currently assessed companies.
A Federal Register Notice issued December, 8, 2005, (attached) explained the rationale for the policy change.  The Federal Register Notice advises tobacco manufacturers and importers that, effective January 1, 2006, the determination whether a tobacco company is subject to the assessment will be based on the company's market share expressed to the sixth decimal place.

**Is CCC's decision to not retroactively charge tobacco companies that were previously considered *di minimus* and exempt from TTPP assessment, but would now owe a TTPP assessment as a result of the policy change regarding the expression of market share, factually correct and in accordance with the 2004 Act?**

Appellant asserts that this policy should be applied retroactively to tobacco companies that previously were considered exempt but would now owe an assessment based on the policy change.  CCC's holds that it is inappropriate to retroactively implement a policy change that is more restrictive when both policies are factually correct and comply with the 2004 Act.  As a result, Appellant's appeal with regard to this issue is denied.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

**Did CCC erroneously include expenses for TTPP program outreach and related services in the total third quarter Fiscal Year 2005 TTPP assessment?**

Appellants assert that expenses incurred by USDA for program outreach and related services are "administrative expenses," which the 2004 Act expressly prohibits from being paid out of the Tobacco Trust Fund.  CCC has reviewed these expenditures and has determined that these expenses will not be included in TTPP assessment amounts. As a result, CCC has determined to grant Appellant's appeal to the extent that these expenditures will be appropriately credited during the aforementioned Fiscal Year 2005 TTPP assessment reconciliation process.  In February 2006, affected tobacco companies will receive an invoice showing any Fiscal Year 2005 TTPP assessment adjustments and any overpayments will be credited (including applicable interest).

**Did CCC improperly include tobacco loan pool losses in corresponding quarterly TTPP assessments rather than amortize these losses over the remaining years of TTPP?**

The Third Quarter fiscal year 2005 total assessment was significantly higher than previous quarterly assessments due to the inclusion of CCC loan losses from the required disposal of loan pool stocks held by tobacco associations in the total quarterly assessment amount.  Appellant asserts that these loan pool stock losses should be amortized over the remaining years of TTPP rather than included in the corresponding quarter TTPP assessment.

Section 641(c)(2) of the 2004 Act requires the Secretary to transfer funds to CCC from the Tobacco Trust Fund to reimburse CCC for any net losses that CCC may sustain under its loan agreements with the tobacco associations.  Section 625(b)(2)(B) of the 2004 Act requires that these expenses be included in the TTPP assessment for the corresponding quarter base period.  The 2004 Act does not provide CCC the latitude to amortize loan pool stock losses; therefore, Appellant's appeal with regard to this issue must be denied.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

**Determination:**

I conclude that the classification and assessment of small cigars and large cigars in the same specific class of tobacco is consistent with the 2004 Act. I further conclude that CCC correctly computed cigar manufacturers' or importers' market shares based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in domestic commerce without regard to the size of the cigars. Accordingly, Appellant's appeal with regard to this issue is denied.

With respect to the manner in which Appellants' TTPP assessments have been determined, I grant Appellants' appeal to the extent CCC will include (for purposes of determining Appellants market share) production and excise tax information from all known manufacturers or importers when computing market shares, provided that such entities have submitted information as required by CCC or, if not, have submitted data to the U.S. Department of the Treasury or the U.S. Department of Homeland Security which CCC can rely upon in making such determinations.

With regard to Appellants assertion that it is paying more than its proportional share of the total assessment amount, I grant the appeal to the extent that CCC will perform a recalculation and reconciliation of Fiscal Year 2005 assessments.

With regard to CCC exempting from assessment manufacturers and importers with a *di minimus* market share, I find that CCC properly excluded from TTPP assessment tobacco companies with a market share of less than .0001. I also find that CCC's decision to not retroactively charge tobacco companies that were previously exempt from assessment, but would not owe a TTPP assessment as a result of the policy change in the expression of market share, is correct. Therefore, Appellant's appeal with regard to these issues is denied.

With regard to Appellant's contention that CCC used incorrect data in the computation of market shares, I deny Appellant's appeal.

With regard to CCC violating Appellant's due process rights, I deny Appellant's appeal.

With regard to TTPP program outreach and related services expenditures included in the third quarter Fiscal Year 2005 TTPP assessment, I grant Appellants' appeal to the extent that these expenditures will be appropriately credited during the Fiscal Year 2005 TTPP assessment reconciliation process.

I also find that because there are no provisions for relief in the 2004 Act or the controlling regulations, Appellant's request for relief must be denied.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

This is the final administrative decision. If Appellant does not believe this determination is in accordance with the 2004 Act or the controlling regulations, Appellant may seek judicial review in the United States District Court for the District of Columbia or for the district in which the Appellant resides or has its principal place of business.


John A. Johnson
Deputy Administrator for Farm Programs
Designee of Executive Vice President,
Commodity Credit Corporation


Attachments

Page 11 of 11

Case 1:06-cv-01071-RWR   Document 9   Filed 06/09/2006   Page 93 of 104

§ 1404.9

shall be liable in any suit if payment is made to the assignor without regard to the existence of any assignment, and no notice contained herein shall be construed to authorize any suit against the United States, the CCC, the Secretary, or any disbursing agent if payment is not made to the assignee, or if payment is made to only one of several assignees.

## § 1404.10 OMB Control Numbers assigned pursuant to the Paperwork Reduction Act.

Information collection requirements contained in this part have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 35 and have been assigned OMB control number 0560–0004.

## PART 1405—LOANS, PURCHASES, AND OTHER OPERATIONS

Sec.
1405.1 Interest.
1405.2 Basic rule of fractions.
1405.3 Effect of changes in regulations.
1405.4 Delegations of authority.
1405.5 Notice and comment.
1405.6 Crop insurance requirement.
1405.7 Uruguay Round Agreements Act.
1405.8 Disqualification due to Federal crop insurance fraud.

AUTHORITY: 7 U.S.C. 1515; 7 U.S.C. 7981(c); 15 U.S.C. 714b and 714c.

SOURCE: 61 FR 37575, July 18, 1996, unless otherwise noted.

## § 1405.1 Interest.

(a) Except as may otherwise be determined by CCC as provided in individual program regulations, program concentrate or such other means as deemed appropriate by CCC, the rate of interest applicable to CCC loans shall be equal to the rate of interest charged by the U.S. Treasury for funds borrowed by CCC on the date the loan is disbursed, plus 1 percent. This interest rate shall be in effect until the earlier of the maturity of the loan or the next January 1, or the next January 1.

