# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SINGLE STICK, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 06-1077 (RWR) |
| ) | |
| v. ) | |
| ) | |
| MICHAEL JOHANNS and the UNITED ) | |
| STATES DEPARTMENT OF ) | |
| AGRICULTURE, ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants Michael Johanns and the United States Department of Agriculture respectfully move this Court to dismiss plaintiff's complaint for failure to state a claim for relief. Points and authorities supporting defendants' motion are presented in the attached Memorandum in Support of Defendant's Motion to Dismiss.

Dated: August 30, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

JAMES J. GILLIGAN
Assistant Branch Director

   /s/ Peter J. Phipps
PETER J. PHIPPS
United States Department of Justice

Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants

2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SINGLE STICK, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 06-1077 (RWR)** |
| ) | |
| **v.** ) | |
| ) | |
| **MICHAEL JOHANNS and the UNITED** ) | |
| **STATES DEPARTMENT OF** ) | |
| **AGRICULTURE,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

**INTRODUCTION**

Plaintiff Single Stick, Inc. manufacturers small cigars and perceives that it has paid more

money in assessments under the Tobacco Transition Payment Program than is properly due.

Under those auspices, Single Stick sues the United States Department of Agriculture ("USDA")

under the Administrative Procedure Act (the "APA") to dispute USDA's calculations of Single

Stick's assessments.  Single Stick first challenges USDA's statutory interpretation of the Fair and

Equitable Tobacco Reform Act of 2004 (the "Reform Act"), which provides the method for

apportioning assessments under the Tobacco Transition Payment Program among the

manufacturers and importers of tobacco products.  Specifically, Single Stick contends that

assessments should be based on the weight of tobacco in cigars and not on the number of cigars;

that Single Stick's assessment exceeds its share of the cigar market; and that smuggled cigars

1

should be included in calculating Single Stick's market share.  Single Stick additionally sues for

production and correction of the underlying data that USDA relied on to calculate Single Stick's

assessment, claiming that USDA erred in denying Single Stick's Information Quality Act

("IQA") request for such production and correction.  These allegations do not state a claim for

relief, and Single Stick's complaint must be dismissed.

Single Stick's complaint is premised on a misinterpretation of the Reform Act.  The

Reform Act makes clear that cigar assessments are calculated on a 'per-stick' basis, meaning that

USDA measures the number of cigars removed from a warehouse or imported into domestic

commerce.  See 7 U.S.C. § 518d(g)(3)(A).  That same text leaves no room for Single Stick's

proposal that assessments should be calculated based on the weight of tobacco in cigars.  See id.

Nor does the per-stick calculation method subject Single Stick to an assessment greater than its

market share – cigar market share is also measured on a per-stick basis.  See id.  Single Stick's

argument to include smuggled cigars fails as well; the Reform Act states that assessments are

apportioned among manufacturers and importers, and smuggled cigars are not taken into account.

See 7 U.S.C. § 518d(e)(1).

Single Stick also fails to state a claim arising out of USDA's denial of Single Stick's

request under the IQA for production and correction of data that USDA used to calculate Single

Stick's assessment.  The IQA does not confer Single Stick the right to production or correction of

the underlying data.  See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006).  Nor does the

APA provide a remedy since under the IQA production and correction of data is "committed to

agency discretion," and thus beyond the APA's coverage.  See 5 U.S.C. § 701(a)(2); Heckler v.

Chaney, 470 U.S. 821, 830 (1985).  Moreover, the data that Single Stick seeks to have USDA

produce and correct comes from other cigar manufacturers' excise tax returns, and USDA is statutorily prohibited from releasing such information. See 26 U.S.C. §§ 6103(a), 7213; Church of Scientology of Cal. v. I.R.S., 484 U.S. 9, 18 (1987). Finally, neither the IQA nor any of the implementing guidelines allow for the correction of confidential information.

For these reasons, developed more fully below, Single Stick's complaint should be dismissed with prejudice for failure to state a claim for relief.

## STATUTORY AND REGULATORY BACKGROUND

The Fair and Equitable Tobacco Reform Act of 2004 (the "Reform Act") terminated tobacco price support programs and marketing quotas for tobacco growers. See Pub. L. No 108-357, 118 Stat. 1418, 1522 (Oct. 22, 2004). In place of those programs, the Reform Act creates the Tobacco Transition Payment Program, under which eligible tobacco quota holders and growers receive payments for ten years, not to exceed a total of $10.14 billion, from the Commodity Credit Corporation (the "CCC"), an agency within USDA. See generally 7 U.S.C. § 518a (providing for payments for tobacco quota holders), § 518b (providing for payments for producers of quota tobacco), § 518f (limiting the total amount of the expenditure to $10.14 billion). Unlike a typical subsidy or price support policy, the Tobacco Transition Program works by reimbursing the CCC for these payments from the funds collected through assessments on manufacturers and importers of tobacco products, which are made to the CCC and then deposited in the Tobacco Trust Fund. See 7 U.S.C. § 518d(d)(1); 7 C.F.R. § 1463.9. In essence, through these assessments, manufacturers and importers of tobacco products provide the funding for the monetary assistance that USDA, through the CCC, provides to tobacco quota holders and growers.

