IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| SINGLE STICK, INC. | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No: 06-1077 (RWR) |
| | ) |
| MICHAEL JOHANNS, and the UNITED | ) |
| STATES DEPARTMENT OF | ) |
| AGRICULTURE | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF SINGLE STICK, INC.'S REPLY
TO DEFENDANT'S MOTION TO DISMISS
PURSUANT TO RULE 12(b)(6)**

Dated: September 11, 2006

Respectfully submitted,

REED RUBINSTEIN
DONALD STEIN

Greenberg Traurig LLP
800 Connecticut Avenue, N.W.
Washington, DC 20006
202/331-3100
RubinsteinR@gtlaw.com
SteinD@gtlaw.com

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

ARGUMENT ............................................................................................................ 7

I.      THE STANDARD OF REVIEW ..................................................................... 7

      A.     The Standard For A 12(b)(6) Motion ......................................... 7

      B.     The Standard For Statutory Interpretation/Chevron Deference ................. 8

II.     PARAGRAPH 44(a) STATES A CLAIM ........................................................ 10

      A.     The DOA's Stick Count Assessment Violated the Reform Act ............... 10

      B.     The DOA Should Have Counted For Smuggled Cigars ............................ 14

III.    PARAGRAPHS 44(c) - (d) STATE A CLAIM ................................................. 15

      A.     The Language And History IQA ................................................ 15

      B.     SSI Has Enforceable IQA Rights .............................................. 18

      C.     IQA Correction Is Not Entrusted Solely To Agency Discretion ............. 22

      D.     The DOA May Not Hide Behind "Confidentiality" ................................ 24

CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

Arizona, et al., v. Tommy G. Thompson, 281 F. 3d 248  (D.C. Cir. 2002) ......................9

Alexander v. Sandoval, 532 US, 275 (2001)................................................................19

American Hosp. Ass'n v. Bowen, 834 F. 2d 1037 (D.C. Cir. 1987)................................16

American Min. Congress v. Mine Safety & Health Admin.,
995 F. 2d 1106 (D.C. Cir. 1993)................................................................................16

American Trucking Ass'ns v. E.P.A., 175 F.3d 1027 (D.C. Cir. 1999)...........................24

Appalachian Power Co. v. E.P.A., 208 F. 3d 1015 (D.C. Cir. 2000) ..............................16

Barnhart v. Walton, 535 U.S. 212 (2002)......................................................................9

Bennett v. Spear, 520 U.S. 154 (1987).......................................................................22

Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667 (1986) ...............................22

Bragdon v. Abbott, 524 U.S. 627 (1998)......................................................................11

CC Distributor, Inc. v. United States, 883 F.2d 146 (D.C. Cir. 1989) ...........................23

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
467 U.S. 837 (1984) ..............................................................................................8,9

Chemical Mfrs. Ass'n v. EPA,  919 F. 2d 158 (D.C. Cir. 1990) ......................................9

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) .................................23

Chrysler Corp. v Brown, 441 U.S. 281 (1979)................................................................16

Cooper Indus. Inc., v. Aviall Servs. Inc., 543 U.S. ___ (2005)..........................................8

Cort v. Ash, 422 US 66 (1975).....................................................................................19

Federal Election Comm'n v. Akins, 524 U.S. 11 (1998) ...............................................18

Government of Guam v. American President Lines, 28 F. 3d 142 (DC Cir. 1994)..........19

Halverson v. Slater, 129 F. 3d 180  (D.C. Cir. 1997).......................................................8

Hechler v. Chaney, 470 U.S. 821 (1985)......................................................23

Holloway v. United States, 526 U.S. 1 (1999) ...............................................8

Japan Whaling Ass'n. v. American Cetacean Soc., 478 U.S. 221 (1986)........................22

Leather Ind. of America v. E.P.A., 40 F.3d 392 (D.C. Cir. 1994) ...................................24

Lincoln v. Vigil, 508 U.S. 182 (1993) .............................................................23

In Re: Operation of the Missouri River System Litig,, 363 F. Supp. 2d. 1145
(D. Minn. 2004)........................................................................................22

Park v. Hyatt Corp., 436 F. Supp. 2d 60 (D.D.C. 2006) ..............................................7

PDK Labs. Inc., v. D.E.A., 362 F. 3d 786 D.C. Cir. 2004)............................................14

Professional Reactor Operator Soc. v. N.R.C., 939 F. 2d 1047 (DC Cir. 1991)...............18

Rapanos et ux., et al. v. United States, ___ U.S. ___ (2006).................................8

Reiter v. Sonotone Corp., 442 U.S. 330 (1979).............................................8

Salt Institute v. Leavitt, 440 F. 3rd 156 (4th Cir. 2006) .......................................20

Transitional Hosps. Corp. of La. v. Shalala, 222 F. 3d 1019 (D.C. Cir. 2000).................9

Tax Analysts v. I.R.S., 214 F. 3d 179 (D.C. Cir 2000) ...................................18

## Statutes and Rules

5 U.S.C. § 701 ......................................................................................15

5 U.S.C. § 706 ......................................................................................7

7 U.S.C. §518d .................................................................................*passim*

12 U.S.C. § 5702 ...................................................................................3

44 U.S.C. § 3516 ..............................................................................*passim*

P.L. No. 93-109 ...................................................................................1

Fed. R. Civ. P. 12(b)(6) .........................................................................7

## Other Authorities

67 Fed. Reg. 845 (Feb. 22, 2000) ............................................................................*passim*

70 Fed. Reg. at 7008 (Feb. 10, 2005) ................................................................4,5

92 Cong. Rec. 2148 (1946) ....................................................................................18

H.R. Report No. 105-595 (1998)............................................................................21

James W. Conrad, The Information Quality Act- Antiregulatory Costs of Mythic
Proportions?, 12 Kan. J.L & Pub. Pol'y 521  (2003) ..........................................20

Letter from Rep. Thomas Bliley to OMB (May 20, 1999)
(www.thecre.com/quality/letter-blibley-lew.html)...............................................21

Letters from Rep. Jo Ann Emerson to OMB (May 6, 1999)
(www.thecre.com/quality/letter-emerson-lew.html...............................................21

Letter from Rep. Jo Ann Emerson to OMB (March 20, 2000)
(www.thecre.com/quality/EmersonLetter20000320.html)....................................21

Letter from John T. Spotila to Rep. Jo Ann Emerson (April 18, 2000)
(www.thecre.com/ quality/2004102_letter.htm) ..................................................22

"Explaining CCC cigar policy,"
(http://askfsa.cvushelp.com ..............................................................................*passim*

## INTRODUCTION

This case raises matters of first impression under the Fair and Equitable Tobacco Reform Act (the "Reform Act"), U.S.C. § 518d et seq. (Ex. 1), and matters of first impression in this Circuit under the Information Quality Act, 44 U.S.C. § 3516, note (the "IQA") (Ex. 2).

Plaintiff Single Stick, Inc. ("SSI") is a cigar manufacturer and importer, selling primarily "small" or "little" cigars, defined as cigars containing less than three pounds of tobacco per thousand units or "sticks." See Complaint ("Cmpl.") at ¶ 5 (Ex. 3).[1]  SSI has sued the defendants because: (1)  they violated the Reform Act; (2) denied SSI's administrative appeal, contrary to the preponderance of the information demonstrating that the Department of Agriculture ("DOA") Tobacco Transition Payment Program ("TTPP") assessments were incorrect;[2] (3) willfully violated SSI's IQA, statutory, and due process rights; and (4) wrongfully discriminated against SSI and others similarly situated.  Cmpl. at ¶¶ 43, 44(a) - (f).

The defendants have moved to dismiss Complaint paragraphs 44(a), and (c)-(d) for failure to state a claim.  See Memo. in Supp. of Def. Mot. to Dismiss Pursuant to Rule 12(b)(6) at 2 (August 30, 2006)("Def. Memo") (Ex. 4).[3]  They assert the DOA's TTPP

---

[1] Historically, federal law and regulators have distinguished between small and large cigars for tax and regulatory purposes because cigars contain different amounts of tobacco.  See Cmpl. ¶ 18. For example, the Federal Trade Commission distinguishes between "Little Cigars" which contain less than 3 lbs of tobacco per 1,000,  "Medium Cigars" containing 3 to 10 lbs of tobacco per 1,000, and "Large Cigars" containing more than 10 lbs of tobacco per 1,000.  See P.L. 93-109.

[2] 7 U.S.C. § 518d(j)(3) states the Court "shall" restrain collection of an assessment unsupported "by a preponderance of the information available to the Secretary."

[3] The sufficiency of paragraphs 44(b)(the DOA arbitrarily and capriciously over-estimated SSI's market share), 44(e)(the DOA violated SSI's statutory and due process rights by

assessments were fully consistent with the Reform Act. (Def. Memo 11-15.)  Yet, in the
face of the plain language of 7 U.S.C. § 518d(e)(1) providing assessments "shall be
allocated on a pro rata basis...based on each [company's] share of gross domestic
volume," the DOA has assessed SSI far in excess of its pro rata share, wrongfully
burdening SSI with a potential $25 million liability.  (Cmpl. ¶¶ 2(b), 31-33, 40-41.)[4]
Congress guaranteed all cigar companies fair and equitable treatment by prohibiting
assessments in excess of a company's pro rata share of the total volume of cigars
removed into commerce.  The DOA has thus violated both the letter and spirit of the law.

The defendants also claim the DOA may violate the IQA with impunity, for SSI
has no IQA rights. (Def. Memo at 16.) Yet, in the face of the IQA's plain language
directing the defendants to provide an administrative process through which SSI can
exercise its right to "seek and obtain" correction of information that does not meet IQA
standards, the DOA asserts Congress did not mean what it said, offering only a
transparently baseless, post-hoc justification for ignoring SSI's IQA Petition. (Def.
Memo at 6.)[5]  Through IQA, Congress created a meaningful informational right, subject

---

refusing to make information available), 44(f)(the DOA improperly denied SSI's appeal),
and 44(g)(wrongful discrimination) have not been challenged.

[4]The DOA ignored the Reform Act's plain language, overturning the statutory scheme,
by disconnecting cigar assessments from gross domestic volume.  As a result, it assessed
cigar tobacco used by SSI at the effective rate of $1.68 - $1.82 per pound, while assessing
tobacco used in large cigars at the rate of only $0.08 - $0.25 per pound.  (Cmpl. ¶ 22.)

[5] The defendants claim: "Having informed [SSI] of the statutory prohibition on releasing
the excise tax data, the [DOA] did not separately respond to [SSI's] IQA petition, which
sought production and correction of the underlying source data" regarding market share.
(Def. Memo at 6.)  However, "excise tax data" was not the subject of SSI's IQA Petition,
and could not have been the justification for the defendants' refusal to respond: as stated
on the defendants' own website, the DOA *did not use excise taxes to assess cigar
companies.* See "Explaining CCC cigar policy," (http://askfsa.custhelp.com)("Cigar

to judicial review and enforcement under the traditional mechanisms of the Administrative Procedure Act ("APA"). The defendants' refusal to follow its own guidelines, and acknowledge SSI's IQA rights, cannot be justified.

The defendants' motion is meritless and should be denied.

