From the U.S. Code Online via GPO Access
[wais.access.gpo.gov]
[Laws in effect as of January 24, 2002]
[Document not affected by Public Laws enacted between
  January 24, 2002 and December 19, 2002]
[CITE: 44USC3516]


TITLE 44--PUBLIC PRINTING AND DOCUMENTS

CHAPTER 35--COORDINATION OF FEDERAL INFORMATION POLICY

SUBCHAPTER I--FEDERAL INFORMATION POLICY

Sec. 3516. Rules and regulations

    The Director shall promulgate rules, regulations, or procedures
necessary to exercise the authority provided by this subchapter.

(Added Pub. L. 104-13, Sec. 2, May 22, 1995, 109 Stat. 182; amended Pub.
L. 106-398, Sec. 1 [[div. A], title X, Sec. 1064(b)], Oct. 30, 2000, 114
Stat. 1654, 1654A-275.)


Prior Provisions

    A prior section 3516, added Pub. L. 96-511, Sec. 2(a), Dec. 11,
1980, 94 Stat. 2824, related to rules and regulations prior to the
general amendment of this chapter by Pub. L. 104-13.


Amendments

    2000--Pub. L. 106-398 substituted ``subchapter'' for ``chapter''.


Effective Date of 2000 Amendment

    Amendment by Pub. L. 106-398 effective 30 days after Oct. 30, 2000,
see section 1 [[div. A], title X, Sec. 1065] of Pub. L. 106-398, set out
as an Effective Date note under section 3531 of this title.


Policy and Procedural Guidelines

    Pub. L. 106-554, Sec. 1(a)(3) [title V, Sec. 515], Dec. 21, 2000,
114 Stat. 2763, 2763A-153, provided that:
    ``(a) In General.--The Director of the Office of Management and
Budget shall, by not later than September 30, 2001, and with public and
Federal agency involvement, issue guidelines under sections 3504(d)(1)
and 3516 of title 44, United States Code, that provide policy and
procedural guidance to Federal agencies for ensuring and maximizing the
quality, objectivity, utility, and integrity of information (including
statistical information) disseminated by Federal agencies in fulfillment
of the purposes and provisions of chapter 35 of title 44, United States
Code, commonly referred to as the Paperwork Reduction Act.
    ``(b) Content of Guidelines.--The guidelines under subsection (a)
shall--
        ``(1) apply to the sharing by Federal agencies of, and access
    to, information disseminated by Federal agencies; and

``(2) require that each Federal agency to which the guidelines apply--

``(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

``(B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

``(C) report periodically to the Director--

``(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and

``(ii) how such complaints were handled by the agency.''



Friday,
February 22, 2002

Part IX

# Office of Management and Budget

Guidelines for Ensuring and Maximizing
the Quality, Objectivity, Utility, and
Integrity of Information Disseminated by
Federal Agencies; Notice; Republication

## OFFICE OF MANAGEMENT AND BUDGET

**Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication**

**Editorial Note:** Due to numerous errors, this document is being reprinted in its entirety. It was originally printed in the **Federal Register** on Thursday, January 3, 2002 at 67 FR 369–378 and was corrected on Tuesday, February 5, 2002 at 67 FR 5365.

**AGENCY:** Office of Management and Budget, Executive Office of the President.

**ACTION:** Final guidelines.

**SUMMARY:** These final guidelines implement section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106–554; H.R. 5658). Section 515 directs the Office of Management and Budget (OMB) to issue government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies." By October 1, 2002, agencies must issue their own implementing guidelines that include "administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency" that does not comply with the OMB guidelines. These final guidelines also reflect the changes OMB made to the guidelines issued September 28, 2001, as a result of receiving additional comment on the "capable of being substantially reproduced" standard (paragraphs V.3.B, V.9, and V.10), which OMB previously issued on September 28, 2001, on an interim final basis.

**DATES:** *Effective Date:* January 3, 2002.

**FOR FURTHER INFORMATION CONTACT:** Brooke J. Dickson, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503. Telephone (202) 395–3785 or by e-mail to informationquality@omb.eop.gov.

**SUPPLEMENTARY INFORMATION:** In section 515(a) of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106–554; H.R. 5658), Congress directed the Office of Management and Budget (OMB) to issue, by September 30, 2001, government-wide guidelines that "provide policy and procedural

guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies * * *" Section 515(b) goes on to state that the OMB guidelines shall:

"(1) apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and

"(2) require that each Federal agency to which the guidelines apply—

"(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

"(B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

"(C) report periodically to the Director—

"(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency and;

"(ii) how such complaints were handled by the agency."

Proposed guidelines were published in the Federal Register on June 28, 2001 (66 FR 34489). Final guidelines were published in the Federal Register on September 28, 2001 (66 FR 49718). The Supplementary Information to the final guidelines published in September 2001 provides background, the underlying principles OMB followed in issuing the final guidelines, and statements of intent concerning detailed provisions in the final guidelines.

In the final guidelilnes published in September 2001, OMB also requested additional comment on the "capable of being substantially reproduced" standard and the related definition of "influential scientific or statistical information" (paragraphs V.3.B, V.9, and V.10), which were issued on an interim final basis. The final guidelines published today discuss the public comments OMB received, the OMB response, and amendments to the final guidelines published in September 2001.

In developing agency-specific guidelines, agencies should refer both to the Supplementary Information to the final guidelines published in the Federal Register on September 28, 2001 (66 FR 49718), and also to the Supplementary Information published today. We stress that the three "Underlying Principles" that OMB

followed in drafting the guidelines that we published on September 28, 2001 (66 FR 49719), are also applicable to the amended guidelines that we publish today.

In accordance with section 515, OMB has designed the guidelines to help agencies ensure and maximize the quality, utility, objectivity and integrity of the information that they disseminate (meaning to share with, or give access to, the public). It is crucial that information Federal agencies disseminate meets these guidelines. In this respect, the fact that the Internet enables agencies to communicate information quickly and easily to a wide audience not only offers great benefits to society, but also increases the potential harm that can result from the dissemination of information that does not meet basic information quality guidelines. Recognizing the wide variety of information Federal agencies disseminate and the wide variety of dissemination practices that agencies have, OMB developed the guidelines with several principles in mind.

First, OMB designed the guidelines to apply to a wide variety of government information dissemination activities that may range in importance and scope. OMB also designed the guidelines to be generic enough to fit all media, be they printed, electronic, or in other form. OMB sought to avoid the problems that would be inherent in developing detailed, prescriptive, "one-size-fits-all" government-wide guidelines that would artificially require different types of dissemination activities to be treated in the same manner. Through this flexibility, each agency will be able to incorporate the requirements of these OMB guidelines into the agency's own information resource management and administrative practices.

Second, OMB designed the guidelines so that agencies will meet basic information quality standards. Given the administrative mechanisms required by section 515 as well as the standards set forth in the Paperwork Reduction Act, it is clear that agencies should not disseminate substantive information that does not meet a basic level of quality. We recognize that some government information may need to meet higher or more specific information quality standards than those that would apply to other types of government information. The more important the information, the higher the quality standards to which it should be held, for example, in those situations involving "influential scientific, financial, or statistical information" (a phrase defined in these guidelines). The guidelines recognize, however, that

information quality comes at a cost. Accordingly, the agencies should weigh the costs (for example, including costs attributable to agency processing effort, respondent burden, maintenance of needed privacy, and assurances of suitable confidentiality) and the benefits of higher information quality in the development of information, and the level of quality to which the information disseminated will be held.

Third, OMB designed the guidelines so that agencies can apply them in a common-sense and workable manner. It is important that these guidelines do not impose unnecessary administrative burdens that would inhibit agencies from continuing to take advantage of the Internet and other technologies to disseminate information that can be of great benefit and value to the public. In this regard, OMB encourages agencies to incorporate the standards and procedures required by these guidelines into their existing information resources management and administrative practices rather than create new and potentially duplicative or contradictory processes. The primary example of this is that the guidelines recognize that, in accordance with OMB Circular A–130, agencies already have in place well-established information quality mechanisms that allow persons to seek and obtain correction of information that is maintained and disseminated by the agency. Under the OMB guidelines, agencies need only ensure that their own guidelines are consistent with these OMB guidelines, and then ensure that their administrative mechanisms satisfy the standards and procedural requirements in the new agency guidelines. Similarly, agencies may rely on their implementation of the Federal Government's computer security laws (formerly, the Computer Security Act, and now the computer security provisions of the Paperwork Reduction Act) to establish appropriate security safeguards for ensuring the "integrity" of the information that the agencies disseminate.

In addition, in response to concerns expressed by some of the agencies, we want to emphasize that OMB recognizes that Federal agencies provide a wide variety of data and information. Accordingly, OMB understands that the guidelines discussed below cannot be implemented in the same way by each agency. In some cases, for example, the data disseminated by an agency are not collected by that agency; rather, the information the agency must provide in a timely manner is compiled from a variety of sources that are constantly updated and revised and may be confidential. In such cases, while agencies' implementation of the guidelines may differ, the essence of the guidelines will apply. That is, these agencies must make their methods transparent by providing documentation, ensure quality by reviewing the underlying methods used in developing the data and consulting (as appropriate) with experts and users, and keep users informed about corrections and revisions.

## Summary of OMB Guidelines

These guidelines apply to Federal agencies subject to the Paperwork Reduction Act (44 U.S.C. chapter 35). Agencies are directed to develop information resources management procedures for reviewing and substantiating (by documentation or other means selected by the agency) the quality (including the objectivity, utility, and integrity) of information before it is disseminated. In addition, agencies are to establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, correction of information disseminated by the agency that does not comply with the OMB or agency guidelines. Consistent with the underlying principles described above, these guidelines stress the importance of having agencies apply these standards and develop their administrative mechanisms so they can be implemented in a common sense and workable manner. Moreover, agencies must apply these standards flexibly, and in a manner appropriate to the nature and timeliness of the information to be disseminated, and incorporate them into existing agency information resources management and administrative practices.

Section 515 denotes four substantive terms regarding information disseminated by Federal agencies: quality, utility, objectivity, and integrity. It is not always clear how each substantive term relates—or how the four terms in aggregate relate—to the widely divergent types of information that agencies disseminate. The guidelines provide definitions that attempt to establish a clear meaning so that both the agency and the public can readily judge whether a particular type of information to be disseminated does or does not meet these attributes.

In the guidelines, OMB defines "quality" as the encompassing term, of which "utility," "objectivity," and "integrity" are the constituents. "Utility" refers to the usefulness of the information to the intended users. "Objectivity" focuses on whether the disseminated information is being presented in an accurate, clear, complete, and unbiased manner, and as a matter of substance, is accurate, reliable, and unbiased. "Integrity" refers to security—the protection of information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification. OMB modeled the definitions of "information," "government information," "information dissemination product," and "dissemination" on the longstanding definitions of those terms in OMB Circular A–130, but tailored them to fit into the context of these guidelines.

In addition, Section 515 imposes two reporting requirements on the agencies. The first report, to be promulgated no later than October 1, 2002, must provide the agency's information quality guidelines that describe administrative mechanisms allowing affected persons to seek and obtain, where appropriate, correction of disseminated information that does not comply with the OMB and agency guidelines. The second report is an annual fiscal year report to OMB (to be first submitted on January 1, 2004) providing information (both quantitative and qualitative, where appropriate) on the number, nature, and resolution of complaints received by the agency regarding its perceived or confirmed failure to comply with these OMB and agency guidelines.

## Public Comments and OMB Response

*Applicability of Guidelines.* Some comments raised concerns about the applicability of these guidelines, particularly in the context of scientific research conducted by Federally employed scientists or Federal grantees who publish and communicate their research findings in the same manner as their academic colleagues. OMB believes that information generated and disseminated in these contexts is not covered by these guidelines unless the agency represents the information as, or uses the information in support of, an official position of the agency.

