Cir. 2005). As the Fourth Circuit summarized, the IQA "does not create a legal right to access to information or to correctness." Salt Inst. v. Leavitt, 440 F.3d at 159. In short, the IQA does not confer any legal rights to a private entity such as Single Stick.[4]

### 3. The IQA cannot form the basis for a suit under the APA for production and correction of agency information.

Nor can Single Stick sue for an alleged violation of the IQA through an APA action. While the APA protects against agency action that is "arbitrary, capricious, an abuse of discretion of otherwise not in accordance with the law," Donnelly v. Fed. Aviation. Admin., 411 F.3d 267, 271 (D.C. Cir. 2005) (quoting Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854, 856 (D.C. Cir. 1988)), Single Stick does not state such a claim here. Because the IQA does not provide Single Stick with a right to the production or correction of agency information, see Salt. Inst. v. Leavitt, 440 F.3d at 159, USDA could not be acting arbitrarily, capriciously, or contrarily to law by not producing or correcting the primary source excise tax data. Standing alone, that reason prevents Single Stick from using the IQA as a basis to sue under the APA for production or correction of agency information. Put another way, because both an enforceable right and mechanism to remedy that right are required to sue the sovereign, the possibility that the APA may provide a remedy means nothing where the IQA does not provide the underlying right. See Gonzaga Univ., 536 U.S. at 283-84; Alexander, 532 U.S. at 286.

---

[4] Because the IQA does not create a legal right to information or its correctness, Single Stick is unable to satisfy the injury in fact requirement for Article III standing. See Salt Inst., 440 F.3d at 159 ("because [the IQA,] does not create a legal right to access to information or to correctness, appellants have not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy Article III."). Without Article III standing, Single Stick's IQA challenge could alternatively be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction.

Nonetheless, the remedies available under the APA are not available for an IQA

challenge because the APA does not apply where "agency action is committed to agency

discretion by law." 5 U.S.C. § 701(a)(2). A matter is "committed to agency discretion by law"

when the governing law "is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830

(1985); see also Steenholdt v. Fed. Aviation Admin., 314 F.3d 633, 638 (D.C. Cir. 2003) ("If no

'judicially manageable standard' exists by which to judge the agency's action, meaningful

judicial review is impossible and the courts are without jurisdiction to review the action."

(quoting Heckler, 470 U.S. at 830)). In addition, "courts have been especially inclined to regard

as unreviewable those aspects of agency decisions that involve a considerable degree of expertise

or experience . . . ." Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 579 (3d Cir.

1979).

Here, neither the IQA, nor the OMB guidance, nor USDA's guidelines provide a

meaningful standard against which to evaluate USDA's decisions with respect to production or

correction of information. The IQA speaks in broad and general terms, requiring guidance from

OMB "for ensuring and maximizing the quality, objectivity, utility, and integrity" of agency

information. See Pub. L. No. 106-554, Tit. V, § 515(a), (b)(2)(A), 114 Stat. 2762A-153-54. The

IQA does not define the precise contours of these general concepts. See id. Continuing that

trend, the OMB guidance disavows any effort to create a meaningful standard by which the IQA

will be applied. Rather, OMB explains that it did not issue "detailed, prescriptive, 'one-size-fits-

all' government-wide guidelines that would artificially require different types of dissemination

activities to be treated in the same manner." 67 Fed. Reg. at 8452. Moreover, the OMB

guidance instructs that information quality "is to be ensured and established at levels *appropriate*

to the nature and timeliness of the information to be disseminated." 67 Fed. Reg. at 8459

(emphasis added). Thus, OMB's guidance is expressly deferential to an agency's conclusions as

to the "appropriate" response, without attempting to prescribe standards for determining the level

or criteria for "appropriate" information quality. Id. Similarly, USDA's guidelines are written at

a conceptual level, without a meaningful standard: "USDA will strive to ensure and maximize

the quality, objectivity, utility, and integrity of the information that its agencies and offices

disseminate to the public." *USDA Quality of Information Guidelines: General Requirements*

(available at http://www.ocio.usda.gov/qi_guide/index.html). Thus, beyond these general

exhortations, the IQA and its implementing guidelines do not provide judicially manageable

standards to evaluate USDA's decisions under the IQA. And as explained above, without a set

of judicially manageable standards, the APA does not afford a right to judicial review of agency

decisions regarding the production and correction of agency information. See Salt Inst. v.

