# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **SINGLE STICK, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 06-1077 (RWR)** |
| ) | |
| **v.** ) | |
| ) | |
| **MICHAEL JOHANNS and the UNITED** ) | |
| **STATES DEPARTMENT OF** ) | |
| **AGRICULTURE,** ) | |
| ) | |
| **Defendants.** ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    A.   *Chevron* Deference Applies Here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    B.   Single Stick Does Not State a Claim Regarding USDA's Calculation of Single
Stick's Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

        1.   USDA correctly uses a per-stick method to calculate Single
Stick's assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

        2.   Single Stick's proposed 'volume of tobacco' interpretation
of the Reform Act is unsound and incomplete. . . . . . . . . . . . . . . . . . . . . **5**

        3.   Contrary to Single Stick's policy argument, the Reform Act
does not distinguish between large cigars and small cigars. . . . . . . . . . . **10**

        4.   Smuggled cigars should not be included in the assessment
calculation (assuming that is possible), and even if they
were, Single Stick's allegations fail to state a claim for
relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

    C.   Single Stick Does Not State a Claim under the Information Quality Act. . . . . . **14**

        1.   The IQA does not create a right to either the production or
the correction of agency information. . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

        2.   The APA does not permit judicial review of claims for
production and correction of agency information under the
IQA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        3.   The IQA does not provide for correction or production of
agency information regarding confidential excise tax return
information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

    D.   Single Stick's Entire Complaint Should Be Dismissed. . . . . . . . . . . . . . . . . . **21**

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

## INTRODUCTION

Single Stick's complaint fails to state a claim for relief and should be dismissed in its entirety.  None of the arguments offered by Single Stick suffices to inject any legal vitality into Single Stick's inadequate allegations that the United States Department of Agriculture ("USDA") incorrectly calculated Single Stick's assessment due under the Fair and Equitable Tobacco Reform Act of 2004 (the "Reform Act") or that USDA improperly denied Single Stick any information to which it was entitled.

Single Stick's allegations regarding USDA's calculation of Single Stick's assessment due under the Reform Act fail because USDA correctly calculated Single Stick's assessment.  By the plain terms of the Reform Act, it was proper for USDA to employ a per-stick method of calculating Single Stick's assessment, which was proportional to Single Stick's market share.  See 7 U.S.C. § 518d(f), § 518d(g)(3).  It was also appropriate for USDA not to include smuggled cigars in the assessment calculations as assessments are apportioned "among manufacturers and importers" and not smugglers.  See 7 U.S.C. § 518d(e)(1).  Single Stick's suggested alternative readings of the Reform Act must be rejected because they do not comport with established principles of statutory construction and they improperly look to external sources to define terms that are sufficiently explained in the Reform Act.  Furthermore, if any gap, ambiguity, or uncertainty existed in the meaning of the Reform Act, the implementing regulations, which are entitled to Chevron deference, resolve those concerns and confirm that USDA correctly calculated Single Stick's assessment.

Single Stick also fails to state a claim for a violation of its alleged informational rights. The Information Quality Act (the "IQA") does not create a legal right to the production or

correction of agency information upon which Single Stick can base a lawsuit.  See Salt Institute v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006).  Also, because the IQA fails to provide judicially manageable standards for the production and correction of agency information, suit under the Administrative Procedure Act is not permitted since, without such standards, such a dispute is "committed to agency discretion," and outside the bounds of judicial review.  See Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 602-03 (E.D. Va. 2004), aff'd on other grounds, Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006).  Finally, the information that Single Stick seeks comes from excise tax returns, is therefore confidential, and not covered by the IQA.  See 26 U.S.C. § 6103(a); 26 U.S.C. § 7213(a).

For these reasons, the allegations in Single Stick's complaint fail to state any claim for relief, and the entire complaint must be dismissed.

## ARGUMENT

### A.    *Chevron* Deference Applies Here.

Single Stick contends that Chevron deference does not apply here.  (Mem. in Opp. at 8-10.)  At one level, this position is not surprising since Single Stick's Memorandum in Opposition does not acknowledge the existence of the Reform Act implementing regulations, which are located at 7 C.F.R. §§ 1463.1-.201.  In every other respect, however, Single Stick's position is a radical departure from firmly settled principles of administrative law.  Chevron deference applies here, and USDA's regulations implementing the Reform Act are entitled to the force of law.

Under principles of Chevron deference, if any ambiguities or gaps exist in a statute, then an agency's reasonable resolution of those through regulation carries the force of law.  See Barnhart v. Thomas, 540 U.S. 20, 26 (2003) (explaining that when a statute is silent or

2

ambiguous, a court "must defer to a reasonable construction by the agency charged with its

implementation").  As the Supreme Court has explained, where a statute confers upon an agency

the authority to make regulations or where the agency is entrusted to administer a statutory

scheme, "Congress would expect the agency to be able to speak with the force of law."  United

States v. Mead Corp., 533 U.S. 218, 229 (2001).  As set forth in USDA's Motion to Dismiss

(Mem. at 10), and not disputed, Congress has conferred upon USDA the authority to make

regulations regarding the Reform Act and USDA is charged with administering the Reform Act.[1]

Under those circumstances, USDA's regulations and other interpretations of the Reform Act

carry the force of law, as made clear by the Supreme Court:

> [A] reviewing court has no business rejecting an agency's exercise of its generally
> conferred authority to resolve a particular statutory ambiguity simply because the
> agency's chosen resolution seems unwise, but is obligated to accept the agency's
> position if Congress has not previously spoken to the point at issue and the
> agency's interpretation is reasonable.