(b) The rate of interest applicable to all CCC loans that are outstanding as of January 1 of any year shall be adjusted as of such date to the interest of interest equal to the U.S. Treasury level of interest applicable to the earlier of the next January 1,

[remainder of column illegible]

## § 1405.2 Basic rule of fractions.

Fractions shall be rounded in accordance with the provisions of 7 CFR part 718.

## § 1405.3 Effect of changes in regulations.

Unless otherwise indicated, the regulations in effect in this chapter as of April 1, 1996, shall continue to apply to the 1991 through 1995 crops of agricultural commodities. To milk produced on or before May 1, 1996, and to peanut commodities entered into prior to any agreement entered into prior to that date.

## § 1405.4 Delegations of authority.

The delegations of authority relating to the CCC programs and activities are set forth in the By-laws of CCC and in policies approved by the CCC Board. The directors of CCC, the By-laws and policies approved by the CCC Board of Directors. Copies may be obtained from the docket may be obtained from the Secretary of CCC.

## § 1405.5 Notice and comment.

The level of loans, purchases, and payments made in accordance with the programs set forth in this chapter shall be determined without regard to the notice and comment provisions of 5 U.S.C. 553.

## § 1405.6 Crop insurance requirement.

(a) To be eligible for any benefit or payments under 7 CFR part 1410, the producer must obtain at least the catastrophic level of insurance for each crop of economic significance in which the producer has an interest or provide a written waiver to the Secretary that waives any eligibility for emergency crop loss assistance in connection with the crop for which the producer may—

(1) Obtain at least the catastrophic level of crop insurance in all counties for each crop of economic significance in which the producer has an interest, or

(2) Obtain at least the catastrophic level of crop insurance for significant

[remainder of column illegible]

## Commodity Credit Corporation, USDA   Pt. 1407

not all, crops of economic significance on the record, will be subject to one or more of the sanctions described in section 515(b)(3). In section 515(b)(3), the FCIA specifies that in the case of a violation committed by a producer, the producer may be disqualified for a period of no 5 years from receiving any benefit or non-monetary benefit. The list includes, but is not limited to, benefits under:

(1) Title V of the FCIA.

(2) The Agricultural Market Transition Act (7 U.S.C. 7201 et seq.), including the Noninsured Crop Disaster Assistance Program under section 196 of the Agricultural Act of 1949 (7 U.S.C. 1421 et seq.).

(4) The Agricultural Act of 1949 (7 U.S.C. 1421 et seq.).

(5) The Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.).

(6) The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.).

(6) Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 et seq.).

(7) Any law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in prices of agricultural commodities.

(b) Violation determinations are made by FCIC. However, upon notice from FCIC to CCC that a producer has been found to have committed a violation to which paragraph (a) of this section applies, that person shall be considered ineligible for payments under the programs specified in paragraph (a) for the same period of time for which the producer is determined by FCIC, the producer will be ineligible for crop insurance benefits of the kind referred to in paragraph (a)(1) of this section. Appeals of the determination of ineligibility will be administered under the rules set by FCIC.

(c) Other sanctions may also apply.

[68 FR 39448, July 2, 2003]

## PART 1407—DEBARMENT AND SUSPENSION

Sec.
1407.1 Purpose.
1407.2 Nonprocurement debarment and suspension.

347

**Required inspection** means an examination by an authorized representative of FSA of a farm specifically selected by application of prescribed rules to determine adherence to program requirements.

**Rice** means rice that is planted, or caused to be planted, on a farm for harvest.

*Secretary* means the Secretary of Agriculture of the United States, or a designee.

*Sharecropper* means one who performs work in connection with the production of a crop under the supervision of the operator and who receives a share of such crop for its labor.

*Skip-row or strip-crop planting* means a cultural practice in which strips or rows of the crop are alternated with strips or rows of idle land or another crop.

**Standard deduction** means an acreage that is excluded from the gross acreage for a field because such acreage is considered as being used for farm equipment turn-areas. Such acreage is established by application of a prescribed percentage of the area planted to the crop in lieu of measuring the turn area.

*State* means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands of the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or the Trust Territory of the Pacific Islands.

*Subdivision* means a part of a field that is separated from the balance of the field by a temporary boundary, such as a cropline which could be easily moved or will likely disappear.

*Tenant* means:

(1) One who rents land from another in consideration of the payment of a specified amount of cash or amount of a commodity; or

(2) One (other than a sharecropper) who rents land from another person in

---

consideration of the payment of a share of the crops or proceeds therefrom.

*Tolerance* means a prescribed amount within which the reported acreage and the determined acreage may differ and still be considered as correctly reported.

*Tract* means a unit of contiguous land under one ownership, which is operated as a farm, or part of a farm.

*Tract combination* means the combining of two or more tracts if the tracts have common ownership and are contiguous.

*Turn-area* means the area across the ends of crop rows which is used for operation of equipment necessary to the enabling operation, to the production of a tow crop (also called turn row, headland, or end row).

*Upland cotton* means the area seeded to a cotton variety commonly known as long staple upland planting and harvesting practices from Barbadoese is grown, and produced from other than pure strain varieties of the species, any hybrid thereof, and/or any other variety of cotton in which one or more of these varieties predominate.

*Wheat* means wheat for feed or dual purpose variety that follows the standard planting and harvesting practice of the area in which the wheat is grown.

[68 FR 16574, Apr. 3, 2003; 68 FR 250, Jan. 5, 2004]

**§ 718.3   State committee responsibilities.**

(a) The State committees shall, with respect to county committees:

(1) Take any action required of the county committee, which the county committee fails to take in accordance with this part;

(2) Correct or require the county committee to correct any action taken by such committee, which is not in accordance with this part; or

(3) Require the county committee to withhold taking any action which is not in accordance with this part.

---

(a) Review county office rates for producer services to determine equity between counties;

(b) Determine, based on cost effectiveness, which counties will use aerial compliance methods and which counties will use ground measurement compliance methods; or,

(c) Adjust the per acre rate for acreage in excess of 35 acres to reflect the actual cost involved when performing measurement service from aerial slides or digital images.

**§ 718.4   Authority for farm entry and providing information.**

(a) A representative of FSA may enter any farm that participates in an FSA or CCC program in order to conduct a farm inspection as defined in this part. A program participant may request written authorization for the present written authorization for access to the farm. If a farm inspection is not allowed within 30 days of written authorization:

(1) All FSA and CCC program benefits for that farm shall be denied; and

(2) The person preventing the farm inspection shall pay all costs associated with the farm inspection.