3

Under the Reform Act, the amounts of assessments on tobacco manufacturers and importers are determined through a two-step process. Under the first step ("Step A"), the CCC apportions the annual payment to tobacco quota holders and growers among the manufacturers and importers of six classes of tobacco products. See 7 U.S.C. § 518d(c)(1)-(2); § 518d(f); 7 C.F.R. §§ 1463.4, 1463.5. Those six classes are (i) cigarettes; (ii) cigars; (iii) snuff; (iv) roll-your-own tobacco; (v) chewing tobacco; and (vi) pipe tobacco. See 7 U.S.C. § 518d(c)(1); 7 C.F.R. § 1464.5. For example, the manufacturers and importers in the cigar class were responsible for 2.783 per cent of the total assessment in 2005. See 7 U.S.C. § 518d(c)(1)(B). After determining the liability for each of the six classes of tobacco products, the second step ("Step B") is to pro rate each class's assessment among the manufacturers and importers in that class, so that each manufacturer or importer's assessment is proportional to its market share for that class. See 7 U.S.C. § 518d(e)(1); 7 C.F.R. § 1463.7. For the cigar class, that pro ration is done based on the number of cigars "removed" into commerce, see 7 U.S.C. § 518d(g)(3)(A), 7 C.F.R. § 1463.7(b)(1), with the data for the number of cigars coming from excise tax reports of the manufacturers and importers, see 7 U.S.C. § 518d(h); 7 C.F.R. § 1463.7(b)(1). The pro rated share is essentially a market share determination, calculated to the fourth decimal place by dividing the number of cigars from a particular manufacturer or importer by the total number of cigars removed or imported into the domestic market. See 7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(c); see also 7 U.S.C. § 518d(a)(3) (providing that market share is to be determined to the fourth decimal place); *Tobacco Transition Assessments*, 70 Fed. Reg. 7279-81 (Dec. 8, 2005) (interpreting "fourth decimal place" to mean fourth decimal place when expressed as a percentage). The resulting percentage of market share is then multiplied by the total assessment

4

due for the cigar class to determine each manufacturer or importer's assessment.  <u>See</u> 7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(a)-(b).

If a manufacturer or importer disputes the amount of its assessment, the Reform Act and the implementing regulations provide an administrative mechanism to challenge an assessment. Within 30 days of receiving notice of the assessment, a manufacturer or importer may submit a written statement to the CCC that sets forth the basis for the disputed assessment.  <u>See</u> 7 U.S.C. § 518d(i)(1); 7 C.F.R. § 1463.11(a).  Following the written submission, an informal hearing takes place wherein a hearing officer will develop an administrative record through oral and written evidence sufficient to render a final determination on the disputed matter.  <u>See</u> 7 C.F.R. § 1463.11(b).  After the hearing, the CCC will then issue a final administrative decision.  <u>See</u> 7 C.F.R. § 1463.11(c).  If the manufacturer or importer disagrees with the results of that hearing, it may seek review of the determination in United States District Court.  <u>See</u> 7 U.S.C. § 518d(j)(1); 7 C.F.R. § 1463.11(d).

## PRIOR ADMINISTRATIVE HISTORY

Single Stick initiated administrative proceedings with USDA regarding its March 1, 2005, and June 1, 2005, assessments due under the Reform Act.  (<u>See</u> Compl., Ex. 4.)  On November 17, 2005, a hearing was held with regard to those assessments, and a final administrative determination issued on February 8, 2006.  (<u>See</u> <u>id.</u>, Ex. 9, at 1.)  That final administrative decision addressed several questions raised in this litigation.  USDA answered whether all assessments in the cigar class should be determined on a per-stick basis or whether large cigars and small cigars should be treated differently.  After examining the relevant law, the USDA hearing officer concluded that the Reform Act directs that all cigars, both large cigars and

5

small cigars, should be assessed on a per-stick basis.  (See id., Ex. 9, at 2-4.)  The USDA hearing officer also concluded that USDA's calculation of Single Stick's market share was correct, and that Single Stick's assessment did not exceed its market share.  (See id., Ex. 9, at 4-7.)

Beyond that administrative hearing, Single Stick also tried to gain access to USDA's primary source data used to calculate the total number of cigars removed into commerce.  Single Stick sought that information, which, as noted above, comes from excise tax returns, by requests under the Freedom of Information Act ("FOIA") and under the Information Quality Act (the "IQA"), both dated September 13, 2005.  (See id., Ex. 7 (denying the FOIA request); id., Ex. 8.)  USDA denied Single Stick's FOIA request explaining that the information Single Stick sought was protected by statute, which prohibits disclosure of excise tax return information.  (See id., Ex. 7 (citing to 26 U.S.C. § 6103).)  Having informed Single Stick of the statutory prohibition on releasing the excise-tax data, USDA did not separately respond to Single Stick's IQA petition, which sought production and correction of the underlying primary source data.  Single Stick did not pursue its FOIA request further, but Single Stick interpreted the lack of a specific response to its IQA request as a denial of that request.  (See id., Ex. 8.)

Single Stick then proceeded to file the present complaint challenging USDA's reading of the Reform Act, as upheld by the hearing officer, and USDA's denial of its IQA request for production and correction of primary source data from excise tax returns.

## SINGLE STICK'S COMPLAINT

In its complaint, Single Stick challenges USDA's calculation of Single Stick's assessments due under the Reform Act, and seeks declaratory and injunctive relief on the basis of USDA's alleged over-assessments.  (Compl. at ¶ 1; id. at pp. 12-13.)  Single Stick's challenges

fall into two tiers.  First, Single Stick disputes USDA's interpretation of the Reform Act's methodology for determining Single Stick's market share within the cigar class (a challenge to Step B of the assessment process).  Second, Single Stick demands that USDA produce the underlying primary source data and correct that data, which Single Stick alleges is incorrect.