## BACKGROUND

The Reform Act authorized the DOA to levy and collect TTPP assessments from tobacco companies. (Cmpl. ¶ 12.) All tobacco products were placed into one of six classes - cigarettes, cigars, snuff, "roll your own", chewing tobacco, and pipe tobacco - and the DOA was directed to apportion the total TTPP obligation between classes based on respective shares of "gross domestic volume,"[6] defined as the volume of tobacco "removed."[7] See 7 U.S.C. § 518d(a)(2); 7 U.S.C. § 518d(c); (Cmpl. ¶ 13.) TTPP assessments within each class are based on each company's "market share;"[8] Congress, however, specifically prohibited the DOA from assessing a tobacco company in excess of its pro rata share of the gross domestic volume for its particular class. 7 U.S.C. § 518d(e)(2); (Cmpl. ¶ 16.)

---

Policy")(Ex. 5). Instead, the DOA used "volume, rather than taxes paid, as the metric for calculating market shares in the cigar product category." Id.

[6] "Gross domestic volume" is defined at 7 U.S.C. § 518d(a)(2).

[7] "Removed" is defined at 7 U.S.C. § 518d(a)(2)(A) by reference to 26 U.S.C. § 5702(k), and means "[T]he removal of tobacco products or cigarette papers or tubes from the factory or from internal revenue bond under section 5704...and...the smuggling or other unlawful importation of such articles into the United States."

[8] "Market Share" is defined at 7 U.S.C. § 518d(a)(3) as the share "of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment under this section."

The DOA used the amount of paid excise taxes - taxes levied based on tobacco volume - as a gross domestic volume surrogate for apportioning TTPP liability between classes. See 70 Fed. Reg. at 7008 (Feb. 10, 2005)(Table 1) (Ex. 6); (Cmpl.¶ 18.) [9]  A single excise tax rate applied to pipe tobacco, chewing tobacco, snuff, roll your own, which are sold by weight.  A single excise tax rate also applied to cigarettes, because cigarettes sold in the U.S. each contain basically the same amount of tobacco (for this reason, a cigarette stick count also yields a reasonably reliable estimate of gross domestic volume).  In all of these cases, the amount of taxes paid directly correlated to gross domestic volume.  See Cigar Policy at 1.  ("For all products, excluding cigars, a constant tax rate per unit results in exactly the same calculation whether volume or taxes paid is used in the formula").

Cigars had to be treated differently.  Id.  As the DOA recognized, cigars, although sold in sticks like cigarettes, contain very different amounts of tobacco; one large cigar might contain more tobacco that twenty or more small cigars.  (Cmpl. ¶ 18); see also Cigar Policy at 2.  Small cigars are roughly uniform in size and weight, and taxed at a common rate.  Large cigars vary in size and weight, and are taxed at the rate of 18.063% of sales price, capped at $48.75 per thousand.  (Ex. 6); see 26 U.S.C. § 5701(a).Thus, the DOA could not rely on either a single excise tax rate or a stick count to reliably measure gross domestic volume.

Consequently, consistent with historic practice (and the Reform Act's plain language), the DOA separated small and large cigars into separate categories, measured

---

[9] Cigarettes were allocated 96.331% and cigars 2.783% of the TTPP bill, with the balance allocated among the four other classes.  (Cmpl. ¶ 14); 7 U.S.C. § 518d(c)(1).

both "total quantity" of sticks sold and "estimated taxes" (applying the differential tax rates) on volume, and then aggregated the information to determine the proportion of the cigar class assessment for each sector. According to the DOA, small cigars accounted for approximately 35% of the total cigar sticks sold, but only approximately 2% of the cigar sector's gross domestic volume. 70 Fed. Reg. at 7008 (Table 1); (Cmpl. ¶ 14.)

SSI began receiving TTPP assessments in early 2005. The DOA calculated these assessments by taking the number of cigars SSI sold divided by the DOA's estimated total number of individual cigars sold in the United States without accounting for the fact that small cigars remove far less tobacco than large cigars. See (Cmpl. ¶ 19.) Consequently, SSI was assessed far in excess of its pro rata share of gross domestic volume. The DOA's estimate for the period December 2004 - June 2005 exceeded SSI's market share, as measured by its share of the total amount of excise taxes paid by all cigar manufacturers (6.83% v. 0.79%), and by SSI's best estimates based on the A.C. Nielsen "point of sale" survey data (4.81% - 7.78% v. 1.05% - 2.5%). (Cmpl. ¶¶ 20, 21, 24-25, 30-32.)[10]

SSI timely appealed each excessive assessment. (Cmpl. at ¶ 24.) While its appeals were pending, SSI filed a Freedom of Information Act ("FOIA") Request and an IQA Petition (Ex. 7) requesting that the DOA disclose or correct, as appropriate, the raw data, statistical methods, and information the DOA used to calculate the total number of cigars sold. SSI requested the data to reproduce and test the DOA's statistical determinations, and to help prove it had been unlawfully assessed. (Cmpl. ¶ 26.) The

---

[10]SSI was assessed $339,719.00 for the period October 2004 - December 2004, based on an alleged market share of 4.81%; $455,374.00 for the period January 2005 - March 2005, based on an alleged market share of 6.45%; and $1,152,530.00 for the period April 2005-June 2005, based on an alleged market share of 7.78%. (Cmpl. ¶ 20.)

DOA denied SSI's FOIA Request, alleging that tax information was specifically excluded from FOIA disclosure, while ignoring SSI's IQA Petition and Request for Reconsideration. (See Cmpl. ¶¶ 26-27); (Def. Memo at 6.) Consequently, SSI was unable to evaluate, or (as events later proved) to effectively challenge the DOA's assessments. (Cmpl. ¶ 29.)

At its November 17, 2005 hearing, SSI argued that the DOA's failure to link cigar assessments to pro rata shares of gross domestic volume violated the Reform Act. SSI also introduced uncontroverted evidence that the A.C. Nielsen survey data was recognized as the best available information on market share in the industry, and demonstrated that the DOA over-estimated SSI's market share. (Cmpl. ¶¶ 31-32.) The DOA did not introduce any evidence either refuting the A.C. Nielsen data or supporting the accuracy and reliability of its own market share estimate. (Cmpl. ¶ 33.)

SSI's appeal was substantially denied.[11]  See Letter from John A. Johnson to Reed D. Rubinstein (February 8, 2006)("DOA Decision")(Ex. 8).  Acknowledging that SSI "may be philosophically well founded" to argue the inequity of assessing small cigars as if each stick contained the same volume of tobacco as contained in a large cigar, the DOA ruled Congress mandated such an outcome. (Ex. 8 at 4); (Cmpl. ¶ 34.)  It held SSI's FOIA request was "outside the scope of this review as it pertains to the appeal of the assessment," while again ignoring SSI's IQA Petition and Request for Reconsideration.

---

[11] The DOA affirmed SSI's appeal "to the extent [DOA] will perform a recalculation and reconciliation of the (2005) assessments." This recalculation and reconciliation was slated to occur due to the DOA's admitted failure to meet Reform Act requirements in the initial round of assessments which, in turn, caused the DOA to underestimate the number of cigars sold, and thereby improperly inflate SSI's pro rata share. Even so, the recalculation failed Reform Act requirements because the DOA erroneously ignored 7 U.S.C. §518d(a)(2)'s requirement that all removed tobacco, including cigars smuggled or unlawfully imported into the United States, be counted. (Cmpl. ¶ 35.)

Contrary to all the evidence, the DOA erroneously determined that SSI had failed to demonstrate harm due to its inability to obtain information and stated: "The fact that [SSI] was unable to obtain, review, and scrutinize the underlying data used to calculate market shares does not mean [SSI's] assertions are well-founded nor does it render the data incorrect." Finally, the DOA arbitrarily and capriciously determined "[Single Stick] has made no sustainable argument that the data relied on…was incorrect or used improperly…" (Cmpl. ¶ 36.)

On or about March 1, 2006, Single Stick received recalculated assessments. The DOA raised Single Stick's estimated market share for October-December 2004 from 4.81% to 5.32%, and increased the assessment due to $351,007.23, raised Single Stick's estimated market share for January - March 2005 from 6.45% to 7.15%, and increased the assessment due to $472,017.47, and maintained Single Stick's estimated market share for April - June 2005 at 7.78%, but reduced the assessment demanded to $1,135,353.46. (Cmpl. ¶ 38.)

## **ARGUMENT**

I.     THE STANDARD OF REVIEW

      A.     <u>The Standard For A 12(b)(6) Motion.</u>

A Rule 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. <u>Park v. Hyatt Corporation</u>, 436 F. Supp. 2d 60, 62 (D.D.C. 2006)(citations and internal quotation marks omitted). Dismissal is proper only when, taking the material allegations of the complaint as admitted, and construing them in plaintiff's favor, the court finds that the plaintiff cannot allege the material elements of its cause of action. <u>Id.</u>

B.     The Standard For Statutory Interpretation/Chevron Deference.

5 U.S.C. § 706 authorizes the Court to "decide all relevant questions of law,

interpret constitutional and statutory provisions, and determine the meaning or

applicability of the terms of an agency action."

This case requires the Court to interpret and apply the Reform Act and the IQA.

These statutes must be interpreted consistently, giving effect to the language of particular

sections in context with the language and design of each statute as a whole. Holloway v.

United States, 526 U.S. 1, 6 (1999) ("In interpreting the statute at issue, we consider not

only the bare meaning of the critical word or phrase but also its ... purpose in the statutory

scheme") (internal quotation marks and brackets omitted); Halverson v. Slater, 129 F. 3d

180, 184 (D.C. Cir. 1997)(citation omitted).  The court is obliged to give effect, if

possible, to every word used by Congress. Reiter v. Sonotone Corp., 442 U.S. 330, 339

(1979).   In all cases, Congress' plain words control.  See Rapanos et ux., et al v. United

States, __ U.S. __ (2006); Cooper Indus., Inc. v. Aviall Serv., Inc., ___ U.S. ___ (2004).

Defendants demand deference pursuant to Chevron U.S.A., Inc. v. Natural Res.

Def. Council, Inc., 467 U.S. 837 (1984).  (See Def. Memo 9-10.)  Chevron directs courts

to accord deference to an agency's reasonable policy choices, reflected in statutory or

regulatory interpretation, if Congress delegated to the agency the discretion to make such

choices, and provides a two-step test for courts to use in evaluating an agency's

interpretation and implementation of a statute.  "Employing traditional tools of statutory

construction," the court must determine whether "Congress has an intention on the

precise question at issue," and if so "that intention is the law and must be given effect."

Chevron, 467 U.S. at 843 n. 9 ("Step 1").  Only if a statute is unclear, and Congress has

not directly spoken to the issue, may a court defer to an agency's interpretation of the statute, and even then, only so long as that interpretation is reasonable and not "manifestly contrary to the statute." Chevron, supra at 844-45 ("Step 2").    However, deference is not proper in this case.

As a threshold matter, deference to an agency's statutory interpretation is only appropriate when the agency has exercised its own judgment, not - as here - when it believes an interpretation is compelled by Congress.  In denying SSI's appeal, the DOA stated:

> Appellant pointed out that it takes many small cigars to equal the volume of one large cigar and argued that it is not equitable (sic) to assess small cigars at the same rate as large cigars.  That argument may be philosophically well founded; however, it is not consistent with the statutory requirements....Section 625(g)(3)(A)...*requires* the volume of domestic sales associated with cigars to be measured on a per-stick basis.