As a general matter, these guidelines apply to "information" that is "disseminated" by agencies subject to the Paperwork Reduction Act (44 U.S.C. 3502(1)). See paragraphs II, V.5 and V.8. The definitions of "information" and "dissemination" establish the scope of the applicability of these guidelines. "Information" means "any communication or representation of knowledge such as facts or data * * *" This definition of information in paragraph V.5 does "not include opinions, where the agency's presentation makes it clear that what is

being offered is someone's opinion rather than fact or the agency's views."

"Dissemination" is defined to mean "agency initiated or sponsored distribution of information to the public." As used in paragraph V.8, "agency INITIATED * * * distribution of information to the public" refers to information that the agency disseminates, e.g., a risk assessment prepared by the agency to inform the agency's formulation of possible regulatory or other action. In addition, if an agency, as an institution, disseminates information prepared by an outside party in a manner that reasonably suggests that the agency agrees with the information, this appearance of having the information represent agency views makes agency dissemination of the information subject to these guidelines. By contrast, an agency does not "initiate" the dissemination of information when a Federally employed scientist or Federal grantee or contractor publishes and communicates his or her research findings in the same manner as his or her academic colleagues, even if the Federal agency retains ownership or other intellectual property rights because the Federal government paid for the research. To avoid confusion regarding whether the agency agrees with the information (and is therefore disseminating it through the employee or grantee), the researcher should include an appropriate disclaimer in the publication or speech to the effect that the "views are mine, and do not necessarily reflect the view" of the agency.

Similarly, as used in paragraph V.8., "agency * * * SPONSORED distribution of information to the public" refers to situations where an agency has directed a third-party to disseminate information, or where the agency has the authority to review and approve the information before release. Therefore, for example, if an agency through a procurement contract or a grant provides for a person to conduct research, and then the agency directs the person to disseminate the results (or the agency reviews and approves the results before they may be disseminated), then the agency has "sponsored" the dissemination of this information. By contrast, if the agency simply provides funding to support research, and it the researcher (not the agency) who decides whether to disseminate the results and—if the results are to be released—who determines the content and presentation of the dissemination, then the agency has not "sponsored" the dissemination even though it has funded the research

and even if the Federal agency retains ownership or other intellectual property rights because the Federal government paid for the research. To avoid confusion regarding whether the agency is sponsoring the dissemination, the researcher should include an appropriate disclaimer in the publication or speech to the effect that the "views are mine, and do not necessarily reflect the view" of the agency. On the other hand, subsequent agency dissemination of such information requires that the information adhere to the agency's information quality guidelines. In sum, these guidelines govern an agency's dissemination of information, but generally do not govern a third-party's dissemination of information (the exception being where the agency is using the third-party to disseminate information on the agency's behalf). Agencies, particularly those that fund scientific research, are encouraged to clarify the applicability of these guidelines to the various types of information they and their employees and grantees disseminate.

Paragraph V.8 also states that the definition of "dissemination" does not include "* * * distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes." The exemption from the definition of "dissemination" for "adjudicative processes" is intended to exclude, from the scope of these guidelines, the findings and determinations that an agency makes in the course of adjudications involving specific parties. There are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions. These guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal.

*The Presumption Favoring Peer-Reviewed Information.* As a general matter, in the scientific and research context, we regard technical information that has been subjected to formal, independent, external peer review as presumptively objective. As the guidelines state in paragraph V.3.b.i: "If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity." An example of a formal, independent, external peer review is the review process used by scientific journals.

Most comments approved of the prominent role that peer review plays in the OMB guidelines. Some comments contended that peer review was not accepted as a universal standard that incorporates an established, practiced, and sufficient level of objectivity. Other comments stated that the guidelines would be better clarified by making peer review one of several factors that an agency should consider in assessing the objectivity (and quality in general) of original research. In addition, several comments noted that peer review does not establish whether analytic results are capable of being substantially reproduced. In light of the comments, the final guidelines in new paragraph V.3.b.i qualify the presumption in favor of peer-reviewed information as follows: "However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance."

We believe that transparency is important for peer review, and these guidelines set minimum standards for the transparency of agency-sponsored peer review. As we state in new paragraph V.3.b.i: "If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity. However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance. If agency-sponsored peer review is employed to help satisfy the objectivity standard, the review process employed shall meet the general criteria for competent and credible peer review recommended by OMB–OIRA to the President's Management Council (9/20/01) (http://www.whitehouse.gov/omb/inforeg/oira_review-process.html), namely, 'that (a) peer reviewers be selected primarily on the basis of necessary technical expertise, (b) peer reviewers be expected to disclose to agencies prior technical/policy positions they may have taken on the issues at hand, (c) peer reviewers be expected to disclose to agencies their sources of personal and institutional funding (private or public sector), and (d) peer reviews be conducted in an open and rigorous manner.'"

The importance of these general criteria for competent and credible peer review has been supported by a number of expert bodies. For example, "the work of fully competent peer-review panels can be undermined by allegations of conflict of interest and bias. Therefore, the best interests of the Board are served by effective policies and procedures regarding potential conflicts of interest, impartiality, and panel balance." (*EPA's Science Advisory*

*Board Panels: Improved Policies and Procedures Needed to Ensure Independence and Balance,* GAO–01–536, General Accounting Office, Washington, DC, June 2001, page 19.) As another example, "risk analyses should be peer-reviewed and accessible—both physically and intellectually—so that decision-makers at all levels will be able to respond critically to risk characterizations. The intensity of the peer reviews should be commensurate with the significance of the risk or its management implications." (*Setting Priorities, Getting Results: A New Direction for EPA,* Summary Report, National Academy of Public Administration, Washington, DC, April 1995, page 23.)

These criteria for peer reviewers are generally consistent with the practices now followed by the National Research Council of the National Academy of Sciences. In considering these criteria for peer reviewers, we note that there are many types of peer reviews and that agency guidelines concerning the use of peer review should tailor the rigor of peer review to the importance of the information involved. More generally, agencies should define their peer-review standards in appropriate ways, given the nature and importance of the information they disseminate.

*Is Journal Peer Review Always Sufficient?* Some comments argued that journal peer review should be adequate to demonstrate quality, even for influential information that can be expected to have major effects on public policy. OMB believes that this position overstates the effectiveness of journal peer review as a quality-control mechanism.

Although journal peer review is clearly valuable, there are cases where flawed science has been published in respected journals. For example, the NIH Office of Research Integrity recently reported the following case regarding environmental health research:

"Based on the report of an investigation conducted by [XX] University, dated July 16, 1999, and additional analysis conducted by ORI in its oversight review, the US Public Health Service found that Dr. [X] engaged in scientific misconduct. Dr. [X] committed scientific misconduct by intentionally falsifying the research results published in the journal SCIENCE and by providing falsified and fabricated materials to investigating officials at [XX] University in response to a request for original data to support the research results and conclusions report in the SCIENCE paper. In addition, PHS finds that there is no original data or other corroborating evidence to support the research results and conclusions reported in the SCIENCE paper as a whole." (66 FR 52137, October 12, 2001).

Although such cases of falsification are presumably rare, there is a significant scholarly literature documenting quality problems with articles published in peer-reviewed research. "In a [peer-reviewed] meta-analysis that surprised many—and some doubt—researchers found little evidence that peer review actually improves the quality of research papers." (*See, e.g., Science,* Vol. 293, page 2187 (September 21, 2001.)) In part for this reason, many agencies have already adopted peer review and science advisory practices that go beyond journal peer review. See, e.g., Sheila Jasanoff, *The Fifth Branch: Science Advisers as Policy Makers,* Cambridge, MA, Harvard University Press, 1990; Mark R. Powell, *Science at EPA: Information in the Regulatory Process.* Resources for the Future, Washington, DC., 1999, pages 138–139; 151–153; *Implementation of the Environmental Protection Agency's Peer Review Program: An SAB Evaluation of Three Reviews,* EPA–SAB–RSAC–01–009, A Review of the Research Strategies Advisory Committee (RSAC) of the EPA Science Advisory Board (SAB), Washington, DC., September 26, 2001. For information likely to have an important public policy or private sector impact, OMB believes that additional quality checks beyond peer review are appropriate.

*Definition of "Influential".* OMB guidelines apply stricter quality standards to the dissemination of information that is considered "influential." Comments noted that the breadth of the definition of "influential" in interim final paragraph V.9 requires much speculation on the part of agencies.

We believe that this criticism has merit and have therefore narrowed the definition. In this narrower definition, "influential," when used in the phrase "influential scientific, financial, or statistical information", is amended to mean that "the agency can reasonably determine that dissemination of the information will have or does have a clear and substantial impact on important public policies or important private sector decisions." The intent of the new phrase "clear and substantial" is to reduce the need for speculation on the part of agencies. We added the present tense—"or does have"—to this narrower definition because on occasion, an information dissemination may occur simultaneously with a particular policy change. In response to a public comment, we added an explicit reference to "financial" information as consistent with our original intent.

Given the differences in the many Federal agencies covered by these guidelines, and the differences in the nature of the information they disseminate, we also believe it will be helpful if agencies elaborate on this definition of "influential" in the context of their missions and duties, with due consideration of the nature of the information they disseminate. As we state in amended paragraph V.9, "Each agency is authorized to define 'influential' in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible."

*Reproducibility.* As we state in new paragraph V.3.b.ii: "If an agency is responsible for disseminating influential scientific, financial, or statistical information, agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties." OMB believes that a reproducibility standard is practical and appropriate for information that is considered "influential", as defined in paragraph V.9—that "will have or does have a clear and substantial impact on important public policies or important private sector decisions." The reproducibility standard applicable to influential scientific, financial, or statistical information is intended to ensure that information disseminated by agencies is sufficiently transparent in terms of data and methods of analysis that it would be feasible for a replication to be conducted. The fact that the use of original and supporting data and analytic results have been deemed "defensible" by peer-review procedures does not necessarily imply that the results are transparent and replicable.

*Reproducibility of Original and Supporting Data.* Several of the comments objected to the exclusion of original and supporting data from the reproducibility requirements. Comments instead suggested that OMB should apply the reproducibility standard to original data, and that OMB should provide flexibility to the agencies in determining what constitutes "original and supporting" data. OMB agrees and asks that agencies consider, in developing their own guidelines, which categories of original and supporting data should be subject to the reproducibility standard and which should not. To help in resolving this issue, we also ask agencies to consult directly with relevant scientific and technical communities on the feasibility of having the selected categories of original and supporting data subject to the reproducibility standard. Agencies are encouraged to address ethical, feasibility, and confidentiality issues

with care. As we state in new paragraph V.3.b.ii.A, "Agencies may identify, in consultation with the relevant scientific and technical communities, those particular types of data that can practicably be subjected to a reproducibility requirement, given ethical, feasibility, or confidentiality constraints." Further, as we state in our expanded definition of "reproducibility" in paragraph V.10, "If agencies apply the reproducibility test to specific types of original or supporting data, the associated guidelines shall provide relevant definitions of reproducibility (e.g., standards for replication of laboratory data)." OMB urges caution in the treatment of original and supporting data because it may often be impractical or even impermissible or unethical to apply the reproducibility standard to such data. For example, it may not be ethical to repeat a "negative" (ineffective) clinical (therapeutic) experiment and it may not be feasible to replicate the radiation exposures studied after the Chernobyl accident. When agencies submit their draft agency guidelines for OMB review, agencies should include a description of the extent to which the reproducibility standard is applicable and reflect consultations with relevant scientific and technical communities that were used in developing guidelines related to applicability of the reproducibility standard to original and supporting data.

It is also important to emphasize that the reproducibility standard does not apply to all original and supporting data disseminated by agencies. As we state in new paragraph V.3.b.ii.A, "With regard to original and supporting data related [to influential scientific, financial, or statistical information], agency guidelines shall not require that all disseminated data be subjected to a reproducibility requirement." In addition, we encourage agencies to address how greater transparency can be achieved regarding original and supporting data. As we also state in new paragraph V.3.b.ii.A, "It is understood that reproducibility of data is an indication of transparency about research design and methods and thus a replication exercise (i.e., a new experiment, test, or sample) shall not be required prior to each dissemination." Agency guidelines need to achieve a high degree of transparency about data even when reproducibility is not required.