Thompson, 345 F. Supp. 2d at 602-03; In re Operation of the Missouri River Sys., 363 F. Supp.

2d at 1175; see also Heckler, 470 U.S. at 830; Steenholdt, 314 F.3d at 633.

    In sum, Single Stick cannot use the APA to sue for the alleged violations of the IQA

because the IQA creates no substantive rights, and even if it did, the production and correction of

agency information is "committed to agency discretion" and thus excluded from the APA's

coverage.

**D.**     **Even if Single Stick could legally proceed under the APA for alleged IQA violations, Single Stick nevertheless fails to state a claim for relief.**

    **1.**     **Single Stick does not state a claim for production of the underlying primary source data.**

Single Stick complains that even if a per-stick calculation method is appropriate, USDA nonetheless wrongly denied Single Stick's IQA request for production of the underlying primary source data used to determine Single Stick's share of the cigar market.  (See, e.g., Compl., at ¶¶ 23, 29, 44(e).)

Even if Single Stick could proceed with an IQA action, it would still fail to state a claim because USDA is statutorily precluded from releasing the primary source data, which consists of information reported in excise tax returns.  USDA determined the amounts of Single Stick's Tobacco Transition Payment Program assessments based on excise tax data that it receives from cigar manufacturers.  See 7 U.S.C. § 518d(h)(1)-(2); 7 C.F.R. § 1463.7(b)(1); see also 26 U.S.C. § 5703(b)(1).  USDA aggregates this data for all cigar manufacturers and notifies cigar manufacturers of those totals and their share of those totals.  (See, e.g., Compl., Ex. 4).  But, by reason of explicit statutory prohibition, USDA cannot provide more information because any additional information would reveal excise tax return information from each and every cigar manufacturer.  See 26 U.S.C. § 6103(a) ("No officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise under the provisions of this section."); 26 U.S.C. § 7213 ("It shall be unlawful for any officer or employee of the United States . . . willfully to disclose to any person, except as authorized in this title, any return or return information."); see also Church of Scientology of Cal. v. I.R.S., 484 U.S. 9, 18 (1987) (holding

23

that § 6103 precludes disclosure of individualized tax return information); King v. I.R.S., 688 F.2d 488, 490-94 (7th Cir. 1982) (same).  Because individualized tax return information cannot be released, Single Stick has no right to the underlying excise tax information from the other cigar manufacturers.[5]  In short, Single Stick's request for information beyond the totals for the cigar market is statutorily precluded by § 6103(a), and thus Single Stick states no claim for relief for production of that data.

### 2.    Nor does Single Stick state a claim for correction of the underlying primary source data.

Even if Single Stick could proceed under the IQA, it would still not be able seek correction of the allegedly incorrect underlying cigar market-share data because that data is confidential and thus exempt from correction.[6]

Confidential information is excluded from the scope of the IQA.  The text of the IQA requires OMB to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained *and disseminated* by the agency *that does not comply with [OMB's guidelines]*."  Pub. L. No. 106-554, Tit. V, § 515(b)(2)(B), 114 Stat. 2762A-154.  Most basically, Single Stick's claim fails because the primary source excise tax information that it seeks is not publicly disseminated.  See 67 Fed. Reg. at 8460 (explaining that dissemination means "agency initiated or sponsored distribution of information to the public").

---

[5]  Because Single Stick does not facially challenge the constitutionality of the statutory prohibition on disclosing tax return information, USDA's actions consistent with the statute cannot be deemed to violate the Due Process Clause.

[6]  Nonetheless, USDA reviewed its primary source data and calculations and affirmed the accuracy of those results.  (See Compl., Ex. 9, at 6 (finding that "the data used and the methodology applied in CCC's computation of market shares complies with the provisions of the 2004 Act."))

24

Indeed, public dissemination of such information is expressly prohibited by statute as discussed

above. See 26 U.S.C. §§ 6103(a), 7213. It is therefore outside of the scope of the IQA.