Mead Corp., 533 U.S. at 229 (citations omitted).  In short, the implementing regulations receive

the force of law in resolving any ambiguity or gap in the Reform Act.  See Nat'l Cable &

Telecomm. Ass'n v. Brand X Internet Servs., 125 S.Ct. 2688, 2699 (2005); Mead Corp., 533

U.S. at 227; Chevron, U.S.C., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984).

Thus, Single Stick's Chevron analysis is inaccurate and incomplete because Single Stick pays no

heed to the presumed force of law given to USDA's implementing regulations.

_____

[1] As explained in the Motion to Dismiss (Mem. at 10), Congress delegated rule-making
authority under the Reform Act to USDA in several ways: by providing the Secretary with the
abilities to promulgate regulations, see 7 U.S.C. § 519a; to administer the Tobacco Transition
Payment Program by imposing quarterly assessments, see 7 U.S.C. § 518d(b)(1); to assess
additional amounts to cover insufficiencies, see 7 U.S.C. § 518d(c)(3); and to determine the
volume of domestic sales for tobacco manufacturers and importers, see 7 U.S.C. § 518d(g)(1).

**B.      Single Stick Does Not State a Claim Regarding USDA's Calculation of Single Stick's Assessment.**

USDA's method for calculating Single Stick's assessment due under the Reform Act (as alleged in the complaint) fully comports with the Reform Act.  USDA correctly used a per-stick measurement of volume of domestic sales to calculate Single Stick's market share, ensuring that Single Stick was not over-assessed.  Moreover, it is permissible and prudent for USDA not to include smuggled cigars in the assessment calculations.  Single Stick's arguments to the contrary fail because they conflict with canons of statutory construction, and to the extent that the Reform Act is unclear or uncertain, USDA's Reform Act regulations, entitled to full <u>Chevron</u> deference, confirm the correctness of USDA's calculation method.

**1.      USDA correctly uses a per-stick method to calculate Single Stick's assessment.**

As explained in USDA's Motion to Dismiss (Mem. at 11-12), the Reform Act requires that cigar assessments be calculated on a per-stick basis.  Described briefly, the total amount of assessments due from all cigar manufacturers and importers, set by 7 U.S.C. § 518d(c)(1)(B), is apportioned among these manufacturers or importers on a pro rata, or proportional, basis.  <u>See</u> 7 U.S.C. § 518d(e)(1).  Specifically, a manufacturer or importer's "market share" within a class of tobacco products is multiplied by the total assessment due for that class.  <u>See</u> 7 U.S.C. § 518d(f).  By definition, the term "market share" refers to the share of  the "volume of domestic sales" that a manufacturer or importer has within a class of tobacco products.  7 U.S.C. § 518d(a)(3).  The Reform Act then expressly mandates (i.e., it uses "shall" language) that the "volume of domestic sales" for cigars be measured by "the ***number*** of  . . . cigars" removed into commerce, <u>see</u> 7 U.S.C. § 518d(g)(3) (emphasis added), as reported on certified copies of excise

4

tax returns submitted by cigar manufacturers and importers, see 7 U.S.C. § 518d(h)(1)-(2).  Thus, by using the number of cigars as the basis for "volume of domestic sales," which is used to determine "market share," which is in turn used to apportion assessments among cigar manufacturers and importers, the Reform Act mandates the so-called 'per-stick' method for calculating a cigar manufacturer or importer's assessment.

**2.  Single Stick's proposed 'volume of tobacco' interpretation of the Reform Act is unsound and incomplete.**

Single Stick's desired interpretation of the Reform Act – in way that would significantly reduce the amount of assessments it owes – is flawed for several reasons.  (Mem. in Opp. at 10-14.)  A keystone to Single Stick's interpretation is the term "gross domestic volume," as used in 7 U.S.C. § 518d(e), and defined in 7 U.S.C. § 518d(a)(2).  Single Stick first claims that the term "volume" is undefined and then looks to dictionary definitions to give that term meaning.  (Mem. in Opp. at 11; id. at n.12.)  Single Stick's approach is premised on concocted ambiguities or gaps in the Reform Act and directly conflicts with the canons of statutory construction.