(b) The entire crop production on the farm will be considered to be in excess of the quota established for the farm; and

(4) For tobacco, the farm operator must furnish proof of disposition of:

(i) All tobacco shown on the production above the marketing card issued with respect to such farm;

(ii) No credit will be given for disposing of excess tobacco other than that identified in a marketing card, unless disposed of in the presence of FSA, in accordance with §718.109 of this part.

---

(c) If a program participant refuses to furnish reports or data necessary to determine benefits in accordance with paragraph (a) of this section, or FSA determines that the report or data was erroneously provided through the lack of good faith, all program benefits relating to the report or data requested will be denied.

**§ 718.5   Rule of fractions.**

(a) Fractions shall be rounded after completion of the entire associated computation. All mathematical calculations shall be carried to two decimal places beyond the number of decimals required by the regulations governing each program. In rounding, fractional digits of 49 or less beyond the required number of decimal places shall be dropped if the fractional digit beyond the last required decimal place is four or less. Fractional digits of 50 or more, the figure at the last required decimal place shall be increased by "1" as follows:

| Required decimal | Computation | Result |
|---|---|---|
| Whole numbers | 6.49 (or less) | 6 |
| | 6.50 (or more) | 7 |
| Tenths | 7.649 (or less) | 7.6 |
| | 7.650 (or more) | 7.7 |
| Hundredths | 8.8449 (or less) | 8.84 |
| | 8.8450 (or more) | 8.85 |
| Thousandths | 9.83449 (or less) | 9.834 |
| | 9.83450 (or more) | 9.835 |
| 0 thousandths | 10.993149 (or less) | 10.99314 |
| | 10.993150 (or more) | 10.99315 |

**§ 718.6   Controlled substance.**

(a) The following terms apply to this section:

(1) USDA benefit means the issuance of any grant, contract, loan, or payment by an appropriated fund of the United States.

(2) Person means an individual.

(3) Notwithstanding any other provision of law, any person convicted under Federal or State law of:

## DEPARTMENT OF AGRICULTURE

## Commodity Credit Corporation

## Tobacco Transition Assessments

**AGENCY:** Commodity Credit Corporation, USDA.

**ACTION:** Notice.

**SUMMARY:** This notice sets forth the interpretation the Commodity Credit Corporation (CCC) will use in administering the regulations set forth at 7 CFR part 1463 with respect to the Tobacco Transition Assessments. Generally, under these regulations CCC must determine the market share of a tobacco product manufacturer or tobacco product importer as a percentage of six statutorily specified sectors of the tobacco trade. Based upon information provided to CCC in the conduct of administrative hearings held pursuant to 7 CFR 1463.11, CCC has determined that the manner in which it calculates this percentage is subject to more than one interpretation and, based upon the evidence provided at these hearings, has determined that changes to the calculation should be made beginning with assessments collected under 7 CFR part 1463 after January 1, 2006. However, this change will not apply to invoices issued February 1, 2006. These invoices will reflect corrections and other necessary adjustments associated with fiscal year 2005.

**FOR FURTHER INFORMATION CONTACT:** Misty Jones, Tobacco Division, Farm Service Agency (FSA), United States Department of Agriculture (USDA), Stop 0514, 1400 Independence Avenue, SW., Washington, DC 20250–0514. Phone: (202) 720–7413; e-mail: *Misty.Jones@wdc.usda.gov*. Persons with disabilities who require alternative means for communication (Braille, large print, audio tape, etc.) should contact the USDA Target Center at (202) 720–2600 (voice and TDD).

**Background**

Title VI of the American Jobs Creation Act of 2004 (Pub. L. 108–357) (the 2004 Act) repealed the marketing quota and acreage allotment (marketing quota) and price support programs for tobacco that were authorized by the Agricultural Adjustment Act of 1938 and the Agricultural Act of 1949, effective with the 2005 and subsequent crops of tobacco. Sections 622 and 623 of the 2004 Act establish a 10-year transitional payment program for tobacco producers and owners of tobacco marketing quotas who were affected by the termination of the marketing quota and price support

programs. Sections 625 through 627 of the 2004 Act established an assessment regime under which CCC collects assessments to fund the 10-year transitional payment program. Generally, these assessments are to be collected for 40 calendar quarters (2005–2014) and are based upon individual market shares of tobacco product manufacturers and importers within six sectors specified by the 2004 Act. The regulations issued by CCC with respect to these assessments were issued in a final rule published in the **Federal Register** on February 10, 2005 (70 FR 7007–7014). The purpose of this notice to advise tobacco product manufacturers and tobacco product importers that effective with assessment notices issued after January 1, 2006, CCC will determine such entities' market share within a sector as a percentage expressed to the sixth decimal point.

As explained below, section 625(a)(3) of the 2004 Act is ambiguous with respect to its directive in calculating entities' market shares. Section 625(b)(3) defines "market share" as follows:

*Market Share.*—The term "market share" means the share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product.

In implementing this provision, CCC construed "market share" to mean an entity's percentage of the market determined, for all products except cigars, by dividing the volume of gross taxable removals for the entity by the total removals for the sector for all entities reporting to CCC, and, for cigars, by dividing the excise taxes paid for each entity by the total excise taxes paid for all cigar manufacturers and importers. Accordingly, under CCC's initial interpretation, if there were 10 entities who equally comprised all of the market of a sector, each market share was expressed as 0.1000. CCC recognized that in using its initial method of calculating a market share of an entity that there could be a disproportionate impact on entities with market shares less than .0001 that reach the "cut-off point" in that entities with market shares from .00005 to .00009 would, due to rounding, each be deemed to have a .0001 market share. Thus, CCC provided that once this determination had been made as to which entities to include in the assessment, CCC would calculate the actual assessment for an entity to the ninth decimal point.

During the course of administrative hearings in which appellants contested the level of their assessments in the first

two quarters, it was brought to CCC's attention that this was not the only interpretation that could be given to the concept of expressing a market share to the "fourth decimal point". Appellants argued that a "market share" of 10 percent is more properly referred to in this example as 10.0000 percent and not .1000. The following is the written submission in support of this interpretation presented jointly by six of the entities subject to the assessment:

FETRA (the Fair and Equitable Tobacco Reform Act) assessments should be allocated based on *percentage* market shares expressed as decimals to the fourth place.

FETRA defines market share as the "share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product." This language, properly read, means that market share is to be calculated as a *percentage* share expressed to four decimal places. Accordingly, under FETRA, a manufacturer or importer should be required to pay an assessment unless its market share rounds to less than 00.0001% (which can also be written as .000001).

The USDA's first three assessment notices did not adopt this approach. Instead, the agency has exempted from assessment liability any company whose market share rounds to less than 00.01% (which can also be written as .0001). Consequently, there is a two-decimal place difference between the two approaches, which means that a company exempted from FETRA assessments under the USDA approach could have a market share as much as 100 times larger than the largest company exempted under the correct percentage share approach.