Single Stick first disputes that the Reform Act requires that cigar assessments be calculated on a per-stick basis.  Rather, Single Stick contends that cigar assessments should be based on the amount of tobacco contained in cigars.  Single Stick argues that because small cigars do not contain as much tobacco as large cigars, small cigars should not be treated the same as large cigars for purposes of the assessments due under the Reform Act.  (Id. at ¶¶ 19, 21-22, 39-41, 44(a)(i), (iv).)  Consequently, Single Stick contends that USDA should take this disparity into account when calculating assessments for small cigars.  (Id.)  Single Stick additionally argues that it has been assessed without regard for the statutory limitation, which prevents its assessment from exceeding its share of gross domestic volume.  (Id. at ¶¶ 16, 44(a)(ii), (b).)  Single Stick further complains that USDA's method for determining cigar assessments should account for smuggled cigars and that it does not do so.  (Id. at ¶¶ 35, 44(a)(iii).)

Single Stick's next tier of challenges is unrelated to the methodology for determining the amounts of the assessments.  Instead, it is premised on the Information Quality Act (the "IQA") and seeks production and correction of the primary source data (which consists of information from excise tax returns) that USDA used to calculate Single Stick's assessment.  (Id. at ¶¶ 23, 29, 44(d)-(e).)  Specifically, Single Stick goes on to seek a declaration and order that USDA must produce the underlying primary source data that USDA used to calculate total market volume for the cigar market.  (Id. at ¶¶ 25, 36, 44(c).)  Single Stick further complains that USDA violated the

7

IQA by not correcting the primary source data, which Single Stick alleges is incorrect.  (Id. at

¶¶ 27-29, 44(c), (e), (f).)

## ARGUMENT

### A.  Standards of Review

#### 1.    Standard of Review for a Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism for testing the legal

sufficiency of the factual allegations in a plaintiff's complaint.  See Browning v. Clinton, 292

F.3d 235, 242 (D.C. Cir. 2002).  Under this rule, a court treats the complaint's factual allegations

as true and draws all reasonable inferences in plaintiff's favor.  See Harris v. Ladner, 127 F.3d

1121, 1123 (D.C. Cir. 1997); Alexis v. District of Columbia, 44 F. Supp. 2d 331, 336-37 (D.D.C.

1999).  However, a court "need not accept inferences drawn by [a plaintiff] if such inferences are

unsupported by the facts set out in the complaint."  Kowal v. MCI Communications Corp., Inc.,

16 F.3d 1271, 1275 (D.C. Cir. 1994).  The scope of the court's evaluation of the sufficiency of

the factual allegations is limited to "only the facts alleged in the complaint, any documents either

attached to or incorporated in the complaint and matters of  . . . judicial notice."  E.E.O.C. v. St.

Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  Moreover, the Rule 12(b)(6)

pleading standard applies only to factual allegations, and does not apply to "legal conclusions

cast in the form of factual allegations."  Kowal, 16 F.3d at 1275.

To survive a motion to dismiss, the complaint "must set forth sufficient information to

suggest that there is some recognized legal theory upon which relief can be granted."  District of

Columbia v. Air Florida, Inc., 750 F.2d 1077, 1078 (D.C. Cir. 1984).  Those allegations must be

"neither vague nor conclusory" and must "cover all the elements that comprise the theory for

relief." <u>ASA Accugrade, Inc. v. Am. Numismatic Ass'n</u>, 370 F. Supp. 2d 213, 215 (D.D.C.

2005) (quoting <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 201-02 (4th Cir. 2002)).  Consistent

with that standard, "[a] court must dismiss a complaint where, even assuming all the factual

allegations are true, the plaintiff has failed to establish a right to relief based upon those facts."

<u>Gregg v. Barrett</u>, 771 F.2d 529, 547 (D.C. Cir. 1985); <u>see also</u> <u>Weyrich v. The New Republic,</u>

<u>Inc.</u>, 235 F.3d 617, 623 (D.C. Cir. 2001).

### 2.     Standard of Review for a Federal Agency's Statutory Interpretation.

Federal agencies are provided significant deference in their interpretation of statutes.  The

Supreme Court has "long recognized that considerable weight should be accorded to an executive

department's construction of a statutory scheme it is entrusted to administer, and the principle of

deference to administrative interpretations."  <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council,</u>

<u>Inc.</u>, 467 U.S. 837, 844 (1984).  Under principles of <u>Chevron</u> deference, a court's first step in

analyzing an agency's statutory interpretation is to determine whether the statute unambiguously

forbids the agency's interpretation.  <u>See</u> <u>Barnhart v. Walton</u>, 535 U.S. 212, 218 (2002); <u>see also</u>

<u>Chevron</u>, 467 at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the

court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress."); <u>Northpoint Tech., Ltd v. Fed. Communications Comm'n</u>, 412 F.3d 145, 151 (D.C.

Cir. 2005).  Where the agency's reading of a statute is not plainly incorrect, a court then

evaluates whether the agency's interpretation is "based on a permissible reading of the statute."

<u>Chevron</u>, 467 at 843.  In resolving that question, a court "must defer to a reasonable

interpretation by the agency charged with its implementation."  <u>Barnhart v. Thomas</u>, 540 U.S. 20,

26 (2003); <u>see also</u> <u>Safe Food & Fertilizer v. Envtl. Prot. Agency</u>, 350 F.3d 1263, 1268 (D.C.