DOA Decision at 4; (Cmpl. ¶ 34.)  Because the DOA did not purport to exercise discretion, instead claiming its programmatic choice was compelled by statutory command, Chevron deference is inappropriate.  State of Ariz. et al., v. Tommy G. Thompson, 281 F. 3d 248, 253-4 (D.C. Cir. 2002) citing Chevron, 467 U.S. at 843 n.9; see also Transitional Hosps. Corp. v. Shalala, 222 F. 3d 1019, 1026 (D.C. Cir. 2000).

Additionally, the DOA fails Chevron's test.  The DOA fails Step 1, as the Reform Act specifically forbids the agency's assessment of SSI in excess of its pro rata share of gross domestic volume.  See 7 U.S.C. § 518d(e).  The DOA also fails Step 2, for its excision of gross domestic volume from the assessment calculus is inconsistent with the statute's purpose, specifically, the fair and equitable assessment of SSI and other tobacco companies based on their pro rata share of gross domestic volume.  See 7 U.S.C. 518d(e), (g)(2). By treating large and small cigars as if each removed an equivalent amount of

tobacco, the DOA wrongly and needlessly overturned settled agency tax and regulatory practice (see supra at 4-6) and upset the Reform Act's statutory scheme (see infra at 11,13). No deference should be given.

II.     PARAGRAPH 44(a) STATES A CLAIM

A.     The DOA's Stick Count Assessment Violated the Reform Act.

The defendants assert SSI's allegations in paragraph 44(a) of the Complaint, that the DOA's stick count assessment violated the Reform Act, fail to state a claim for which relief can be granted. They argue the Reform Act, through 7 U.S.C. § 518d(g)(3), mandates stick count assessment for cigars, without regard for a company's pro rata share of gross domestic volume. The defendants' interpretation, however, is viable only if 7 U.S.C. § 518d(g)(3) is read in isolation from the rest of the Reform Act, and the plain language of 7 U.S.C. § 518d(e) ignored. In fact, defendants must wreck the statutory scheme, sanction the unjust and absurd result that one small cigar and one large cigar - though removing far different amounts of tobacco, having different federal excise tax rates, and commanding vastly different prices in the consumer market - must nevertheless be treated identically for assessment purposes, and twist the Reform Act's plain language beyond all recognition, to justify the challenged assessment in this case.

The Reform Act is simple and straight-forward. It begins by defining three key terms: "gross domestic volume," "removed," and "market share." "Gross domestic volume," defined at 7 U.S.C. § 518d(a)(2), means:

> [T]he volume of tobacco products-- (A) removed (as defined by section 5702 of the Internal Revenue Code of 1986); and (B) not exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

"Removed," defined by reference to 26 U.S.C. § 5702(k), means:

[T]he removal of tobacco products or cigarette papers or tubes from the factory or from internal revenue bond under section 5704 as the Secretary shall by regulation prescribe, or release from customs custody, and shall also include the smuggling or other unlawful importation of such articles into the United States.

"Market Share," defined at 7 U.S.C. § 518d(a)(3), means:

[T]he share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment under this section.

Congress clearly limited the amount individual companies could be lawfully assessed in 7 U.S.C. § 518d(e)(1). There it stated: "The assessment for each class of tobacco product...shall be allocated on a pro rata basis...based on each manufacturer's or importer's share of gross domestic volume." In § 518d(e)(2), it stated: "No [company] shall be required to pay an assessment that is based on a share that is in excess of the [company's] share of domestic volume." Congress did not define the term "domestic volume."[12]

The DOA's assessments of tobacco companies in all other tobacco classes reflected each company's pro rata share of gross domestic volume, and complied with the Reform Act's requirements. See Cigar Policy, supra (explaining use of excise rates). The DOA, however, violated the Reform Act by denying cigar companies similar

---

[12] The ordinary meaning of words controls. See Rapanos, supra. The ordinary meaning of "volume" is amount or mass. See RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (Unabridged) (1971). The ordinary meaning of "number" means the sum, total, count or aggregate of a collection of units. Id. These words do not mean the same thing. Furthermore, tobacco has long been taxed and regulated based on removed volume. See 7 U.S.C. § 518d(a)(defining gross domestic volume based on removed volume); (Ex. 8). Congress is presumed to have been aware of how the word "volume" had been used in relation to the regulation of the tobacco industry at the time it enacted the Reform Act, and to have used the word in the same manner here. See Bragdon v. Abbot, 524 U.S. 624, 625 (1998). Consequently, "domestic volume" cannot be read to mean "domestic number" as the defendants effectively suggest.

treatment. As the DOA was well aware, small cigars and large cigars are taxed at different rates, and priced differently, precisely because they contain substantially different volumes of tobacco. Treating the two products identically for assessment purposes was simply irrational.[13]   Nevertheless, the DOA arbitrarily and capriciously collapsed the distinction between the two products, and thereby ran afoul of the Reform Act's requirement that cigar companies be assessed no more than their pro rata share of gross domestic volume.

The defendants cite 7 U.S.C. 518d(g)(3)A, titled "Measurement" to justify their interpretation, claiming the Reform Act "dictates that...assessments are based on the number of cigars, and not on the weight of the tobacco in the cigars." In other words, they claim Congress is to blame for the DOA's assessments based solely on the number of cigar sticks sold in a given quarter. (Def. Memo at 13); DOA Decision at 4 (SSI's arguments "philosophically well founded," but assessment outcome mandated by Congress). Section 518d(g)(3)(A) does in fact provide the volume of domestic sales shall be measured by the "number of cigars." However, the defendants wrench this provision out of context, upending the statutory scheme. It is the DOA, not Congress, that is at fault.

The defendants' proffered, narrow reading of 518d(g)(3)(A) - one totally divorced from gross domestic volume - cannot be squared  with either § 518d(g)(2), which explicitly provides that the volume of domestic sales "shall be calculated based on gross domestic volume," or with § 518d(e), which prohibits the DOA from levying assessments

---

[13] Under the DOA's reasoning, assessments incident to milk price support programs should be based not on the volume of milk, but rather upon the number of cartons sold; a child's pint and a gallon jug must be assessed precisely the same amount.

in excess of a company's pro rata share of gross domestic volume. The defendants' claim that the phrase "number of cigars" justifies a "stick count only" assessment simply does not make sense; the Reform Act's interpretative touchstone is the volume of tobacco removed, not number of cigars sold. Congress used the word "volume" repeatedly in § 518d(a) to define key terms, and in 518d(e) to cap cigar manufacturer assessment liability, but used "number" only once, and then for the limited purpose of subsections (g)(3)(A) and (h).

Rewriting the Reform Act to permit the DOA's assessment in this case would require the Court to ignore Congress, change § 518d(a)(2)(A)'s definition of "gross domestic volume" to mean the **number** of tobacco products removed, and § 518d(e) to mean pro rata allocation must occur based solely on the **number** of tobacco products removed. Among other things, such post-enactment re-drafting would wreck havoc on other tobacco class assessments.[14]

The DOA's improperly narrow interpretation of § 518d(g)(3)(A) produces an absurd and inequitable result (assessing small and large cigars identically), causing entirely unnecessary internal conflicts in the Reform Act. However, the DOA could have avoided such conflict, complied with 7 U.S.C. § 518d(e) and maintained the integrity of the statutory scheme simply by first recognizing the existing regulatory classifications for large and small cigars, then determining each sector's relative share of gross domestic

---

[14] If the word "volume" really means "number" as the DOA apparently determined, then the pro rata assessments and market share calculations of pipe tobacco companies (for example) would have to be based on the "number" of pipe tobacco products removed - a plainly absurd result. It is telling that the defendants do not even pretend to justify interpreting two different words as if they mean precisely the same thing, and utterly fail to address or resolve the interpretative problems created when the DOA improperly collapsed the distinction between two distinct terms. See supra at n.12.

volume with the cigar class, *precisely as it did when calculating the cigar class' share of gross domestic volume,* and only then assessing market share between the companies in each sectors using stick count per § 518d(g)(3)(A).[15] This approach would have preserved the Reform Act's consistency and integrity, ensured conformance with 7 U.S.C. § 518d(e), and guaranteed SSI and other cigar companies were assessed on the same pro rata basis as all other tobacco companies.

      B.    <u>The DOA Should Have Counted Smuggled Cigars.</u>

Defendants claim they need not count smuggled cigars to calculate SSI's market share. (Def. Memo at 14.)  The Reform Act states assessments shall be allocated on a pro rata basis based on each company's share of gross domestic volume.  7 U.S.C. § 518d(e).  "Gross domestic volume" includes all cigars, including those smuggled or unlawfully imported into the United States.  <u>See</u> 7 U.S.C. 518d(a)(2).  Therefore, the DOA had to count such cigars.

The defendants offer one weak argument to justify their failure to do so. Arguing that § 518d(e)(1) provides a method for calculating assessments that does not include smuggled cigars, the defendants assert that "manufacturers and importers - not smugglers - are responsible for the assessments for each cigar class…."  (Def. Memo at 14.)  This argument begs the question; the issue is not who pays assessments, but how the DOA calculates gross domestic volume. By excluding smuggled cigars from the

---

[15] When an agency has the erroneous belief that a statutory interpretation was mandated by Congress (and thus the agency had no latitude to adopt a different interpretation), the case will be remanded so that the agency -- now freed from its confined view of its own discretion -- can reconsider its interpretation of the statute.  <u>PDK Lab. Inc., v. United States Drug Enforcement Administration</u>,  362 F. 3d 786, 804 (D.C. Cir. 2004)(Roberts, J., concurring). Remand for reconsideration would be appropriate here.

equation, the DOA necessarily under-estimates gross domestic volume, over-estimates

SSI's relative pro rata share, and improperly inflates SSI's assessment.[16]

III.    PARAGRAPHS 44(c) - (d) STATE A CLAIM.

The defendants - having ignored SSI's IQA Petition for Correction, and Request

for Reconsideration - do not deny SSI's IQA rights were violated. Instead, they make

the remarkable assertion that SSI has no IQA rights, thus paragraphs 44(c) - (d) fail to

state a claim for relief.[17]    The defendants, however, err.

A.    The Langauge And History IQA.

The Congress enacted IQA in December 2000. It provides:

> (a)    IN GENERAL. The Director of the Office of Management and
> Budget shall, by not later then September 30, 2001, and with public and Federal
> agency involvement, issue guidelines under sections 3504 (d)(1) and 3516 of title
> 44, United States Code, that provide policy and procedural guidance to Federal
> agencies for ensuring and maximizing the quality, objectivity, utility, and
> integrity of information (including statistical information) disseminated by
> Federal agencies in fulfillment of the purposes and provisions of chapter 35 of

---

[16] The defendants also cite § 518d(g)(1) to justify their deviation from the Congressional directive in § 518d(a)(2) that all cigars, including smuggled cigars, be counted to calculate gross domestic volume. See (Def. Memo at 14-15.) However, 518d(g)(1) concerns the "volume of domestic sales," not gross domestic volume. Also, § 518d(g)(1) explicitly requires the DOA to use information "provided by the manufacturers and importers...as well as any other relevant information provided to or obtained by the Secretary." The Reform Act's plain language does not support the defendants' assertion that "it is proper for the Secretary to rely only on the primary source excise tax data provided by the manufacturers and importers;" rather, it actually requires the DOA to obtain as much relevant information from as many potential information sources as possible to ensure companies are not over-assessed.