*Reproducibility of Analytic Results.* Many public comments were critical of the reproducibility standard and expressed concern that agencies would be required to reproduce each analytical result before it is disseminated. While several comments commended OMB for establishing an appropriate balance in the "capable of being substantially reproduced" standard, others considered this standard to be inherently subjective. There were also comments that suggested the standard would cause more burden for agencies.

It is not OMB's intent that each agency must reproduce each analytic result before it is disseminated. The purpose of the reproducibility standard is to cultivate a consistent agency commitment to transparency about how analytic results are generated: the specific data used, the various assumptions employed, the specific analytic methods applied, and the statistical procedures employed. If sufficient transparency is achieved on each of these matters, then an analytic result should meet the "capable of being substantially reproduced" standard.

While there is much variation in types of analytic results, OMB believes that reproducibility is a practical standard to apply to most types of analytic results. As we state in new paragraph V.3.b.ii.B, "With regard to analytic results related [to influential scientific, financial, or statistical information], agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public. These transparency standards apply to agency analysis of data from a single study as well as to analyses that combine information from multiple studies." We elaborate upon this principle in our expanded definition of "reproducibility" in paragraph V.10: "With respect to analytic results, 'capable of being substantially reproduced' means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error."

Even in a situation where the original and supporting data are protected by confidentiality concerns, or the analytic computer models or other research methods may be kept confidential to protect intellectual property, it may still be feasible to have the analytic results subject to the reproducibility standard. For example, a qualified party, operating under the same confidentiality protections as the original analysts, may be asked to use the same data, computer model or statistical methods to replicate the analytic results reported in the original study. *See, e.g.,* "Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality," A Special Report of the Health Effects Institute's Particle Epidemiology Reanalysis Project, Cambridge, MA, 2000.

The primary benefit of public transparency is not necessarily that errors in analytic results will be detected, although error correction is clearly valuable. The more important benefit of transparency is that the public will be able to assess how much an agency's analytic result hinges on the specific analytic choices made by the agency. Concreteness about analytic choices allows, for example, the implications of alternative technical choices to be readily assessed. This type of sensitivity analysis is widely regarded as an essential feature of high-quality analysis, yet sensitivity analysis cannot be undertaken by outside parties unless a high degree of transparency is achieved. The OMB guidelines do not compel such sensitivity analysis as a necessary dimension of quality, but the transparency achieved by reproducibility will allow the public to undertake sensitivity studies of interest.

We acknowledge that confidentiality concerns will sometimes preclude public access as an approach to reproducibility. In response to public comment, we have clarified that such concerns do include interests in "intellectual property." To ensure that the OMB guidelines have sufficient flexibility with regard to analytic transparency, OMB has, in new paragraph V.3.b.ii.B.i, provided agencies an alternative approach for classes or types of analytic results that cannot practically be subject to the reproducibility standard. "[In those situations involving influential scientific, financial, or statistical information * * *] making the data and methods publicly available will assist in determining whether analytic results are reproducible. However, the objectivity standard does not override other compelling interests such as privacy, trade secrets, intellectual property, and other confidentiality protections." Specifically, in cases where reproducibility will not occur due to other compelling interests, we expect agencies (1) to perform robustness checks appropriate to the importance of the information involved, e.g., determining whether a specific statistic is sensitive to the choice of analytic method, and, accompanying the information disseminated, to document their efforts to assure the needed robustness in information quality, and (2) address in their guidelines the

degree to which they anticipate the opportunity for reproducibility to be limited by the confidentiality of underlying data. As we state in new paragraph V.3.b.ii.B.*ii*, "In situations where public access to data and methods will not occur due to other compelling interests, agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken. Agency guidelines shall, however, in all cases, require a disclosure of the specific data sources that have been used and the specific quantitative methods and assumptions that have been employed."

Given the differences in the many Federal agencies covered by these guidelines, and the differences in robustness checks and the level of detail for documentation thereof that might be appropriate for different agencies, we also believe it will be helpful if agencies elaborate on these matters in the context of their missions and duties, with due consideration of the nature of the information they disseminate. As we state in new paragraph V.3.b.ii.B.ii, "Each agency is authorized to define the type of robustness checks, and the level of detail for documentation thereof, in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible."

We leave the determination of the appropriate degree of rigor to the discretion of agencies and the relevant scientific and technical communities that work with the agencies. We do, however, establish a general standard for the appropriate degree of rigor in our expanded definition of "reproducibility" in paragraph V.10: "'Reproducibility' means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased)." OMB will review each agency's treatment of this issue when reviewing the agency guidelines as a whole.

Comments also expressed concerns regarding interim final paragraph V.3.B.iii, "making the data and models publicly available will assist in determining whether analytic results are capable of being substantially reproduced," and whether it could be interpreted to constitute public dissemination of these materials, rendering moot the reproducibility test. (For the equivalent provision, see new paragraph V.3.b.ii.B.*i*.) The OMB guidelines do not require agencies to reproduce each disseminated analytic result by independent reanalysis. Thus,

public dissemination of data and models *per se* does not mean that the analytic result has been reproduced. It means only that the result should be CAPABLE of being reproduced. The transparency associated with this capability of reproduction is what the OMB guidelines are designed to achieve.

We also want to build on a general observation that we made in our final guidelines published in September 2001. In those guidelines we stated: "... in those situations involving influential scientific[, financial,] or statistical information, the substantial reproducibility standard is added as a quality standard above and beyond some peer review quality standards" (66 FR 49722 (September 28, 2001)). A hypothetical example may serve to illustrate this point. Assume that two Federal agencies initiated or sponsored the dissemination of five scientific studies after October 1, 2002 (see paragraph III.4) that were, before dissemination, subjected to formal, independent, external peer review, i.e., that met the presumptive standard for "objectivity" under paragraph V.3.b.i. Further assume, at the time of dissemination, that neither agency reasonably expected that the dissemination of any of these studies would have "a clear and substantial impact" on important public policies, *i.e.*, that these studies were not considered "influential" under paragraph V.9, and thus not subject to the reproducibility standards in paragraphs V.3.b.ii.A or B. Then assume, two years later, in 2005, that one of the agencies decides to issue an important and far-reaching regulation based clearly and substantially on the agency's evaluation of the analytic results set forth in these five studies and that such agency reliance on these five studies as published in the agency's notice of proposed rulemaking would constitute dissemination of these five studies. These guidelines would require the rulemaking agency, prior to publishing the notice of proposed rulemaking, to evaluate these five studies to determine if the analytic results stated therein would meet the "capable of being substantially reproduced" standards in paragraph V.3.b.ii.B and, if necessary, related standards governing original and supporting data in paragraph V.3.b.ii.A. If the agency were to decide that any of the five studies would not meet the reproducibility standard, the agency may still rely on them but only if they satisfy the transparency standard and— as applicable—the disclosure of

robustness checks required by these guidelines. Otherwise, the agency should not disseminate any of the studies that did not meet the applicable standards in the guidelines at the time it publishes the notice of proposed rulemaking.

Some comments suggested that OMB consider replacing the reproducibility standard with a standard concerning "confirmation" of results for influential scientific and statistical information. Although we encourage agencies to consider "confirmation" as a relevant standard—at least in some cases—for assessing the objectivity of original and supporting data, we believe that "confirmation" is too stringent a standard to apply to analytic results. Often the regulatory impact analysis prepared by an agency for a major rule, for example, will be the only formal analysis of an important subject. It would be unlikely that the results of the regulatory impact analysis had already been confirmed by other analyses. The "capable of being substantially reproduced" standard is less stringent than a "confirmation" standard because it simply requires that an agency's analysis be sufficiently transparent that another qualified party could replicate it through reanalysis.

*Health, Safety, and Environmental Information.* We note, in the scientific context, that in 1996 the Congress, for health decisions under the Safe Drinking Water Act, adopted a basic standard of quality for the use of science in agency decisionmaking. Under 42 U.S.C. 300g–1b(3)(A), an agency is directed, "to the degree that an Agency action is based on science," to use "(i) the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices; and (ii) data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data)."

We further note that in the 1996 amendments to the Safe Drinking Water Act, Congress adopted a basic quality standard for the dissemination of public information about risks of adverse health effects. Under 42 U.S.C. 300g– 1(b)(3)(B), the agency is directed, "to ensure that the presentation of information [risk] effects is comprehensive, informative, and understandable." The agency is further directed, "in a document made available to the public in support of a regulation [to] specify, to the extent practicable— (i) each population addressed by any estimate [of applicable risk effects]; (ii) the expected risk or central estimate of

risk for the specific populations [affected]; (iii) each appropriate upper-bound or lower-bound estimate of risk; (iv) each significant uncertainty identified in the process of the assessment of [risk] effects and the studies that would assist in resolving the uncertainty; and (v) peer-reviewed studies known to the [agency] that support, are directly relevant to, or fail to support any estimate of [risk] effects and the methodology used to reconcile inconsistencies in the scientific data.''

As suggested in several comments, we have included these congressional standards directly in new paragraph V.3.b.ii.C, and made them applicable to the information disseminated by all the agencies subject to these guidelines: ''With regard to analysis of risks to human health, safety and the environment maintained or disseminated by the agencies, agencies shall either adopt or adapt the quality principles applied by Congress to risk information used and disseminated pursuant to the Safe Drinking Water Act Amendments of 1996 (42 U.S.C. 300g–1(b)(3)(A) & (B)).'' The word ''adapt'' is intended to provide agencies flexibility in applying these principles to various types of risk assessment.

Comments also argued that the continued flow of vital information from agencies responsible for disseminating health and medical information to medical providers, patients, and the public may be disrupted due to these peer review and reproducibility standards. OMB responded by adding to new paragraph V.3.b.ii.C: ''Agencies responsible for dissemination of vital health and medical information shall interpret the reproducibility and peer-review standards in a manner appropriate to assuring the timely flow of vital information from agencies to medical providers, patients, health agencies, and the public. Information quality standards may be waived temporarily by agencies under urgent situations (e.g., imminent threats to public health or homeland security) in accordance with the latitude specified in agency-specific guidelines.''

*Administrative Correction Mechanisms.* In addition to commenting on the substantive standards in these guidelines, many of the comments noted that the OMB guidelines on the administrative correction of information do not specify a time period in which the agency investigation and response must be made. OMB has added the following new paragraph III.3.i to direct agencies to specify appropriate time periods in which the investigation and response need to be made. ''Agencies shall specify appropriate time periods

for agency decisions on whether and how to correct the information, and agencies shall notify the affected persons of the corrections made.''

Several comments stated that the OMB guidelines needed to direct agencies to consider incorporating an administrative appeal process into their administrative mechanisms for the correction of information. OMB agreed, and added the following new paragraph III.3.ii: ''If the person who requested the correction does not agree with the agency's decision (including the corrective action, if any), the person may file for reconsideration within the agency. The agency shall establish an administrative appeal process to review the agency's initial decision, and specify appropriate time limits in which to resolve such requests for reconsideration.'' Recognizing that many agencies already have a process in place to respond to public concerns, it is not necessarily OMB's intent to require these agencies to establish a new or different process. Rather, our intent is to ensure that agency guidelines specify an objective administrative appeal process that, upon furthercomplaint by the affected person, reviews an agency's decision to disagree with the correction request. An objective process will ensure that the office that originally disseminates the information does not have responsibility for both the initial response and resolution of a disagreement. In addition, the agency guidelines should specify that if the agency believes other agencies may have an interest in the resolution of any administrative appeal, the agency should consult with those other agencies about their possible interest.

Overall, OMB does not envision administrative mechanisms that would burden agencies with frivolous claims. Instead, the correction process should serve to address the genuine and valid needs of the agency and its constituents without disrupting agency processes. Agencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved, and explain such practices in their annual fiscal year reports to OMB.

OMB's issuance of these final guidelines is the beginning of an evolutionary process that will include draft agency guidelines, public comment, final agency guidelines, development of experience with OMB and agency guidelines, and continued refinement of both OMB and agency guidelines. Just as OMB requested

public comment before issuing these final guidelines, OMB will refine these guidelines as experience develops and further public comment is obtained.

Dated: December 21, 2001.