Additionally, the IQA does not require the establishment of an administrative mechanism

to correct all information that a federal agency disseminates – only that information that does not

comply with OMB's guidelines. And, the OMB guidelines do not elevate the interests in

correction of information above the compelling interests in preserving confidential information:

> With regard to analytic results related thereto, agency guidelines shall generally
> require sufficient transparency about data and methods that an independent
> reanalysis could be undertaken by a qualified member of the public.

* * *

> ***However, the objectivity standard does not override other compelling interests
> such as privacy, trade secrets, intellectual property, and other confidentiality
> provisions.***

See *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of*

*Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. at 8460,

§ V(3)(b)(ii)(B) (emphasis added). Thus, the OMB guidance makes clear that "compelling

interests" in the preservation of confidential information – such as a statutory mandate to do so –

take precedence over the public's right to the correction of that information. Hence, the

preservation of confidential information, such as excise tax returns, is fully compliant with

OMB's guidance and is not subject to the IQA's provisions regarding administrative mechanisms

for information correction.

Furthermore, USDA's guidelines echo OMB's respect for confidential information by

explaining that "USDA agencies and offices will maintain the integrity of confidential

information and comply with the statutory requirements to protect the information it gathers and

25

disseminates." <u>See</u> *USDA Quality of Information Guidelines: General Requirements* (available at http://www.ocio.usda.gov/qi_guide/index.html). Similarly, the USDA guidelines condition the release of underlying primary source data upon preserving the confidentiality of that information: "To the extent possible, ***consistent with the confidentiality protections***, USDA agencies and offices will identify the source of the information so that the public can assess whether the information is objective." <u>Id.</u> By these terms, it is clear that USDA's guidelines do not elevate correction of information above confidentiality concerns.

Put succinctly, neither the IQA, nor OMB's guidance, nor USDA's guidelines provide a mechanism for seeking correction of confidential information. Accordingly, even if the IQA provided Single Stick with a right to correction of information that was subject to judicial review under the APA – which it does not – Single Stick still would not state a claim for correction of underlying confidential primary source data.

## CONCLUSION

For the foregoing reasons, plaintiff Single Stick does not state a claim for relief, and defendants' motion to dismiss should be granted.

Dated: August 30, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

JAMES J. GILLIGAN
Assistant Branch Director

    /s/ Peter J. Phipps
PETER J. PHIPPS
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that on August 30, 2006, I caused signed copies of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and the attached Memorandum in Support to be served on Reed D. Rubinstein, Esq., Greenberg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, DC 20006, by hand-delivery. Also, on August 30, 2006, I filed electronic versions of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and the attached Memorandum in Support through the CM/ECF case management electronic case filing system administered by the United States District Court, District of Columbia, which I understand will complete electronic service on Mr. Rubinstein as well.

/s/ Peter J. Phipps
Peter J. Phipps

**EXHIBIT 5**

Explaining CCC cigar policy
Case 1:06-cv-01077-RWR    Document 9-3    Filed 09/11/2006    Page 11 of 26
Page 1 of 2

# Explaining CCC cigar policy

## Question

Why does the CCC classify little cigars together in the same category as large cigars? And why does the CCC use tax data to calculate assessments for all classes except cigars, which use volume data?

## Answer

The FETRA of 2004 specifies that "…the volumes of domestic sales shall be measured by—
(A) in the case of cigarettes and cigars, the number of cigarettes and cigars; and
(B) in the case of the other classes of tobacco products specified in subsection (c)(1), in terms of number of pounds, or fractions thereof, of those products."

For all products, excluding cigars, a constant tax rate per unit results in exactly the same calculation irrespective of whether volume or taxes paid is used in the formula. Since the tax rates for large and small cigars are vastly different, the use of taxes paid will not produce the same result as where volume is used as the unit of measurement for "volumes of domestic sales". Thus the Commodity Credit Corporation (CCC) determined to use taxes paid for all products except cigars. Cigar volumes are measured by the statutorily mandated "number of… cigars;…."

CCC's determination to use taxes paid for products other than cigars, resulted from extensive discussions, both in Washington, DC and Cincinnati, OH, with Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau (TTB), personnel. Taxes are paid bi-weekly by tobacco product manufacturers on tobacco product removals and must be paid on or before specified dates. There is very little lag between the time of product removal and the tax remittance. Additionally, there is a highly punitive penalty for missing the payment date for taxes owed on tobacco product removals. Conversely, reports on volumes of removals are less timely; carry no penalty for errors, and according to TTB personnel, much less accurate.