Such a reading is contrary to the canon of construction that a statute should be read to give each clause meaning.  See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 166 (2004) (explaining that the Court is loath to read a statute in a way that would render part of it superfluous); Duncan v. Walker, 533 U.S. 167, 174 (2001); New York v. U.S. Envtl. Prot. Agency, 413 F.3d 3, 39 (D.C. Cir. 2005).  Single Stick's desired reading neglects § 518d(g)(3), which specifies that "volume" for assessment purposes will be measured on a per-stick basis. 7 U.S.C. § 518d(g)(3).  Single Stick also does not address 7 U.S.C. § 518d(f) in its Memorandum in Opposition.  Section 518d(f), entitled "Allocation of total assessments by market share,"

removes any ambiguity in the calculation of assessments by directing that assessments be calculated by multiplying the market share of the manufacturer or importer (expressed as a decimal to four places, see 7 U.S.C. § 518d(a)(3)) by the total amount of the assessment for that class of tobacco product.  7 U.S.C. § 518d(f)(1)-(2).  Single Stick's desired interpretation, which ignores these provisions, must be rejected.

Single Stick next argues that "volume of tobacco removed" is the "interpretative touchstone" here, not the number of cigars (Mem. in Opp. at 13), based on its assertion that the Reform Act defines "gross domestic volume" as the "volume of tobacco removed" (Id. at 3 (citing 7 U.S.C. § 518d(a)(2).)  That is a misstatement of Reform Act's terms.  As defined by § 518d(a)(2), "gross domestic volume" means "the volume of tobacco **products** . . . removed . . . and not exempt from tax."  7 U.S.C. § 518d(a)(2) (emphasis added).  Thus, "gross domestic volume" is not premised on "volume of tobacco," as Single Stick recites (Mem. in Opp. at 3), but rather on the "volume of tobacco products," with the term "tobacco products" referring to "cigars" – not to the weight of tobacco in cigars.  See 26 U.S.C. § 5702(c).

Furthermore, Single Stick improperly looks to dictionary definitions and commercial survey results when the text of the Reform Act fully explains the process for calculating cigar assessments.  (Mem. in Opp. at 6, 11.)  Because § 518d(g)(3) explains that "volume of domestic sales," is measured on a per-stick basis for purposes of calculating cigar assessments, it is contrary to basic canons of construction to look to dictionary definitions for the term "volume" as Single Stick advocates.  See United States v. Smith, 155 F.3d 1051, 1057 (9th Cir. 1998) ("When, as here, the meaning of a word is clearly explained in a statute, courts are not at liberty to look beyond the statutory definition."); see also Stenberg v. Carhart, 530 U.S. 914, 943 (2000)

("When a statute includes an explicit definition, we must follow that definition, even if it varies

from  that term's ordinary meaning."); Meese v. Keene, 481 U.S. 465, 484-85 (1987) ("It is

axiomatic that the statutory definition of the term excludes unstated meanings of that term.").[2]

Well aware of the canons of statutory construction, Single Stick tries to turn them on their

heads by arguing that USDA's reading of the Reform Act fails to explain certain subsections,

§ 518d(e)(1), § 518d(e)(2), and § 518d(g)(2).  (Mem. in Opp. at 12.)  That is inaccurate.  Rather,

USDA's reading of the Reform Act places those subsections in their proper perspective and does

not elevate them beyond their significance.  Section 518d(e)(1) makes clear that pro ration, the

proportional division of liability for assessments, is done "among manufacturers and importers."

7 U.S.C. § 518d(e)(1).  Moreover, the structure of the Reform Act evidences this conclusion by

placing § 518d(e)(1)'s identification of the entities who are responsible for paying each class's

share of the total assessment between § 518d(c), which specifies the process for apportioning the

national assessment among the six classes of tobacco products, and § 518d(f), which provides the

calculation method for assessments due in each class of tobacco products.  See 7 U.S.C.

§ 518d(c); 7 U.S.C. § 518d(f).

Next, § 518d(e)(2) provides that although the manufacturers and importers in a class of

_____

[2] Single Stick's reference to the A. C. Nielsen survey (Mem. in Opp. at 6) is similarly of
no legal significance.  Nothing in the Reform Act suggests that A. C. Nielsen should provide the
operative data set for USDA to determine assessments.  To the contrary, the Reform Act provides
that the calculation of assessments shall be done by submitting certified copies of excise tax
returns to USDA.  7 U.S.C. § 518d(h)(1)-(2).  Furthermore, the Reform Act regulations, entitled
to Chevron deference, confirm that excise tax data, not A. C. Nielsen survey results, is the
operative data set.  See 7 C.F.R. § 1463.6(b)(1)(ii).  Nor do Single Stick's allegations provide
any assurance that A. C. Nielsen measures the appropriate quantities for assessment purposes –
all parties agree that assessments are based on "tobacco products" "removed" into commerce –
but Single Stick provides no basis to conclude that A. C. Nielsen seeks to measure the amount of
"tobacco products" "removed" into commerce.

tobacco products are responsible for the entire assessment for that class, their liability is proportional and is not joint and several liability. In other words, the exception in § 518d(e)(2) ensures that one manufacturer or importer is not liable for the entire portion of another manufacturer or importer's deficient assessment payment. With this understanding of the meaning of § 518d(e)(2) in place, USDA's determination, as explained in its Motion to Dismiss (Mem. at 13-14), that Single Stick has not been assessed an amount in excess of the limitation set forth in § 518d(e)(2) rings doubly true: Single Stick's market share was calculated properly by using a per-stick basis, and Single Stick is not being held jointly and severally liable for assessments due under the Reform Act.