Under the USDA's approach, manufacturers and importers selling substantial quantities of tobacco products would avoid paying assessments—in direct violation of the clear statutory mandate of FETRA. As is explained below, if the data for the most recent quarterly assessment (for the April–June 2005 quarter) are annualized, the portion of the cigarette market, for example, that would be excused from paying any assessment would collectively amount to more than 9.5 million packs of cigarettes, representing sales revenues of more than $33 million.

By contrast, the percentage share approach limits the exemption to companies that legitimately can be viewed as having *de minimis* market shares, thereby effectuating the legislative intent that all manufacturers and importers must pay assessments. As explained below, the percentage share approach is supported by the language of FETRA and by analogous precedents.

Defining market share as a percentage expressed to the fourth decimal place is necessary to effectuate the clear purposes of FETRA.

FETRA imposes the following clear mandate: "The Secretary, acting through the Commodity Credit Corporation, shall impose quarterly assessments * * * on *each* tobacco product manufacturer and tobacco products

importer that sells tobacco products in domestic commerce in the United States * * *." 7 U.S.C. 518d(b)(1) (emphasis added). This language provides no discretion to exempt any manufacturers or importers.

The approach taken by USDA in the initial assessments violates this statutory mandate because it allows companies with substantial sales of cigarettes to avoid FETRA assessments. This point can be illustrated with the following example:

Assume a manufacturer had revenues of $850,000 in the fourth quarter of 2004. There is no rational basis for defining this company as a *de minimis* seller of cigarettes and exempting it from assessment:

• Revenue—$850,000.
• No. of packs sold (assuming $3.50 per pack) = 242,857.
• Taxes owed (FET at .39 per pack) = $94,714.23.
• Market share: [94,714/1,949,053,653] = 0.00004859486.

Under the approach used in the initial assessments, this company would be exempt from the payment of assessments because its market share is .000049, which rounds to .0000 (00.00%). However, if the percentage share approach is applied, the company would have to pay an assessment, since its market share—00.0049%—exceeds the threshold of 00.0001%.

As noted above, the approach used in the initial assessments will allow a significant portion of the cigarette market to remain exempt from assessment. On a per-company basis, this means that an individual manufacturer or importer could have annual sales of as much as 900,000 packs and revenues in excess of $3 million per year and still escape the payment of assessments. In contrast, under the approach described in this paper, the exemption would apply only to companies with annual sales less than approximately 9,000 packs and revenues less than approximately $32,000 per year—which appropriately can be viewed as de minimis. *Id.*

More importantly, the percentage of the market that USDA is exempting from assessment was more than doubled from the first assessment for the fourth quarter of calendar 2004 (companies selling 1,040,638 packs of cigarettes in this quarter exempted from assessment) to the assessment for April– June 2005 (companies selling 2,376,331 packs of cigarettes in this quarter exempted from assessment). This means that millions of packs of cigarettes per year will not be subject to assessment. For example, if the figures from the second calendar quarter of 2005 are projected on an annual basis, USDA's approach to FETRA will result in over 9.5 million packs of cigarettes, representing more than $33 million in revenue, being exempted from FETRA assessment. This is clearly inconsistent with the congressional mandate that USDA impose quarterly assessments on each tobacco product manufacturer and importer that sells tobacco products domestically in the United States. 7 U.S.C. 518d(b)(1).

Adopting the percentage share approach, and thus limiting any exemption to companies with truly *de minimis* market shares, achieves a number of important objectives by—

• More closely effectuating the statutory mandate to assess all manufacturers and importers;
• Leveling the playing field among competitors since no company with substantial sales would have the unfair advantage of an exemption;
• Substantially reducing the USDA's exposure in the likely event that companies subject to assessment are successful in persuading a court that USDA cannot assess them in excess of their true market shares to cover the shares of companies exempted from assessment liability; and
• Perhaps, by reducing the amount at issue, facilitating a resolution of the current market share cap issue short of litigation.

The percentage share approach is supported by the language of FETRA.

In another section of FETRA, Congress clearly uses the word "share" to denote *percentage* share. Thus, in describing how assessments are to be allocated among different classes of tobacco products in subsequent years, FETRA states that:

The Secretary shall periodically adjust the *percentage* of the total amount required under subsection (b) to be assessed against, and paid by, the manufacturers and importers of each class of tobacco product * * * to reflect changes in the *share of gross domestic volume* held by that class of tobacco product.

7 U.S.C. 518d(c)(2) (emphasis added). In this context, it is explicitly clear that the "share" of gross domestic volume is a *percentage share.*

The same section of FETRA uses the same term—"share"—when it defines the term "market share" as each manufacturer's "share * * * of the total volume of domestic sales of the class of tobacco product." This use of the same term is significant because "[i]t is a settled principle of statutory construction that '(w)hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.'" *United States v. Nunez,* 573 F.2d 769, 771 (2d Cir.), *cert. denied,* 436 U.S. 930 (1978), *quoting Meyer v. United States,* 175 F.2d 45, 47 (2d Cir. 1949), *quoting Lewellyn v. Harbison,* 31 F.2d 740, 742 (3d Cir.), *cert. denied,* 280 U.S. 560 (1929); *Arnold v. Eastern Air Lines, Inc.,* 712 F.2d 899, 904 (4th Cir. 1983).

Thus, when FETRA is read as a whole, the proper interpretation of "share" in section 518d(a)(3)—defining "market share"—is that it means a *percentage share* of the total market. Nothing in FETRA provides any basis for a different approach. Accordingly, when section 518d(a)(3) states that each manufacturer's or importer's "share" is to be expressed as a decimal to four places, it means that it should be expressed as a percentage share expressed to four decimal places.

Other federal agencies have interpreted statutory references to "market share" to mean a percentage share of the total market.

The Food, Drug and Cosmetic Act imposes limitations on the types of claims that can appear on food labels. Among other things, the labels on a food product cannot claim that it is low cholesterol unless "the level of cholesterol is substantially less than the level usually present in the food or in a food which substitutes for the food and which has a significant *market share* * * *." 21 U.S.C. § 343(r)(2)(A)(iii)(I) (emphasis added). The statute does not define market share. However, the FDA regulations define that term as a *percentage* of the total market:

If the product meets these conditions only as a result of special processing, alteration, formulation, or reformulation, the amount of cholesterol is reduced by 25 percent or more from the reference product it replaces as described in § 317.313(j)(1) and for which it substitutes as described in § 317.313(d) that has a *significant (e.g., 5 percent or more of a national or regional market) market* share. 9 CFR 317.362(d)(1)(v) (emphasis added). Clearly, the FDA interpreted the term market share using its ordinary and reasonable meaning of a percent of the total market.

The Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") requires EPA to re-register and assess fees for all pesticides initially registered prior to November 1, 1984. If more than one party sought to register the same active ingredient, the EPA would allocate the $150,000 fee based on each registrant's market share for that active ingredient. Specifically, FIFRA stated that:

[i]f two or more registrants are required to pay [a re-registration fee] with respect to a particular active ingredient, the fees for such an active ingredient shall be apportioned among such registrants on the basis of *market share* in United States sales of the active ingredient for the three calendar years preceding the payment of such fee.

7 U.S.C. 136a–1(i)(7) (emphasis added). The term "market share" is not explicitly defined in the statute or in the Agency's regulations. However, when EPA actually assessed each registrant's fee, it did so based upon its percentage share of the total market.

The courts have also interpreted the term "market share" to mean a percentage share.

For example, under the "market share liability" theory used in mass tort cases, "causation and damages are apportioned to defendants based on the *percentage of the product sold by each defendant* within the entire production of the product." *Wood v. Eli Lilly & Co.,* 38 F.3d 510, 513 (10th Cir. 1994) (emphasis added), *citing Sindell v. Abbott Labs.,* 607 P.2d 924, 937, *cert. denied,* 449 U.S. 912 (1980); *Martin v. Abbott Lab.,* 689 P.2d 368, 380 (Wash. 1984). *See also Bateman v. Johns-Manville Sales Corp.,* 781 F.2d 1132, 1133 (5th Cir. 1986) ("Each defendant could not make that exculpatory showing would then be held liable for a proportion of the judgment corresponding to its *percentage* share of the DES market") (emphasis added).

Similarly, in antitrust cases, when courts address market share, they are clearly viewing that term as a *percentage* of the total market at issue. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 213–14 (1993) (describing market share in terms of percentages); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 826 (6th Cir. 1982) ("Market strength is often indicated by market share. During the relevant period, Hilltop's market

share declined from approximately 40% to approximately 30%").''

As noted in the submission of the six appellants, the ambiguity in the 2004 Act stems from whether a "market share" refers to a "percentage share" determined to the fourth decimal point, e.g., is a 10 percent market share to be expressed as 10.000 or .10000?

Accordingly, under this approach the following "market shares" would be determined with respect to an entity comprising the following sizes of the sector:

| Size of sector | Market share in percent | Market share as fraction |
|---|---|---|
| **Assessments Levied** | | |
| All | 100.00000 | 1.0000000 |
| One tenth | 10.00000 | 0.1000000 |
| One hundredth | 1.00000 | 0.0100000 |
| One thousandth | 0.10000 | 0.0010000 |
| One ten-thousandths | 0.01000 | 0.0001000 |
| One hundred-thousandths | 0.00100 | 0.0000100 |
| One millionth | 0.00010 | 0.0000010 |
| **Assessments Not Levied For All Shares Less Than Nine Ten-millionths** | | |
| Nine ten-millionths | 0.00009 | 0.0000009 |

With respect to the assessments levied by CCC in a typical quarter with an assessment of $237.5 million, use of the interpretation set forth by these six appellants would likely produce the following changes for each sector:

### ADDITIONAL COMPANIES ASSESSED UNDER THE NEW METHOD FOR A TYPICAL $237.5 MILLION ASSESSMENT

| Class | Cigarettes | Cigars | Snuff | Roll-own | Chew | Pipe | Total |
|---|---|---|---|---|---|---|---|
| Number of Additional Companies Paying an Assessment | 20 | 57 | 4 | 4 | 1 | 2 | 88 |
| Assessment Collected from Above Companies | $105,928 | $4,752 | $45 | $48 | $3 | $9 | $110,784 |

Use of the interpretation set forth by these six appellants would also produce the following changes for two different sized companies:

### IMPACT OF CHANGE ON TWO DIFFERENT SIZED TOBACCO PRODUCT MANUFACTURERS

| | |
|---|---|
| **Share** | |
| Typical Quarterly Assessment: All kinds | $237,500,000 |
| Cigarettes' Share | 0.96331 |
| Typical Quarterly Assessment: Cigarettes | $228,786,125 |

### Big Company Example

| | |
|---|---|
| **New Method [1]** | |
| Big Company Share | 25.0000% |
| Big Company Quarterly Assessment | $57,196,653 |
| **Previous Method [2]** | |
| Big Company Share | 25.00% |
| Big Company Share recomputed after small companies dropped out) | 25.00729% |
| Big Company Quarterly Assessment | $57,213,210 |
| Big Company Savings | |
| Big Company savings per quarter | −$16,557 |

### Small Company Example

| | |
|---|---|
| **New Method [1]** | |
| Small Company Share | 0.0040% |

### IMPACT OF CHANGE ON TWO DIFFERENT SIZED TOBACCO PRODUCT MANUFACTURERS—Continued

| | |
|---|---|
| Small Company Quarterly Assessment | $9,151 |
| **Previous Method [2]** | |
| Small Company Share | 0.004% |
| Small Company Share Rounded Up | 0.000% |
| Small Company Share recomputed after small companies dropped out | — |
| Small Company Quarterly Assessment | $0 |
| Small Company Cost | |
| Small Company cost per quarter | $9,151 |

[1] Shares not recalculated after small companies drop out.
[2] Shares recalculated to 9 decimal places after small companies drop out.

### Interpretation

It is CCC's position that either interpretation is possible under section 625(b)(3) of the 2004 Act. But, in construing this section within the overall framework established by Congress, CCC has determined that use of the approach set forth by the six appellants provides a more accurate representation of an individual entity's share in each of the six statutorily-defined tobacco sectors. Accordingly, after January 1, 2006, when making determinations under 7 CFR parts 1463.1 through 1463.11 that relate to "market share," CCC will interpret such phrase to mean the percentage share of an entity's market position in one of the six individual tobacco product sectors specified in section 625(c) of the 2004 Act. In expressing this share to the fourth decimal point as provided in section 625(a)(3), for example, a market share of 1/10 of the market will be converted to 10.0000 percent and a market share of 1/10000 will be converted to .0100 percent. In addition, this approach is also consistent with the manner in which Congress has addressed the six sector segments of the tobacco industry. In section 625(c)(3) of the 2004 Act, for example, the share for manufacturers and importers of cigarettes of the overall tobacco industry for Fiscal Year 2005 is expressed as "96.331 percent" and not as .96331. As a result of this change, CCC will no longer further modify assessments to the ninth decimal point for individual companies within these six sectors.