Cir. 2004) ("Unless the statute resolves the issue, we must uphold [the agency's interpretation] so long as its interpretation is reasonable."). Thus, under <u>Chevron</u> deference, unambiguous statutes receive their plain meaning, but for statutes that are silent or ambiguous, an agency's reasonable interpretation controls.

A federal agency receives such <u>Chevron</u> deference when "Congress delegates authority to the agency to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27 (2001). USDA's interpretation of the Reform Act receives such <u>Chevron</u> deference because Congress delegated rule-making authority to USDA in several ways, such as by providing the Secretary with the abilities to promulgate regulations, <u>see</u> 7 U.S.C. § 519a, to administer the Tobacco Transition Payment Program by imposing quarterly assessments, <u>see</u> § 518d(b)(1), to assess additional amounts to cover insufficiencies, <u>see</u> § 518d(c)(3), and to determine the volume of domestic sales for tobacco manufacturers and importers, <u>see</u> § 518d(g)(1). <u>See</u> <u>Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs.</u>, 125 S.Ct. 2688, 2699 (2005) (explaining that an agency qualifies for <u>Chevron</u> deference where the statute delegates powers to enforce and execute the statute as well as to prescribe rules and regulations under the statute). Thus, to the extent that any ambiguities or gaps exist in the Reform Act, USDA's interpretations of those will carry the force of law provided that they are reasonable.

**B.      USDA's method of calculating the amount of Single Stick's assessment (as alleged) is fully consistent with the Reform Act, thus Single Stick fails to state a claim for relief.**

Single Stick's first challenge is to USDA's reading of the Reform Act for purposes of calculating assessments on individual cigar manufacturers (a challenge to USDA's reading of

Step B of the assessment process). Such a statutory interpretation dispute is governed by principles of <u>Chevron</u> deference. As explained below, USDA's reading of the Reform Act is in accord with its plain language. However, even if the Reform Act were ambiguous, USDA's interpretation has a solid foundation in the text of the statute and, under <u>Chevron</u> principles, would be permissible. Therefore, Single Stick's challenge to USDA's interpretation of the Reform Act fails to state a claim for relief.

> **1.    USDA's per-stick method of calculating Single Stick's market share of the cigar market is in perfect accord with the statutory directive of 7 U.S.C. § 518d(g).**

Single Stick complains that USDA, through the CCC, improperly interprets the Reform Act by assessing cigar manufacturers on a per-stick basis. While Single Stick may, as a policy matter, dispute the method of assessment, that disagreement alone does not state a claim for relief here, where USDA's method for calculating assessments on cigar manufacturers is fully consistent with the Reform Act.

According to the Reform Act's terms, assessments will be levied upon the manufacturers and importers of "each class of tobacco product," with cigar manufactures and importers being initially responsible for 2.783 per cent of the total assessment. 7 U.S.C. § 518d(c)(1)(B). In determining how much of that portion each cigar manufacturer or importer must pay, the Reform Act specifies that assessments are determined by multiplying the manufacturer or importer's market share within a class of tobacco products by the total assessment due for that class of tobacco products. 7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(a); <u>see also</u> 7 U.S.C. § 518d(e)(1) (providing that assessments within classes will be done on a pro rata basis). As defined, "the term 'market share' means the share of each manufacturer or importer of a class of tobacco

products (expressed as a decimal to the fourth place) of the total volume of domestic sales of the

class of tobacco product . . . ." 7 U.S.C. § 518d(a)(3); 7 C.F.R. § 1463.3.  The Reform Act then

explains that "volumes of domestic sales" for cigars will be measured on a per-stick basis:

> For purposes of the calculations under this subsection and the certifications under
> subsection (h) by the Secretary, ***the volumes of domestic sales shall be measured
> by*** --
>> (A)    ***in the case of cigarettes and cigars, the number of cigarettes and
>> cigars***; and
>> (B)    in the case of the other classes of tobacco products specified in
>> subsection (c)(1), in terms of the number of pounds, or fraction
>> thereof, of those products.

7 U.S.C. § 518d(g)(3) (emphasis added); see also 7 C.F.R. § 1463.7(b)(1).  The referenced

certifications under subsection (h) are certified copies of excise tax returns from each

manufacturer or importer of tobacco products that are submitted to the Secretary for purposes of

calculating assessments.  See 7 U.S.C. § 518d(h)(1)-(2).

Thus, as specified by the Reform Act's directives, assessments for cigar manufacturers

are calculated by "the volumes of domestic sales . . . measured by . . . the number of . . . cigars."

7 U.S.C. § 518d(g)(3)(A).  That is precisely the process that USDA is alleged to have followed –

it used a per-stick (i.e., per cigar) measure to apportion assessments among members of the cigar

class.  (See Compl. at ¶ 19; id., Ex. 9, at 2 ("CCC computes a cigar manufacturer's or importer's

market share based on the actual number of cigars each manufacturer or importer placed in

domestic commerce as compared to the total number of cigars placed in commerce.").)  In other

words, by determining volume of domestic sales and market share based on the number of cigars,

USDA complied with the Reform Act's unambiguous provisions.  Consequently, Single Stick

states no claim against USDA for using a per-stick method to calculate cigar assessments.