[17] Defendants argue that no party seeking IQA relief ever has the right to judicial review, and that agency IQA action is not reviewable 5 U.S.C. § 701(a)(2) because the decision whether or not to make a correction "is committed to agency discretion by law" as there is no "meaningful standard against which to judge the agency's exercise of discretion." (Def. Memo at 1.) Moreover, they claim the request for disclosure of data and methods cannot be honored because the data is excise tax information and disclosure is prohibited by law. Id. at 25, citing 26 U.S.C. §§ 6103(a), 7213. However, the defendants' fail to note their policy was to ignore excise tax data when calculating cigar market share. See Cigar Policy, supra.

title 44, United States Code, commonly referred to as the Paperwork Reduction Act.

> (b)    CONTENT OF GUIDELINES.  The guidelines under subsection (a) shall (1) apply to the sharing by Federal agencies of, and access to, information disseminated Federal agencies; and (2) require that each Federal agency to which the guidelines apply  (A)  issue guidelines ensuring and maximizing the quality, objectivity, utility and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a); (B) **establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issues under subsection (a)**; and (C) report periodically to the Director: (i)  the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and (ii) how such complaints were handled by the agency.

See Pub. L. No. 106-554 §§ 1 (a)(3), 114 Stat. 2763 (2000)(emphasis added).  The OMB Guidelines, promulgated at 67 Fed. Reg. 8452 (Feb. 22, 2002)(the "Guidelines"), having been specifically authorized by statute and adopted through formal notice and comment rulemaking, are substantive and legislative in character, have the force of law, and are binding on the defendants. Appalachian Power Co. v. EPA, 208 F. 3d 1015, 1020 (D.C. Cir. 2000)("A 'legislative rule' is one that the agency has promulgated in compliance with the procedures laid down in the statute or in the Administrative Procedure Act").[18]

---

[18]  In Chrysler Corp. v. Brown, 441 U.S. 281, 301-303 (1979), the Court characterized a "substantive" or "legislative-type rule" having the "force and effect of law" as one "affecting individual rights and obligations" and promulgated by the agency in accordance with a grant by Congress to it of "quasi-legislature" authority and the procedural requirements of the APA.  Substantive rules "create law, usually implementary to an existing law" and "grant rights" or "impose obligations," in contrast to interpretive rules, which "merely clarify or explain existing law or regulations" and are "essentially hortatory and instructional." American Hospital Association v. Bowen, 834 F. 2d 1037, 1045 (D.C. Cir. 1987)(citations omitted).  One important characteristic of a legislative rule is whether the agency fills a "legislative gap" that is necessary in order to make the statutory scheme operative. American Mining Congress v. United States Department of Labor, 995 F. 2d 1106, 1112 (D.C. Cir. 1993).  In this case, the OMB guidelines were the method Congress specified to implement information quality and are, by any test, substantive "legislative rules."

OMB instructed each federal agency to publish their own "information quality guidelines ensuring and maximizing the quality, objectively, utility and integrity of information, including statistical information disseminated by the agency…" and to "[e]stablish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with these OMB guidelines." 67 Fed. Reg. at 8458. In particular:

> To facilitate public review, agencies shall establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained an disseminated by the agency that does not comply with OMB or agency guidelines. These administrative mechanisms shall be flexible, appropriate to the nature and timeliness of the disseminated information, and incorporated into agency information resources management and administrative practices.

Id. at 8459.

The quality criteria to be applied in adjudicating a request for correction are extensively detailed and defined. With a view toward maximizing the quality of information disseminated to the public, the Guidelines exhaustively define the terms "quality", "utility", "objectivity", "integrity", "information", "dissemination", and "reproducibility," among other things. Id. at 8459-60. For example, each agency must, when asked, "identify the sources of disseminated information…and, in a scientific, financial, or statistical context, the supporting data and models, so that the public can assess for itself whether there may be some reason to question the objectivity of the source." Id. at 8459. In cases where "public access to data and methods will not occur due to other compelling interests [such as confidentiality], agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken." Id. at 8460. However, agencies shall, "in all cases, require a disclosure of

the specific data sources that have been used, and the specific quantitative methods and assumptions that have been employed." Id.[19]

B.    SSI Has Enforceable IQA Rights.

Informational rights are well recognized and have equal constitutional standing with other rights conferred by Congress. Federal Election Commission v. Atkins, 524 U.S. 11, 20-21 (1998). Yet, without any analysis of the IQA's actual language, the defendants argue that the IQA focuses only on the duties of agencies and thus shows no intent to confer private rights.[20] The defendants err.

The Supreme Court has identified four factors for determining whether a statute creates private rights: "(1) Whether the plaintiff is one of the class for whose benefits the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether to the cause of action is traditionally relegated to state law…" Tax Analysts v.

---

[19] Agencies must set deadlines for decisions on "whether and how to correct" information and establish an "appellate" process with time limits, for the review or reconsideration of those decisions. 67 Fed. Reg. at 8458. Each agency must have an independent, "objective" process for adjudicating appeals so that "the office that originally disseminates the information does not have responsibility for both the original response and resolution of a disagreement." Id. The Guidelines allow no exemptions.

[20] The defendants argue that the IQA mandate to create an administrative mechanism for processing a correction request implies an intent to oust judicial review. This argument simply begs the question, for agency action is presumed to be judicially reviewable the APA. See infra at 22. The Congressional mandate to establish an administrative mechanism does not itself imply that there will be no judicial APA review. This is reinforced by 5 U.S.C. § 559 which prohibits any supercession of APA rights across the board except by an express act of Congress. The inference the defendants here attempt to impose is precluded by § 559 and this Circuit's law. See Professional Reactor Operator Soc. v. NRC, 939 F. 2d 1047, 1052 (D.C. Cir. 1991)(Ginsberg J.); 92 Cong. Rec. 2148, 2159 (1946) ("[Implied amendments to the APA] shall be precluded.")

Internal Revenue Service, 214 F. 3d 179, 185-86 (D.C. Cir 2000) citing Cort v. Ash, 422 U.S. 66, 95 (1975). The central analysis is directed at discovering legislative intent by means of the language of the statute, the statutory structure or some other source, Gov't of Guam v. American President Lines 28 F. 3d 142, 145 (D.C. Cir. 1994). The Supreme Court has held further that it looks for "rights creating language" and the statutes regulating the conduct only of agencies imply "far less reason to infer a private remedy in favor of individual persons." Alexander v. Sandoval, 532 U.S. 275, 286-89 (2001).[21]

From its face, it is clear the IQA does not merely focus on "agencies" rather than on "the individuals protected." See Sandoval, 532 U.S. at 289. Instead, it contains ample "rights creating" language, explicitly providing "affected persons" the right to "seek and obtain a correction" of information that fails quality standards. See IQA §(b)(2)(B). Congress's inclusion of specific information quality criteria further reinforces the conclusion that the IQA means what it says, and affected persons have the right to seek and obtain a correction. Congress directed that agencies "shall" ensure and maximize the "quality, objectivity, utility and integrity of information..." This is not a suggestion that agencies to "do their best," instead it is a Congressional mandate for the benefit of SSI and other affected persons.

The right to seek and obtain correction enshrined in the IQA would be nothing but an ephemeral shade without judicial review. One must wonder how an affected person could "seek and obtain" a correction if the person had no right to compel an agency to answer his petition, or to enforce agency compliance with its own information

---

[21] For purposes of this motion, SSI is an affected person. Defendants do not argue that an informational cause of action is traditionally relegated to state law.

quality guidelines, or what purpose Congress would have had to provide the prospect of relief, if the decision to grant or deny it could never be tested.[22]

In <u>Salt Institute v. Leavitt</u>, 440 F. 3rd 156 (4th Cir. 2006), the Fourth Circuit - without ever analyzing the IQA's language - held "Because the statute upon which the appellants rely does not create a legal right to access to information or correctness appellants have not alleged an invasion of a legal right...." [23]  The Fourth Circuit's opinion, however, is difficult to reconcile with <u>Sandoval</u>'s emphases on a careful evaluation of the relevant statutory language.  Neither the Fourth Circuit in <u>Salt,</u> nor the defendants here, had any interest in confronting the IQA's inconvenient language. Instead, both rely on the premise that it the absence of an enforceable right to seek and obtain correction is so obvious that no analysis is necessary.  The defendants have a hard case to make given that Congress identifies the class to be benefited and prescribes what that benefit will be, and specifies how it may be obtained.

The IQA's legislative history reinforces SSI's claim that the IQA means what it says.  By the 1990's Congress had become concerned by the bureaucracy's growing reliance on the Internet and non-regulatory methods of communicating rather than on formal APA rulemaking or adjudication to announce policy and influence private behavior.[24]  In 1995, Congress enacted the Paperwork Reduction Act ("PRA").  44

---

[22] The defendants state that the IQA provides an affected person may "seek" a correction, without noting the IQA also provides a party may "obtain" a correction.  (Def. Memo at 17.)  The defendants, however, cannot repeal Congress's words by overlooking them.

[23] The argument that IQA confers no rights, made by the Fourth Circuit in <u>Salt</u> and by defendants here, had not been made by the government in the case below, was not raised by the trial judge, and was neither briefed nor argued by the parties in the appeal.

[24] <u>See generally</u> James W. Conrad, <u>The Information Quality Act- Antiregulatory Costs of Mythic Proportions?</u>, 12 Kan. J.L & Pub. Pol'y 521, 526 (2003) (citations omitted).

U.S.C. § 3501 et seq. The PRA directed the Office of Management and Budget ("OMB")

to implement "policies, principles, standards, and guidelines" to ensure the quality of the

information used and disseminated by federal agencies, and to promote public access to

that information. See 44 U.S.C. § 3504(d).

OMB did not comply. Therefore, in a non-binding part of the FY 1999 Omnibus

Appropriations Act (Pub. Law 105-277), Congress stated:

> **RELIABILITY AND DISSEMINATION OF INFORMATION**
> The Committee urges the Office of Management and Budget (OMB) to develop,
> with public and Federal agency involvement, rules providing policy and
> procedural guidance to Federal agencies for ensuring and maximizing the quality,
> objectivity, utility and integrity of information (including statistical information)
> disseminated by Federal agencies, and information disseminated by non-Federal
> entities with financial support from the Federal government, in fulfillment of the
> purposes and provision of the Paperwork Reduction Act of 1995 (P.L. 104-13).
> The Committee expects issuance of these rules by September 30, 1999. The
> OMB rules shall also cover the sharing of, and access to, the aforementioned data
> and information, by members of the public. Such OMB rules shall require
> Federal agencies to develop, within one year and with public participation, their
> own rules consistent with the OMB rules. The OMB and agency rules shall
> contain administrative mechanisms allowing affected persons to petition for
> correction of information which does not comply with such rules; and the OMB
> rules shall contain provisions requiring the agencies to report to OMB
> periodically regarding the number and nature of petitions or complaints regarding
> Federal, or Federally supported, information dissemination, and how such
> petitions and complaints were handled. OMB shall report to the Committee of the
> status of implementation of these directives no later than September 30, 1999.

See H.R. Rep. No. 105-595, at 49-50 (1998).

Despite repeated requests, OMB took no action to implement information quality

standards, and in April 2000, OMB expressly declined to issue the required guidelines.[25]

Congress responded by passing the IQA.