**John D. Graham,**
*Administrator, Office of Information and Regulatory Affairs.*

**Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies**

*I. OMB Responsibilities*

Section 515 of the Treasury and General Government Appropriations Act for FY2001 (Public Law 106–554) directs the Office of Management and Budget to issue government-wide guidelines that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by Federal agencies.

*II. Agency Responsibilities*

Section 515 directs agencies subject to the Paperwork Reduction Act (44 U.S.C. 3502(1)) to—

1. Issue their own information quality guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by the agency no later than one year after the date of issuance of the OMB guidelines;

2. Establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with these OMB guidelines; and

3. Report to the Director of OMB the number and nature of complaints received by the agency regarding agency compliance with these OMB guidelines concerning the quality, objectivity, utility, and integrity of information and how such complaints were resolved.

*III. Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*

1. Overall, agencies shall adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal and should take appropriate steps to incorporate information quality criteria into agency information dissemination practices. Quality is to be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated. Agencies shall adopt

specific standards of quality that are appropriate for the various categories of information they disseminate.

2. As a matter of good and effective agency information resources management, agencies shall develop a process for reviewing the quality (including the objectivity, utility, and integrity) of information before it is disseminated. Agencies shall treat information quality as integral to every step of an agency's development of information, including creation, collection, maintenance, and dissemination. This process shall enable the agency to substantiate the quality of the information it has disseminated through documentation or other means appropriate to the information.

3. To facilitate public review, agencies shall establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines. These administrative mechanisms shall be flexible, appropriate to the nature and timeliness of the disseminated information, and incorporated into agency information resources management and administrative practices.

i. Agencies shall specify appropriate time periods for agency decisions on whether and how to correct the information, and agencies shall notify the affected persons of the corrections made.

ii. If the person who requested the correction does not agree with the agency's decision (including the corrective action, if any), the person may file for reconsideration within the agency. The agency shall establish an administrative appeal process to review the agency's initial decision, and specify appropriate time limits in which to resolve such requests for reconsideration.

4. The agency's pre-dissemination review, under paragraph III.2, shall apply to information that the agency first disseminates on or after October 1, 2002. The agency's administrative mechanisms, under paragraph III.3., shall apply to information that the agency disseminates on or after October 1, 2002, regardless of when the agency first disseminated the information.

*IV. Agency Reporting Requirements*

1. Agencies must designate the Chief Information Officer or another official to be responsible for agency compliance with these guidelines.

2. The agency shall respond to complaints in a manner appropriate to

the nature and extent of the complaint. Examples of appropriate responses include personal contacts via letter or telephone, form letters, press releases or mass mailings that correct a widely disseminated error or address a frequently raised complaint.

3. Each agency must prepare a draft report, no later than April 1, 2002, providing the agency's information quality guidelines and explaining how such guidelines will ensure and maximize the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by the agency. This report must also detail the administrative mechanisms developed by that agency to allow affected persons to seek and obtain appropriate correction of information maintained and disseminated by the agency that does not comply with the OMB or the agency guidelines.

4. The agency must publish a notice of availability of this draft report in the Federal Register, and post this report on the agency's website, to provide an opportunity for public comment.

5. Upon consideration of public comment and after appropriate revision, the agency must submit this draft report to OMB for review regarding consistency with these OMB guidelines no later than July 1, 2002. Upon completion of that OMB review and completion of this report, agencies must publish notice of the availability of this report in its final form in the Federal Register, and post this report on the agency's web site no later than October 1, 2002.

6. On an annual fiscal-year basis, each agency must submit a report to the Director of OMB providing information (both quantitative and qualitative, where appropriate) on the number and nature of complaints received by the agency regarding agency compliance with these OMB guidelines and how such complaints were resolved. Agencies must submit these reports no later than January 1 of each following year, with the first report due January 1, 2004.

*V. Definitions*

1. "Quality" is an encompassing term comprising utility, objectivity, and integrity. Therefore, the guidelines sometimes refer to these four statutory terms, collectively, as "quality."

2. "Utility" refers to the usefulness of the information to its intended users, including the public. In assessing the usefulness of information that the agency disseminates to the public, the agency needs to consider the uses of the information not only from the

perspective of the agency but also from the perspective of the public. As a result, when transparency of information is relevant for assessing the information's usefulness from the public's perspective, the agency must take care to ensure that transparency has been addressed in its review of the information.

3. "Objectivity" involves two distinct elements, presentation and substance.

a. "Objectivity" includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner. This involves whether the information is presented within a proper context. Sometimes, in disseminating certain types of information to the public, other information must also be disseminated in order to ensure an accurate, clear, complete, and unbiased presentation. Also, the agency needs to identify the sources of the disseminated information (to the extent possible, consistent with confidentiality protections) and, in a scientific, financial, or statistical context, the supporting data and models, so that the public can assess for itself whether there may be some reason to question the objectivity of the sources. Where appropriate, data should have full, accurate, transparent documentation, and error sources affecting data quality should be identified and disclosed to users.

b. In addition, "objectivity" involves a focus on ensuring accurate, reliable, and unbiased information. In a scientific, financial, or statistical context, the original and supporting data shall be generated, and the analytic results shall be developed, using sound statistical and research methods.

i. If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity. However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance. If agency-sponsored peer review is employed to help satisfy the objectivity standard, the review process employed shall meet the general criteria for competent and credible peer review recommended by OMB–OIRA to the President's Management Council (9/20/01) (http://www.whitehouse.gov/omb/inforeg/oira_review-process.html), namely, "that (a) peer reviewers be selected primarily on the basis of necessary technical expertise, (b) peer reviewers be expected to disclose to agencies prior technical/policy positions they may have taken on the issues at hand, (c) peer reviewers be expected to disclose to agencies their sources of personal and

institutional funding (private or public sector), and (d) peer reviews be conducted in an open and rigorous manner."

ii. If an agency is responsible for disseminating influential scientific, financial, or statistical information, agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties.

A. With regard to original and supporting data related thereto, agency guidelines shall not require that all disseminated data be subjected to a reproducibility requirement. Agencies may identify, in consultation with the relevant scientific and technical communities, those particular types of data that can practicable be subjected to a reproducibility requirement, given ethical, feasibility, or confidentiality constraints. It is understood that reproducibility of data is an indication of transparency about research design and methods and thus a replication exercise (i.e., a new experiment, test, or sample) shall not be required prior to each dissemination.

B. With regard to analytic results related thereto, agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public. These transparency standards apply to agency analysis of data from a single study as well as to analyses that combine information from multiple studies.

i. Making the data and methods publicly available will assist in determining whether analytic results are reproducible. However, the objectivity standard does not override other compelling interests such as privacy, trade secrets, intellectual property, and other confidentiality protections.

ii. In situations where public access to data and methods will not occur due to other compelling interests, agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken. Agency guidelines shall, however, in all cases, require a disclosure of the specific data sources that have been used and the specific quantitative methods and assumptions that have been employed. Each agency is authorized to define the type of robustness checks, and the level of

detail for documentation thereof, in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible.

C. With regard to analysis of risks to human health, safety and the environment maintained or disseminated by the agencies, agencies shall either adopt or adapt the quality principles applied by Congress to risk information used and disseminated pursuant to the Safe Drinking Water Act Amendments of 1996 (42 U.S.C. 300g–1(b)(3)(A) & (B)). Agencies responsible for dissemination of vital health and medical information shall interpret the reproducibility and peer-review standards in a manner appropriate to assuring the timely flow of vital information from agencies to medical providers, patients, health agencies, and the public. Information quality standards may be waived temporarily by agencies under urgent situations (e.g., imminent threats to public health or homeland security) in accordance with the latitude specified in agency-specific guidelines.

4. "Integrity" refers to the security of information—protection of the information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification.

5. "Information" means any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition includes information that an agency disseminates from a web page, but does not include the provision of hyperlinks to information that others disseminate. This definition does not include opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views.

6. "Government information" means information created, collected, processed, disseminated, or disposed of by or for the Federal Government.

7. "Information dissemination product" means any books, paper, map, machine-readable material, audiovisual production, or other documentary material, regardless of physical form or characteristic, an agency disseminates to the public. This definition includes any electronic document, CD–ROM, or web page.

8. "Dissemination" means agency initiated or sponsored distribution of

information to the public (see 5 CFR 1320.3(d) (definition of "Conduct or Sponsor")). Dissemination does not include distribution limited to government employees or agency contractors or grantees; intra- or inter-agency use or sharing of government information; and responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or other similar law. This definition also does not include distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes.

9. "Influential", when used in the phrase "influential scientific, financial, or statistical information", means that the agency can reasonably determine that dissemination of the information will have or does have a clear and substantial impact on important public policies or important private sector decisions. Each agency is authorized to define "influential" in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible.

10. "Reproducibility" means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased). If agencies apply the reproducibility test to specific types of original or supporting data, the associated guidelines shall provide relevant definitions of reproducibility (e.g., standards for replication of laboratory data). With respect to analytic results, "capable of being substantially reproduced" means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error.

[FR Doc. 02–59 Filed 1–2–02; 1:36 pm]
BILLING CODE 3110–01–M

Editorial Note: Due to numerous errors, this document is being reprinted in its entirety. It was originally printed in the Federal Register on Thursday, January 3, 2002 at 67 FR 369–378 and was corrected on Tuesday, February 5, 2002 at 67 FR 5365.

[FR Doc. R2–59 Filed 2–21–02; 8:45 am]
BILLING CODE 1505–01–D

**You are here:** Home / Quality of Information Guidelines

# USDA Quality of Information Guidelines

## General Requirements

These general information quality guidelines apply to all types
of information disseminated by USDA agencies and offices.

- USDA will strive to ensure and maximize the quality,
  objectivity, utility, and integrity of the information that its
  agencies and offices disseminate to the public.
- USDA agencies and offices will adopt a basic standard of
  quality (including objectivity, utility, and integrity) and
  take appropriate steps to incorporate information quality
  criteria into their information dissemination practices.
- USDA agencies and offices will review the quality
  (including objectivity, utility, and integrity) of information
  before it is disseminated to ensure that it complies with
  the standards set forth in these Guidelines.
- USDA agencies and offices will treat information quality as
  integral to every step in their development of information,
  including creation, collection, maintenance, and
  dissemination.
- In accordance with OMB guidance, when collecting
  information that requires OMB clearance under the
  Paperwork Reduction Act, USDA agencies and offices will
  demonstrate in the clearance package submitted to OMB
  that the information collection would result in information
  that will comply with OMB and USDA information quality
  guidelines.

The following information quality criteria comprise the general
quality standards that USDA agencies and offices will follow in
developing and reviewing information and disseminating it to
the public.

### Objectivity

- USDA agencies and offices will strive to ensure that the
  information they disseminate is substantively accurate,
  reliable, and unbiased and presented in an accurate,
  clear, complete, and unbiased manner.
- To the extent possible, consistent with confidentiality
  protections, USDA agencies and offices will identify the
  source of the information so that the public can assess
  whether the information is objective.

### Utility

- USDA agencies and offices will assess the usefulness of
  the information they disseminate to its intended users,
  including the public.
- When transparency of information is relevant for
  assessing the information's usefulness from the public's
  perspective, USDA agencies and offices will ensure that
  transparency is addressed in their review of the
  information prior to its dissemination.
- USDA agencies and offices will ensure that disseminated
  information is accessible to all persons pursuant to the
  requirements of Section 508 of the Rehabilitation Act.

**Integrity**

- USDA agencies and offices will protect information they maintain from unauthorized access or revision to ensure that disseminated information is not compromised through corruption or falsification.
- USDA agencies and offices will secure their information resources by implementing the programs and policies required by the Government Information Security Reform Act.
- USDA agencies and offices will maintain the integrity of confidential information and comply with the statutory requirements to protect the information it gathers and disseminates. These include: The Privacy Act of 1974, as amended; The Paperwork Reduction Act of 1995; The Computer Security Act of 1987; The Freedom of Information Act; and OMB Circulars A-123, A-127, and A-130.