CCC's need for timely corroborating data from TTB in order to ensure complete coverage of product manufacturers and accurate reporting by manufacturers to CCC, provided a compelling argument in favor of using taxes paid on those products for which there was no difference between the results based on taxes or volume of removals.

Concomitantly, it was clear that ultimately, CCC would not be able to depend solely on TTB tobacco product manufacturer data in order to administer the program in a timely manner and would need to receive data directly from manufacturers. The efficacy of TTB data is limited to verification of those data collected by CCC, and then only for taxes paid—not volumes.

The case for using taxes paid by importers, rather than volumes, for those products for which there was no difference in results between using taxes or volume of removals, was even more compelling. Data on taxes paid by importers is readily available, while documents containing import volume measurements are not compiled into a single report, nor are they available electronically. These documents are maintained as hardcopy and each represents a single instance of importation of a tobacco product. The volume of reports for a single 3-month reporting period is immense.

| Answer ID |
| 190 |
| Select a Category |
| Income Support Programs |
|   Tobacco Transition Payment Program |
|     Assessments |
| Date Created |
| 09/14/2005 02:34 PM |
| Last Updated |
| 04/25/2006 03:19 PM |

CCC determined that only direct collection of data from importing companies would enable it to carry out the program in a timely and efficient manner. However, the availability of TTB tax data again provides a benchmark against which to gauge the accuracy of data collected by CCC. TTB does not compile importer volume data for any tobacco products from individual importer reports.

Since tax rates differ for small and large cigars, taxes paid do not substitute for volume data, as in the case of all other tobacco products. Given the statutory mandate to use volume data for cigars, CCC determined to use volume, rather than taxes paid, as the metric for calculating market shares in the cigar product category.

**EXHIBIT 6**

TABLE 1.—CALCULATION OF INITIAL ASSESSMENTS FOR EACH CLASS OF TOBACCO UNDER SECTION 625(C)

| 2003 Calendar year | Domestic (# or lbs) [1] | Imports (# or lbs) [1] | Total quantity (# or lbs) [1] | Maximum tax rate [2] | Estimated taxes (total quantity times tax rate) | Allocation by class (percent) |
|---|---|---|---|---|---|---|
| Cigarettes: small (#) | 377,241,580,953 | 23,085,086,000 | 400,326,666,953 | $19.50/thou ........ | $7,806,370,006 | 96.331 |
| Cigarettes: large (#) | 0 | 0 | 0 | $40.95/thou ........ | 0 | .0.000 |
| Cigars: small (#) | 2,301,972,488 | 172,369,000 | 2,474,341,488 | $1.828/thou ... | 4,523,096 | 0.056 |
| Cigars: large (#) | 4,018,523,214 | 514,566,000 | 4,533,089,214 | $48.75/thou ... | 220,988,099 | 2.727 |
| Snuff (lbs) | 74,700,715 | 8,369 | 74,709,084 | $0.585/lb ........ | 43,704,814 | 0.539 |
| Chewing tobacco (lbs) | 45,906,067 | 174,399 | 46,080,466 | $.195/lb ........ | 8,985,691 | 0.111 |
| Pipe tobacco (lbs) | 4,155,205 | 698,086 | 4,853,291 | $1.0969/lb ........ | 5,323,576 | 0.066 |
| Roll your own (lbs) | 11,353,137 | 1,254,008 | 12,607,145 | $1.0969/lb ........ | 13,828,777 | 0.171 |
| Total ........ | ........ | ........ | ........ | ........ | 8,103,724,058 | 100.000 |

[1] Source: Alcohol and Tobacco Tax and Trade Bureau; National Revenue Center; December 2003 Monthly Statistical Release Re-issued August 19, 2004; Report Symbol TTB S 5200-12-2003 www.ttb.gov/tobacco/stats/index.htm.
[2] Source: Alcohol and Tobacco Tax and Trade Bureau; Tax and Fee Rate www.ttb.gov/alcohol/info/atftaxes.htm.