Finally, § 518d(g)(2) simply confirms the link between the concepts of "domestic sales" and "domestic volume," so that the per-stick method of calculation specified in § 518d(g)(3) may be read to apply to both concepts, should that be necessary. This linkage reconfirms USDA's per-stick assessment method since the definition of "domestic volume" refers to the amount of "tobacco products" removed into commerce, see 7 U.S.C. § 518d(a)(2), where "tobacco products" is defined to include "cigars" and not the weight of cigars, see 26 U.S.C. § 5702(c). Thus, putting these pieces together, § 518d(g)(2) harmonizes easily with the rest of the Reform Act: "domestic sales" is calculated by measuring the volume of "tobacco products," counted by number of cigars, as specified in § 518d(g)(3).

Nonetheless, even there were any ambiguity or gap in the terms used in the Reform Act, USDA's implementing regulations – the clarity of which Single Stick does not attempt to dispute – resolve any confusion. As with the Reform Act, the regulations first specify the percentage of the national assessment that each class of tobacco product is responsible for paying. See

8

7 C.F.R. § 1463.5(b).  Next, the regulations provide that tobacco product manufacturers and importers are required to pay their proportionate share of the assessment, <u>see</u> 7 C.F.R. § 1463.6(a), based on data contained in excise tax reports, <u>see</u> 7 C.F.R. § 1463.6(b)(1)(ii). Within each class of tobacco product, the amount of the assessment will be determined by multiplying the manufacturer or importer's market share (determined by the immediately preceding calendar year quarter) by the total amount of the assessment for that class of tobacco product.  <u>See</u> 7 C.F.R. § 1463.7(a).  The term "market share" is defined to mean "the share of each domestic manufacturer and importer of a class of tobacco products, to the fourth decimal place, of the total volume of domestic sales of a class of tobacco product . . . ."  7 C.F.R. § 1463.3.  The regulations then specify that:

> For purposes of determining the volume of domestic sales of each class of tobacco products and for each entity, such sales shall be based upon the reports filed by domestic manufacturers and importers of tobacco with the Department of Treasury and the Department of Homeland Security and shall correspond to the quantity of the tobacco product that is removed into domestic commerce by each such entity:  (1) ***For cigarettes and cigars, on the number of cigarettes and cigars reported on such forms*** . . . ."

7 C.F.R. § 1463.7(b) (emphasis added).  Putting the pieces together, USDA's alleged per-stick method of calculating assessments is fully consistent with the requirement in the regulations that the number of cigars be used to calculate the volume of domestic sales, which determines market share, which is then used to apportion assessment liability among the cigar manufacturers and importers.  Consequently, even if statutory gaps or ambiguities exist in the Reform Act, the implementing regulations, which receive <u>Chevron</u> deference, make clear that USDA's method of calculating Single Stick's assessment is correct.

### 3. Contrary to Single Stick's policy argument, the Reform Act does not distinguish between large cigars and small cigars.

More broadly, Single Stick urges the Court to interpret the Reform Act in a way that would treat large and small cigars differently. (Mem. in Opp. at 4-5, 11-12.) Contrary to Single Stick's desire, the Reform Act does not distinguish between small cigars and large cigars. Rather, the Reform Act repeatedly groups small cigars and large cigars into one category – "cigars." For instance, § 518d(c)(1), in specifying the initial assessment percentages due for manufacturers and importers of different categories of tobacco products, does not distinguish between large and small cigars. 7 U.S.C. § 518d(c)(1); see also 7 C.F.R. § 1465(b)(2). Nor does the defined term "tobacco products" make a distinction between large cigars and small cigars: "'Tobacco products' means cigars, cigarettes, smokeless tobacco, pipe tobacco, and roll-your-own tobacco." 26 U.S.C. § 5702(c). Consistent with the classes of tobacco products set forth in that definition, the Reform Act repeatedly explains how to calculate assessments by reference to a "class of tobacco product," and not by further subclasses, such as "large cigars" and "small cigars." See 7 U.S.C. § 518d(e)(1) (providing that the assessments within each "class of tobacco product" will be made on a pro rata basis); 7 U.S.C. § 518d(f) (specifying that the amount assessment for each "class of tobacco product" will be made on a market share basis); 7 U.S.C. § 518d(g)(1) (providing that the Secretary shall make the calculation of the assessment of a "class of tobacco product").

By comparison, when Congress intends to treat large cigars and small cigars differently, it does so explicitly. The statutes regarding the collection of excise taxes contain express provisions for taxing large cigars at different rates than small cigars. Specifically, 26 U.S.C.

§ 5701(a) sets different tax rates for small cigars and large cigars based on the "weight" of the cigars measured in pounds per thousand.  26 U.S.C. § 5701(a).[3]  Notably, in making that distinction, the excise tax statute focuses on how much the cigars "weigh" measured in pounds per thousand and does not use the term "volume."  Thus, if Congress wanted to distinguish between large and small cigars in the Reform Act, it knew how to do so, and it would have likely made the distinction using vocabulary such as "weight" and not merely through a reference to "gross domestic volume."