Signed at Washington, DC November 30, 2005.

**Thomas B. Hofeller,**
*Executive Vice President, Commodity Credit Corporation.*

[FR Doc. E5–7030 Filed 12–7–05; 8:45 am]

BILLING CODE 3410–05–P

**EXHIBIT 10**


**USDA**

# Quarterly Assessment – March 1, 2005

## Commodity Credit Corporation (CCC)

SINGLE STICK, INC.
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

| Customer ID | Invoice Number | Assessment |
|---|---|---|
| SINGLESTIC01 | CR05100007A | $351,007.23 |

### Revised National Assessment Information

This assessment is pursuant to 7 U.S.C. 518 – 519 a.
National Quarterly Assessment for March 1, 2005

| Tobacco Class | Percent of Tobacco Sales | Assessment |
|---|---|---|
| A.   Cigarettes | 96.331 | $   228,151,135 |
| B.   Cigars | 2.783 | $       6,591,280 |
| C.   Snuff | 0.539 | $       1,276,572 |
| D.   Roll Your Own | 0.171 | $          404,998 |
| E.   Chewing Tobacco | 0.111 | $          262,893 |
| F.   Pipe Tobacco | 0.066 | $          156,315 |
| Total | 100.001 | $   236,843,193 |

### Calculations for Total Assessments

| | |
|---|---|
| 1/4 of the Annual TTPP Quota Holder/Producer Contract Payments | $  236,475,429 |
| 1/4 of FY05 Net Interest Due to CCC for TTPP Quota Holder/ Producer Contract Payments | $       365,396 |
| Total | $ 236,840,825 |

### Revised Assessment Class Information

#### Cigars

| Volume Reported October 2004 – December 2004 | |
|---|---|
| G.   Total Volume Reported by Class of Tobacco (1) | 1,715,979,965 |
| H.   Total Volume Reported by Your Company | 91,272,623 |
| I.   Your Company's Share (2)   (H/G=I) | .0532 |
| **March 1, 2005 Assessment** | |
| J.   Total Volume by Assessed Companies (3) | 1,713,934,581 |
| K.   Your Company's Share (3)   (H/J=K) | .053253271 |
| L.   Your Company's Assessment (4)   (B*K=L) | $351,007.23 |

### Notes

(1)   Total volume reported by all companies reporting to CCC for this class of tobacco

(2)   Rounded to 4 decimal places as required by 7 U.S.C. 518-519a

(3)   Excludes those companies with a market share of less than .0001 percentage.

(4)   Your Company's Share of the March 1, 2005 assessment multiplied by national quarterly assessment for class of tobacco.

## Additional Interest Will Accrue if Payment is Not Received by March 30, 2006
### Please See Statement for Transaction History and Total Amount Due

---

**Payment Information**
**Pay.gov** - All payments made by 8:00 p.m. EST through pay.gov will be credited that day.  Instructions for paying this invoice online using pay.gov can be found on the FSA web site at www.fsa.usda.gov/tobacco.

Wire transfer information is available by calling the NTPC.  Checks are accepted and will be credited on the day the check is received.  Please make checks payable to the Tobacco Trust Fund/CCC and mail them to NTPC, 1009 Lenox Drive, Suite 101 Bldg. 4, Lawrenceville, NJ 08648.

**Accounts with Outstanding Balances** - All payments received will be credited to any outstanding finance charges before being applied to the oldest outstanding invoice amount.

For additional information and/or questions, contact the National Tobacco Processing Center (NTPC) at (800) 673-2331.

**USDA**

# Quarterly Assessment – June 1, 2005

## Commodity Credit Corporation (CCC)

SINGLE STICK, INC.
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

| Customer ID | Invoice Number | Assessment |
|---|---|---|
| SINGLESTIC01 | CR05200005A | $472,017.47 |

### Revised National Assessment Information

This assessment is pursuant to 7 U.S.C. 518 – 519 a.
National Quarterly Assessment for June 1, 2005

| Tobacco Class | Percent of Tobacco Sales | Assessment |
|---|---|---|
| A. Cigarettes | 96.331 | $ 228,151,135 |
| B. Cigars | 2.783 | $ 6,591,280 |
| C. Snuff | 0.539 | $ 1,276,572 |
| D. Roll Your Own | 0.171 | $ 404,998 |
| E. Chewing Tobacco | 0.111 | 262,893 |
| F. Pipe Tobacco | 0.066 | 156,315 |
| Total | 100.001 | $ 236,843,193 |

### Calculations for Total Assessment

| | |
|---|---|
| 1/4 of the Annual TTPP Quota Holder/Producer Contract Payments | $ 236,475,429 |
| 1/4 of FY05 Net Interest Due to CCC for TTPP Quota Holder/ Producer Contract Payments | $ 365,396 |
| Total | $ 236,840,825 |

### Revised Assessment Class Information

#### Cigars

| Volume Reported January 2005 - March 2005 | |
|---|---|
| G. Total Volume Reported by Class of Tobacco (1) | 1,879,868,452 |
| H. Total Volume Reported by Your Company | 134,493,360 |
| I. Your Company's Share (2) (H/G=I) | .0715 |
| June 1, 2005 Assessment | |
| J. Total Volume by Assessed Companies (3) | 1,878,073,315 |
| K. Your Company's Share (3) (H/J=K) | .071612412 |
| L. Your Company's Assessment (4) (B*K=L) | $472,017.47 |

### Notes

(1) Total volume reported by all companies reporting to CCC for this class of tobacco

(2) Rounded to 4 decimal places as required by 7 U.S.C. 518-519a

(3) Excludes those companies with a market share of less than .0001 percentage.

(4) Your Company's Share of the June 1, 2005 assessment multiplied by national quarterly assessment for class of tobacco.

## Additional Interest Will Accrue if Payment is Not Received by March 30, 2006
## Please See Statement for Transaction History and Total Amount Due

**Payment Information**
**Pay.gov** - All payments made by 8:00 p.m. EST through pay.gov will be credited that day. Instructions for paying this invoice online using pay.gov can be found on the FSA web site at www.fsa.usda.gov/tobacco.

Wire transfer information is available by calling the NTPC. Checks are accepted and will be credited on the day the check is received. Please make checks payable to the Tobacco Trust Fund/CCC and mail them to NTPC, 1009 Lenox Drive, Suite 101 Bldg. 4, Lawrenceville, NJ 08648.

**Accounts with Outstanding Balances** - All payments received will be credited to any outstanding finance charges before being applied to the oldest outstanding invoice amount.