2.      **Single Stick's proposed methods of calculating market share are contrary to the Reform Act and do not state a claim for relief.**

a.      **Single Stick is wrong as a matter of law that its market share should be assessed based on the amount of tobacco contained in its cigars.**

In contravention of the Reform Act's provisions, Single Stick seeks to have its assessments determined by the weight of tobacco in its cigars. That proposed method of assessment directly contradicts the plain terms of the Reform Act. As explained above, the text of § 518d(g)(3) dictates that Reform Act assessments are based on the number of cigars, and not on the weight of the tobacco in the cigars. See 7 U.S.C. § 518d(g)(3); see also 7 C.F.R. § 1463.7(b)(1). Moreover, USDA considered this argument at the administrative hearing and rejected it as contrary to the Reform Act. (See Compl., Ex. 9, at 4.) Thus, Single Stick's argument that the weight of tobacco in the cigars should be the basis for the assessment is contrary to the Reform Act and should be dismissed.

b.      **As a matter of law, Single Stick is not assessed in excess of its share of domestic volume.**

Single Stick next attempts to find refuge in § 518d(e)(2), which states that "[n]o manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume." 7 U.S.C. § 518d(e)(2). Specifically, Single Stick argues that determining its Reform Act assessment on a per-stick basis leads to an assessment that is greater than its share of domestic volume. This argument may be summarily rejected. As explained above, the Reform Act makes clear that the volume of domestic cigar sales will be determined on a per-stick basis. 7 U.S.C. § 518d(g)(3). Because USDA determines Single Stick's share of domestic cigar sales volume through the same per-stick

13

measurement, it is not assessing Single Stick an amount greater than Single Stick's share of domestic volume.

### c. Smuggled cigars are not to be included in the assessment calculation as a matter of law.

Single Stick also argues that smuggled cigars should be taken into account in determining the amount of its Reform Act assessment. This argument fails for two reasons.

First, the Reform Act provides a method for calculating assessments that does not include smuggled cigars. As set forth in § 518d(e)(1), the amount of the assessment for each class of tobacco product "shall be allocated on a pro rata basis ***among the manufacturers and importers*** based on each manufacturer's or importer's share of gross domestic volume." 7 U.S.C. § 518d(e)(1) (emphasis added). By these terms, manufacturers and importers – and not smugglers – are responsible for the assessments for each cigar class, even assuming the presence of non-negligible amount of smuggled cigars (a fact that Single Stick does not allege).

Second, the Reform Act provides that the only mandatory source of data for determining the amount of the assessments will be data provided from manufacturers and importers. Under § 518d(g)(1), the calculations "shall be made by the Secretary based on information provided by the manufacturers and importers pursuant to subsection (h), as well as any other relevant information provided to or obtained by the Secretary." 7 U.S.C. § 518d(g)(1). Thus, it is proper for the Secretary to rely only on the primary source excise tax data provided by the manufacturers and importers in determining the amount of the Reform Act assessments. See 7 U.S.C. § 518d(h)(1)-(2); 7 C.F.R. § 1463.7(b)(1). The Reform Act authorizes, but does not require, the Secretary to obtain any further information, and the decision as to what additional information

14

would be "relevant" is left to the Secretary's discretion.  And, as specified in regulation, the Secretary has chosen to rely on "reports filed by domestic manufacturers and importers of tobacco . . . ."  7 C.F.R. § 1463.7(b); see also 7 U.S.C. § 518d(h) (requiring manufacturers and importers to submit certified copies of their excise tax return forms to USDA).  Under Chevron principles, this statutory deference to the Secretary means that the ensuing regulation, 7 C.F.R. § 1463.7(b)(1), carries the force of binding law.  See Mead Corp., 533 U.S. at 227 (explaining that a regulation pursuant to an express delegation of authority "is binding on the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to statute").

Adding further credence to the legitimacy of USDA's non-inclusion of smuggled cigars are the omissions in Single Stick's complaint.  Single Stick has not alleged that USDA has access to data for the number or weight of tobacco in smuggled cigars.  (Cf. Compl., Ex. 9, at 5 ("CCC has no way to compute an accurate assessment amount with regard to non-reporting cigar companies and, therefore, cannot include the non-reporting companies in the assessment calculation."))  Nor has Single Stick alleged that USDA would have a viable means of levying Reform Act assessments against smugglers.

In sum, § 518d(e)(1) and § 518d(g)(1), taken separately or together, leave little doubt that the Reform Act does not require USDA to account for smuggled cigars in calculating assessments.  Moreover, to the extent that any ambiguities do exist in these statutes, they must be resolved in USDA's favor under Chevron deference, since USDA has a reasonable basis for its reading of the Reform Act.  See Barnhart v. Thomas, 540 U.S. at 26; Safe Food & Fertilizer, 350 F.3d at 1268.  Consequently, Single Stick has no claim that smuggled cigars should be somehow included in calculating Reform Act assessments.

**C.**     **As a matter of law, the Information Quality Act does not provide a basis to sue a federal agency for production and/or correction of underlying primary source data.**

Single Stick attempts to sue under the Information Quality Act (the "IQA") for USDA's alleged failures to produce and to correct the underlying primary source data used to determine the amount of Single Stick's Reform Act assessments.  This count fails because the IQA does not create a legal right to recovery.  See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006).  Additionally, Single Stick is prevented from seeking recovery under the APA, because under the IQA, an agency's management of its information quality is "committed to agency discretion" and thus is outside the scope of APA review.  5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 830 (1985); Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 602-03 (E.D. Va. 2004) (holding that due to a lack of meaningful standards, the APA does not allow suits claiming violations of the IQA), *aff'd on other grounds*, Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006).