---

[25]In 1999 and 2000, Rep. Thomas Bliley (R-VA), chairman of the House Commerce
Committee, and Rep. Jo Ann Emerson (R-MO), a primary IQA sponsor, also sent letters
reminding the OMB of its obligations. See (www.thecre.com/quality/letter-blibley-
lew.html); (www.thecre.com/quality/letter-emerson-lew.html; www.thecre.com/quality/-

In light of this history, the defendants' theory that the IQA does no more urge compliance with data quality standards make no sense. What is more than apparent is that the IQA was intended to force agency compliance and to confer on affected persons the right to maintain compliance in the specific areas of interest to them. This is what Congress intended, and the right to seek and obtain a correction is one this court should protect.

C.     IQA Correction Is Not Entrusted Solely To Agency Discretion.

A right of action in U.S. district court is expressly created by the APA in any case of "final agency action for which there is no other adequate remedy in a court...", 5 U.S.C. § 704, and applied universally "except to the extent that (1) statutes preclude judicial review or (2) agency action is committed to agency discretion by law." Id. § 701(a); Bennett v. Spear, 520 U.S. 154, 175-76 (1987). The APA's promise of judicial review is generous, liberally construed, and readily available in the absence of powerful authority to the contrary. See Japan Whaling Ass'n. v. American Cetacean Soc., 478 U.S. 221, 230 n.4 (1986). There is a "strong presumption that Congress intends judicial review of administrative action." Bowen v. Mich. Acad. Of Family Physicians, 476 U.S. 67, 670 (1986).

The defendants claim the DOA's refusal to respond to SSI's IQA petition is exempt from judicial review. This is an argument of convenience with no substance.[26]

---

EmersonLetter20000320.html); Letter from John T. Spotila to Rep. Jo Ann Emerson of April 18, 2000 (www.thecre.com/ quality/2004102_letter.htm).

[26] The district courts in Salt Institute, 345 F. Supp. 2d 589 (E.D. Va. 2004) and In Re: Missouri River Litigation, 363 F. Supp. 2d. 1145, 1174-75 (D. Minn. 2004) held that the discretionary function exception applied conducted no analysis of the APA or published

The agency discretion exception is "a very narrow one reserved for those rare instances where statutes all drawn in such broad terms that in a given case there is no law to apply" Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971). "There is no law to apply 'if the statute is drawn so that a court would have no meaningful standard against which to judge an agency's exercise of discretion.'" Hechler v. Chaney, 470 U.S. 821, 830 (1985). Regulations can provide "standing for judicial review," of agency action if the statute lacks judicially manageable standards for such review. CC Distrib., Inc. v. United States, 883 F.2d 146, 154 (D.C. Cir. 1989).

The discretionary function exception has not been applied by the Supreme Court to a private party's direct exercise of an express statutory right, such as the one created by the IQA. Furthermore, although the defendants claim there are no standards to apply, such standards are present in abundance.[27] For example, an agency's outright refusal to acknowledge a correction request would be reviewable under 5 U.S.C. § 706 where the reviewing court could decide to "compel agency action unlawfully withheld" and test the agency's conduct to determine whether its actions are "arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law."

If the agency actually commences a correction process, its review and determinations must be guided by the statutory standards for the public dissemination of

---

criteria at all. Neither court engages in an on point analysis of the question. The Fourth Circuit in Salt Institute did not affirm on these grounds.

[27] It is appropriately applied, for example, to an agency decision to initiate enforcement proceedings, reconsider an action taken absent a statutory obligation to do so, agency personnel decisions, in national security matters, the setting of agency priorities, or other decisions of a housekeeping or management nature. Lincoln v. Vigil, 508 U.S. 182, 1991-93 (1993) (collecting authorities). In none of these circumstances is a congressionally-bestowed public right to agency action implicated as it is here.

information set forth in the IQA and elaborated upon in detail in the OMB and agency-specific guidelines for implementing the statute. See 67 Fed. Reg. at 8459-60. The IQA provides that there shall be a process for "ensuring and maximizing the quality, objectivity, utility and integrity of information…disseminated by an agency." 44 U.S.C. § 351(b)(2) note. The Guidelines explain at great length what is meant by each statutory quality test. See 67 Fed. Reg. at 8458-60. This is hardly a standard-less environment.[28]

There is no mystery to this process and no substance to the defendants' claim that there are no judicially manageable standards to apply in determining whether an agency was arbitrary or capricious in refusing to make a correction or consider a request to commence the process of determining whether a correction is appropriate. DOA's claim that there are no standards for the Court to apply is frivolous.

D.    The DOA May Not Hide Behind "Confidentiality".

The defendants claim exemption from the IQA, and seek to hide behind statutory prohibitions on the disclosure of tax information, asserting the DOA: "is statutorily precluded from releasing the primary source data [SSI requested]….[because it] determined [SSI's]…assessments *based on excise tax data it receives from cigar manufacturers.*" (Def. Memo 23) (emphasis added).    The defendants, however, are apparently ignorant of their own practices. The DOA's own web site states cigar

---

[28] Courts may, of course, defer to agency choices or interpretation, but demonstrably bad data is not properly relied upon by an agency whether in a regulation, administrative determination, or otherwise. If, for example, an agency disseminated statistical information to the public that was not supported by sound methods and data, the quality standards prescribed here surely would not be met and if the agency refused a correction, its action would be arbitrary and capricious, and properly struck down. See e.g. Leather Ind. of America v. EPA, 40 F.3d 392, 403-05 (D.C. Cir. 1994); American Trucking Assn. v. EPA, 175 F.3d 1027, 1055 (D.C. Cir. 1999).

assessments are *not* based on excise tax data, but rather on an estimate of the numbers of cigars sold. See "Cigar Policy," supra. The "tax data" defense is a red herring.[29]

In generating financial and statistical information, agencies must use sound statistical and research methods. 67 Fed. Reg. at 8459. SSI requested access to raw cigar count data and the statistical methods the DOA used to calculate market size. The DOA, had it acted in good faith, could have provided the raw data, perhaps in redacted form, disclosed its statistical assumptions and methods, and respected SSI's rights. Instead, the DOA improperly ignored SSI's IQA Petition, and disregarded SSI's informational rights.

### Conclusion

For these reasons, SSI respectfully requests that this Court deny the defendants' motion.

Respectfully submitted,

SINGLE STICK

Reed D. Rubinstein
Donald Stein
Greenberg Traurig LLP
800 Connecticut Avenue, N.W.
Washington, D.C. 20006
(202) 331-3100

---

[29]The DOA could have complied with the IQA, even in the face of a request for excise tax data. The Guidelines were designed to accommodate an agency's confidentiality concerns, stating that where "public access to data and methods will not occur due to other compelling interests [such as confidentiality], agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken." Id. at 8460. Furthermore, agencies shall, "in *all* cases, require a disclosure of the specific data sources that have been used, and the specific quantitative methods and assumptions that have been employed." Id. Consequently, even if SSI's IQA Request had sought nothing but excise tax data and correction, the DOA clearly could have followed the Guidelines, and easily complied.

**EXHIBIT 1**

```
-CITE-
    7 USC CHAPTER 21C - TOBACCO REFORM                    01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM

-HEAD-
                CHAPTER 21C - TOBACCO REFORM


-MISC1-
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO
    Sec.
    518.        Definitions.
    518a.       Contract payments to tobacco quota holders.
    518b.       Contract payments for producers of quota tobacco.
    518c.       Administration.
    518d.       Use of assessments as source of funds for payments.
    518e.       Tobacco Trust Fund.
    518f.       Limitation on total expenditures.

                SUBCHAPTER II - IMPLEMENTATION AND TRANSITION
    519.        Treatment of tobacco loan pool stocks and outstanding
                 loan costs.
    519a.       Regulations.

-End-



-CITE-
    7 USC SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO
        QUOTA HOLDERS AND PRODUCERS OF TOBACCO            01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-End-



-CITE-
    7 USC Sec. 518                                        01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518. Definitions
```

-STATUTE-
     In this subchapter and subchapter II:
  (1) Agricultural Act of 1949
     The term "Agricultural Act of 1949" means the Agricultural Act
of 1949 (7 U.S.C. 1421 et seq.), as in effect on the day before
October 22, 2004.
  (2) Agricultural Adjustment Act of 1938
     The term "Agricultural Adjustment Act of 1938" means the
Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.), as
in effect on the day before October 22, 2004.
  (3) Considered planted
     The term "considered planted" means tobacco that was planted,
but failed to be produced as a result of a natural disaster, as
determined by the Secretary.
  (4) Contract
     The term "contract" means a contract entered into under section
518a or 518b of this title.
  (5) Contract payment
     The term "contract payment" means a payment made under section
518a or 518b of this title pursuant to a contract.
  (6) Producer of quota tobacco
     The term "producer of quota tobacco" means an owner, operator,
landlord, tenant, or sharecropper that shared in the risk of
producing tobacco on a farm where tobacco was produced or
considered planted pursuant to a tobacco farm poundage quota or
farm acreage allotment established under part I of subtitle B of
title III of the Agricultural Adjustment Act of 1938 (7 U.S.C.
1311 et seq.).
  (7) Quota tobacco
     The term 'quota tobacco'(!1) means a kind of tobacco that is
subject to a farm marketing quota or farm acreage allotment for
the 2004 tobacco marketing year under a marketing quota or
allotment program established under part I of subtitle B of title
III of the Agricultural Adjustment Act of 1938 (7 U.S.C. 1311 et
seq.).

  (8) Tobacco
     The term "tobacco" means each of the following kinds of
tobacco:
        (A) Flue-cured tobacco, comprising types 11, 12, 13, and 14.
        (B) Fire-cured tobacco, comprising types 22 and 23.
        (C) Dark air-cured tobacco, comprising types 35 and 36.
        (D) Virginia sun-cured tobacco, comprising type 37.
        (E) Virginia fire-cured tobacco, comprising type 21.
        (F) Burley tobacco, comprising type 31.
        (G) Cigar-filler and cigar-binder tobacco, comprising types
42, 43, 44, 53, 54, and 55.
  (9) Tobacco quota holder
     The term "tobacco quota holder" means a person that was an
owner of a farm, as of October 22, 2004, for which a basic
tobacco farm marketing quota or farm acreage allotment for quota
tobacco was established for the 2004 tobacco marketing year.
  (10) Tobacco Trust Fund
     The term "Tobacco Trust Fund" means the Tobacco Trust Fund
established under section 518e of this title.
  (11) Secretary
     The term "Secretary" means the Secretary of Agriculture.

-SOURCE-

(Pub. L. 108-357, title VI, Sec. 621, Oct. 22, 2004, 118 Stat.
1524.)

-REFTEXT-

REFERENCES IN TEXT

The Agricultural Act of 1949, referred to in par. (1), is act
Oct. 31, 1949, ch. 792, 63 Stat. 1051, as amended, which is
classified principally to chapter 35A (Sec. 1421 et seq.) of this
title. For complete classification of this Act to the Code, see
Short Title note set out under section 1421 of this title and
Tables.