............................................................................................................

http://www.ocio.usda.gov/qi_guide/index.html
Last Modified: 04/20/2006

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

SINGLE STICK, INC.                                )
2046 W Rose Garden Lane                           )
Phoenix, Arizona 85027                            )
                                                  )
        Plaintiff                                 )
                                                  CASE NUMBER   1:06CV01077
v.                                                
                                                  JUDGE: Richard W. Roberts
MICHAEL JOHANNS, Secretary of Agriculture,        
and the UNITED STATES DEPARTMENT OF               DECK TYPE: Administrative Agency Review
AGRICULTURE                                       
1400 Pennsylvania Avenue, S.W.                    DATE STAMP: 06/13/2006
Stop 0506                                         )
Room 3621-S                                       )
Washington, D.C. 20250-0506                       )
                                                  )
        Defendants                                )
                                                  )

COMPLAINT
(For Declaratory and Injunctive Relief)

**Introduction**

1.      This suit for declaratory judgment and injunctive relief asks the Court to

compel defendants to comply with the Fair and Equitable Tobacco Reform Act (the

"Reform Act"), 7 U.S.C. §518d et seq. (Exhibit 1), and the Information Quality Act, 44

U.S.C. §3516, note, and applicable Office of Management and Budget and agency

information quality guidelines (collectively the "IQA") (Exhibit 2).

2.      The defendants have violated the Reform Act, and frustrated

Congressional intent, by a) unlawfully demanding plaintiff, a cigar manufacturer, pay

unauthorized and improper Tobacco Transition Payment Program (the "Payment

Program") "assessments" that could exceed $25 million during the next ten years,  b)

unlawfully assessing plaintiff's "small" cigars at the rate of $1.68 - $1.82 per pound of

tobacco removed, while assessing "large" cigars at the rate of $0.08 - $0.25 per pound of

tobacco removed, and c) unlawfully over-estimating plaintiff's market share, contrary to

all competent record evidence.

     3.     Additionally, the defendants have violated the IQA, and frustrated

plaintiff's statutory and due process rights, by a) failing to correct incorrect disseminated

information, and make available statistical data used to develop defendants' estimate of

the domestic cigar market's size as required by the IQA, b) totally failing to respond to,

or even acknowledge, plaintiff's IQA petition and request for reconsideration, and c)

depriving plaintiff of the information it needed to obtain a full and fair hearing for its

appeal of the defendants' assessments.

     4.     This matter should be remanded with instructions to the defendants to

comply with the Reform Act, to appropriately assess plaintiff, and to correct and/or

disclose data and information, all in accordance with law.

**Parties**

     5.     Plaintiff Single Stick, Inc. ("Single Stick") manufactures and sells

primarily "small" cigars, defined by law as cigars weighing less than three pounds per

thousand "sticks" or units.   Single Stick is a cigar manufacturer or importer for purposes

of the Reform Act, and is subject to Payment Program assessment.

     6.     Defendant Johanns is the Secretary of Agriculture.  He is sued in his

official capacity.

2

7.     The Department of Agriculture ("DOA") is an agency of the United States, and includes the Commodity Credit Corporation ("CCC") and the Farm Service Agency ("FSA") which administer the Payment Program.

## Jurisdiction, Venue and Relief

8.     7 U.S.C. §518d(j)(1) and 28 U.S.C. §1331 confer subject matter jurisdiction.

9.     7 U.S.C. §518d(j)(3), 5 U.S.C. §§701 - 706 and 28 U.S.C. §§1361, 2201, and 2202 authorize the Court to grant the requested relief.

10.     7 U.S.C. §518d(j)(1), 28 U.S.C. §1391(e), and 5 U.S.C. §703 provide the Court is a proper venue for this action.

11.     The defendants' actions and legal determinations in this case are reviewed de novo.

## Facts

12.     The Reform Act, passed in 2004, launched a ten-year phase-out of Depression-era tobacco price support programs, and established the Payment Program to compensate affected domestic tobacco farmers through ten equal installment payments, made during fiscal years 2005-2014.

13.     The Congress funded the Payment Program through "assessments" - or taxes - on tobacco manufacturers and importers. It divided the domestic tobacco market into six major "classes" - cigars, cigarettes, chewing tobacco, pipe tobacco, snuff, and "roll your own" tobacco - and allocated each class a defined percentage portion of the total Payment Program obligation, which it calculated by multiplying net tobacco removed by the maximum excise tax per product (i.e. another measure of volume).

3

Cigarette manufacturers and importers were assessed 96.331% of the total Payment

Program, cigar manufacturers and importers (such as Single Stick) were assessed

2.783%, and the balance was distributed among the remaining four tobacco classes.

14.    The DOA distinguished between large and small cigars when it calculated

initial class assessments, allocating large cigars 2.727% and small cigars 0.056% of the

Payment Program obligation, respectively.  (Exhibit 3).  The DOA then combined them

into one class for "cigars" at 2.783%.

15.    Although the DOA was charged with calculating and collecting Payment

Program assessments for and from each tobacco manufacturer and importer, Congress set

clear statutory guidelines to govern the process.

16.    To ensure equity, and guarantee that manufacturers and importers were

fairly assessed, the Reform Act, in 7 U.S.C. § 518d(e), required pro rata assessment

within each class, and prohibited assessments that exceeded a class member's actual

share of removed volume - meaning the volume of tobacco taken from factories or

internal revenue bond, from customs custody, or that was smuggled or unlawfully

imported into the U.S. by all class members.

17.    As to the cigar class, however, the DOA misapplied the law and frustrated

Congressional intent.

18.    Historically, cigars have been taxed and regulated by the federal

government - acting through the Alcohol and Tobacco Tax and Trade Bureau (TTB) -

based on the volume of tobacco contained in each unit.  A single large cigar can contain

as much or more tobacco than a twenty count package of small cigars. Thus, TTB has

divided the cigar market into two basic categories: small cigars, defined as less than three

4

pounds of tobacco per thousand sticks, and large cigars.  Large cigars account for more than 95% of the removed volume of cigar tobacco in the U.S. market.

19.     Failing to recognize a small cigar removed but a fraction of the volume of tobacco removed in a large cigar, the DOA never measured, and its cigar class assessments were not based on, gross domestic volume.  Instead, ignoring the Reform Act's plain language, and despite having ready access to removed volume data, the DOA assessed Single Stick based solely on an incomplete and statistically indefensible estimate of domestic cigar market share that the DOA obtained by dividing the number of cigars Single Stick sold ("stick count") by the total number of cigars sold in the United States.

20.     The DOA, through CCC, assessed Single Stick:  a) $339,719.00 for the period October 2004 - December 2004, based on an alleged market share of 4.81% (invoice no. CR05100007); b) $455,374.00 for the period January 2005 - March 2005, based on an alleged cigar market share of 6.45% (invoice no. CR05200005), and c) $1,152,530.00 for the period April 2005-June 2005, based on an alleged cigar market share of 7.78% (invoice no. CR050300004) (Exhibit 4).

21.     The DOA violated the Reform Act by assessing Single Stick far in excess of its pro rata share of the removed volume of cigar tobacco.  For example, Single Stick's average market share between December 2004 and June 2005 was 0.79%, measured by excise taxes paid on the volume of tobacco removed, not the 6.83% calculated by CCC. (Exhibit 5).

22.    Furthermore, the DOA arbitrarily and capriciously assessed Single Stick $1.68 - $1.82 per pound of tobacco removed for small cigars, while assessing tobacco used for large cigars at the rate of only $0.08 - $0.25 per pound removed. (Exhibit 6).

23.    Finally, the DOA substantially overstated Single Stick's "stick count" market share, and improperly inflated Single Stick's Payment Program obligation.

24.    Single Stick timely appealed the CCC assessments.

25.    While its appeal was pending, Single Stick attempted to verify the CCC's estimated cigar market "stick count." Lacking access to the CCC's primary data sources and unable to independently test or verify the CCC's estimate of market share, yet requiring this information to be able to fully and fairly pursue its appeal, Single Stick requested raw data and full identification of all CCC data sources.

26.    On September 13, 2005, Single Stick sent the DOA a Freedom of Information Act Request. This Request was denied on October 24, 2005 because the DOA claimed its data sources were specifically exempted from FOIA disclosure. (Exhibit 7).

27.    Also on September 13, 2005, Single Stick sent the DOA an IQA Petition seeking information correction and data source disclosure. The DOA did not respond to the Petition. On December 20, 2005, Single Stick filed a Request for Reconsideration. Again, the DOA failed to respond. (Exhibit 8).

28.    The DOA's failure to acknowledge, much less respond to, Single Stick's IQA Petition or its Request for Reconsideration constituted effective denial and final agency action.

6

29.  Due to the DOA's total disregard for Single Stick's informational rights, Single Stick was unable to evaluate, much less challenge, the agency's market share estimate. Consequently, Single Stick's statutory and due process rights to a full and fair hearing were violated.

30.  Single Stick's appeal was heard by an administrative law judge on November 17, 2005. Single Stick argued, *inter alia*, that the DOA had violated the Reform Act and wrongly estimated market share.

31.  Single Stick submitted A.C. Nielsen "point of sale" survey data demonstrating the DOA over-estimated its market share by several orders of magnitude. Single Stick also submitted uncontroverted evidence that the A.C. Nielsen survey is recognized as the most accurate commercially available measure of market share, and is relied on by industry executives to make advertising, product, distribution, and other critical business decisions.

32.  According to A.C. Nielsen, Single Stick's total market share between October, 2004 and October, 2005 was approximately 1.05% - 2.5%. The DOA's unverified market share estimate was between 4.81% and 7.78% for the identical time-period.

33.  During the hearing, the defendants failed to introduce any independent evidence into the record demonstrating its market share estimate was complete or accurate, or that it included a statistically defensible estimate of the number of cigars smuggled or unlawfully imported into the United States.

34.  The DOA decided Single Stick's appeal on February 8, 2006. The appeal was denied in part and granted in part. (Exhibit 9). The DOA acknowledged Single

7

Stick "may be philosophically well founded" to argue the inequity of assessing small

cigars as if each stick contained the same volume of tobacco as contained in a large cigar.

However, the DOA ruled against Single Stick, erroneously asserting Congress had

mandated such an outcome.

35.    The DOA also affirmed Single Stick's appeal claim that it was paying

more than its proportional share "to the extent CCC will perform a recalculation and

reconciliation of the (2005) assessments." This recalculation and reconciliation was

slated to occur due to the CCC's admitted failure to meet Reform Act requirements when

it issued the initial round of assessments. Nevertheless, the DOA erroneously concluded

that recalculation had to be based solely on data submitted to the CCC, or to the

Departments of Homeland Security or Treasury, ignoring 7 U.S.C. §518d(a)(2)'s

requirement that all removed tobacco, including cigars smuggled or unlawfully imported

into the United States, be used to calculate market share.

36.    The DOA stated Single Stick's FOIA request was "outside the scope of

this review as it pertains to the appeal of the [Payment Program] assessment." However,

the DOA erroneously determined that Single Stick had failed to demonstrate that denial

of its FOIA request had interfered with its due process or otherwise caused harm.

Furthermore, the DOA erroneously ruled that "The fact that [Single Stick] was unable to

obtain, review, and scrutinize the underlying data used [by CCC] to calculate market

shares does not mean [Single Stick's] assertions are well-founded nor does it render

[CCC's] data incorrect." Contrary to the record, it determined "[Single Stick] has made

no sustainable argument that the data relied on by CCC was incorrect or used

improperly..."

8

37.     The DOA never mentioned Single Stick's IQA Petition or Request for Reconsideration.

38.     On or about March 1, 2006, Single Stick received recalculated assessments.  The DOA: a) raised Single Stick's estimated market share for October-December 2004 from 4.81% to 5.32%, and increased the assessment due to $351,007.23, b) raised Single Stick's estimated market share for January - March 2005 from 6.45% to 7.15%, and increased the assessment due to $472,017.47, and c) maintained Single Stick's estimated market share for April - June 2005 at 7.78%, but reduced the assessment demanded to $1,135,353.46. (Exhibit 10).