Section 625(c)(2) of the 2004 Act requires the Secretary to periodically adjust these percentages as changes occur in the marketplace. Beginning in FY 2006, it is CCC's intention to adjust the class percentages annually by using this same methodology to ascertain changes in the volume of sales of each class.

*Market Shares and Base Period*

Section 625(b)(1) of the 2004 Act provides that in each of the FY's 2005 through 2014, CCC will impose assessments "on each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year." The 2004 Act provides that for each such entity, within each of the six specified sectors, the Secretary must establish individual assessments by determining a statutorily prescribed "market share" for each manufacturer and importer. This market share is defined by section 625(a)(3) of the 2004 Act as the entity's share of the "class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year* * *." The "base period" is defined in section 625(a)(1) as the "one-year period ending the June 30 before the beginning of a fiscal year." For FY 2005 that would be July 1, 2003 through June 30, 2004 and an entity's FY 2005 market share would be its share of the sale of a class of tobacco products from July 1, 2003 through June 30, 2004.

Section 625(f) provides that the determination of the amount of a quarterly assessment owed by an entity will be based upon its prior quarterly period sales. Thus, as payments made by an entity cover a calendar year period, the first quarterly payment that is due on March 31, 2005 will be

determined by using the October 1, 2004 through December 31, 2004 market share of the entity within each of the six product sectors. Accordingly, the use of the 2004 Act's "market share" and "base period," are effectively limited to being used to determine the division of the national assessment among the six previously listed sectors.

In order to establish these market shares, section 625(h)(1) provides that each manufacturer and importer of tobacco products must submit "a certified copy of each of the returns or forms described by paragraph (2) that are required to be filed with a Federal agency on the same date that those returns or forms are filed, or required to be filed, with the agency." Section 625(h)(2) provides that these returns and forms "are those that relate to, "(A) the removal of tobacco products into domestic commerce (as defined by section 5702 of the Internal Revenue Code of 1986; and (B) the payment of the taxes imposed under chapter 52 of the Internal Revenue Code of 1986, including AFT [sic] Form 5000.24 and United States Customs Form 7501 under currently applicable regulations." With respect to the information provided to the Department of the Treasury, data to develop a market share would be obtained from sources such as TTB Form 5000.24, which is required to be filed monthly. To the extent amended forms are filed, CCC would incorporate those changes to the extent it deemed practicable, taking into consideration when the amended form was submitted. With respect to imports of tobacco products, CCC intends to use information provided to the Department of the Treasury and the Department of Homeland Security when the product enters the United States.

At the current time, this information would be of the type submitted monthly on TTB Form 5220.6, ATF Form 5210.5,

TTB Form 5000.24, TTB Form 5620.8 and Customs and Border Protection Form 7501. Because the name and identification of these and other forms may change over time, CCC will provide actual notice to domestic manufacturers and importers of tobacco products of those forms from which information could be obtained for purposes of compliance with this subpart. Due to the need to obtain this information as soon as possible for use in FY 2005, CCC will provide actual notice to those entities who have received a permit, as identified below, from the Department of the Treasury since October 1, 2004 in order to obtain information regarding their October 1 through December 31, 2004 marketings. To the extent that future submissions to the Department of the Treasury and the Department of Homeland Security may be combined with that needed for the administration of the 2004 Act, CCC will attempt to obtain the information from the two agencies without the need to obtain the same information from tobacco manufacturers and tobacco product importers.

*Quarterly Assessments*

Section 625(b)(1) of the 2004 Act requires that CCC "* * * impose quarterly assessments during each of fiscal years 2005 through 2014, * * * on each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year."

Section 625(b)(2) further provides that: "Beginning with the calendar quarter ending on December 31 of each of fiscal years 2005 through 2014, the assessment payments over each four-calendar quarter period shall be sufficient to cover—

**EXHIBIT 7**

# Greenberg
# Traurig

Reed D. Rubinstein
Tel. 202.533.2314
Fax 202.331.3101
rubinsteinr@gtlaw.com

September 13, 2005

**VIA CERTIFIED MAIL**
Quality of Information Officer
USDA/FSA, Room 3086-South
1400 Independence Ave., S.W.
Washington, DC 20250

Re:    **Request For Information Quality Act Disclosure and Correction/CCC Tobacco
       Transition Payment Program Information**

Dear Sir/Madam:

        This is a Petition under the Information Quality Act, Section 515 of Public Law 106-554, 44 U.S.C. § 3516, note, and the information quality guidelines issued by the Office of Management and Budget, 67 Fed. Reg. 8459-60 (Feb. 22, 2002) (the "OMB Guidelines"), and the United States Department of Agriculture (USDA) (the "USDA Guidelines") (*http://www.ocio.usda.gov/qi_guide*)(collectively the "IQA").