In short, the Reform Act evidences no intent to distinguish between large cigars and small cigars for assessments; consequently, Single Stick's complaint seeking such a reading fails to state a claim for relief.

**4.    Smuggled cigars should not be included in the assessment calculation (assuming that is possible), and even if they were, Single Stick's allegations fail to state a claim for relief.**

Single Stick argues that USDA should have included smuggled cigars in its calculation of assessments.  (Mem. in Opp. at 14-15.)  This argument is rejected by the text of the Reform Act,

---

[3]  The text of 26 U.S.C. § 5701(a) states:

**(a) Cigars**
On cigars, manufactured in or imported into the United States, there shall be imposed the following taxes:
    **(1) Small cigars**
    On cigars, weighing not more than 3 pounds per thousand, $1.828 cents per thousand ($1.594 cents per thousand on cigars removed during 2000 or 2001);
    **(2) Large cigars**
    On cigars weighing more than 3 pounds per thousand, a tax equal to 20.719 percent (18.063 percent on cigars removed during 2000 or 2001) of the price for which sold but not more than $48.75 per thousand ($42.50 per thousand on cigars removed during 2000 or 2001).
Cigars not exempt from tax under this chapter which are removed but not intended for sale shall be taxed at the same rate as similar cigars removed for sale.

which makes clear that USDA is not required to account for smuggled cigars in calculating assessments. The assessment obligations for each class of tobacco products are set out in § 518d(c)(1). <u>See</u> 7 U.S.C. § 518d(c)(1). These assessments are then apportioned on a pro rata basis ***"among the manufacturers and importers"*** within each class of tobacco products based on the market share of each manufacturer or importer. 7 U.S.C. § 518d(e)(1); <u>see also</u> 7 U.S.C. § 518d(f). Put simply, the Reform Act establishes that liability for assessments is divided proportionately "among the manufacturers and importers," without inclusion of smugglers. <u>See</u> 7 U.S.C. § 518d(e)(1).

Not only is the structure of the Reform Act devoid of any congressional intent to require inclusion of smuggled cigars in assessment calculations, but to the contrary, the Reform Act specifies that the data source for calculating assessments are reports filed by manufacturers or importers. <u>See</u> 7 U.S.C. § 518d(g)(1) (calculation of volume of domestic sales will be based on data from manufacturers and importers); 7 U.S.C. § 518d(h)(1) (requiring each manufacturer or importer to submit certified copies of excise tax returns). Thus, the Reform Act does not provide for reporting or collection of any data regarding unknown cigars, and it certainly does not mandate that data regarding smuggled cigars be included in calculating assessments.

If any uncertainty exists as to whether the Reform Act requires accounting for smuggled cigars in calculating assessments, then it is resolved by the implementing regulations. Under the regulations, which are entitled to <u>Chevron</u> deference, only the manufacturers and importers are responsible for assessments, in proportion to their market share:

> ***All domestic manufacturers and importers of tobacco products*** are required to pay to CCC ***their proportionate share*** of a calendar years' national assessments. Such entities are those that import or manufacture tobacco products in a calendar

> year and are required to report to the United States Department of Treasury or to
> the Department of Homeland Security the removal of tobacco products under the
> Revenue Code or are required to pay taxes under chapter 52 of such code.

7 C.F.R. § 1463.6(a); see also 7 C.F.R. § 1463.7(b).  This regulation, like all of the other

implementing regulations, makes no mention of smuggled cigars or any other unknown

quantities of cigars.  Therefore, USDA is justified in its non-inclusion of smuggled cigars in

calculating a cigar manufacturer or importer's assessment.

Without any direct basis to require the inclusion of smuggled cigars in assessment

calculations, Single Stick turns to § 518d(g)(1), which ***authorizes*** USDA to take into account

"any other relevant information" for purposes of calculating assessments, and argues that USDA

is ***required*** to include information of smuggled cigars.  (Mem. in Opp. at 15 n.16.)  This

argument cannot prevail because at most § 518d(g)(1) permits USDA to include data on

smuggled cigars (if such data were available) in calculating assessments; it does not mandate that

USDA do so.  See 7 U.S.C. § 518d(g)(1).  Moreover, Single Stick's argument is foreclosed by

regulation, which directs that USDA will base its calculations "upon the reports filed by domestic

manufacturers and importers of tobacco with the Department of Treasury and the Department of

Homeland Security and shall correspond to the quantity of the tobacco product that is removed

into commerce by each such entity."  7 C.F.R. § 1463.7(b).  Thus, by omitting any reference to

the inclusion of smuggled cigar data, the regulation, entitled to Chevron deference, confirms that

USDA is under no legal obligation to account for smuggled cigars in calculating assessments.