For additional information and/or questions, contact the National Tobacco Processing Center (NTPC) at (800) 673-2331.



# Quarterly Assessment – September 1, 2005

## Commodity Credit Corporation (CCC)

SINGLE STICK, INC.
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

| Customer ID | Invoice Number | Assessment |
|---|---|---|
| SINGLESTIC01 | CR05300004A | $1,135,353.46 |

### Revised National Assessment Information

This assessment is pursuant to 7 U.S.C. 518 – 519 a.
National Quarterly Assessment for September 1, 2005

| Tobacco Class | Percent of Tobacco Sales | Assessment |
|---|---|---|
| A. Cigarettes | 96.331 | $ 504,823,970 |
| B. Cigars | 2.783 | $ 14,584,351 |
| C. Snuff | 0.539 | $ 2,824,637 |
| D. Roll Your Own | 0.171 | $ 896,128 |
| E. Chewing Tobacco | 0.111 | $ 581,697 |
| F. Pipe Tobacco | 0.066 | $ 345,874 |
| Total | 100.001 | $ 524,056,657 |

### Calculations for Total Assessment

| | |
|---|---|
| 1/4 of the Annual TTPP Quota Holder/Producer Contract Payments | $ 236,475,429 |
| 1/4 of FY05 Net Interest Due to CCC for TTPP Quota Holder/ Producer Contract Payments | $365,396 |
| Tobacco Loan Pool Stock Disposal Losses through June 30, 2005 | $287,210,591 |
| Total | $ 524,051,416 |

### Revised Assessment Class Information

#### Cigars

| Volume Reported April 2005 - June 2005 | |
|---|---|
| G. Total Volume Reported by Class of Tobacco (1) | 2,075,055,728 |
| H. Total Volume Reported by Your Company | 161,407,980 |
| I. Your Company's Share (2)  (H/G=I) | .0778 |
| September 1, 2005 Assessment | |
| J. Total Volume by Assessed Companies (3) | 2,073,390,096 |
| K. Your Company's Share (3)  (H/J=K) | .077847377 |
| L. Your Company's Assessment (4)  (B*K=L) | $1,135,353.46 |

### Notes

(1) Total volume reported by all companies reporting to CCC for this class of tobacco

(2) Rounded to 4 decimal places as required by 7 U.S.C. 518-519a

(3) Excludes those companies with a market share of less than .0001 percentage.

(4) Your Company's Share of the September 1, 2005 assessment multiplied by national quarterly assessment for class of tobacco.

## Additional Interest Will Accrue if Payment is Not Received by March 30, 2006
## Please See Statement for Transaction History and Total Amount Due

---

**Payment Information**

**Pay.gov** - All payments made by 8:00 p.m. EST through pay.gov will be credited that day.  Instructions for paying this invoice online using pay.gov can be found on the FSA web site at www.fsa.usda.gov/tobacco.

Wire transfer information is available by calling the NTPC.  Checks are accepted and will be credited on the day the check is received.  Please make checks payable to the Tobacco Trust Fund/CCC and mail them to NTPC, 1009 Lenox Drive, Suite 101 Bldg. 4, Lawrenceville, NJ 08648.

**Accounts with Outstanding Balances** - All payments received will be credited to any outstanding finance charges before being applied to the oldest outstanding invoice amount.

For additional information and/or questions, contact the National Tobacco Processing Center (NTPC) at (800) 673-2331.

# USDA

# Quarterly Assessment – March 1, 2005
## Commodity Credit Corporation (CCC)

SINGLE STICK, INC.
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

| Customer ID | Invoice Number | Assessment |
|---|---|---|
| SINGLESTIC01 | CR05100007A | $351,007.23 |

| Revised National Assessment Information | | |
|---|---|---|
| This assessment is pursuant to 7 U.S.C. 518 – 519 a. National Quarterly Assessment for March 1, 2005 | | |
| Tobacco Class | Percent of Tobacco Sales | Assessment |
| A.  Cigarettes | 96.331 | $    228,151,135 |
| B.  Cigars | 2.783 | $    6,591,280 |
| C.  Snuff | 0.539 | $    1,276,572 |
| D.  Roll Your Own | 0.171 | $    404,998 |
| E.  Chewing Tobacco | 0.111 | $    262,893 |
| F.  Pipe Tobacco | 0.066 | $    156,315 |
| Total | 100.001 | $    236,843,193 |

| Calculations for Total Assessments | |
|---|---|
| 1/4 of the Annual TTPP Quota Holder/Producer Contract Payments | $  236,475,429 |
| 1/4 of FY05 Net Interest Due to CCC for TTPP Quota Holder/ Producer Contract Payments | $      365,396 |
| Total | $  236,840,825 |

| Revised Assessment Class Information | |
|---|---|
| Cigars | |
| Volume Reported October 2004 – December 2004 | |
| G.  Total Volume Reported by Class of Tobacco (1) | 1,715,979,965 |
| H.  Total Volume Reported by Your Company | 91,272,623 |
| I.  Your Company's Share (2) (H/G=I) | .0532 |
| March 1, 2005 Assessment | |
| J.  Total Volume by Assessed Companies (3) | 1,713,934,581 |
| K.  Your Company's Share (3)  (H/J=K) | .053253271 |
| L.  Your Company's Assessment (4) (B*K=L) | $351,007.23 |

| Notes |
|---|
| (1)  Total volume reported by all companies reporting to CCC for this class of tobacco |
| (2)  Rounded to 4 decimal places as required by 7 U.S.C. 518-519a |
| (3)  Excludes those companies with a market share of less than .0001 percentage. |
| (4)  Your Company's Share of the March 1, 2005 assessment multiplied by national quarterly assessment for class of tobacco. |

## Additional Interest Will Accrue if Payment is Not Received by March 30, 2006
## Please See Statement for Transaction History and Total Amount Due

**Payment Information**

**Pay.gov** - All payments made by 8:00 p.m. EST through pay.gov will be credited that day.  Instructions for paying this invoice online using pay.gov can be found on the FSA web site at www.fsa.usda.gov/tobacco.

Wire transfer information is available by calling the NTPC.  Checks are accepted and will be credited on the day the check is received.  Please make checks payable to the Tobacco Trust Fund/CCC and mail them to NTPC, 1009 Lenox Drive, Suite 101 Bldg. 4, Lawrenceville, NJ 08648.

**Accounts with Outstanding Balances** - All payments received will be credited to any outstanding finance charges before being applied to the oldest outstanding invoice amount.

For additional information and/or questions, contact the National Tobacco Processing Center (NTPC) at (800) 673-2331.