**1.**     **Statutory and Regulatory Background for the Information Quality Act.**

The Information Quality Act was enacted as a rider to appropriations legislation for the 2001 fiscal year, and is encoded as a note to 44 U.S.C. § 3516.  See Pub. L. No. 106-554, Tit. V, § 515, 114 Stat. 2762A-153 (Dec. 21, 2000); see also 44 U.S.C. § 3516 (note).  The IQA contains two principal commands.  First, it directs the Office of Management and Budget ("OMB") to "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code . . . ."  Pub. L. No. 106-554, Tit. V, § 515(a), 114 Stat. 2762A-153-54.  Second, the IQA requires OMB to include three directives in its guidelines to federal

16

agencies:  that they (i) develop their own information quality guidelines within one year of the

issuance of OMB's guidelines; (ii) establish administrative mechanisms allowing affected

persons to seek correction of information that does not comply with OMB's guidelines; and

(iii) report periodically to OMB on complaints they receive.  Pub. L. No. 106-554, Tit. V,

§ 515(b)(2), 114 Stat. 2762A-154.

In accordance with the IQA, OMB issued guidance to federal agencies regarding the

information that they disseminate to the public.  See *Guidelines for Ensuring and Maximizing the*

*Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies;*

*Republication*, 67 Fed. Reg. 8452 (Feb. 22, 2002).[1]  OMB's guidance contained each required

element, see 67 Fed. Reg. 8452, 8458, § II, and provided additional policy and procedural

guidance as well, including guidance in the area of confidential information, see id. at 8460,

§ V(3)(b)(ii)(B).  OMB summarized the extent of the obligations that its guidelines imposed on

agencies as follows: "agencies need only ensure that their own guidelines are consistent with

these OMB guidelines, and then ensure that their administrative mechanisms satisfy the standards

and procedural requirements in the new agency guidelines."  See id. at 8453.

Pursuant to OMB's guidance, USDA issued guidelines for information that it

disseminates to the public.  See *USDA Quality of Information Guidelines* (available at

http://www.ocio.usda.gov/qi_guide/index.html).  USDA's guidelines contain assurances as to the

---

[1]  The February 2002 guidelines are the most recent; OMB had previously issued
guidelines and proposed guidelines for notice and comment.  See *Guidelines for Ensuring and*
*Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by*
*Federal Agencies*, 66 Fed. Reg. 49718 (Sept. 28, 2001); *Proposed Guidelines for Ensuring and*
*Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by*
*Federal Agencies,* 66 Fed. Reg. 34489 (June 28, 1001).

quality of the information that USDA will disseminate to the public.  For instance, these guidelines state that "USDA will strive to ensure and maximize the quality, objectivity, utility, and integrity of the information that its agencies and offices disseminate to the public."  Id.  As with the OMB guidance, USDA's guidelines also express concern for preserving confidential information.  Id.

> **2.     The IQA does not create a right to either the production or the correction of agency information.**

Single Stick attempts to use the IQA as a basis for suing USDA for failure to produce and correct underlying primary source data.  This count fails because the IQA does not create a legal right to agency information or its correctness.

In evaluating whether a statute creates an enforceable right, a court examines the text and structure of the statute to determine whether it displays an intent to create such a right.  See Gonzaga Univ. v. Doe, 536 U.S. 273, 286 (2002); Alexander v. Sandoval, 532 U.S. 275, 288 (2001).

The IQA does not create an enforceable right because it lacks evidence of a congressional intent to do so.  The IQA sets forth a regulatory framework between federal agencies.  Under the IQA, OMB will issue guidance for other federal agencies to follow with respect to information that they disseminate to the public.  See Pub. L. No. 106-554, Tit. V, § 515(a), 114 Stat. 2762A-154.  Those federal agencies will in turn have three administrative responsibilities: to issue guidelines regarding the information quality, to establish administrative mechanisms for correction of the information, and to make periodic reports to OMB.  See Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154.  This focus on federal agency regulation leaves no

doubt that the IQA does not create an enforceable right, as the Supreme Court explained, "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" Alexander, 532 U.S. at 289 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). Furthermore, the text of the IQA does not focus on individuals or a class of individuals that it seeks to protect.[2] And, in focusing on the duties of federal agencies, particularly OMB, the IQA contains no rights-creating language, "critical to showing the requisite congressional intent to create new rights." Gonzaga Univ., 536 U.S. at 287. In sum, the IQA, like the statute at issue in Alexander v. Sandoval, "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating." 532 U.S. at 289. Accordingly, the IQA similarly fails to create an enforceable legal right.[3]

Consistent with this conclusion, every court to consider whether the IQA creates a legal right to production or correction of information has concluded that the IQA creates no such right. See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006); Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 601 (E.D. Va. 2004); In re Operation of the Missouri River Sys., 363 F. Supp. 2d 1145, 1174-75 (D. Minn. 2004), vacated in part and aff'd in part on other grounds, 421 F.3d 618 (8th

---

[2] The only mention that the IQA makes of persons affected is in § 515(b)(2) when it requires each agency to establish mechanisms for affected persons to seek correction of that information. Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154. Here again, Alexander v. Sandoval is instructive as to the significance of this reference to administrative mechanisms for affected persons: "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Alexander, 532 U.S. at 290. Thus, by providing administrative mechanisms for affected persons, the IQA forecloses the possibility that it also creates a separately enforceable legal right for those persons.

[3] Without a legal right to information or its correctness under the IQA, USDA's denial of such information to Single Stick does not violate the Due Process Clause.