The Agricultural Adjustment Act of 1938, referred to in pars.
(2), (6), and (7), is act Feb. 16, 1938, ch. 30, 52 Stat. 31, as
amended, which is classified principally to chapter 35 (Sec. 1281
et seq.) of this title. Part I of subtitle B of title III of the
Act was classified to subpart I (Sec. 1311 et seq.) of part B of
subchapter II of chapter 35 of this title prior to repeal by Pub.
L. 108-357, title VI, Sec. 611(a), Oct. 22, 2004, 118 Stat. 1522.
For complete classification of this Act to the Code, see section
1281 of this title and Tables.

-MISC1-

EFFECTIVE DATE

Pub. L. 108-357, title VI, Sec. 643, Oct. 22, 2004, 118 Stat.
1536, provided that: "This title [see Short Title note below] and
the amendments made by this title shall apply to the 2005 and
subsequent crops of each kind of tobacco."

SHORT TITLE

Pub. L. 108-357, title VI, Sec. 601, Oct. 22, 2004, 118 Stat.
1521, provided that: "This title [enacting this chapter, amending
sections 609, 1282, 1301, 1303, 1314h, 1361, 1371, 1373, 1375,
1378, 1379, 1428, 1433c-1, and 1441 of this title and section 714c
of Title 15, Commerce and Trade, repealing sections 511r, 515 to
515k, 625, 1311 to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to
1314j, 1315, 1316, 1445, 1445-1, and 1445-2 of this title, enacting
provisions set out as notes under this section and section 515 of
this title, and repealing provisions set out as a note under
section 1314c of this title] may be cited as the 'Fair and
Equitable Tobacco Reform Act of 2004'."

-FOOTNOTE-

(!1) So in original.

-End-

-CITE-

7 USC Sec. 518a                                          01/03/05

-EXPCITE-

TITLE 7 - AGRICULTURE
CHAPTER 21C - TOBACCO REFORM
SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
PRODUCERS OF TOBACCO

-HEAD-

Sec. 518a. Contract payments to tobacco quota holders

-STATUTE-
(a) Contract offered
    The Secretary shall offer to enter into a contract with each
tobacco quota holder under which the tobacco quota holder shall be
entitled to receive payments under this section in exchange for the
termination of tobacco marketing quotas and related price support
under the amendments made by sections 611 and 612.(!1) The contract
payments shall constitute full and fair consideration for the
termination of such tobacco marketing quotas and related price
support.

(b) Eligibility
    To be eligible to enter into a contract to receive a contract
payment under this section, a person shall submit to the Secretary
an application containing such information as the Secretary may
require to demonstrate to the satisfaction of the Secretary that
the person is a tobacco quota holder. The application shall be
submitted within such time, in such form, and in such manner as the
Secretary may require.
(c) Base quota level
    (1) Establishment
    The Secretary shall establish a base quota level applicable to
each tobacco quota holder identified under subsection (b).
    (2) Poundage quotas
    Subject to adjustment under subsection (d), for each kind of
tobacco for which the marketing quota is expressed in pounds, the
base quota level for each tobacco quota holder shall be equal to
the basic quota for quota tobacco established for the 2002
tobacco marketing year under a marketing quota program
established under part I of subtitle B of title III of the
Agriculture (!2) Adjustment Act of 1938 [7 U.S.C. 1311 et seq.]
on the farm owned by the tobacco quota holder.

    (3) Marketing quotas other than poundage quotas
    Subject to adjustment under subsection (d), for each kind of
tobacco for which there is marketing quota or allotment on an
acreage basis, the base quota level for each tobacco quota holder
shall be the quantity equal to the product obtained by
multiplying -
        (A) the basic tobacco farm marketing quota or allotment for
    the 2002 marketing year established by the Secretary for quota
    tobacco owned by the tobacco quota holder; by
        (B) the average production yield, per acre, for the period
    covering the 2001, 2002, and 2003 crop years for that kind of
    tobacco in the county in which the quota tobacco is located.
(d) Treatment of certain contracts and agreements
    (1) Effect of purchase contract
    If there was an agreement for the purchase of all or part of a
farm described in subsection (c) as of October 22, 2004, and the
parties to the sale are unable to agree to the disposition of
eligibility for contract payments, the Secretary, taking into
account any transfer of quota that has been agreed to, shall
provide for the equitable division of the contract payments among
the parties by adjusting the determination of who is the tobacco
quota holder with respect to particular pounds or allotment of
the quota.
    (2) Effect of agreement for permanent quota transfer
    If the Secretary determines that there was in existence, as of

the day before October 22, 2004, an agreement for the permanent
transfer of quota, but that the transfer was not completed by
that date, the Secretary shall consider the tobacco quota holder
to be the party to the agreement that, as of that date, was the
owner of the farm to which the quota was to be transferred.
(e) Contract payments
   (1) Calculation of total payment amount
   The total amount of contract payments to which an eligible
tobacco quota holder is entitled under this section, with respect
to a kind of tobacco, shall be equal to the product obtained by
multiplying -
      (A) $7.00 per pound; by
      (B) the base quota level of the tobacco quota holder
   determined under subsection (c) with respect to that kind of
   tobacco.
   (2) Annual payment
   During each of fiscal years 2005 through 2014, the Secretary
shall make a contract payment under this section to each eligible
tobacco quota holder, with respect to a kind of tobacco, in an
amount equal to  1/10  of the amount determined under paragraph
(1) for the tobacco quota holder for that kind of tobacco.
(f) Death of tobacco quota holder
   If a tobacco quota holder who is entitled to contract payments
under this section dies and is survived by a spouse or one or more
dependents, the right to receive the payments shall transfer to the
surviving spouse or, if there is no surviving spouse, to the estate
of the tobacco quota holder.


-SOURCE-
   (Pub. L. 108-357, title VI, Sec. 622, Oct. 22, 2004, 118 Stat.
   1525.)


-REFTEXT-
                   REFERENCES IN TEXT
   Sections 611 and 612, referred to in subsec. (a), are sections
611 and 612 of Pub. L. 108-357, which amended sections 609, 1282,
1301, 1303, 1361, 1371, 1373, 1375, 1378, 1379, 1428, 1433c-1, and
1441 of this title and section 714c of Title 15, Commerce and
Trade, repealed sections 511r, 515 to 515k, 625, 1311 to 1314,
1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315, 1316, 1445,
1445-1, and 1445-2 of this title, and repealed provisions set out
as a note under section 1314c of this title.
   Part I of subtitle B of title III of the Agricultural Adjustment
Act of 1938, referred to in subsec. (c)(2), was classified to
subpart I (Sec. 1311 et seq.) of part B of subchapter II of chapter
35 of this title prior to repeal by Pub. L. 108-357, title VI, Sec.
611(a), Oct. 22, 2004, 118 Stat. 1522. For complete classification
of this Act to the Code, see section 1281 of this title and Tables.


-FOOTNOTE-
   (!1) See References in Text note below.

   (!2) So in original. Probably should be "Agricultural".


-End-


-CITE-

7 USC Sec. 518b                                      01/03/05

-EXPCITE-
     TITLE 7 - AGRICULTURE
     CHAPTER 21C - TOBACCO REFORM
     SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
     Sec. 518b. Contract payments for producers of quota tobacco

-STATUTE-
     (a) Contract offered
       The Secretary shall offer to enter into a contract with each
     producer of quota tobacco under which the producer of quota tobacco
     shall be entitled to receive payments under this section in
     exchange for the termination of tobacco marketing quotas and
     related price support under the amendments made by sections 611 and
     612.(!1) The contract payments shall constitute full and fair
     consideration for the termination of such tobacco marketing quotas
     and related price support.

     (b) Eligibility
       (1) Application and determination
       To be eligible to enter into a contract to receive a contract
     payment under this section, a person shall submit to the
     Secretary an application containing such information as the
     Secretary may require to demonstrate to the satisfaction of the
     Secretary that the person is a producer of quota tobacco. The
     application shall be submitted within such time, in such form,
     and in such manner as the Secretary may require.
       (2) Effect of multiple producers for same quota tobacco
       If, on the basis of the applications submitted under paragraph
     (1) or other information, the Secretary determines that two or
     more persons are a producer of the same quota tobacco, the
     Secretary shall provide for an equitable distribution among the
     persons of the contract payments made under this section with
     respect to that quota tobacco, based on relative share of such
     persons in the risk of producing the quota tobacco and such other
     factors as the Secretary considers appropriate.
     (c) Base quota level
       (1) Establishment
       The Secretary shall establish a base quota level applicable to
     each producer of quota tobacco, as determined under this
     subsection.
       (2) Flue-cured and burley tobacco
       In the case of Flue-cured tobacco (types 11, 12, 13, and 14)
     and Burley tobacco (type 31), the base quota level for each
     producer of quota tobacco shall be equal to the effective tobacco
     marketing quota (irrespective of disaster lease and transfers)
     under part I of subtitle B of title III of the Agriculture (!2)
     Adjustment Act of 1938 [7 U.S.C. 1311 et seq.] for the 2002
     marketing year for quota tobacco produced on the farm.

       (3) Other kinds of tobacco
       In the case of each kind of tobacco (other than tobacco covered
     by paragraph (2)), for the purpose of calculating a contract
     payment to a producer of quota tobacco, the base quota level for
     the producer of quota tobacco shall be the quantity obtained by
     multiplying -

(A) the basic tobacco farm acreage allotment for the 2002 marketing year established by the Secretary for quota tobacco produced on the farm; by

(B) the average annual yield, per acre, of quota tobacco produced on the farm for the period covering the 2001, 2002, and 2003 crop years.

(d) Contract payments

(1) Calculation of total payment amount

Subject to subsection (b)(2), the total amount of contract payments to which an eligible producer of quota tobacco is entitled under this section, with respect to a kind of tobacco, shall be equal to the product obtained by multiplying –

(A) subject to paragraph (2), $3.00 per pound; by

(B) the base quota level of the producer of quota tobacco determined under subsection (c) with respect to that kind of tobacco.

(2) Annual payment

During each of fiscal years 2005 through 2014, the Secretary shall make a contract payment under this section to each eligible producer of tobacco, with respect to a kind of tobacco, in an amount equal to 1/10 of the amount determined under paragraph (1) for the producer for that kind of tobacco.

(3) Variable payment rates

The rate for payments to a producer of quota tobacco under paragraph (1)(A) shall be equal to –

(A) in the case of a producer of quota tobacco that produced quota tobacco marketed, or considered planted, under a marketing quota in all three of the 2002, 2003, or 2004 tobacco marketing years, the rate prescribed under paragraph (1)(A);

(B) in the case of a producer of quota tobacco that produced quota tobacco marketed, or considered planted, under a marketing quota in only two of those tobacco marketing years, 2/3 of the rate prescribed under paragraph (1)(A);

(C) in the case of a producer of quota tobacco that produced quota tobacco marketed, or considered planted, under a marketing quota in only one of those tobacco marketing years, 1/3 of the rate prescribed under paragraph (1)(A).

(e) Death of tobacco producer

If a producer of quota tobacco who is entitled to contract payments under this section dies and is survived by a spouse or one or more dependents, the right to receive the contract payments shall transfer to the surviving spouse or, if there is no surviving spouse, to the estate of the producer.

–SOURCE–

(Pub. L. 108-357, title VI, Sec. 623, Oct. 22, 2004, 118 Stat. 1527.)