39.     The DOA contradicted the Reform Act's plain language and Congressional intent by assessing solely based on an incomplete stick count, and thereby harmed and disproportionately burdened Single Stick and other similarly situated small cigar manufacturers and importers.

40.     The DOA over-assessed Single Stick $1,715,910.70 between October 2004 and June 2005.  As of December 2005, the amount unlawfully demanded by DOA from Single Stick totaled approximately $2,947,000.00.  Based on this data, and barring relief from this Court, Single Stick estimates it could be illegally assessed over $25 million during the life of the Payment Program.

41.     Furthermore, although large cigars account for approximately 95% of the total removed volume of cigar tobacco, small cigar manufacturers and importers, including Single Stick, are presently paying over 30% of the total cigar market assessment.  The small cigar market is inelastic, so the DOA's disproportionately high

9

assessments cannot be passed through to customers, placing the business viability of some small cigar manufacturers and importers at risk.

**Cause of Action**

Count 1:    <u>The Administrative Procedure Act</u>

42.    Single Stick repeats paragraphs 1 - 41.

43.    Single Stick is aggrieved for the purposes of 7 U.S.C. § 718d(j)(1), has suffered legal wrong and is adversely affected and aggrieved by the DOA's final agency action for the purposes of 5 U.S.C. § 702.

44.    The DOA's actions, as described in this complaint, were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, without observance of procedure required by law, unsupported by substantial evidence on the record of an agency hearing provided by statute, and unwarranted by the facts in that:

a)    The defendants, in excess of statutory authority, short of statutory right, and in abuse of its discretion, violated the Reform Act by, *inter alia*: (i) assessing Single Stick in excess of its pro rata share of the removed volume of cigar tobacco contrary to 7 U.S.C. § 625(e)(2), (ii) assessing Single Stick without regard for its share of gross domestic volume contrary to 7 U.S.C. §518d(e)(1), (iii) calculating Single Stick's volume of domestic sales based solely on data submitted to the CCC, or possibly to the Departments of Homeland Security and Treasury contrary to 7 U.S.C. §518d(g)(2), ignoring 7 U.S.C. §518d(a)(2)'s requirement that all removed tobacco, including cigars smuggled or unlawfully

10

imported into the United States, be accounted for when calculating market share, and (iv) applying 7 U.S.C. §518d(g)(3), which states the "volumes of domestic sales shall be measured by --(A) in the case of cigarettes and cigars, the number of cigarettes and cigars" without first correcting for the disparity in gross domestic volume between small and large cigars.

b)    The defendants arbitrarily and capriciously abused their discretion, and, in excess of statutory authority, over-estimated Single Stick's market share.

c)    The defendants, in excess of statutory authority and without legal right, violated the IQA by failing to correct influential information disseminated in violation of statutory, OMB, and agency guidelines, and/or to make available data and data sources Single Stick needed and requested to test and reproduce the DOA's estimate of market share.

d)    The defendants, in violation of statutory limitations and without observance of procedures required by law, refused to respond or otherwise acknowledge Single Stick's IQA Petition and Request for Reconsideration.

e)    The defendants, contrary to constitutional authority and without statutory right, wrongfully violated Single Stick's statutory appeal and/or its due process rights by failing to make available sufficient information for Single Stick to effectively, fully, and fairly exercise those rights.

f)    The defendants' denial of Single Stick's appeal was contrary to the evidence, and its determinations therein were unsupported by the substantial evidence on the record of an agency hearing provided by statute.

11

g)      The defendants wrongfully discriminated against Single Stick and others similarly situated, without rational basis and contrary to the Reform Act and the small cigar manufacturers' and importers' constitutional rights, by ignoring the Reform Act's plain language and imposing a disproportionate share of the cigar class assessment on small cigar manufacturers and importers.

### Relief Requested

WHEREFORE, Single Stick requests the following relief:

A.      This Court should hold unlawful and set aside the defendants' illegal over-assessments of Single Stick and remand with instructions to the DOA that it (i) assess Single Stick in accordance with its pro rata share of the removed volume of cigar tobacco in accordance with 7 U.S.C. § 625(e)(2), (ii) assess Single Stick based solely on its share of gross domestic volume in accordance with 7 U.S.C. §518d(e)(1), (iii) calculate Single Stick's volume of domestic sales based solely on data that complies with 7 U.S.C. §518d(a)(2) and accounts for all removed tobacco, including cigars smuggled or unlawfully imported into the United States when calculating market share, and/or (iv) assess Single Stick by applying 7 U.S.C. §518d(g)(3), which states the "volumes of domestic sales shall be measured by --(A) in the case of cigarettes and cigars, the number of cigarettes and cigars" after first correcting for the disparity in gross domestic volume between small and large cigars based on gross domestic volume, as specified in the Reform Act.

B.      This Court should declare the defendants have violated the Reform Act and IQA, and issue a mandatory, permanent injunction requiring compliance therewith.

C.    This Court should order the defendants to comply with the IQA and otherwise appropriately respond to Single Stick's IQA Petition.

D.    This Court should award Single Stick the costs of the litigation, including such attorney fees as may be allowed by law.

E.    This Court should award such other and further relief as it deems just.


Respectfully submitted,
SINGLE STICK

Reed D. Rubinstein
Donald Stein
Greenberg Traurig LLP
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
(202) 331-3100

wdc-fs1\279449v01\3/14/06

13

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **SINGLE STICK, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 06-1077 (RWR)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL JOHANNS and the UNITED STATES DEPARTMENT OF AGRICULTURE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants Michael Johanns and the United States Department of Agriculture respectfully move this Court to dismiss plaintiff's complaint for failure to state a claim for relief. Points and authorities supporting defendants' motion are presented in the attached Memorandum in Support of Defendant's Motion to Dismiss.

Dated: August 30, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

JAMES J. GILLIGAN
Assistant Branch Director

   /s/ Peter J. Phipps
PETER J. PHIPPS
United States Department of Justice

Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SINGLE STICK, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 06-1077 (RWR)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL JOHANNS and the UNITED** | ) | |
| **STATES DEPARTMENT OF** | ) | |
| **AGRICULTURE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

### INTRODUCTION

Plaintiff Single Stick, Inc. manufacturers small cigars and perceives that it has paid more money in assessments under the Tobacco Transition Payment Program than is properly due. Under those auspices, Single Stick sues the United States Department of Agriculture ("USDA") under the Administrative Procedure Act (the "APA") to dispute USDA's calculations of Single Stick's assessments. Single Stick first challenges USDA's statutory interpretation of the Fair and Equitable Tobacco Reform Act of 2004 (the "Reform Act"), which provides the method for apportioning assessments under the Tobacco Transition Payment Program among the manufacturers and importers of tobacco products. Specifically, Single Stick contends that assessments should be based on the weight of tobacco in cigars and not on the number of cigars; that Single Stick's assessment exceeds its share of the cigar market; and that smuggled cigars

1

should be included in calculating Single Stick's market share. Single Stick additionally sues for

production and correction of the underlying data that USDA relied on to calculate Single Stick's

assessment, claiming that USDA erred in denying Single Stick's Information Quality Act

("IQA") request for such production and correction. These allegations do not state a claim for

relief, and Single Stick's complaint must be dismissed.

   Single Stick's complaint is premised on a misinterpretation of the Reform Act. The

Reform Act makes clear that cigar assessments are calculated on a 'per-stick' basis, meaning that

USDA measures the number of cigars removed from a warehouse or imported into domestic

commerce. See 7 U.S.C. § 518d(g)(3)(A). That same text leaves no room for Single Stick's

proposal that assessments should be calculated based on the weight of tobacco in cigars. See id.

Nor does the per-stick calculation method subject Single Stick to an assessment greater than its

market share – cigar market share is also measured on a per-stick basis. See id. Single Stick's

argument to include smuggled cigars fails as well; the Reform Act states that assessments are

apportioned among manufacturers and importers, and smuggled cigars are not taken into account.

See 7 U.S.C. § 518d(e)(1).

   Single Stick also fails to state a claim arising out of USDA's denial of Single Stick's

request under the IQA for production and correction of data that USDA used to calculate Single

Stick's assessment. The IQA does not confer Single Stick the right to production or correction of

the underlying data. See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006). Nor does the

APA provide a remedy since under the IQA production and correction of data is "committed to

agency discretion," and thus beyond the APA's coverage. See 5 U.S.C. § 701(a)(2); Heckler v.

Chaney, 470 U.S. 821, 830 (1985). Moreover, the data that Single Stick seeks to have USDA

produce and correct comes from other cigar manufacturers' excise tax returns, and USDA is statutorily prohibited from releasing such information. See 26 U.S.C. §§ 6103(a), 7213; Church of Scientology of Cal. v. I.R.S., 484 U.S. 9, 18 (1987). Finally, neither the IQA nor any of the implementing guidelines allow for the correction of confidential information.

For these reasons, developed more fully below, Single Stick's complaint should be dismissed with prejudice for failure to state a claim for relief.

## STATUTORY AND REGULATORY BACKGROUND

The Fair and Equitable Tobacco Reform Act of 2004 (the "Reform Act") terminated tobacco price support programs and marketing quotas for tobacco growers. See Pub. L. No 108-357, 118 Stat. 1418, 1522 (Oct. 22, 2004). In place of those programs, the Reform Act creates the Tobacco Transition Payment Program, under which eligible tobacco quota holders and growers receive payments for ten years, not to exceed a total of $10.14 billion, from the Commodity Credit Corporation (the "CCC"), an agency within USDA. See generally 7 U.S.C. § 518a (providing for payments for tobacco quota holders), § 518b (providing for payments for producers of quota tobacco), § 518f (limiting the total amount of the expenditure to $10.14 billion). Unlike a typical subsidy or price support policy, the Tobacco Transition Program works by reimbursing the CCC for these payments from the funds collected through assessments on manufacturers and importers of tobacco products, which are made to the CCC and then deposited in the Tobacco Trust Fund. See 7 U.S.C. § 518d(d)(1); 7 C.F.R. § 1463.9. In essence, through these assessments, manufacturers and importers of tobacco products provide the funding for the monetary assistance that USDA, through the CCC, provides to tobacco quota holders and growers.

3

Under the Reform Act, the amounts of assessments on tobacco manufacturers and importers are determined through a two-step process. Under the first step ("Step A"), the CCC apportions the annual payment to tobacco quota holders and growers among the manufacturers and importers of six classes of tobacco products. See 7 U.S.C. § 518d(c)(1)-(2); § 518d(f); 7 C.F.R. §§ 1463.4, 1463.5. Those six classes are (i) cigarettes; (ii) cigars; (iii) snuff; (iv) roll-your-own tobacco; (v) chewing tobacco; and (vi) pipe tobacco. See 7 U.S.C. § 518d(c)(1); 7 C.F.R. § 1464.5. For example, the manufacturers and importers in the cigar class were responsible for 2.783 per cent of the total assessment in 2005. See 7 U.S.C. § 518d(c)(1)(B). After determining the liability for each of the six classes of tobacco products, the second step ("Step B") is to pro rate each class's assessment among the manufacturers and importers in that class, so that each manufacturer or importer's assessment is proportional to its market share for that class. See 7 U.S.C. § 518d(e)(1); 7 C.F.R. § 1463.7. For the cigar class, that pro ration is done based on the number of cigars "removed" into commerce, see 7 U.S.C. § 518d(g)(3)(A), 7 C.F.R. § 1463.7(b)(1), with the data for the number of cigars coming from excise tax reports of the manufacturers and importers, see 7 U.S.C. § 518d(h); 7 C.F.R. § 1463.7(b)(1). The pro rated share is essentially a market share determination, calculated to the fourth decimal place by dividing the number of cigars from a particular manufacturer or importer by the total number of cigars removed or imported into the domestic market. See 7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(c); see also 7 U.S.C. § 518d(a)(3) (providing that market share is to be determined to the fourth decimal place); Tobacco Transition Assessments, 70 Fed. Reg. 7279-81 (Dec. 8, 2005) (interpreting "fourth decimal place" to mean fourth decimal place when expressed as a percentage). The resulting percentage of market share is then multiplied by the total assessment

4

due for the cigar class to determine each manufacturer or importer's assessment. <u>See</u> 7 U.S.C.