## I.    REQUESTOR CONTACT INFORMATION.

Requestor is Single Stick, Inc., c/o Greenberg Traurig LLP, 800 Connecticut Avenue N.W., Suite 500, Washington, D.C., 20006, attn: Donald Stein, Esq. and Reed Rubinstein, Esq. Requestor's counsel may be reached at 202-331-3100, or steind@gtlaw.com and rubinsteinr@gtlaw.com.

## II.    DESCRIPTION OF INFORMATION TO CORRECT.

Requestor seeks correction of influential statistical and financial information, specifically, information regarding market share, total volume, company volume, and gross sales statistics (collectively the "disseminated information"), disseminated by USDA through quarterly Tobacco Transition Payment Program (TTPP) assessments to the cigar industry.

## III.    EXPLANATION OF NON-COMPLIANCE.

Section 625(e) of the America Job Creation Act of 2004 (Pub. L. 108-357) (the "Act") , codified at 7 U.S.C. § 518d, prohibits TTPP assessments "in excess of the manufacturer's or importer's share of domestic volume." In the preamble to the final rule promulgated as 7 C.F.R. Part 1463, USDA stated that it would use information obtained from the Department

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

Greenberg Traurig, LLP | Attorneys at Law | 800 Connecticut Avenue, NW | Suite 500 | Washington, D.C. 20006
Tel 202.331.3100 | Fax 202.331.3101

www.gtlaw.com

Chief Information Officer
September 13, 2005
Page 2

---

of the Treasury and from the Department of Homeland Security to calculate "share of domestic volume." 70 Fed. Reg. 7007-8 (February 10, 2005). However, based on a verbal conversation with USDA personnel, it appears USDA calculated "domestic volume" (market share) based solely on "reported" volume; that is, the total sales volume voluntarily reported by companies complying with § 625(h) disclosure requirements. Consequently, when USDA calculated and disseminated the influential statistical and financial information, it intentionally excluded sales by at least 349 companies from the analysis. Furthermore, USDA has never formally disclosed its data sources, methods, or data verification measures, thereby preventing Requestor and others from reproducing and verifying the disseminated information.

In December, 2000, the Congress enacted IQA, requiring government information to meet quality standards, providing "affected persons" with the right to seek and obtain correction of disseminated information, and directing agencies to provide those persons with an administrative mechanism that could be used to obtain the requisite relief. IQA provides:

> (a) IN GENERAL – [OMB] shall…issue guidelines…that shall provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies….

> (b) CONTENT OF GUIDELINES – The guidelines under subsection (a) shall - -

> (1)    apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and

> (2)    require that each Federal agency to which the guidelines apply-

> (A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information(including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

> (B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a)

IQA was enacted to ensure government information is objective and supported by statistically sound data, and that the public has meaningful access to the data and methodological information needed to test and reproduce the disseminated information. *See* 67 Fed. Reg. at 8455-57. The law recognizes that the public's capacity to test the objectivity and reproducibility

Chief Information Officer
September 13, 2005
Page 3

---

of government information depends entirely upon the quality of an agency's disclosure of data sources and methods. *See* 67 Fed. Reg. at 8455-58. IQA requires source and method transparency, thereby deterring reliance on flawed calculations or inaccurate statistics, and encouraging sound decision-making. Correction and disclosure are the remedy for an agency's dissemination of inaccurate information, or its failure to provide enough information for the public to test the soundness of its methods or the reproducibility of its conclusions.