Finally, Single Stick argues that excluding smuggled cigars will result in USDA

overestimating Single Stick's market share.  (Mem. in Opp. at 14-15.)  In addition to the reasons

mentioned above, this argument fails as a matter of pleading.  Single Stick does not allege that

13

including smuggled cigars would have any effect on the amount of its assessment.  In other words, Single Stick's complaint fails to allege a non-negligible amount (i.e., a market share greater than the fourth decimal place, see 7 U.S.C. § 518d(a)(3)) of smuggled cigars.  Without such an allegation, Single Stick does not state a claim that USDA's non-inclusion of smuggled cigars caused Single Stick any injury.

For these reasons, USDA's method of calculating cigar assessments is accurate, and Single Stick's complaint should be dismissed.

**C.    Single Stick Does Not State a Claim under the Information Quality Act.**

     **1.    The IQA does not create a right to either the production or the correction of agency information.**

Single Stick cannot rebut the point that the IQA does not create a right to the correction or production of agency information, as the Fourth Circuit held in Salt Institute v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006).  The Supreme Court makes clear that to state a claim for a statutory violation requires both a statutorily defined right and a statutorily defined remedy.  See Alexander v. Sandoval, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.")  The IQA does not create a legal right to the production or correction of agency information, let alone confidential excise tax return information, and thus, Single Stick does not state a claim under the IQA.  See Salt Institute, 440 F.3d at 159 ("The IQA . . . does not create any legal right to information or its correctness.").

Single Stick incorrectly contends that the IQA's focus is on rights-creating language. (Mem. in Opp. at 19-20.)  At the outset, Single Stick's position is contradicted by its own

14

recitation of the indirect legislative history of the IQA, (see Mem. in Opp. at 20-22), the focus of which was entirely on regulating the conduct of federal agencies, and not on the creation of individual rights.  Moreover, the focus of the IQA is not on the creation of new legal rights, but rather on the imposition of three responsibilities on federal agencies: to issue guidelines regarding information quality, to establish administrative mechanisms for correction of the information, and to make periodic reports to the Office of Management and Budget ("OMB").  See Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154.  Thus, the IQA focuses on the entity regulated and does not display an intention to confer rights on a particular class of persons, and therefore it does not create a legal right enabling Single Stick to sue USDA.  See Salt Institute, 440 F.3d at 159 ("By its terms, [the IQA] creates no legal rights in any third parties."); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 287-88 (2002) (finding no legal right where the statutory terms focused on institutional policy and practice).

Single Stick also argues that the IQA's requirement that agencies establish mechanisms for affected persons to seek correction of information evidences a congressional intent to create a legal right.  (Mem. in Opp. at 19.)  That argument fails because the appropriate standard is whether the statute "focuses" on creating individual rights, and not merely that it protects individuals by its increased regulation.  See Alexander v. Sandoval, 532 U.S. at 289.  Moreover, the mere provision of an administrative mechanism for remedy does not amount to the creation of a new legal right.  To the contrary, as the Supreme Court explained in Alexander v. Sandoval, "[t]he express provision of one method of enforcing a substantive rules suggests that Congress intended to preclude others." 532 U.S. at 290.  Thus, by allowing some form of administrative procedure, Congress evidenced an intent to avoid creating a broad, new legal right to production

15

and correction of agency information.

Single Stick resorts to petitioning the Court to follow the test in Cort v. Ash, 422 U.S. 66, 78 (1975), to support its IQA claim for production and correction of agency information.  (Mem. in Opp. at 18-19.)  This effort should be rejected for two reasons.  First, the Cort test applies only to whether a statute creates a legal remedy, and not whether a statute creates a legal right.  Cort, 422 U.S. at 78 (articulating a test to determine "whether a private *remedy* is implicit in a statute not expressly providing one") (emphasis added).  Thus, the Cort test governs remedies, and offers no support to the proposition that the IQA somehow creates private legal rights.  Second, the Cort framework for finding an implied legal remedy has been effectively overtaken by the Supreme Court's decisions in Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76 (1979) and Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 23-24 (1979), which converted "one of [Cort's] four factors (congressional intent) into *the determinative factor*, with the other three merely indicative of its presence or absence."  Thompson v. Thompson, 484 U.S. 174, 189 (1988) (Scalia, J., concurring) (emphasis in original).

Summing up, the IQA does not evidence a congressional intent to create a new legal right to the production or correction of agency information, and therefore Single Stick does not state a claim under the IQA.  See Salt Institute, 440 F.3d at 159.

## 2. The APA does not permit judicial review of claims for production and correction of agency information under the IQA.

Even if the IQA created a legal right to the production or correction of agency information (which it does not), the remedies available under the Administrative Procedure Act are not available for Single Stick's IQA claims.  See Salt Inst. v. Thompson, 345 F. Supp. 2d

16

589, 602-03 (E.D. Va. 2004); In re Operation of the Missouri River Sys., 363 F. Supp. 2d 1145,

1175 (D. Minn. 2004), *vacated in part and aff'd in part on other grounds*, 421 F.3d 618 (8th Cir.

2005).  Contrary to this point of law, Single Stick contends that the correction of information

under the IQA is judicially reviewable under the APA.  (Mem. in Opp. at 22-24.)