# Quarterly Assessment – June 1, 2005

## Commodity Credit Corporation (CCC)

SINGLE STICK, INC.
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

| Customer ID | Invoice Number | Assessment |
|---|---|---|
| SINGLESTIC01 | CR05200005A | $472,017.47 |

### Revised National Assessment Information

**This assessment is pursuant to 7 U.S.C. 518 – 519 a.**
National Quarterly Assessment for June 1, 2005

| | Tobacco Class | Percent of Tobacco Sales | Assessment |
|---|---|---|---|
| A. | Cigarettes | 96.331 | $ 228,151,135 |
| B. | Cigars | 2.783 | $ 6,591,280 |
| C. | Snuff | 0.539 | $ 1,276,572 |
| D. | Roll Your Own | 0.171 | $ 404,998 |
| E. | Chewing Tobacco | 0.111 | $ 262,893 |
| F. | Pipe Tobacco | 0.066 | $ 156,315 |
| | Total | 100.001 | $ 236,843,193 |

### Calculations for Total Assessments

| | |
|---|---|
| 1/4 of the Annual TTPP Quota Holder/Producer Contract Payments | $ 236,475,429 |
| 1/4 of FY05 Net Interest Due to CCC for TTPP Quota Holder/ Producer Contract Payments | $ 365,396 |
| Total | $ 236,840,825 |

### Revised Assessment Class Information
#### Cigars

| Volume Reported January 2005 – March 2005 | |
|---|---|
| G.  Total Volume Reported by Class of Tobacco (1) | 1,879,868,452 |
| H.  Total Volume Reported by Your Company | 134,493,360 |
| I.  Your Company's Share (2)  (H/G=I) | .0715 |
| June 1, 2005 Assessment | |
| J.  Total Volume by Assessed Companies (3) | 1,878,073,315 |
| K.  Your Company's Share (3)  (H/J=K) | .071612412 |
| L.  Your Company's Assessment (4)  (B*K=L) | $472,017.47 |

### Notes

(1) Total volume reported by all companies reporting to CCC for this class of tobacco

(2) Rounded to 4 decimal places as required by 7 U.S.C. 518-519a

(3) Excludes those companies with a market share of less than .0001 percentage.

(4) Your Company's Share of the June 1, 2005 assessment multiplied by national quarterly assessment for class of tobacco.

## <u>Additional Interest Will Accrue if Payment is Not Received by March 30, 2006</u>
## Please See Statement for Transaction History and Total Amount Due

**Payment Information**
**Pay.gov** - All payments made by 8:00 p.m. EST through pay.gov will be credited that day.  Instructions for paying this invoice online using pay.gov can be found on the FSA web site at www.fsa.usda.gov/tobacco.

Wire transfer information is available by calling the NTPC.  Checks are accepted and will be credited on the day the check is received.  Please make checks payable to the Tobacco Trust Fund/CCC and mail them to NTPC, 1009 Lenox Drive, Suite 101 Bldg. 4, Lawrenceville, NJ 08648.

**Accounts with Outstanding Balances** - All payments received will be credited to any outstanding finance charges before being applied to the oldest outstanding invoice amount.

For additional information and/or questions, contact the National Tobacco Processing Center (NTPC) at (800) 673-2331.

# Quarterly Assessment – September 1, 2005

## Commodity Credit Corporation (CCC)

SINGLE STICK, INC.
2046 W ROSE GARDEN LN
PHOENIX, AZ 85027

| Customer ID | Invoice Number | Assessment |
|---|---|---|
| SINGLESTIC01 | CR05300004A | $1,135,353.46 |

| Revised National Assessment Information | | |
|---|---|---|
| This assessment is pursuant to 7 U.S.C. 518 – 519 a. | | |
| National Quarterly Assessment for September 1, 2005 | | |
| Tobacco Class | Percent of Tobacco Sales | Assessment |
| A.   Cigarettes | 96.331 | $ 504,823,970 |
| B.   Cigars | 2.783 | $   14,584,351 |
| C.   Snuff | 0.539 | $     2,824,637 |
| D.   Roll Your Own | 0.171 | $        896,128 |
| E.   Chewing Tobacco | 0.111 | $        581,697 |
| F.   Pipe Tobacco | 0.066 | $        345,874 |
| Total | 100.001 | $   524,056,657 |

| Calculations for Total Assessments | |
|---|---|
| 1/4 of the Annual TTPP Quota Holder/Producer Contract Payments | $ 236,475,429 |
| 1/4 of FY05 Net Interest Due to CCC for TTPP Quota Holder/ Producer Contract Payments | $365,396 |
| Tobacco Loan Pool Stock Disposal Losses through June 30, 2005 | $287,210,591 |
| Total | $ 524,051,416 |

| Revised Assessment Class Information | |
|---|---|
| Cigars | |
| Volume Reported April 2005 – June 2005 | |
| G.   Total Volume Reported by Class of Tobacco (1) | 2,075,055,728 |
| H.   Total Volume Reported by Your Company | 161,407,980 |
| I.   Your Company's Share (2)  (H/G=I) | .0778 |
| September 1, 2005 Assessment | |
| J.   Total Volume by Assessed Companies (3) | 2,073,390,096 |
| K.   Your Company's Share (3)  (H/J=K) | .077847377 |
| L.   Your Company's Assessment (4)  (B*K=L) | $1,135,353.46 |

| Notes |
|---|
| (1)   Total volume reported by all companies reporting to CCC for this class of tobacco |
| (2)   Rounded to 4 decimal places as required by 7 U.S.C. 518-519a |
| (3)   Excludes those companies with a market share of less than .0001 percentage. |
| (4)   Your Company's Share of the September 1, 2005 assessment multiplied by national quarterly assessment for class of tobacco. |

## Additional Interest Will Accrue if Payment is Not Received by March 30, 2006
## Please See Statement for Transaction History and Total Amount Due

**Payment Information**

**Pay.gov** - All payments made by 8:00 p.m. EST through pay.gov will be credited that day. Instructions for paying this invoice online using pay.gov can be found on the FSA web site at www.fsa.usda.gov/tobacco.

Wire transfer information is available by calling the NTPC. Checks are accepted and will be credited on the day the check is received. Please make checks payable to the Tobacco Trust Fund/CCC and mail them to NTPC, 1009 Lenox Drive, Suite 101 Bldg. 4, Lawrenceville, NJ 08648.

**Accounts with Outstanding Balances** - All payments received will be credited to any outstanding finance charges before being applied to the oldest outstanding invoice amount.

For additional information and/or questions, contact the National Tobacco Processing Center (NTPC) at (800) 673-2331.