Cir. 2005).  As the Fourth Circuit summarized, the IQA "does not create a legal right to access to information or to correctness."  Salt Inst. v. Leavitt, 440 F.3d at 159.  In short, the IQA does not confer any legal rights to a private entity such as Single Stick.[4]

### 3.     The IQA cannot form the basis for a suit under the APA for production and correction of agency information.

Nor can Single Stick sue for an alleged violation of the IQA through an APA action. While the APA protects against agency action that is "arbitrary, capricious, an abuse of discretion of otherwise not in accordance with the law," Donnelly v. Fed. Aviation. Admin., 411 F.3d 267, 271 (D.C. Cir. 2005) (quoting Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854, 856 (D.C. Cir. 1988)), Single Stick does not state such a claim here.  Because the IQA does not provide Single Stick with a right to the production or correction of agency information, see Salt. Inst. v. Leavitt, 440 F.3d at 159, USDA could not be acting arbitrarily, capriciously, or contrarily to law by not producing or correcting the primary source excise tax data.  Standing alone, that reason prevents Single Stick from using the IQA as a basis to sue under the APA for production or correction of agency information.  Put another way, because both an enforceable right and mechanism to remedy that right are required to sue the sovereign, the possibility that the APA may provide a remedy means nothing where the IQA does not provide the underlying right.  See Gonzaga Univ., 536 U.S. at 283-84; Alexander, 532 U.S. at 286.

---

[4]  Because the IQA does not create a legal right to information or its correctness, Single Stick is unable to satisfy the injury in fact requirement for Article III standing.  See Salt Inst., 440 F.3d at 159 ("because [the IQA,] does not create a legal right to access to information or to correctness, appellants have not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy Article III.").  Without Article III standing, Single Stick's IQA challenge could alternatively be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction.

Nonetheless, the remedies available under the APA are not available for an IQA challenge because the APA does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A matter is "committed to agency discretion by law" when the governing law "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985); see also Steenholdt v. Fed. Aviation Admin., 314 F.3d 633, 638 (D.C. Cir. 2003) ("If no 'judicially manageable standard' exists by which to judge the agency's action, meaningful judicial review is impossible and the courts are without jurisdiction to review the action." (quoting Heckler, 470 U.S. at 830)). In addition, "courts have been especially inclined to regard as unreviewable those aspects of agency decisions that involve a considerable degree of expertise or experience . . . ." Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 579 (3d Cir. 1979).

Here, neither the IQA, nor the OMB guidance, nor USDA's guidelines provide a meaningful standard against which to evaluate USDA's decisions with respect to production or correction of information. The IQA speaks in broad and general terms, requiring guidance from OMB "for ensuring and maximizing the quality, objectivity, utility, and integrity" of agency information. See Pub. L. No. 106-554, Tit. V, § 515(a), (b)(2)(A), 114 Stat. 2762A-153-54. The IQA does not define the precise contours of these general concepts. See id. Continuing that trend, the OMB guidance disavows any effort to create a meaningful standard by which the IQA will be applied. Rather, OMB explains that it did not issue "detailed, prescriptive, 'one-size-fits-all' government-wide guidelines that would artificially require different types of dissemination activities to be treated in the same manner." 67 Fed. Reg. at 8452. Moreover, the OMB

guidance instructs that information quality "is to be ensured and established at levels **appropriate** to the nature and timeliness of the information to be disseminated."  67 Fed. Reg. at 8459 (emphasis added).  Thus, OMB's guidance is expressly deferential to an agency's conclusions as to the "appropriate" response, without attempting to prescribe standards for determining the level or criteria for "appropriate" information quality.  Id.  Similarly, USDA's guidelines are written at a conceptual level, without a meaningful standard: "USDA will strive to ensure and maximize the quality, objectivity, utility, and integrity of the information that its agencies and offices disseminate to the public."  *USDA Quality of Information Guidelines: General Requirements* (available at http://www.ocio.usda.gov/qi_guide/index.html).  Thus, beyond these general exhortations, the IQA and its implementing guidelines do not provide judicially manageable standards to evaluate USDA's decisions under the IQA.  And as explained above, without a set of judicially manageable standards, the APA does not afford a right to judicial review of agency decisions regarding the production and correction of agency information.  See Salt Inst. v. Thompson, 345 F. Supp. 2d at 602-03; In re Operation of the Missouri River Sys., 363 F. Supp. 2d at 1175; see also Heckler, 470 U.S. at 830; Steenholdt, 314 F.3d at 633.

In sum, Single Stick cannot use the APA to sue for the alleged violations of the IQA because the IQA creates no substantive rights, and even if it did, the production and correction of agency information is "committed to agency discretion" and thus excluded from the APA's coverage.

22

**D.      Even if Single Stick could legally proceed under the APA for alleged IQA violations, Single Stick nevertheless fails to state a claim for relief.**

**1.      Single Stick does not state a claim for production of the underlying primary source data.**

Single Stick complains that even if a per-stick calculation method is appropriate, USDA nonetheless wrongly denied Single Stick's IQA request for production of the underlying primary source data used to determine Single Stick's share of the cigar market.  (See, e.g., Compl., at ¶¶ 23, 29, 44(e).)