–REFTEXT–

REFERENCES IN TEXT

Sections 611 and 612, referred to in subsec. (a), are sections 611 and 612 of Pub. L. 108-357, which amended sections 609, 1282, 1301, 1303, 1361, 1371, 1373, 1375, 1378, 1379, 1428, 1433c-1, and 1441 of this title and section 714c of Title 15, Commerce and Trade, repealed sections 511r, 515, 515a to 515k, 625, 1311 to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315, 1316, 1445, 1445-1, and 1445-2 of this title, and repealed provisions set out as a note under section 1314c of this title.

Part I of subtitle B of title III of the Agricultural Adjustment Act of 1938, referred to in subsec. (c)(2), was classified to

subpart I (Sec. 1311 et seq.) of part B of subchapter II of chapter 35 of this title prior to repeal by Pub. L. 108-357, title VI, Sec. 611(a), Oct. 22, 2004, 118 Stat. 1522. For complete classification of this Act to the Code, see section 1281 of this title and Tables.

-FOOTNOTE-
    (!1) See References in Text note below.

    (!2) So in original. Probably should be "Agricultural".


-End-



-CITE-
    7 USC Sec. 518c                                         01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518c. Administration

-STATUTE-
    (a) Time for payment of contract payments
      Contract payments required to be made for a fiscal year shall be
    made by the Secretary as soon as practicable.
    (b) Use of county committees to resolve disputes
      Any dispute regarding the eligibility of a person to enter into a
    contract or to receive contract payments, and any dispute regarding
    the amount of a contract payment, may be appealed to the county
    committee established under section 590h of title 16 for the county
    or other area in which the farming operation of the person is
    located.
    (c) Role of National Appeals Division
      Any adverse determination of a county committee under subsection
    (b) may be appealed to the National Appeals Division established
    under subtitle H of the Department of Agriculture Reorganization
    Act of 1994 (7 U.S.C. 6991 et seq.).
    (d) Use of financial institutions
      The Secretary may use a financial institution to manage assets,
    make contract payments, and otherwise carry out this title.(!1)

    (e) Payment to financial institutions
      The Secretary shall permit a tobacco quota holder or producer of
    quota tobacco entitled to contract payments to assign to a
    financial institution the right to receive the contract payments.
    Upon receiving notification of the assignment, the Secretary shall
    make subsequent contract payments for the tobacco quota holder or
    producer of quota tobacco directly to the financial institution
    designated by the tobacco quota holder or producer of quota
    tobacco. The Secretary shall make information available to tobacco
    quota holders and producers of quota tobacco regarding their
    ability to elect to have the Secretary make payments directly to a
    financial institution under this subsection so that they may obtain
    a lump sum or other payment.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 624, Oct. 22, 2004, 118 Stat.
    1528.)

-REFTEXT-
                        REFERENCES IN TEXT
     The Department of Agriculture Reorganization Act of 1994,
referred to in subsec. (c), is title II of Pub. L. 103-354, Oct.
13, 1994, 108 Stat. 3209, as amended. Subtitle H of the Act is
classified principally to subchapter VIII (Sec. 6991 et seq.) of
chapter 98 of this title. For complete classification of this Act
to the Code, see Tables.
     This title, referred to in subsec. (d), means title VI of Pub. L.
108-357, which enacted this chapter, amended sections 609, 1282,
1301, 1303, 1314h, 1361, 1371, 1373, 1375, 1378, 1379, 1428,
1433c-1, and 1441 of this title and section 714c of Title 15,
Commerce and Trade, repealed sections 511r, 515 to 515k, 625, 1311
to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315,
1316, 1445, 1445-1, and 1445-2 of this title, enacted provisions
set out as notes under sections 515 and 518 of this title, and
repealed provisions set out as a note under section 1314c of this
title. For complete classification of title VI to the Code, see
Short Title note set out under section 518 of this title and
Tables.

          -FOOTNOTE-


    (!1) See References in Text note below.


-End-



-CITE-
    7 USC Sec. 518d                                     01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518d. Use of assessments as source of funds for payments

-STATUTE-
    (a) Definitions
     In this section:
     (1) Base period
      The term "base period"(!1) means the one-year period ending the
    June 30 before the beginning of a fiscal year.

     (2) Gross domestic volume
      The term "gross domestic volume" means the volume of tobacco
    products -
        (A) removed (as defined by section 5702 of title 26); and
        (B) not exempt from tax under chapter 52 of title 26 at the

time of their removal under that chapter or the Harmonized Tariff Schedule of the United States.

(3) Market share

The term "market share" means the share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment under this section.

(b) Quarterly assessments

(1) Imposition of assessment

The Secretary, acting through the Commodity Credit Corporation, shall impose quarterly assessments during each of fiscal years 2005 through 2014, calculated in accordance with this section, on each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year.

(2) Amounts

Beginning with the calendar quarter ending on December 31 of each of fiscal years 2005 through 2014, the assessment payments over each four-calendar quarter period shall be sufficient to cover -

(A) the contract payments made under sections 518a and 518b of this title during that period; and

(B) other expenditures from the Tobacco Trust Fund made during the base quarter periods corresponding to the four calendar quarters of that period.

(3) Deposit

Assessments collected under this section shall be deposited in the Tobacco Trust Fund.

(c) Assessments for classes of tobacco products

(1) Initial allocation

The percentage of the total amount required by subsection (b) to be assessed against, and paid by, the manufacturers and importers of each class of tobacco product in fiscal year 2005 shall be as follows:

(A) For cigarette manufacturers and importers, 96.331 percent.

(B) For cigar manufacturers and importers, 2.783 percent.

(C) For snuff manufacturers and importers, 0.539 percent.

(D) For roll-your-own tobacco manufacturers and importers, 0.171 percent.

(E) For chewing tobacco manufacturers and importers, 0.111 percent.

(F) For pipe tobacco manufacturers and importers, 0.066 percent.

(2) Subsequent allocations

For subsequent fiscal years, the Secretary shall periodically adjust the percentage of the total amount required under subsection (b) to be assessed against, and paid by, the manufacturers and importers of each class of tobacco product specified in paragraph (1) to reflect changes in the share of gross domestic volume held by that class of tobacco product.

(3) Effect of insufficient amounts

If the Secretary determines that the assessment imposed under subsection (b) will result in insufficient amounts to carry out this subchapter during a fiscal year, the Secretary shall assess such additional amounts as the Secretary determines to be necessary to carry out this subchapter during that fiscal year. The additional amount shall be allocated to manufacturers and importers of each class of tobacco product specified in paragraph

(1) in the same manner and based on the same percentages applicable under paragraph (1) or (2) for that fiscal year.
(d) Notification and timing of assessments
    (1) Notification of assessments
    The Secretary shall provide each manufacturer or importer subject to an assessment under subsection (b) with written notice setting forth the amount to be assessed against the manufacturer or importer for each quarterly payment period. The notice for a quarterly period shall be provided not later than 30 days before the date payment is due under paragraph (3).
    (2) Content
    The notice shall include the following information with respect to the quarterly period used by the Secretary in calculating the amount:
        (A) The total combined assessment for all manufacturers and importers of tobacco products.
        (B) The total assessment with respect to the class of tobacco products manufactured or imported by the manufacturer or importer.
        (C) Any adjustments to the percentage allocations among the classes of tobacco products made pursuant to paragraph (2) or (3) of subsection (c).
        (D) The volume of gross sales of the applicable class of tobacco product treated as made by the manufacturer or importer for purposes of calculating the manufacturer's or importer's market share under subsection (f).
        (E) The total volume of gross sales of the applicable class of tobacco product that the Secretary treated as made by all manufacturers and importers for purposes of calculating the manufacturer's or importer's market share under subsection (f).
        (F) The manufacturer's or importer's market share of the applicable class of tobacco product, as determined by the Secretary under subsection (f).
        (G) The market share, as determined by the Secretary under subsection (f), of each other manufacturer and importer, for each applicable class of tobacco product.
    (3) Timing of assessment payments
        (A) Collection date
        Assessments shall be collected at the end of each calendar year quarter, except that the Secretary shall ensure that the final assessment due under this section is collected not later than September 30, 2014.
        (B) Base period quarter
        The assessment for a calendar year quarter shall correspond to the base period quarter that ended at the end of the preceding calendar year quarter.
(e) Allocation of assessment within each class of tobacco product
    (1) Pro rata basis
    The assessment for each class of tobacco product specified in subsection (c)(1) shall be allocated on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume.
    (2) Limitation
    No manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume.
(f) Allocation of total assessments by market share
    The amount of the assessment for each class of tobacco product specified in subsection (c)(1) to be paid by each manufacturer or importer of that class of tobacco product shall be determined for

each quarterly payment period by multiplying –
    (1) the market share of the manufacturer or importer, as
calculated with respect to that payment period, of the class of
tobacco product; by
    (2) the total amount of the assessment for that quarterly
payment period under subsection (c), for the class of tobacco
product.
(g) Determination of volume of domestic sales
    (1) In general
    The calculation of the volume of domestic sales of a class of
tobacco product by a manufacturer or importer, and by all
manufacturers and importers as a group, shall be made by the
Secretary based on information provided by the manufacturers and
importers pursuant to subsection (h), as well as any other
relevant information provided to or obtained by the Secretary.
    (2) Gross domestic volume
    The volume of domestic sales shall be calculated based on gross
domestic volume.
    (3) Measurement
    For purposes of the calculations under this subsection and the
certifications under subsection (h) by the Secretary, the volumes
of domestic sales shall be measured by –
        (A) in the case of cigarettes and cigars, the number of
    cigarettes and cigars; and
        (B) in the case of the other classes of tobacco products
    specified in subsection (c)(1), in terms of number of pounds,
    or fraction thereof, of those products.
(h) Measurement of volume of domestic sales
    (1) Submission of information
    Each manufacturer and importer of tobacco products shall submit
to the Secretary a certified copy of each of the returns or forms
described by paragraph (2) that are required to be filed with a
Federal agency on the same date that those returns or forms are
filed, or required to be filed, with the agency.
    (2) Returns and forms
    The returns and forms described by this paragraph are those
returns and forms that relate to –
        (A) the removal of tobacco products into domestic commerce
    (as defined by section 5702 of title 26); and
        (B) the payment of the taxes imposed under charter (!2) 52 of
    title 26, including AFT Form 5000.24 and United States Customs
    Form 7501 under currently applicable regulations.

    (3) Effect of failure to provide required information
    Any person that knowingly fails to provide information required
under this subsection or that provides false information under
this subsection shall be subject to the penalties described in
section 1003 of title 18. The Secretary may also assess against
the person a civil penalty in an amount not to exceed two percent
of the value of the kind of tobacco products manufactured or
imported by the person during the fiscal year in which the
violation occurred, as determined by the Secretary.
(i) Challenge to assessment
    (1) Appeal to Secretary
    A manufacturer or importer subject to this section may contest
an assessment imposed on the manufacturer or importer under this
section by notifying the Secretary, not later than 30 business
days after receiving the assessment notification required by
subsection (d), that the manufacturer or importer intends to
contest the assessment.

(2) Information

Not later than 180 days after October 22, 2004, the Secretary shall establish by regulation a procedure under which a manufacturer or importer contesting an assessment under this subsection may present information to the Secretary to demonstrate that the assessment applicable to the manufacturer or importer is incorrect. In challenging the assessment, the manufacturer or importer may use any information that is available, including third party data on industry or individual company sales volumes.