§ 518d(f); 7 C.F.R. § 1463.7(a)-(b).

If a manufacturer or importer disputes the amount of its assessment, the Reform Act and

the implementing regulations provide an administrative mechanism to challenge an assessment.

Within 30 days of receiving notice of the assessment, a manufacturer or importer may submit a

written statement to the CCC that sets forth the basis for the disputed assessment. <u>See</u> 7 U.S.C.

§ 518d(i)(1); 7 C.F.R. § 1463.11(a).  Following the written submission, an informal hearing takes

place wherein a hearing officer will develop an administrative record through oral and written

evidence sufficient to render a final determination on the disputed matter. <u>See</u> 7 C.F.R.

§ 1463.11(b).  After the hearing, the CCC will then issue a final administrative decision. <u>See</u>

7 C.F.R. § 1463.11(c).  If the manufacturer or importer disagrees with the results of that hearing,

it may seek review of the determination in United States District Court. <u>See</u> 7 U.S.C.

§ 518d(j)(1); 7 C.F.R. § 1463.11(d).

## PRIOR ADMINISTRATIVE HISTORY

Single Stick initiated administrative proceedings with USDA regarding its March 1,

2005, and June 1, 2005, assessments due under the Reform Act.  (<u>See</u> Compl., Ex. 4.)  On

November 17, 2005, a hearing was held with regard to those assessments, and a final

administrative determination issued on February 8, 2006.  (<u>See id.</u>, Ex. 9, at 1.)  That final

administrative decision addressed several questions raised in this litigation.  USDA answered

whether all assessments in the cigar class should be determined on a per-stick basis or whether

large cigars and small cigars should be treated differently.  After examining the relevant law, the

USDA hearing officer concluded that the Reform Act directs that all cigars, both large cigars and

5

small cigars, should be assessed on a per-stick basis. (See id., Ex. 9, at 2-4.) The USDA hearing

officer also concluded that USDA's calculation of Single Stick's market share was correct, and

that Single Stick's assessment did not exceed its market share. (See id., Ex. 9, at 4-7.)

Beyond that administrative hearing, Single Stick also tried to gain access to USDA's

primary source data used to calculate the total number of cigars removed into commerce. Single

Stick sought that information, which, as noted above, comes from excise tax returns, by requests

under the Freedom of Information Act ("FOIA") and under the Information Quality Act (the

"IQA"), both dated September 13, 2005. (See id., Ex. 7 (denying the FOIA request); id., Ex. 8.)

USDA denied Single Stick's FOIA request explaining that the information Single Stick sought

was protected by statute, which prohibits disclosure of excise tax return information. (See id.,

Ex. 7 (citing to 26 U.S.C. § 6103).) Having informed Single Stick of the statutory prohibition on

releasing the excise-tax data, USDA did not separately respond to Single Stick's IQA petition,

which sought production and correction of the underlying primary source data. Single Stick did

not pursue its FOIA request further, but Single Stick interpreted the lack of a specific response to

its IQA request as a denial of that request. (See id., Ex. 8.)

Single Stick then proceeded to file the present complaint challenging USDA's reading of

the Reform Act, as upheld by the hearing officer, and USDA's denial of its IQA request for

production and correction of primary source data from excise tax returns.

### SINGLE STICK'S COMPLAINT

In its complaint, Single Stick challenges USDA's calculation of Single Stick's

assessments due under the Reform Act, and seeks declaratory and injunctive relief on the basis of

USDA's alleged over-assessments. (Compl. at ¶ 1; id. at pp. 12-13.) Single Stick's challenges

6

fall into two tiers. First, Single Stick disputes USDA's interpretation of the Reform Act's methodology for determining Single Stick's market share within the cigar class (a challenge to Step B of the assessment process). Second, Single Stick demands that USDA produce the underlying primary source data and correct that data, which Single Stick alleges is incorrect.

Single Stick first disputes that the Reform Act requires that cigar assessments be calculated on a per-stick basis. Rather, Single Stick contends that cigar assessments should be based on the amount of tobacco contained in cigars. Single Stick argues that because small cigars do not contain as much tobacco as large cigars, small cigars should not be treated the same as large cigars for purposes of the assessments due under the Reform Act. (Id. at ¶¶ 19, 21-22, 39-41, 44(a)(i), (iv).) Consequently, Single Stick contends that USDA should take this disparity into account when calculating assessments for small cigars. (Id.) Single Stick additionally argues that it has been assessed without regard for the statutory limitation, which prevents its assessment from exceeding its share of gross domestic volume. (Id. at ¶¶ 16, 44(a)(ii), (b).) Single Stick further complains that USDA's method for determining cigar assessments should account for smuggled cigars and that it does not do so. (Id. at ¶¶ 35, 44(a)(iii).)

Single Stick's next tier of challenges is unrelated to the methodology for determining the amounts of the assessments. Instead, it is premised on the Information Quality Act (the "IQA") and seeks production and correction of the primary source data (which consists of information from excise tax returns) that USDA used to calculate Single Stick's assessment. (Id. at ¶¶ 23, 29, 44(d)-(e).) Specifically, Single Stick goes on to seek a declaration and order that USDA must produce the underlying primary source data that USDA used to calculate total market volume for the cigar market. (Id. at ¶¶ 25, 36, 44(c).) Single Stick further complains that USDA violated the

IQA by not correcting the primary source data, which Single Stick alleges is incorrect. (Id. at ¶¶ 27-29, 44(c), (e), (f).)

## ARGUMENT

### A. Standards of Review

#### 1.    Standard of Review for a Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism for testing the legal sufficiency of the factual allegations in a plaintiff's complaint. See Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). Under this rule, a court treats the complaint's factual allegations as true and draws all reasonable inferences in plaintiff's favor. See Harris v. Ladner, 127 F.3d 1121, 1123 (D.C. Cir. 1997); Alexis v. District of Columbia, 44 F. Supp. 2d 331, 336-37 (D.D.C. 1999). However, a court "need not accept inferences drawn by [a plaintiff] if such inferences are unsupported by the facts set out in the complaint." Kowal v. MCI Communications Corp., Inc., 16 F.3d 1271, 1275 (D.C. Cir. 1994). The scope of the court's evaluation of the sufficiency of the factual allegations is limited to "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of . . . judicial notice." E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). Moreover, the Rule 12(b)(6) pleading standard applies only to factual allegations, and does not apply to "legal conclusions cast in the form of factual allegations." Kowal, 16 F.3d at 1275.

To survive a motion to dismiss, the complaint "must set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted." District of Columbia v. Air Florida, Inc., 750 F.2d 1077, 1078 (D.C. Cir. 1984). Those allegations must be "neither vague nor conclusory" and must "cover all the elements that comprise the theory for

8

relief." ASA Accugrade, Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 215 (D.D.C.

2005) (quoting Dickson v. Microsoft Corp., 309 F.3d 193, 201-02 (4th Cir. 2002)). Consistent

with that standard, "[a] court must dismiss a complaint where, even assuming all the factual

allegations are true, the plaintiff has failed to establish a right to relief based upon those facts."

Gregg v. Barrett, 771 F.2d 529, 547 (D.C. Cir. 1985); see also Weyrich v. The New Republic,

Inc., 235 F.3d 617, 623 (D.C. Cir. 2001).

### 2.    Standard of Review for a Federal Agency's Statutory Interpretation.

Federal agencies are provided significant deference in their interpretation of statutes.  The

Supreme Court has "long recognized that considerable weight should be accorded to an executive

department's construction of a statutory scheme it is entrusted to administer, and the principle of

deference to administrative interpretations." Chevron U.S.A., Inc. v. Natural Res. Def. Council,

Inc., 467 U.S. 837, 844 (1984).  Under principles of Chevron deference, a court's first step in

analyzing an agency's statutory interpretation is to determine whether the statute unambiguously

forbids the agency's interpretation.  See Barnhart v. Walton, 535 U.S. 212, 218 (2002); see also

Chevron, 467 at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the

court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress."); Northpoint Tech., Ltd v. Fed. Communications Comm'n, 412 F.3d 145, 151 (D.C.

Cir. 2005).  Where the agency's reading of a statute is not plainly incorrect, a court then

evaluates whether the agency's interpretation is "based on a permissible reading of the statute."

Chevron, 467 at 843.  In resolving that question, a court "must defer to a reasonable

interpretation by the agency charged with its implementation." Barnhart v. Thomas, 540 U.S. 20,

26 (2003); see also Safe Food & Fertilizer v. Envtl. Prot. Agency, 350 F.3d 1263, 1268 (D.C.

Cir. 2004) ("Unless the statute resolves the issue, we must uphold [the agency's interpretation] so long as its interpretation is reasonable."). Thus, under Chevron deference, unambiguous statutes receive their plain meaning, but for statutes that are silent or ambiguous, an agency's reasonable interpretation controls.

A federal agency receives such Chevron deference when "Congress delegates authority to the agency to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). USDA's interpretation of the Reform Act receives such Chevron deference because Congress delegated rule-making authority to USDA in several ways, such as by providing the Secretary with the abilities to promulgate regulations, see 7 U.S.C. § 519a, to administer the Tobacco Transition Payment Program by imposing quarterly assessments, see § 518d(b)(1), to assess additional amounts to cover insufficiencies, see § 518d(c)(3), and to determine the volume of domestic sales for tobacco manufacturers and importers, see § 518d(g)(1). See Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs., 125 S.Ct. 2688, 2699 (2005) (explaining that an agency qualifies for Chevron deference where the statute delegates powers to enforce and execute the statute as well as to prescribe rules and regulations under the statute). Thus, to the extent that any ambiguities or gaps exist in the Reform Act, USDA's interpretations of those will carry the force of law provided that they are reasonable.

**B.    USDA's method of calculating the amount of Single Stick's assessment (as alleged) is fully consistent with the Reform Act, thus Single Stick fails to state a claim for relief.**

Single Stick's first challenge is to USDA's reading of the Reform Act for purposes of calculating assessments on individual cigar manufacturers (a challenge to USDA's reading of

Step B of the assessment process).  Such a statutory interpretation dispute is governed by

principles of Chevron deference.  As explained below, USDA's reading of the Reform Act is in

accord with its plain language.  However, even if the Reform Act were ambiguous, USDA's

interpretation has a solid foundation in the text of the statute and, under Chevron principles,

would be permissible.  Therefore, Single Stick's challenge to USDA's interpretation of the

Reform Act fails to state a claim for relief.

> **1.    USDA's per-stick method of calculating Single Stick's market share of
> the cigar market is in perfect accord with the statutory directive of
> 7 U.S.C. § 518d(g).**

Single Stick complains that USDA, through the CCC, improperly interprets the Reform

Act by assessing cigar manufacturers on a per-stick basis.  While Single Stick may, as a policy

matter, dispute the method of assessment, that disagreement alone does not state a claim for

relief here, where USDA's method for calculating assessments on cigar manufacturers is fully

consistent with the Reform Act.

According to the Reform Act's terms, assessments will be levied upon the manufacturers

and importers of "each class of tobacco product," with cigar manufactures and importers being

initially responsible for 2.783 per cent of the total assessment.  7 U.S.C. § 518d(c)(1)(B).  In

determining how much of that portion each cigar manufacturer or importer must pay, the Reform

Act specifies that assessments are determined by multiplying the manufacturer or importer's

market share within a class of tobacco products by the total assessment due for that class of

tobacco products.  7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(a); see also 7 U.S.C. § 518d(e)(1)

(providing that assessments within classes will be done on a pro rata basis).  As defined, "the

term 'market share' means the share of each manufacturer or importer of a class of tobacco

products (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product . . . ." 7 U.S.C. § 518d(a)(3); 7 C.F.R. § 1463.3. The Reform Act then explains that "volumes of domestic sales" for cigars will be measured on a per-stick basis:

> For purposes of the calculations under this subsection and the certifications under subsection (h) by the Secretary, *the volumes of domestic sales shall be measured by* --
>
>     (A)   *in the case of cigarettes and cigars, the number of cigarettes and cigars*; and
>
>     (B)   in the case of the other classes of tobacco products specified in subsection (c)(1), in terms of the number of pounds, or fraction thereof, of those products.