The USDA Guidelines specifically require USDA agencies and offices to collect and create information using only sound statistical methods that are consistent with generally accepted professional and industry standards. When compiling and using statistical or financial information from administrative data files and records or original sources, USDA requires the use of only the most reliable data and the most reliable data sources available, and directs that the data be validated against other information where practicable. The USDA Guidelines further require the transparent documentation of data sources, methods, and sources of error when disseminating original or supporting statistical or financial data. In analyzing and reporting statistical or financial information, USDA agencies and offices must use sound analytical techniques, and provide a clear explanation of data sources, methodologies used, and assumptions made.

The disseminated information that is the subject of this Petition is "influential" as a matter of law. *See* 67 Fed. Reg. 8452, 8460 (February 22, 2002). Consequently, the USDA Guidelines specifically direct USDA agencies and offices to provide "a high degree of transparency about data and methods to facilitate its reproducibility by qualified third parties." Reproducibility means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. The USDA Guidelines provide further: "In all cases, USDA agencies and offices must disclose the specific data sources, quantitative methods, and assumptions used in the analysis."

The disseminated information does not comply with the IQA in that:

- The specific data sources, quantitative methods, and assumptions used by USDA have not been disclosed.
- Transparent documentation of data sources, methods, and sources of error have not been provided.
- USDA apparently did not validate the accuracy of the disseminated information against other information as required. In any event, its data verification methods and results have not been disclosed.
- Requestor lacks the data needed for it to attempt to reproduce USDA's statistical conclusions.

Chief Information Officer
September 13, 2005
Page 4

---

- USDA's estimation of assessable market share was not consistent with sound statistical methods, nor with generally accepted professional and industry standards.
- Commercial survey data based on actual sales suggests that USDA has over-estimated Requestor's market share by four to six orders of magnitude.  Upon information and belief, USDA has over-estimated other companies' market share as well.

IV.    EXPLANATION OF THE EFFECT OF THE ERROR

The disseminated information has been used by USDA to calculate and impose TTPP assessments on the cigar industry. However, because the underlying data is erroneous, the disseminated information, and the TTPP assessments based on that information, are also erroneous.  Due to USDA's failure to comply with the IQA, some companies have suffered substantial economic harm, while others have obtained an undeserved economic windfall.

Requestor has been substantially and adversely affected by USDA's failure to comply with the IQA.  Requestor has been assessed at a rate four to six times higher than can be justified by the sound financial and statistical data.  Consequently, it is threatened with losses that could exceed one million dollars.  Furthermore, USDA's failure to disclose the specific data sources, quantitative methods, and assumptions it used to generate the influential information has effectively prevented Requestor from even attempting to reproduce USDA's statistical results. As a result, it cannot fully assess its own legal obligations.

V.    RECOMMENDATIONS AND JUSTIFICATION FOR HOW INFORMATION SHOULD BE CORRECTED.

Requestor recommends the following:

1.    USDA should disclose all specific data sources, quantitative methods, and assumptions it has used in generating the assessments, as required by law.  Only if this information is disclosed can Requestor and others test and reproduce the agency's statistical and financial conclusions, and respond appropriately to the TTPP assessments.

2.    Industry market share calculations should be based on actual market share data only.  The USDA Guidelines mandated the use of sound statistical methods in accordance with generally accepted professional and industry standards.  Instead, USDA knowingly disseminated inaccurate influential information.  It knew it had over-estimated Requestor's market share by failing to develop a statistical model that would compensate for missing reported sales data. The agency's failure to do so was not a "sound statistical method," nor consistent with "generally accepted professional and industry standards" as required by law.

Chief Information Officer
September 13, 2005
Page 5

_____

3.      USDA should suspend all TTPP assessments pending IQA compliance.
        Alternatively, it should immediately disclose all operative data sources, methods,
        and data validation results, proceed to recalculate the assessments, and issue
        credits and refunds, as appropriate, as soon as possible.

Please contact me if you have any questions.