　　　　Single Stick's argument fails because the correction of agency information is committed

to agency discretion and not judicially reviewable under the APA.  The remedies available under

the APA do not permit an IQA challenge because the APA does not apply where "agency action

is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  A matter is "committed to

agency discretion by law" when the governing law "is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion," and the IQA

provides no such meaningful standards for judicial review.  Heckler v. Chaney, 470 U.S. 821,

830 (1985); see also Steenholdt v. Fed. Aviation Admin., 314 F.3d 633, 638 (D.C. Cir. 2003);

Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 579 (3d Cir. 1979).

　　　　The terms of the IQA, the OMB guidance, and USDA's guidelines do not provide a

meaningful standard for judging the correctness of USDA's decisions regarding the production or

correction of information.  As to the statutory text itself, the IQA speaks in broad and general

terms, requiring guidance from OMB "for ensuring and maximizing the quality, objectivity,

utility, and integrity" of agency information.  See Pub. L. No. 106-554, Tit. V, § 515(a),

(b)(2)(A), 114 Stat. 2762A-153-54.  As Single Stick implicitly concedes, the IQA makes no

effort to add specificity or clarity to these general concepts.  The OMB guidance does not refine

these general standards, and in fact goes in the other direction by explaining that it did not issue

"detailed, prescriptive, 'one-size-fits-all' government-wide guidelines that would artificially

require different types of dissemination activities to be treated in the same manner." *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. 8452, 8452 (Feb. 22, 2002). The OMB guidance is further cloaked with language indicating a desire to commit decisions as to information quality to agency discretion by providing that information quality "is to be ensured and established at levels ***appropriate*** to the nature and timeliness of the information to be disseminated." 67 Fed. Reg. at 8459 (emphasis added). Finally, Single Stick does not contend that USDA's guidelines provide a meaningful standard for judicial review either. This makes sense as USDA's guidelines do not do so, but rather speak in general terms: "USDA will strive to ensure and maximize the quality, objectivity, utility, and integrity of the information that its agencies and offices disseminate to the public." *USDA Quality of Information Guidelines: General Requirements* (available at http://www.ocio.usda.gov/qi_guide/index.html).

Single Stick argues that it is "frivolous" to contend that the IQA does not provide meaningful standards of judicial review (Mem. in Opp. at 24), but Single Stick's bold pronouncement is simply untrue, and more tellingly, it is belied by the holding of the district court for the Eastern District of Virginia:

> Neither the IQA nor the OMB guidelines provide judicially manageable standards that would allow meaningful judicial review to determine whether an agency properly exercised its discretion in deciding a request to correct a prior communication.

See Salt Inst., 345 F. Supp. 2d at 602-03.

In sum, without meaningful, judicially manageable standards, it is clear that Congress intended to commit decisions regarding an agency's production and correction of information

under the IQA to agency discretion, without resort to judicial review.  See Salt Inst., 345 F. Supp.

2d at 602-03; In re Operation of the Missouri River Sys., 363 F. Supp. 2d at 1175; see also

Heckler, 470 U.S. at 830; Steenholdt, 314 F.3d at 633.  For that reason, Single Stick cannot use

the APA to sue for production or correction of agency information under the IQA (assuming that

the IQA created a private right to do so).

> **3.    The IQA does not provide for correction or production of agency information regarding confidential excise tax return information.**

As explained in USDA's Motion to Dismiss (Mem. at 23-26), USDA is statutorily

precluded from releasing the confidential primary source excise tax data that Single Stick seeks.

Rather than dispute the confidentiality associated with excise tax return information, Single Stick

accuses USDA of being ignorant of its own practices and argues that there is no confidential

information at issue.  (Mem. in Opp. at 24-25.)  This contention is wrong for several reasons.

First, it is rebutted by Exhibit 7 to Single Stick's complaint, USDA's denial of Single

Stick's FOIA request.  In denying Single Stick's request for information, USDA explained that

the data sought by Single Stick implicate confidential excise tax return information.  (See

Compl., Ex. 7 at 1.)  Tellingly, Single Stick did not challenge USDA's denial of its FOIA request

on the basis of the confidential information at issue.

The only basis Single Stick uses (incorrectly) to support its contention that excise tax

information is not at issue is an internet question-and-answer posting on USDA's website,

"Explaining CCC cigar policy."  Single Stick misconstrues that document.  The internet posting

does not deny that USDA uses data from excise tax returns to calculate cigar assessments; rather,

it explains, that USDA does not use actual excise "taxes paid" to determine cigar assessments,

and that USDA uses volume information from excise tax returns for cigars:

> Since tax rates differ for small and large cigars, ***taxes paid do not substitute for volume data***, as in the case of all other tobacco products. Given the statutory mandate to use ***volume data*** for cigars, CCC determined to use ***volume, rather than taxes*** paid as the metric for calculating market shares in the cigar product category."