Even if Single Stick could proceed with an IQA action, it would still fail to state a claim because USDA is statutorily precluded from releasing the primary source data, which consists of information reported in excise tax returns.  USDA determined the amounts of Single Stick's Tobacco Transition Payment Program assessments based on excise tax data that it receives from cigar manufacturers.  See 7 U.S.C. § 518d(h)(1)-(2); 7 C.F.R. § 1463.7(b)(1); see also 26 U.S.C. § 5703(b)(1).  USDA aggregates this data for all cigar manufacturers and notifies cigar manufacturers of those totals and their share of those totals.  (See, e.g., Compl., Ex. 4).  But, by reason of explicit statutory prohibition, USDA cannot provide more information because any additional information would reveal excise tax return information from each and every cigar manufacturer.  See 26 U.S.C. § 6103(a) ("No officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise under the provisions of this section."); 26 U.S.C. § 7213 ("It shall be unlawful for any officer or employee  of the United States . . . willfully to disclose to any person, except as authorized in this title, any return or return information."); see also Church of Scientology of Cal. v. I.R.S., 484 U.S. 9, 18 (1987) (holding

that § 6103 precludes disclosure of individualized tax return information); King v. I.R.S., 688 F.2d 488, 490-94 (7th Cir. 1982) (same). Because individualized tax return information cannot be released, Single Stick has no right to the underlying excise tax information from the other cigar manufacturers.[5]  In short, Single Stick's request for information beyond the totals for the cigar market is statutorily precluded by § 6103(a), and thus Single Stick states no claim for relief for production of that data.

**2.    Nor does Single Stick state a claim for correction of the underlying primary source data.**

Even if Single Stick could proceed under the IQA, it would still not be able seek correction of the allegedly incorrect underlying cigar market-share data because that data is confidential and thus exempt from correction.[6]

Confidential information is excluded from the scope of the IQA.  The text of the IQA requires OMB to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained *and disseminated* by the agency *that does not comply with [OMB's guidelines]*."  Pub. L. No. 106-554, Tit. V, § 515(b)(2)(B), 114 Stat. 2762A-154.  Most basically, Single Stick's claim fails because the primary source excise tax information that it seeks is not publicly disseminated.  See 67 Fed. Reg. at 8460 (explaining that dissemination means "agency initiated or sponsored distribution of information to the public").

---

[5]  Because Single Stick does not facially challenge the constitutionality of the statutory prohibition on disclosing tax return information, USDA's actions consistent with the statute cannot be deemed to violate the Due Process Clause.

[6]  Nonetheless, USDA reviewed its primary source data and calculations and affirmed the accuracy of those results.  (See Compl., Ex. 9, at 6 (finding that "the data used and the methodology applied in CCC's computation of market shares complies with the provisions of the 2004 Act."))

Indeed, public dissemination of such information is expressly prohibited by statute as discussed above. <u>See</u> 26 U.S.C. §§ 6103(a), 7213. It is therefore outside of the scope of the IQA.

Additionally, the IQA does not require the establishment of an administrative mechanism to correct all information that a federal agency disseminates – only that information that does not comply with OMB's guidelines. And, the OMB guidelines do not elevate the interests in correction of information above the compelling interests in preserving confidential information:

> With regard to analytic results related thereto, agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public.

* * *

> ***However, the objectivity standard does not override other compelling interests such as privacy, trade secrets, intellectual property, and other confidentiality provisions.***

<u>See</u> *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. at 8460, § V(3)(b)(ii)(B) (emphasis added). Thus, the OMB guidance makes clear that "compelling interests" in the preservation of confidential information – such as a statutory mandate to do so – take precedence over the public's right to the correction of that information. Hence, the preservation of confidential information, such as excise tax returns, is fully compliant with OMB's guidance and is not subject to the IQA's provisions regarding administrative mechanisms for information correction.

Furthermore, USDA's guidelines echo OMB's respect for confidential information by explaining that "USDA agencies and offices will maintain the integrity of confidential information and comply with the statutory requirements to protect the information it gathers and

25

disseminates." <u>See</u> *USDA Quality of Information Guidelines: General Requirements* (available at http://www.ocio.usda.gov/qi_guide/index.html).  Similarly, the USDA guidelines condition the release of underlying primary source data upon preserving the confidentiality of that information: "To the extent possible, ***consistent with the confidentiality protections***, USDA agencies and offices will identify the source of the information so that the public can assess whether the information is objective." <u>Id.</u>  By these terms, it is clear that USDA's guidelines do not elevate correction of information above confidentiality concerns.

Put succinctly, neither the IQA, nor OMB's guidance, nor USDA's guidelines provide a mechanism for seeking correction of confidential information.  Accordingly, even if the IQA provided Single Stick with a right to correction of information that was subject to judicial review under the APA – which it does not – Single Stick still would not state a claim for correction of underlying confidential primary source data.

### CONCLUSION

For the foregoing reasons, plaintiff Single Stick does not state a claim for relief, and defendants' motion to dismiss should be granted.

Dated: August 30, 2006                    Respectfully submitted,

                                          PETER D. KEISLER
                                          Assistant Attorney General

                                          KENNETH L. WAINSTEIN
                                          United States Attorney

                                          JAMES J. GILLIGAN
                                          Assistant Branch Director

                                             /s/ Peter J. Phipps
                                          PETER J. PHIPPS
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          Tel: (202) 616-8482
                                          Fax: (202) 616-8470
                                          peter.phipps@usdoj.gov

                                          Mailing Address:
                                          Post Office Box 883
                                          Washington, D.C.  20044

                                          Courier Address:
                                          20 Massachusetts Ave., N.W.
                                          Washington, D.C. 20001

                                          Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 30, 2006, I caused signed copies of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and the attached Memorandum in Support to be served on Reed D. Rubinstein, Esq., Greenberg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, DC 20006, by hand-delivery.  Also, on August 30, 2006, I filed electronic versions of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and the attached Memorandum in Support through the CM/ECF case management electronic case filing system administered by the United States District Court, District of Columbia, which I understand will complete electronic service on Mr. Rubinstein as well.

/s/ Peter J. Phipps
Peter J. Phipps