(3) Revision

If a manufacturer or importer establishes that the initial determination of the amount of an assessment is incorrect, the Secretary shall revise the amount of the assessment so that the manufacturer or importer is required to pay only the amount correctly determined.

(4) Time for review

Not later than 30 days after receiving notice from a manufacturer or importer under paragraph (1), the Secretary shall —

(A) decide whether the information provided to the Secretary under paragraph (2), and any other information that the Secretary determines is appropriate, is sufficient to establish that the original assessment was incorrect; and

(B) make any revisions necessary to ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources.

(5) Immediate payment of undisputed amounts

The regulations promulgated by the Secretary under paragraph (2) shall provide for the immediate payment by a manufacturer or importer challenging an assessment of that portion of the assessment that is not in dispute. The manufacturer and importer may place into escrow, in accordance with such regulations, only the portion of the assessment being challenged in good faith pending final determination of the claim.

(j) Judicial review

(1) In general

Any manufacturer or importer aggrieved by a determination of the Secretary with respect to the amount of any assessment may seek review of the determination in the United States District Court for the District of Columbia or for the district in which the manufacturer or importer resides or has its principal place of business at any time following exhaustion of the administrative remedies available under subsection (i).

(2) Time limits

Administrative remedies shall be deemed exhausted if no decision by the Secretary is made within the time limits established under subsection (i)(4).

(3) Excessive assessments

The court shall restrain collection of the excessive portion of any assessment or order a refund of excessive assessments already paid, along with interest calculated at the rate prescribed in section 3717 of title 31, if it finds that the Secretary's determination is not supported by a preponderance of the information available to the Secretary.

(k) Termination date

The authority provided by this section to impose assessments terminates on September 30, 2014.

-SOURCE-

(Pub. L. 108-357, title VI, Sec. 625, Oct. 22, 2004, 118 Stat. 1529.)

-REFTEXT-
REFERENCES IN TEXT
The Harmonized Tariff Schedule of the United States, referred to in subsec. (a)(2)(B), is not set out in the Code. See Publication of Harmonized Tariff Schedule note set out under section 1202 of Title 19, Customs Duties.

-FOOTNOTE-
(!1) So in original.

(!2) So in original. Probably should be "chapter".

-End-

-CITE-
7 USC Sec. 518e                                    01/03/05

-EXPCITE-
TITLE 7 - AGRICULTURE
CHAPTER 21C - TOBACCO REFORM
SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                PRODUCERS OF TOBACCO

-HEAD-
Sec. 518e. Tobacco Trust Fund

-STATUTE-
(a) Establishment
There is established in the Commodity Credit Corporation a revolving trust fund, to be known as the "Tobacco Trust Fund", which shall be used in carrying out this subchapter. The Tobacco Trust Fund shall consist of the following:
(1) Assessments collected under section 518d of this title.
(2) Such amounts as are necessary from the Commodity Credit Corporation.
(3) Any interest earned on investment of amounts in the Tobacco Trust Fund under subsection (c).
(b) Expenditures
(1) Authorized expenditures
Subject to paragraph (2), and notwithstanding any other provision of law, the Secretary shall use amounts in the Tobacco Trust Fund, in such amounts as the Secretary determines are necessary -
(A) to make payments under sections 518a and 518b of this title;
(B) to provide reimbursement under section 519(c) of this title;
(C) to reimburse the Commodity Credit Corporation for costs incurred by the Commodity Credit Corporation under paragraph (2); and
(D) to make payments to financial institutions to satisfy contractual obligations under section 518a or 518b of this title.
(2) Expenditures by Commodity Credit Corporation

Notwithstanding any other provision of law, the Secretary shall use the funds, facilities, and authorities of the Commodity Credit Corporation to make payments described in paragraph (1). Not later than January 1, 2015, the Secretary shall use amounts in the Tobacco Trust Fund to fully reimburse, with interest, the Commodity Credit Corporation for all funds of the Commodity Credit Corporation expended under the authority of this paragraph. Administrative costs incurred by the Secretary or the Commodity Credit Corporation to carry out this title (!1) may not be paid using amounts in the Tobacco Trust Fund.

(c) Investment of amounts
  (1) In general
    The Commodity Credit Corporation shall invest such portion of the amounts in the Tobacco Trust Fund as are not, in the judgment of the Commodity Credit Corporation, required to meet current expenditures.
  (2) Interest-bearing obligations
    Investments may be made only in interest-bearing obligations of the United States.
  (3) Acquisition of obligations
    For the purpose of investments under paragraph (1), obligations may be acquired –
      (A) on original issue at the issue price; or
      (B) by purchase of outstanding obligations at the market price.
  (4) Sale of obligations
    Any obligation acquired by the Tobacco Trust Fund may be sold by the Commodity Credit Corporation at the market price.
  (5) Credits to Fund
    The interest on, and the proceeds from the sale or redemption of, any obligations held in the Tobacco Trust Fund shall be credited to and form a part of the Fund.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 626, Oct. 22, 2004, 118 Stat. 1533.)

-REFTEXT-
                    REFERENCES IN TEXT
    This title, referred to in subsec. (b)(2), means title VI of Pub. L. 108-357, which enacted this chapter, amended sections 609, 1282, 1301, 1303, 1314h, 1361, 1371, 1373, 1375, 1378, 1379, 1428, 1433c-1, and 1441 of this title and section 714c of Title 15, Commerce and Trade, repealed sections 511r, 515 to 515k, 625, 1311 to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315, 1316, 1445, 1445-1, and 1445-2 of this title, enacted provisions set out as notes under sections 515 and 518 of this title, and repealed provisions set out as a note under section 1314c of this title. For complete classification of title VI to the Code, see Short Title note set out under section 518 of this title and Tables.

-FOOTNOTE-
    (!1) See References in Text note below.


-End-

-CITE-
    7 USC Sec. 518f                                    01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER I - TRANSITIONAL PAYMENTS TO TOBACCO QUOTA HOLDERS AND
                    PRODUCERS OF TOBACCO

-HEAD-
    Sec. 518f. Limitation on total expenditures

-STATUTE-
        The total amount expended by the Secretary from the Tobacco Trust
    Fund to make payments under sections 518a and 518b of this title
    and for the other authorized purposes of the Fund shall not exceed
    $10,140,000,000.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 627, Oct. 22, 2004, 118 Stat.
    1534.)

-End-


-CITE-
    7 USC SUBCHAPTER II - IMPLEMENTATION AND TRANSITION    01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-HEAD-
                SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-End-


-CITE-
    7 USC Sec. 519                                    01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-HEAD-
    Sec. 519. Treatment of tobacco loan pool stocks and outstanding
      loan costs

-STATUTE-
    (a) Disposal of stocks
        To provide for the orderly disposition of quota tobacco held by
    an association that has entered into a loan agreement with the
    Commodity Credit Corporation under section 106A or 106B of the
    Agricultural Act of 1949 (7 U.S.C. 1445-1, 1445-2) (referred to in
    this section as an "association"), loan pool stocks for each kind

of tobacco held by the association shall be disposed of in
accordance with this section.
(b) Disposal by associations
    For each kind of tobacco held by an association, the association
shall be responsible for the disposal of a specific quantity of the
loan pool stocks for that kind of tobacco held by the association.
The quantity transferred to the association for disposal shall be
equal to the quantity determined by dividing -
    (1) the amount of funds held by the association in the No Net
Cost Tobacco Fund and the No Net Cost Tobacco Account established
under sections 106A and 106B of the Agricultural Act of 1949 (7
U.S.C. 1445-1, 1445-2) for the kind of tobacco; by
    (2) the average list price per pound for the kind of tobacco,
as determined by the Secretary.
(c) Disposal of remainder by Commodity Credit Corporation
    (1) Disposal
    Any loan pool stocks of a kind of tobacco of an association
that are not transferred to the association under subsection (b)
for disposal shall be disposed of by Commodity Credit Corporation
in a manner determined by the Secretary.
    (2) Reimbursement
    As required by section 518e(b)(1)(B) of this title, the
Secretary shall transfer from the Tobacco Trust Fund to the No
Net Cost Tobacco Fund or the No Net Cost Tobacco Account of an
association established under section 106A or 106B of the
Agricultural Act of 1949 (7 U.S.C. 1445-1, 1445-2) such amounts
as the Secretary determines will be adequate to reimburse the
Commodity Credit Corporation for any net losses that the
Corporation may sustain under its loan agreements with the
association.
(d) Transfer of remaining no net cost funds
    Any funds in the No Net Cost Tobacco Fund or the No Net Cost
Tobacco Account of an association established under sections 106A
and 106B of the Agricultural Act of 1949 (7 U.S.C. 1445-1, 1445-2)
that remain after the application of subsections (b) and (c) shall
be transferred to the association for distribution to producers of
quota tobacco in accordance with a plan approved by the Secretary.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 641, Oct. 22, 2004, 118 Stat.
1534.)

-REFTEXT-
                        REFERENCES IN TEXT
    Sections 106A and 106B of the Agricultural Act of 1949, referred
to in text, were classified to sections 1445-1 and 1445-2,
respectively, of this title prior to repeal by Pub. L. 108-357,
title VI, Sec. 612(a), Oct. 22, 2004, 118 Stat. 1523.

-End-

-CITE-
    7 USC Sec. 519a                                01/03/05

-EXPCITE-
    TITLE 7 - AGRICULTURE
    CHAPTER 21C - TOBACCO REFORM
    SUBCHAPTER II - IMPLEMENTATION AND TRANSITION

-HEAD-
    Sec. 519a. Regulations

-STATUTE-
    (a) In general
    The Secretary may promulgate such regulations as are necessary to
implement this title (!1) and the amendments made by this
title.(!1)

    (b) Procedure
    The promulgation of the regulations and administration of this
title (!1) and the amendments made by this title (!1) shall be made
without regard to -
        (1) the notice and comment provisions of section 553 of title
    5;
        (2) the Statement of Policy of the Secretary of Agriculture
    effective July 24, 1971 (36 Fed. Reg. 13804), relating to notices
    of proposed rulemaking and public participation in rulemaking;
    and
        (3) chapter 35 of title 44 (commonly known as the "Paperwork
    Reduction Act").
    (c) Congressional review of agency rulemaking
    In carrying out this section, the Secretary shall use the
authority provided under section 808 of title 5.

-SOURCE-
    (Pub. L. 108-357, title VI, Sec. 642, Oct. 22, 2004, 118 Stat.
1535.)

-REFTEXT-
                        REFERENCES IN TEXT
    This title, referred to in subsecs. (a) and (b), means title VI
of Pub. L. 108-357, which enacted this chapter, amended sections
609, 1282, 1301, 1303, 1314h, 1361, 1371, 1373, 1375, 1378, 1379,
1428, 1433c-1, and 1441 of this title and section 714c of Title 15,
Commerce and Trade, repealed sections 511r, 515 to 515k, 625, 1311
to 1314, 1314-1, 1314b, 1314b-1, 1314b-2, 1314c to 1314j, 1315,
1316, 1445, 1445-1, and 1445-2 of this title, enacted provisions
set out as notes under sections 515 and 518 of this title, and
repealed provisions set out as a note under section 1314c of this
title. For complete classification of title VI to the Code, see
Short Title note set out under section 518 of this title and
Tables.

-FOOTNOTE-
    (!1) See References in Text note below.

-End-

**EXHIBIT 2**