7 U.S.C. § 518d(g)(3) (emphasis added); see also 7 C.F.R. § 1463.7(b)(1). The referenced certifications under subsection (h) are certified copies of excise tax returns from each manufacturer or importer of tobacco products that are submitted to the Secretary for purposes of calculating assessments. See 7 U.S.C. § 518d(h)(1)-(2).

Thus, as specified by the Reform Act's directives, assessments for cigar manufacturers are calculated by "the volumes of domestic sales . . . measured by . . . the number of . . . cigars." 7 U.S.C. § 518d(g)(3)(A). That is precisely the process that USDA is alleged to have followed – it used a per-stick (i.e., per cigar) measure to apportion assessments among members of the cigar class. (See Compl. at ¶ 19; id., Ex. 9, at 2 ("CCC computes a cigar manufacturer's or importer's market share based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in commerce.").) In other words, by determining volume of domestic sales and market share based on the number of cigars, USDA complied with the Reform Act's unambiguous provisions. Consequently, Single Stick states no claim against USDA for using a per-stick method to calculate cigar assessments.

2.    **Single Stick's proposed methods of calculating market share are contrary to the Reform Act and do not state a claim for relief.**

a.    **Single Stick is wrong as a matter of law that its market share should be assessed based on the amount of tobacco contained in its cigars.**

In contravention of the Reform Act's provisions, Single Stick seeks to have its assessments determined by the weight of tobacco in its cigars. That proposed method of assessment directly contradicts the plain terms of the Reform Act. As explained above, the text of § 518d(g)(3) dictates that Reform Act assessments are based on the number of cigars, and not on the weight of the tobacco in the cigars. See 7 U.S.C. § 518d(g)(3); see also 7 C.F.R. § 1463.7(b)(1). Moreover, USDA considered this argument at the administrative hearing and rejected it as contrary to the Reform Act. (See Compl., Ex. 9, at 4.) Thus, Single Stick's argument that the weight of tobacco in the cigars should be the basis for the assessment is contrary to the Reform Act and should be dismissed.

b.    **As a matter of law, Single Stick is not assessed in excess of its share of domestic volume.**

Single Stick next attempts to find refuge in § 518d(e)(2), which states that "[n]o manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume." 7 U.S.C. § 518d(e)(2). Specifically, Single Stick argues that determining its Reform Act assessment on a per-stick basis leads to an assessment that is greater than its share of domestic volume. This argument may be summarily rejected. As explained above, the Reform Act makes clear that the volume of domestic cigar sales will be determined on a per-stick basis. 7 U.S.C. § 518d(g)(3). Because USDA determines Single Stick's share of domestic cigar sales volume through the same per-stick

13

measurement, it is not assessing Single Stick an amount greater than Single Stick's share of domestic volume.

### c.    Smuggled cigars are not to be included in the assessment calculation as a matter of law.

Single Stick also argues that smuggled cigars should be taken into account in determining the amount of its Reform Act assessment. This argument fails for two reasons.

First, the Reform Act provides a method for calculating assessments that does not include smuggled cigars. As set forth in § 518d(e)(1), the amount of the assessment for each class of tobacco product "shall be allocated on a pro rata basis *among the manufacturers and importers* based on each manufacturer's or importer's share of gross domestic volume." 7 U.S.C. § 518d(e)(1) (emphasis added). By these terms, manufacturers and importers – and not smugglers – are responsible for the assessments for each cigar class, even assuming the presence of non-negligible amount of smuggled cigars (a fact that Single Stick does not allege).

Second, the Reform Act provides that the only mandatory source of data for determining the amount of the assessments will be data provided from manufacturers and importers. Under § 518d(g)(1), the calculations "shall be made by the Secretary based on information provided by the manufacturers and importers pursuant to subsection (h), as well as any other relevant information provided to or obtained by the Secretary." 7 U.S.C. § 518d(g)(1). Thus, it is proper for the Secretary to rely only on the primary source excise tax data provided by the manufacturers and importers in determining the amount of the Reform Act assessments. See 7 U.S.C. § 518d(h)(1)-(2); 7 C.F.R. § 1463.7(b)(1). The Reform Act authorizes, but does not require, the Secretary to obtain any further information, and the decision as to what additional information

14

would be "relevant" is left to the Secretary's discretion.  And, as specified in regulation, the

Secretary has chosen to rely on "reports filed by domestic manufacturers and importers of

tobacco . . . ."  7 C.F.R. § 1463.7(b); see also 7 U.S.C. § 518d(h) (requiring manufacturers and

importers to submit certified copies of their excise tax return forms to USDA).  Under Chevron

principles, this statutory deference to the Secretary means that the ensuing regulation, 7 C.F.R.

§ 1463.7(b)(1), carries the force of binding law.  See Mead Corp., 533 U.S. at 227 (explaining

that a regulation pursuant to an express delegation of authority "is binding on the courts unless

procedurally defective, arbitrary or capricious in substance, or manifestly contrary to statute").

Adding further credence to the legitimacy of USDA's non-inclusion of smuggled cigars

are the omissions in Single Stick's complaint.  Single Stick has not alleged that USDA has access

to data for the number or weight of tobacco in smuggled cigars.  (Cf. Compl., Ex. 9, at 5 ("CCC

has no way to compute an accurate assessment amount with regard to non-reporting cigar

companies and, therefore, cannot include the non-reporting companies in the assessment

calculation."))  Nor has Single Stick alleged that USDA would have a viable means of levying

Reform Act assessments against smugglers.

In sum, § 518d(e)(1) and § 518d(g)(1), taken separately or together, leave little doubt that

the Reform Act does not require USDA to account for smuggled cigars in calculating

assessments.  Moreover, to the extent that any ambiguities do exist in these statutes, they must be

resolved in USDA's favor under Chevron deference, since USDA has a reasonable basis for its

reading of the Reform Act.  See Barnhart v. Thomas, 540 U.S. at 26; Safe Food & Fertilizer, 350

F.3d at 1268.  Consequently, Single Stick has no claim that smuggled cigars should be somehow

included in calculating Reform Act assessments.

15

**C.**    **As a matter of law, the Information Quality Act does not provide a basis to sue a federal agency for production and/or correction of underlying primary source data.**

Single Stick attempts to sue under the Information Quality Act (the "IQA") for USDA's alleged failures to produce and to correct the underlying primary source data used to determine the amount of Single Stick's Reform Act assessments. This count fails because the IQA does not create a legal right to recovery. See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006). Additionally, Single Stick is prevented from seeking recovery under the APA, because under the IQA, an agency's management of its information quality is "committed to agency discretion" and thus is outside the scope of APA review. 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 830 (1985); Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 602-03 (E.D. Va. 2004) (holding that due to a lack of meaningful standards, the APA does not allow suits claiming violations of the IQA), aff'd on other grounds, Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006).

**1.**    **Statutory and Regulatory Background for the Information Quality Act.**

The Information Quality Act was enacted as a rider to appropriations legislation for the 2001 fiscal year, and is encoded as a note to 44 U.S.C. § 3516. See Pub. L. No. 106-554, Tit. V, § 515, 114 Stat. 2762A-153 (Dec. 21, 2000); see also 44 U.S.C. § 3516 (note). The IQA contains two principal commands. First, it directs the Office of Management and Budget ("OMB") to "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code . . . ." Pub. L. No. 106-554, Tit. V, § 515(a), 114 Stat. 2762A-153-54. Second, the IQA requires OMB to include three directives in its guidelines to federal

16

agencies: that they (i) develop their own information quality guidelines within one year of the issuance of OMB's guidelines; (ii) establish administrative mechanisms allowing affected persons to seek correction of information that does not comply with OMB's guidelines; and (iii) report periodically to OMB on complaints they receive. Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154.

In accordance with the IQA, OMB issued guidance to federal agencies regarding the information that they disseminate to the public. See *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. 8452 (Feb. 22, 2002).[1] OMB's guidance contained each required element, see 67 Fed. Reg. 8452, 8458, § II, and provided additional policy and procedural guidance as well, including guidance in the area of confidential information, see id. at 8460, § V(3)(b)(ii)(B). OMB summarized the extent of the obligations that its guidelines imposed on agencies as follows: "agencies need only ensure that their own guidelines are consistent with these OMB guidelines, and then ensure that their administrative mechanisms satisfy the standards and procedural requirements in the new agency guidelines." See id. at 8453.

Pursuant to OMB's guidance, USDA issued guidelines for information that it disseminates to the public. See *USDA Quality of Information Guidelines* (available at http://www.ocio.usda.gov/qi_guide/index.html). USDA's guidelines contain assurances as to the

---

[1] The February 2002 guidelines are the most recent; OMB had previously issued guidelines and proposed guidelines for notice and comment. See *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*, 66 Fed. Reg. 49718 (Sept. 28, 2001); *Proposed Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*, 66 Fed. Reg. 34489 (June 28, 1001).

quality of the information that USDA will disseminate to the public.  For instance, these

guidelines state that "USDA will strive to ensure and maximize the quality, objectivity, utility,

and integrity of the information that its agencies and offices disseminate to the public."  Id.  As

with the OMB guidance, USDA's guidelines also express concern for preserving confidential

information.  Id.

### 2.    The IQA does not create a right to either the production or the correction of agency information.

Single Stick attempts to use the IQA as a basis for suing USDA for failure to produce and

correct underlying primary source data.  This count fails because the IQA does not create a legal

right to agency information or its correctness.

In evaluating whether a statute creates an enforceable right, a court examines the text and

structure of the statute to determine whether it displays an intent to create such a right.  See

Gonzaga Univ. v. Doe, 536 U.S. 273, 286 (2002); Alexander v. Sandoval, 532 U.S. 275, 288

(2001).

The IQA does not create an enforceable right because it lacks evidence of a congressional

intent to do so.  The IQA sets forth a regulatory framework between federal agencies.  Under the

IQA, OMB will issue guidance for other federal agencies to follow with respect to information

that they disseminate to the public.  See Pub. L. No. 106-554, Tit. V, § 515(a), 114 Stat. 2762A-

154.  Those federal agencies will in turn have three administrative responsibilities: to issue

guidelines regarding the information quality, to establish administrative mechanisms for

correction of the information, and to make periodic reports to OMB.  See Pub. L. No. 106-554,

Tit. V, § 515(b)(2), 114 Stat. 2762A-154.  This focus on federal agency regulation leaves no

doubt that the IQA does not create an enforceable right, as the Supreme Court explained, "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" Alexander, 532 U.S. at 289 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). Furthermore, the text of the IQA does not focus on individuals or a class of individuals that it seeks to protect.[2] And, in focusing on the duties of federal agencies, particularly OMB, the IQA contains no rights-creating language, "critical to showing the requisite congressional intent to create new rights." Gonzaga Univ., 536 U.S. at 287. In sum, the IQA, like the statute at issue in Alexander v. Sandoval, "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating." 532 U.S. at 289. Accordingly, the IQA similarly fails to create an enforceable legal right.[3]

Consistent with this conclusion, every court to consider whether the IQA creates a legal right to production or correction of information has concluded that the IQA creates no such right. See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006); Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 601 (E.D. Va. 2004); In re Operation of the Missouri River Sys., 363 F. Supp. 2d 1145, 1174-75 (D. Minn. 2004), vacated in part and aff'd in part on other grounds, 421 F.3d 618 (8th

---

[2] The only mention that the IQA makes of persons affected is in § 515(b)(2) when it requires each agency to establish mechanisms for affected persons to seek correction of that information. Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154. Here again, Alexander v. Sandoval is instructive as to the significance of this reference to administrative mechanisms for affected persons: "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Alexander, 532 U.S. at 290. Thus, by providing administrative mechanisms for affected persons, the IQA forecloses the possibility that it also creates a separately enforceable legal right for those persons.

[3] Without a legal right to information or its correctness under the IQA, USDA's denial of such information to Single Stick does not violate the Due Process Clause.

19