                                                Sincerely,

                                                Reed D. Rubinstein

RDR:jmj

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com℠

# OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7004 0550 0000 9127 8291

*Sent To*
Quality of Information Officer
*Street, Apt. No.; or PO Box No.*
USDA/FSA, Room 3086-South
*City, State, ZIP+4*
1400 Independence Ave. SW
Washington, DC 20250

PS Form 3800, June 2002          See Reverse for Instructions

**McGruder-Jackson, Jean (AdmAst-DC-LT)**

From:           TrackingUpdates@fedex.com
nt:             Wednesday, December 21, 2005 12:12 PM
ro:             McGruder-Jackson, Jean (AdmAst-DC-LT)
Subject:        FedEx Shipment 790753555114 Delivered

---

*This tracking update has been requested by:*

*Name:  'not provided by requestor'*

*E-mail:  'not provided by requestor'*

---

*Our records indicate that the following shipment has been delivered:*

*Tracking number:*          *790753555114*
*Reference:*                *58435.011800/rdr*
*Ship (P/U) date:*          *Dec 21, 2005*
*Delivery date:*            *Dec 21, 2005 11:12 AM*
*Sign for by:*              *R.VAUGHN*
*Delivered to:*             *Receptionist/Front Desk*
*  rvice type:*             *FedEx Priority Overnight*
*  ackaging type:*          *FedEx Envelope*
*Number of pieces:*         *1*
*Weight:*                   *0.5 LB*

*Shipper Information*           *Recipient Information*
*Reed D. Rubinstein*            *Quality of Information Officer QUIi*
*Greenberg Traurig LLP*         *USDA/FSA, Room 3086-South*
*800 Connecticut Avenue, N.W.*    *1400 Independence Avenue, S.W.*
*Suite 500*                     *Washington*
*Washington*                    *DC*
*DC*                            *US*
*US*                            *20250*
*20006*

*Special handling/Services:*
*Deliver Weekday*

*Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 10:33 AM CST on 12/21/2005.*

*To learn more about FedEx Express, please visit our website at fedex.com.*

*  weights are estimated.*

*To track the status of this shipment online, please use the following:*

*https://www.fedex.com/fedexiv/us/findit/nrp.jsp?tracknumbers=790753555114*
*&language=en&opco=FX&clientype=ivpodalrt*

*This tracking update has been sent to you by FedEx on the behalf of the Requestor noted above. FedEx does not*
*validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the*
*request, the requestor's message, or the accuracy of this tracking update. For tracking results and fedex.com's*
*terms of use, go to fedex.com.*

*Thank you for your business.*

# Greenberg
# Traurig

**Reed D. Rubinstein**
Tel. 202.533.2314
Fax 202.331.3101
rubinsteinr@gtlaw.com

December 20, 2005

**VIA FEDERAL EXPRESS AND CERTIFIED MAIL**
Quality of Information Officer
USDA/FSA, Room 3086-South
1400 Independence Ave., S.W.
Washington, DC 20250

Re:    **Request For Reconsideration of Information Quality Act Disclosure and
Correction/CCC Tobacco Transition Payment Program Information**

Dear Sir/Madam:

Attached is a Request for Reconsideration of our Petition under the Information
Quality Act, Section 515 of Public Law 106-554, 44 U.S.C. § 3516, note, and the
information quality guidelines issued by the Office of Management and Budget, 67 Fed.
Reg. 8459-60 (Feb. 22, 2002) (the "OMB Guidelines"), and the United States Department of
Agriculture (USDA) (the "USDA Guidelines")(*http://www.ocio.usda.gov/qi_guide*)
(collectively the "IQA") sent certified mail and dated September 13, 2005 (Exhibit 1).

According to the USDA Guidelines, the USDA's response to our request was due on
or before November 13, 2005. We assume USDA's failure to respond constitutes a denial of
the September 13, 2005 request. Therefore, we submit this request for reconsideration.

Please contact me if you have any questions

Sincerely,

Reed D. Rubinstein

RDR:jmj
Enclosure

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

www.gtlaw.com

Greenberg Traurig, LLP | Attorneys at Law | 800 Connecticut Avenue, NW | Suite 500 | Washington, D.C. 20006
Tel 202.331.3100 | Fax 202.331.3101

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

# OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 4.88 | |

7004 0550 0000 9127 8314

Sent To
Quality of Information Officer
Street, Apt. No.: 1400 Independence Ave. SW
or PO Box No.
City, State, ZIP+4
Washington, DC   20250

PS Form 3800, June 2002              See Reverse for Instructions

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 11th day of September, 2006 to:

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C.  20044

Reed D. Rubinstein