"Explaining CCC cigar policy" (attached to Single Stick's Mem. in Opp., Ex. 5) (emphasis added). Such an explanation is fully consistent with regulation, which provides that for cigars, excise "taxes paid" will not be used to calculate market share, but rather "market share" will be determined "based on the number of such products removed into domestic commerce," i.e., on a per-stick basis. 7 C.F.R. § 1463.7(c),

The mere fact that USDA relies on other tax return information and not simply upon "taxes paid" to calculate cigar assessments has no bearing on the confidentiality of the underlying primary source excise tax volume information at issue. By statute, tax "return information" includes data "received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return . . ." and is confidential and not subject to disclosure. 26 U.S.C. § 6103(b)(2)(a) (defining tax "return information"); see also 26 U.S.C. § 6103(a); 26 U.S.C. § 7213(a). Thus, statutory confidentiality extends beyond simply the amount of "taxes paid" and includes all "tax information." Here, that "tax information" includes data, such as the number of cigars manufactured which are reported on excise tax forms,[4] that are certified and submitted to USDA for assessment purposes under 7 U.S.C. § 518d(h)(1)-(2); see also 7 C.F.R. § 1463.6(b)(1)(ii) (requiring each manufacturer or importer to report "the total amount of tobacco

---

[4] See, e.g., TTB Form 5210.5, cols. 8(a)-(b) (containing data fields for the number of large cigars and small cigars manufactured) (available at www.ttb.gov/forms/f52105.pdf).

products" reported for excise tax purposes to the CCC).

Because the information that Single Stick seeks is tax "return information," it merits confidentiality and is not subject to production or correction under the IQA, as explained in USDA's opening brief (see Mot. to Dismiss, Mem. at 23-26). Single Stick makes no effort to rebut this point of law, i.e., that the IQA does not require production or correction of confidential information, and thus Single Stick's IQA claim fails for this reason as well.[5]

### D.    Single Stick's Entire Complaint Should Be Dismissed.

Single Stick's complaint alleges two categorical disputes: a challenge to USDA's method for calculating cigar assessments and a claim for data production and correction under the IQA. Single Stick fails to state a claim for relief in either category. USDA properly determined Single Stick's assessment – it was calculated on a per-stick basis and apportioned among the cigar manufacturers and importers. Nor does Single Stick state a claim under the IQA because the IQA does not create a right of action, the IQA does not provide judicially manageable standards of review to permit APA review, and the IQA, even if it did create a legally cognizable right, would not apply here since it does not cover confidential data, such as the excise tax return information at issue. Thus, Single Stick's entire complaint should be dismissed.

_____

[5] Single Stick suggests, in footnote 29 of its memorandum, that USDA could have complied with the IQA by making known the specific data sources upon which it bases its calculation. If Single Stick's suggestion comprises the extent of its IQA demand, then this count is moot because USDA has already informed Single Stick of how to learn the data sources and rationale used to calculate assessments. (See Compl., Ex. 7 at 2 ("For information concerning data sources used to develop and verify total volume, etc. and the basis or rationale for USDA's exclusion of sales by companies that failed to report sales data as required may be found on our website at http://www.fsa.usda.gov/tobacco.").) That website provides further information such as a letter to manufacturers and importers of tobacco products specifying the seven categories of documents (including excise tax forms) that USDA uses to calculate assessments. See "Tobacco Product Manufacturers and Importers Letter" (available at http://www.fsa.usda.gov/tobacco).

To avoid a complete dismissal of its complaint, Single Stick asserts, in footnote 3 of its Memorandum in Opposition, that USDA does not challenge the sufficiency of four categories of Single Stick's allegations. That is incorrect. As stated throughout its Motion to Dismiss, USDA has provided grounds to dismiss Single Stick's entire complaint, including these four points. As to three of those four points, that (i) USDA does not challenge its allegation that USDA "arbitrarily and capriciously overestimated its market share"; (ii) USDA improperly denied Single Stick's appeal; and (iii) USDA wrongfully discriminated against Single Stick, they each fail because, as explained above and in its Motion to Dismiss (Mem. at 10-15), USDA's calculations of Single Stick's assessment were fully consistent with the Reform Act. Hence, USDA did not act arbitrarily and capriciously in calculating Single Stick's assessment, nor did USDA err in denying Single Stick's administrative appeal, nor was USDA impermissibly discriminating against Single Stick. Finally, as its fourth point, Single Stick asserts that its statutory and constitutional due process allegations are still viable. This is erroneous as well. USDA has made abundantly clear that Single Stick has no informational rights (because USDA's denial of excise tax information was fully consistent with the IQA and the FOIA, see Mem. at 16-26), and thus Single Stick had no basis for a constitutional challenge except through facial challenge to those statutes – which Single Stick does not do. Therefore, none of Single Stick's hyper-technical reasons to prolong the life of its complaint has merit, and Single Stick's entire complaint should be dismissed.

**CONCLUSION**

For the foregoing reasons as well as those stated in Defendants' Motion to Dismiss, Single Stick's entire complaint should be dismissed.

Dated: September 21, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

JAMES J. GILLIGAN
Assistant Branch Director

   /s/ Peter J. Phipps
PETER J. PHIPPS
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants

23