IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| SINGLE STICK, INC.<br>2046 W Rose Garden Lane<br>Phoenix, Arizona  85027<br><br>        Plaintiff<br><br>v.<br><br>MICHAEL JOHANNS, Secretary of Agriculture,<br>and the UNITED STATES DEPARTMENT OF<br>AGRICULTURE<br>1400 Pennsylvania Avenue, S.W.<br>Stop 0506<br>Room 3621-S<br>Washington, D.C.  20250-0506<br><br>        Defendants | Case No. 1:06-CV-01077 (RWR)<br><br>Judge Richard W. Roberts |

## SINGLE STICK, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, and for the reasons set forth in its

supporting Memorandum of Points and Authorities, Plaintiff Single Stick, Inc. ("Single

Stick") moves this Court for summary judgment against defendants Michael Johanns and

the United States Department of Agriculture, and requests the following relief:

1.      An order holding unlawful and setting aside the defendants' illegal over-

assessments of Single Stick (invoices CR0510007A, CR05200005A, and

CR050300004A) in their entirety, and remand with instructions to the DOA that it assess

Single Stick according to its pro rata share of the removed volume of cigar tobacco and

calculate Single Stick's volume of domestic sales based solely on data that  accounts for

all removed tobacco, including cigars smuggled or unlawfully imported into the United States.

2.    An order restraining collection of the excessive portions of invoices CR0510007A, CR05200005A, and CR050300004A, specifically, all sums in excess of the amounts appropriately allocable to Single Stick based on its market share of between 1.05% and 2.05%, as established by the evidence in the record at R-20, ¶¶ 7-9, R (App.) 0028, 0032, 0039, 0053, 0103, 0166, 0241, and as authorized by 7 U.S.C. § 518d(j)(3).

3.    An order compelling the defendants to comply with the Information Quality Act, and to disclose and correct information in accordance with Single Stick's petition.

Respectfully submitted,
SINGLE STICK

_____/s/ Reed D. Rubinstein_____
Reed D. Rubinstein (DC 400153)
Donald Stein (DC 358903)
GREENBERG TRAURIG LLP
800 Connecticut Avenue, N.W.
Washington, D.C. 20006
(202) 331-3100

*Attorneys for Single Stick, Inc.*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

SINGLE STICK, INC.                          )
2046 W Rose Garden Lane                     )
Phoenix, Arizona 85027                      )
                                            )
        Plaintiff                           )
                                            )        Case No. 1:06-CV-01077 (RWR)
v.                                          )
                                            )        Judge Richard W. Roberts
MICHAEL JOHANNS, Secretary of Agriculture,  )
and the UNITED STATES DEPARTMENT OF         )
AGRICULTURE                                 )
1400 Pennsylvania Avenue, S.W.              )
Stop 0506                                   )
Room 3621-S                                 )
Washington, D.C. 20250-0506                 )
                                            )
        Defendants                          )
                                            )

## Rule LCvR 7 Statement of Material Facts

1.      Plaintiff Single Stick, Inc. ("SSI") is a cigar manufacturer and importer,
selling primarily "small" or "little" cigars, as defined at 26 U.S.C.§ 5701(2005)(three
pounds or less tobacco per thousand). R (App)-241 ¶2.

2.      Historically, federal law and regulations have distinguished between small
and large cigars for tax and regulatory purposes, due to the widely disparate amount of
tobacco contained in each.

3.      The Reform Act authorized the defendant United States Department of
Agriculture ("USDA") to levy and collect TTPP assessments from tobacco companies.

4.      The Reform Act placed all tobacco products into one of six classes -
cigarettes, cigars, snuff, "roll your own", chewing tobacco, and pipe tobacco - and the

USDA was directed to apportion the total TTPP obligation between classes based on respective shares of "gross domestic volume" as defined at 7 U.S.C. § 518d(a)(2).

5. TTPP assessments within each class are based on each company's "market share;" as defined at 7 U.S.C. § 518d(a)(3).

6. Congress specifically prohibited the USDA from assessing a tobacco company in excess of its pro rata share of the gross domestic volume for its particular class pursuant to 7 U.S.C. § 518d(e)(2).

7. The USDA used the amount of paid excise taxes - taxes levied based on tobacco volume - as a surrogate for gross domestic volume as set forth at 70 Fed. Reg. at 7008.

8. A single excise tax rate applied to pipe tobacco, chewing tobacco, snuff, roll your own, which are sold by weight.

9. A single excise tax rate also applied to cigarettes, because cigarettes sold in the U.S. each contain basically the same amount of tobacco.

10. For example, loose cigarette and pipe tobacco are commonly sold in containers of 150 and 300 grams, and pouches containing six or 16 ounces. Such tobacco products are not assessed for TTPP purposes by the package, but rather the assessment is based on the weight of tobacco contained therein.

11. In all of these cases, the amount of taxes paid directly correlated to gross domestic volume.

12. The USDA acknowledges that cigars, although sold in sticks like cigarettes, contain different amounts of tobacco.

13.    One large cigar can contain more tobacco that twenty or more small cigars.

14.    Small cigars are roughly uniform in size and weight, and taxed at a common rate of $1.828 per thousand as set forth at 26 U.S.C. § 5701(a).

15.    Large cigars vary in size and weight, and are taxed at the rate of 18.063% of sales price, capped at $48.75 per thousand as set forth at 26 U.S.C. § 5701(a).

16.    The USDA could not rely on either a single excise tax rate or a stick count to reliably measure gross domestic volume of the cigar class.

17.    The USDA separated small and large cigars into separate categories, measured both "total quantity" of sticks sold and "estimated taxes" (applying the differential tax rates) on volume, and then aggregated the information to determine the proportion of the cigar class assessment for each category.

18.    Small cigars accounted for approximately 35% of the total cigar sticks sold, but only approximately 2% of the cigar sector's gross domestic volume, as set forth at 70 Fed. Reg. 7007, 7008 (Table 1).

19.    SSI began receiving TTPP assessments in early 2005.

20.    The USDA calculated these assessments by taking the number of cigars SSI sold divided by the USDA's estimated total number of individual cigars sold in the United States, without accounting for the fact that small cigars remove far less tobacco than large cigars. R (FSA)-10.

21.    SSI was assessed $339,719.00 for the period October 2004 - December 2004, based on an alleged market share of 4.81%.

22.     SSI was assessed $455,374.00 for the period January 2005 - March 2005, based on an alleged market share of 6.45%.

23.     SSI was assessed $1,152,530.00 for the period April 2005-June 2005, based on an alleged market share of 7.78%.

24.     The USDA's market share estimate substantially exceeded SSI's actual market share, as measured by SSI's share of the total amount of excise taxes paid by all cigar manufacturers and by SSI's best estimates based on the A.C. Nielsen "point of sale" survey data.

25.     SSI timely appealed each assessment.

26.     SSI filed a Freedom of Information Act ("FOIA") Request.

27.     SSI filed an IQA Petition requesting that the USDA disclose or correct, as appropriate, the raw data, statistical methods, and information the USDA used to calculate the total number of cigars sold.

28.     The USDA denied SSI's FOIA Request, stating that tax information was specifically excluded from FOIA disclosure.

29.     The USDA did not respond to SSI's IQA Petition and/or Request for Reconsideration.

30.     SSI was denied access to the underlying data the USDA used to calculate SSI's assessments.

31.     SSI had an administrative hearing on November 17, 2005 in accordance with 7 U.S.C. § 518d(i).

32.     The Reform Act provides that in challenging the assessment, SSI could use any information that is available, including third party data on industry or individual company sales volume.

33.     The USDA treats one "little" cigar as the equivalent of one "large" cigar for assessment purposes, despite the fact that a little cigar removes a fraction of the tobacco removed by a large cigar. R (App) - 241-3, ¶¶2, 9-10.

34.     Taking into account tobacco removals, Single Stick and all others similarly situated pay a disproportionately large share of the cigar assessment. See R (App) - 242-3 ¶¶ 9-10.

35.     The USDA's estimate of the number of sticks sold by Single Stick is accurate. R-81 - 188.

36.     The USDA knew its estimate of the total number of cigars sold (total market size) was inaccurate when it assessed Appellant. R (FSA) - 9.

37.     Single Stick's actual market share, based upon the most reliable commercially available point of sale data source, the A.C. Nielsen survey, was approximately 1.05% - 2.5%. See R-20 ¶¶ 7-9; R (App) - 28, 32, 39, 53, 103, 166, 241-2 ¶¶ 4-5.

38.     Industry believes the A.C. Nielsen survey to be the most accurate "real time" source of information available.  Empirical, market experience has demonstrated the reliability of A.C. Nielsen survey data.  Investment, marketing, and other business decisions are made using this information. R (App.) 241 ¶ 4.

39.     Single Stick has not been given access to the raw data USDA used to calculate market size. R (App)-228, 230, 242 ¶¶ 6-8.

40.    The USDA has not disclosed all of the data sources it used to calculate market size. R (App)-230, 242 ¶ 6.

41.    There is no evidence in the record demonstrating that USDA's data is accurate or reproducible.  See R (App) - 242 ¶¶ 6-8.

42.    The USDA did not introduce any evidence into the record refuting the A.C. Nielsen data.

43.    The USDA did not introduce any evidence into the record supporting the accuracy and reliability of its own market share estimate.

44.    Single Stick's inability to test and reproduce USDA's calculation of market size materially impaired its ability to pursue its administrative appeal. R (App) - 242 ¶¶ 6-8.

45.    The USDA never provided SSI with any raw data, information, or evidence that would allow SSI to evaluate or independently test the accuracy of the USDA's estimate of SSI's market share.

46.    The Reform Act provides at 7 U.S.C. § 518d(i)(4)(B) that the defendants must "ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources."

47.    SSI's appeal was substantially denied.

48.    The USDA acknowledged that SSI "may be philosophically well founded" to argue the inequity of assessing small cigars as if each stick contained the same volume of tobacco as contained in a large cigar.

49.    The USDA stated SSI's FOIA request was "outside the scope of this review as it pertains to the appeal of the assessment."

50.    The USDA did not respond to SSI's IQA Petition and Request for Reconsideration.

51.    The USDA rejected the A.C. Nielsen data regarding Single Stick's market share without a basis in the record to do so.

52.    The USDA affirmed the accuracy of its own market share estimate without affording SSI the opportunity to review, test, or evaluate the data, and without a basis in the record to do so.

53.    On or about March 1, 2006, Single Stick received recalculated assessments.

54.    The USDA raised Single Stick's estimated market share for October-December 2004 from 4.81% to 5.32%, and increased the assessment due to $351,007.23.

55.    The USDA raised Single Stick's estimated market share for January - March 2005 from 6.45% to 7.15%, and increased the assessment due to $472,017.47.

56.    The USDA maintained Single Stick's estimated market share for April - June 2005 at 7.78%, but reduced the assessment demanded to $1,135,353.46.

57.    The USDA did not count smuggled cigars prior to calculating SSI's market share.

58.    The OMB IQA Guidelines, promulgated at 67 Fed. Reg. 8452 (Feb. 22, 2002)(the "Guidelines"), were adopted through formal notice and comment rulemaking.

59.    The Guidelines instruct each federal agency to publish their own "information quality guidelines ensuring and maximizing the quality, objectively, utility and integrity of information, including statistical information disseminated by the agency…" and to "[e]stablish administrative mechanisms allowing affected persons to

seek and obtain correction of information maintained and disseminated by the agency that does not comply with these OMB guidelines."

60.     The Guidelines define the terms "quality", "utility", "objectivity", "integrity", "information", "dissemination", and "reproducibility," among other things.

61.     Each agency must, when asked, "identify the sources of disseminated information…and, in a scientific, financial, or statistical context, the supporting data and models, so that the public can assess for itself whether there may be some reason to question the objectivity of the source."

62.     In cases where "public access to data and methods will not occur due to other compelling interests [such as confidentiality], agencies shall apply especially rigorous robustness checks to analytic results and document what checks were undertaken."

63.     However, agencies shall, "in all cases, require a disclosure of the specific data sources that have been used, and the specific quantitative methods and assumptions that have been employed."

64.     The USDA did not disclose the specific data sources used, and the specific quantitative methods and assumptions that were employed to determine SSI's market share.

65.     The USDA could have provided the raw data SSI requested in redacted form, and disclosed its statistical assumptions and methods, without violating confidentiality requirements.

66.     The USDA's current assessment approach, solely based on stick count, deviates from traditional regulatory practice, and disproportionately burdens Appellant

and other similarly situated "little" or "small" cigar manufacturers and importers because (a) little cigars remove a fraction of the amount of tobacco into commerce as large cigars, and (b) stick count assessment has a disparate impact on the little cigar market.    For example, although little cigars constitute only 5% of the total cigar market, little cigar manufacturers appear to be paying over 30% of the total cigar assessment.  R (App.) 242-3, ¶¶ 9-10.

    67.    The USDA assessments are having a significant economic impact on Single Stick..  R (App)-241 ¶3.

Respectfully submitted,
SINGLE STICK

        /s/ Reed D. Rubinstein
Reed D. Rubinstein (DC 400153)
Donald Stein (DC 358903)
GREENBERG TRAURIG LLP
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
(202) 331-3100

*Attorneys for Single Stick, Inc.*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| SINGLE STICK, INC.<br>2046 W Rose Garden Lane<br>Phoenix, Arizona 85027<br><br>　　　　Plaintiff<br><br>v.<br><br>MICHAEL JOHANNS, Secretary of Agriculture,<br>and the UNITED STATES DEPARTMENT OF<br>AGRICULTURE<br>1400 Pennsylvania Avenue, S.W.<br>Stop 0506<br>Room 3621-S<br>Washington, D.C. 20250-0506<br><br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)　Case No. 1:06-CV-01077 (RWR)<br>)<br>)　Judge Richard W. Roberts<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## SINGLE STICK, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Reed D. Rubinstein (DC 400153)
Donald Stein (DC 358903)
GREENBERG TRAURIG LLP
800 Connecticut Avenue, N.W.
Washington, D.C. 20006
(202) 331-3100

*Attorneys for Single Stick, Inc.*

## Table of Contents

I.    INTRODUCTION ......................................................................................................1

II.   FACTUAL BACKGROUND ....................................................................................2

III.  QUESTIONS PRESENTED.....................................................................................9

IV.   ARGUMENT ..........................................................................................................10

      A.    THE STANDARD OF REVIEW ................................................................10

      B.    THE DEFENDANTS VIOLATED THE REFORM ACT..............................11

            1.   The USDA Unlawfully Assessed SSI In Excess Of Its Pro Rata Share Of Gross Domestic Volume. ..................................................................................11

            2.   The USDA Should Have Counted Smuggled Cigars...................................16

      C.    THE DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED SSI'S APPEAL..........................................................................................17

            1.   The Defendants Arbitrarily and Capriciously Denied SSI's Appeal Contrary To The Preponderance of the Evidence......................................17

            2.   The Defendants' Wrongfully Failed To Consider Or Respond To The Nielsen Data................................................................................................18

            3.   The USDA Wrongfully Withheld Information From SSI .........................19

      D.    THE USDA VIOLATED SSI'S RIGHT TO A CORRECTION UNDER THE INFORMATION QUALITY ACT AND SSI IS ENTITLED TO JUDICIAL ENFORCEMENT OF THESE RIGHTS AS A MATTER OF LAW ............20

            1.   The IQA Confers Rights On Affected Persons Like SSI ...........................21

            2.   The Denial Of An IQA Request Is Reviewable Under The APA ..............23

      V.    CONCLUSION.................................................................................................25

## TABLE OF AUTHORITIES

**Federal Cases**

Alexander v. Sandoval, 532 U.S., 275 (2001) ...................................................................21, 23

Bowen v. Mich Acad. of Family Physicians, 476 U.S. 67 (1986) ............................................24, 25

Bragdon v. Abbot, 524 U.S. 624 (1998) ....................................................................................14

Canadian Ass'n of Petroleum Producers v. FERC, 254 F.3d 289 (D.C. Cir. 2001) .....................19

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...........................................................................10

Chevron U.S.A., Inc. v. Natural Re. Def. Council, Inc., 467 U.S. 837 (1984) ............................10

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) ................................18, 20

Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602 (1993)........................17

Federal Election Comm'n v. Akins, 524 U.S. 11 (1998) .............................................................23

Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029 (D.C. Cir. 1988) ..................................................10

Gonzaga Univ v. Doe, 536 U.S. 273 (2002)................................................................................21

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989)......................................................18

Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121 (1991) ......................................................22

National Treasury Employees Union v. Federal Labor Relations Authority,
    404 F.3d 454 (D.C. Cir. 2005)............................................................................................18

Ohio Bell Telephone Co. v. Public Utilities Comm'n of Ohio, 301 U.S. 292 (1937) ..................20

PSC of Ky. v. FERC, 397 F.3d 1004 (D.C. Cir. 2005) ...............................................................19

Salt Institute v. Leavitt, 440 F.3d 156 (4th Cir 2006) ................................................................21

**Federal Statutes**

5 U.S.C. § 551(13)......................................................................................................................23

5 U.S.C. §§ 701-706 .............................................................................................................passim

7 U.S.C. § 518 .............................................................................................................................1

7 U.S.C. § 518d(a) ...............................................................................................................passim

7 U.S.C. § 518d(c) ..................................................................................................3

7 U.S.C. § 518d(e) ...........................................................................................passim

7 U.S.C. § 518d(i) ................................................................................................17

7 U.S.C. § 518d(j) ................................................................................................17

26 U.S.C. § 5701 ..................................................................................................14

26 U.S.C. § 5701(a) .........................................................................................4, 14

26 U.S.C. § 5701(b) ......................................................................................passim

26 U.S.C. § 5702(a) .........................................................................................2, 13

26 U.S.C. § 5702(c) ..............................................................................................13

26 U.S.C. § 5702(k) ....................................................................................1, 2, 13

44 U.S.C. § 3501 ..................................................................................................22

44 U.S.C. § 3504(d) ..............................................................................................22

44 U.S.C. § 3516 ............................................................................................10, 20

FY 2001 Treasury General Government Appropriations Act (H.R. 5658) ...................23

H.R. Rep. No. 105-5092 at 49-50 (1998) ...........................................................22, 23

## Federal Register

67 Fed. Reg. 8452, 8459-60 (February 22, 2002) ..........................................................25

70 Fed. Reg. 7007, 7008 (February 10, 2005) ..........................................................4, 5

## Other

USDA Fact Sheet, "Tobacco Transition Payment Program" ..........................................2

USDA Farm Service Agency, "Tobacco Transition Payment Program" ..........................2

USDA Farm Service Agency, "Explaining CCC Cigar Policy" ....................................4

USDA Quality of Information Guidelines ..................................................................7

# I.  INTRODUCTION

The primary issue before the Court is whether The Fair and Equitable Tobacco Reform Act (the "Reform Act"), 7 U.S.C. § 518 et seq. (Exhibit 1), should be applied as written.[1]

The Reform Act authorizes the defendant United States Department of Agriculture to assess tobacco manufacturers and importers to pay for government subsidies to eligible "quota holders'" (the landowners of the farm where a tobacco quota was assigned) and "producers" (the persons who shared in the risk of producing tobacco).  The Reform Act provides in 7 U.S.C. §518d(e) that each tobacco company shall be assessed "on a pro rata basis...based on each manufacturer's or importer's share of gross domestic volume."   "Gross domestic volume" is defined at 7 U.S.C. § 518d(a)(2) to mean:

> [T]he volume of tobacco products-- (A) removed (as defined by section 5702 of the Internal Revenue Code of 1986);[2] and (B) not exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

The Reform Act further provides in 7 U.S.C. §518d(e)(2), as a basis for its interpretation and enforcement, that: "No [company] shall be required to pay an assessment that is based on a share that is in excess of the [company's] share of domestic volume."

---

[1] This is a case of first impression under the Reform Act, and a case of first impression in this Circuit under the Information Quality Act, 44 U.S.C. § 3516, note (the "IQA").

[2] 26 U.S.C. § 5702(k) defines "removed" as:

> [T]he removal of tobacco products or cigarette papers or tubes from the factory or from internal revenue bond under section 5704 as the Secretary shall by regulation prescribe, or release from customs custody, and shall also include the smuggling or other unlawful importation of such articles into the United States.

Plaintiff Single Stick, Inc. ("SSI") manufactures, imports, and sells primarily "small" cigars.[3] According to data published by the defendant United States Department of Agriculture (the "USDA"), small cigars account for approximately 35% of all the cigars sold in the United States annually, but only for approximately 2% of the total volume of cigar tobacco actually removed. See 70 Fed. Reg. at 7008 (Table 1).[4]  The USDA has assessed cigar companies based solely on the USDA's unverified estimate of the total number of cigars sold in the United States without controlling for the volume of tobacco removed.   Therefore, the USDA has assessed SSI in excess of its pro rata share of gross domestic volume, and violated the law.

## II.  FACTUAL BACKGROUND

In 2004, Congress enacted the Reform Act and created the Tobacco Transition Payment Program (the "TTPP"), a ten-year, $10.14 billion subsidy for eligible "quota holders"(the landowners of the farm where a tobacco quota was assigned) and "producers"(the persons who shared in the risk of producing tobacco) that is funded by assessments on tobacco manufacturers and importers. See USDA Fact Sheet "Tobacco Transition Payment Program," http://www.fsa.usda.gov/Internet/FSA_File/ttpp05.pdf  (March, 2005) (Exhibit 2); 7 U.S.C. § 518d(e).[5]  The Reform Act directs the USDA to calculate the TTPP subsidy payments to quota

---

[3] "Cigar" is defined at 26 U.S.C. § 5702(a) to mean a "roll of tobacco wrapped in leaf tobacco or in any substance containing tobacco [other than cigarettes]…"  Cigars are taxed and regulated based on the volume of tobacco contained in each unit or "stick."  Cigars containing less than three pounds of tobacco per thousand units or "sticks" are classified as "small" or "little" cigars. 26 U.S.C. § 5701(a)(1).  Cigars containing more than three pounds per thousand sticks are classified as "large cigars." 26 U.S.C. § 5701(a)(2).  The Congress first distinguished between large and small cigars for tax purposes in 1954, largely to reflect the fact that one large cigar can contain a larger volume of tobacco than twenty small cigars.

[4] A cigar is "removed" when it is taken from a bonded warehouse  - or smuggled or unlawfully imported into the United States - for sale and/or use. See 26 U.S.C. § 5702(k).

[5] The TTPP subsidy eases the quota holders' and producers' transition to free market competition.  See USDA Farm Service Agency, "Tobacco Transition Payment Program"

holders and producers based on the volume of tobacco each produces, and to calculate the TTPP

assessments on tobacco manufacturers and importers (collectively "tobacco companies") based

on the volume of tobacco each removes.[6]  See USDA Fact Sheet, supra at pp. 1-2.

To ensure that all tobacco companies are fairly assessed, the Reform Act requires the

USDA to calculate the TTPP assessments in two basic steps: (1) the total TTPP liability is

apportioned between six tobacco product classes (cigarettes, cigars, snuff, "roll your own",

chewing tobacco, and pipe tobacco) based on their respective shares of gross domestic volume,

and (2) the total TTPP liability for a given class is apportioned between tobacco companies

based on their respective "market share."[7]  See 7 U.S.C. § 518d(a)(2); 7 U.S.C. § 518d(c).

However, the Reform Act specifically prohibits the USDA from ever assessing a tobacco

company in excess of its pro rata share of the gross domestic volume for its particular class.  7

U.S.C. § 518d(e)(2).  This section, it is submitted, expresses the fundamental Congressional

intention to equalize the burden on all of the tobacco companies that must pay assessments, and

should be the guiding principal in construing the Reform Act in this case.

The USDA apportioned the TTPP liability between all tobacco product classes except

cigars (Step 1) based on the amount of total excise taxes, which are levied based on the volume

---

website,        http://www.fsa.usda.gov/FSA/webapp?area=home&subject=toba&topic=landing
(January 22, 2007) (Exhibit 3).

[6] The annual payment for quota holders is $7 per pound based on the basic quota at the
2002 marketing year level.  The annual payment for producers is calculated by multiplying the
eligible producer's Base Quota Level (BQL) for each farm for crop years 2002, 2003, or 2004 by
$0.10 per pound per year.  See USDA Fact Sheet, supra at pp. 2-3.

[7] "Market Share" is defined at 7 U.S.C. § 518d(a)(3) as the share "of each manufacturer
or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total
volume of domestic sales of the class of tobacco product during the base period for a fiscal year
for an assessment under this section."

of tobacco removed, paid by each class.[8]  See 70 Fed. Reg. 7007, 7008 (February 10, 2005) (Table 1); 26 U.S.C. § 5701(a)-(b), (e)-(g).  For all tobacco companies within these five classes, the USDA also used the amount of excise taxes paid to determine tobacco company shares (Step 2), because the amount of taxes paid accurately correlated to the volume of tobacco removed. See USDA Farm Service Agency "Explaining CCC Cigar Policy" at 1 (April 25, 2006) (the "Cigar Policy") ("For all products, excluding cigars, a constant tax rate per unit results in exactly the same calculation whether volume or taxes paid is used in the formula") (Exhibit 4).[9]

The USDA, however, treated the cigar class differently.  See generally Cigar Policy at 2. Although Small cigars are roughly uniform in size and weight and are taxed at a common rate of $1.828 per thousand, large cigars vary in size and weight (one large cigar can contain more tobacco than twenty small cigars) and are taxed at the rate of 18.063% of sales price, capped at $48.75 per thousand.  See 26 U.S.C. § 5701(a).  Therefore, the USDA could not rely on either a single excise tax rate or a stick count to reliably measure the cigar class' share of gross domestic volume.[10]  (Step 1).  Consequently, the USDA separated small and large cigars into separate categories, measured both the "total quantity" of sticks sold and "estimated taxes" for large cigars (using the volume-based statutory tax rates) and then aggregated the actual taxes paid for

---

[8] Cigarettes and cigars were allocated 96.331% and 2.783% of the TTPP bill respectively, and the balance was allocated among the four other classes.

[9] For pipe tobacco, chewing tobacco, snuff, and roll your own products, the amount of excise taxes paid directly correlates to relative shares of gross domestic volume because these products are sold by weight and taxed at a uniform rate.  Taxes paid also accurately measure cigarette company shares of gross domestic volume, because all cigarettes sold in the U.S. contain essentially the same amount of tobacco (and for this reason, a cigarette stick count also yields a reasonably reliable estimate of gross domestic volume).

[10] Small cigars are also taxed at a uniform rate.  If the USDA had properly interpreted the Reform Act, small cigar company shares could have been determined the same way the USDA determined company shares for all other tobacco classes - by taking the aggregate amount of excise taxes paid, and then allocating company shares of the TTPP liability based on company shares of the total excise tax pool.

4

small cigars with the estimated taxes paid for large cigars.  70 Fed. Reg. at 7008 (Table 1).[11]
This approach was consistent with historic practice[12] and with the Reform Act's plain language.

The USDA, however, used an entirely different approach to determine assessments for cigar companies *within* the cigar class (Step 2).  It determined cigar company assessments by simply dividing the number of cigars a company sold (the "stick count") by the USDA's estimate of the total number of cigars, both large and small, sold in the United States.  The USDA did not adjust company assessments to reflect the volume of tobacco each company removed as required by 7 U.S.C. § 518d(e)(2).[13]  As a result, SSI was assessed in excess of its actual share of gross domestic volume, simply because large cigars contain so much more tobacco than small cigars.

Presented below is a chart of readily available cigar data (collected and verified by SSI) that illustrates the economic impact of the USDA's failure to adjust cigar company assessments to reflect volume of removals, as required by the Reform Act.

---

[11] Notably, the data demonstrate that although little cigars account for only approximately 5% of all cigar removals based on volume, little cigar manufacturers appear to be paying over 30% of the total cigar class assessment.  70 Fed. Reg. at 7008 (Table 1); R (App.) 0242-3, ¶¶ 9-10.

[12] Separate tax rates for small and large cigars first appeared in the Internal Revenue Code in 1954.

[13] The USDA certainly had the data available to adjust company assessments to accurately reflect company shares of gross domestic volume as required by the Reform Act, and the calculations required to rationalize the assessments are not complex.  The USDA, in rough parallel to the process it used to determine the portion of the total TTPP liability appropriately assigned to the cigar class, could have simply divided the cigar class into large cigar and small cigar sectors, apportioned the total class allocation between sectors based on relative volume of removals, and then allocated between the companies within each sector based on stick count.  Such an approach would have fully complied with the Reform Act's language and intent.

|  | | LARGE CIGARS | | | | SMALL CIGARS | |
|---|---|---|---|---|---|---|---|
|  | Punch Rare Corojo | Hoyo Excalibur | Partagas Black Label Maximo | Macanudo Portofino | Macanudo Prince Phillip | Smokers Choice 100 mm | Smokers Choice 85mm |
| Tobacco Volume per stick (grams) | 21.19 | 24.6 | 16.67 | 7.86 | 20.55 | 1.18 | 1.09 |
| Wholesale Price per stick ($) | 2.38 | 3.95 | 3.76 | 3.81 | 4.63 | 0.0265 | 0.0265 |
| Retail Price per stick ($) | 7.69 | 6.29 | 5.50 | 5.35 | 6.35 | 0.0595 | 0.0595 |
| Federal Excise Tax per stick ($) | 0.04875 | 0.04875 | 0.04875 | 0.04875 | 0.04875 | 0.001828 | 0.001828 |
| USDA Assessment per stick ($) (1) | 0.00438 | 0.00438 | 0.00438 | 0.00438 | 0.00438 | 0.00438 | 0.00438 |
| USDA Assessment per pound ($) | 0.09 (app.) | 0.08 (app.) | 0.18 (app.) | 0.25 (app.) | 0.09 (app.) | 1.68 (app) | 1.82 (app.) |
| USDA Assessment % of Retail Price | 0.057% | 0.069% | 0.080% | 0.082% | 0.069% | 7.36% | 7.36% |

(1) Based on SSI's average assessment per stick for assessments dated 3/1/05, 6/1/05, 9/1/05 and 12/1/05.

See Affidavit of James Deer (January 24, 2007) (Exhibit 5).  By severing the connection between cigar company assessments and removed volume mandated by the Reform Act, the USDA - without statutory sanction or rational basis - assessed the tobacco used in small cigars at the rate of approximately $1.68 per pound of tobacco removed, while assessing the tobacco used in large cigars at the rate of approximately 9.6 cents per pound of tobacco removed. Id.

SSI began receiving excessive quarterly TTPP assessments in early 2005, and timely appealed.[14]  While its appeals were pending, SSI filed a Freedom of Information Act ("FOIA")

_____

[14] The USDA calculated SSI's market share at 4.81%, and assessed SSI $339,719.00 for the period October 2004 - December 2004,  at 6.45%, and assessed SSI $455,374.00 for the period January 2005 - March 2005, and at 7.78%, and assessed SSI $1,152,530.00 for the period April 2005-June 2005. These assessments far exceeded the assessment that SSI owed based on

Request and an IQA Petition to obtain the raw data used by the USDA to determine SSI's assessment. The USDA denied SSI's FOIA Request, stating that the information requested was all tax information specifically excluded from FOIA disclosure. See Letter from J. Burton Eller to Reed D. Rubinstein dated October 24, 2006; R. (App.) 0228. Violating its own information quality guidelines, the USDA simply ignored SSI's IQA Petition and the subsequent Request for Reconsideration, and thereby denied SSI data access. See "USDA Quality of Information Guidelines - Correction of Information," www.ocio.usda.gov/qi_guide/corrections.html; see also Memorandum in Support of Defendants' Motion to Dismiss at 6 (August 30, 2006) (stating "USDA did not separately respond to Single Stick's IQA petition, which sought production and correction of the underlying primary source data"). As a result, SSI was never able to test or (as events later proved) effectively challenge the USDA's assessment.

An administrative appeal hearing was held on November 17, 2005. SSI argued that it had been unlawfully assessed in excess of its share of gross domestic volume and that the USDA had violated the Reform Act as a matter of law. See SSI Post-Hearing Statement at 7 ("SSI Statement") (January 18, 2006) (Exhibit 6). SSI also introduced into the record the raw Nielsen survey data demonstrating that the USDA had grossly overestimated SSI's market share, as measured by the number of cigars sold. R. (App.) 0028 - 0143; see also Deer Aff. at ¶¶ 4-7; R (App.) 0241-2 SSI offered uncontroverted evidence demonstrating that the Nielsen survey data

---

its pro rata share of gross domestic volume. Furthermore, the USDA's estimates of SSI's stick count market share substantially exceeded SSI's actual stick count share, as measured by either SSI's share of the total amount of excise taxes paid by all cigar manufacturers or by A.C. Nielsen "point of sale" survey data market share estimates. The USDA's estimate for the period December 2004 - June 2005 exceeded SSI's market share, as measured by its share of the total amount of excise taxes paid by all cigar manufacturers (6.83% v. 0.79%), and by SSI's best estimates based on the A.C. Nielsen "point of sale" survey data (4.81% - 7.78% v. 1.05% - 2.5%). See Affidavit of James A. Deer, Esq. at ¶¶ 4-7 (January 18, 2006) (the "Deer Aff."); R (App.) 0241-2; R. (App.) 0028 - 0143.

was the best commercially available information regarding cigar market share, measured by the number of sticks sold. <u>See</u> Deer Aff. at ¶ 4; R (App.) 0241-2. Finally, SSI argued that the USDA's failure to make available the data it relied upon to calculate SSI's market share prevented SSI from effectively prosecuting its appeal, and violated SSI's due process rights. <u>Id.</u> at ¶¶ 6-8; R (App.) 0242.

The USDA neither refuted the Nielsen survey data nor introduced any evidence into the record supporting the accuracy or reliability of the data used to calculate the assessments challenged by SSI.

On February 8, 2006, the Secretary determined SSI had "failed to demonstrate that the USDA's assessments were incorrect." <u>See</u> Letter from John A. Johnson to Reed D. Rubinstein dated February 8, 2006 ("Johnson Letter") (<u>Exhibit 7</u>). He asserted Congress had mandated that market share be calculated based on stick count. <u>Id.</u> at p.4. Ignoring the A.C. Nielsen survey data entirely, the Secretary ruled:

> The fact that Appellant was unable to obtain, review, and scrutinize the underlying data used to calculate market shares does not mean Appellant's assertions are well-founded nor does it render that data incorrect. Appellant has made no sustainable argument that the data relied on by the USDA was incorrect…therefore, I must deny Appellant's appeal in this regard.

<u>Id.</u> at p. 7. The Secretary concluded that SSI's due process rights had not been violated by the USDA's failure to make available market share information. <u>Id.</u> at p. 10.

The Secretary granted SSI's appeal subject to the USDA's recalculation and reconciliation of the FY 2005 assessments due to the fact that the USDA had assessed SSI without accounting for the failure of some 300 tobacco companies subject to Reform Act reporting and payment obligations to comply with the law and report as required. SSI received the recalculated assessments on or about March 1, 2006. Despite the purported inclusion of 300

8

additional tobacco companies into the assessment pool, the USDA inexplicably *raised* SSI's estimated market share for October-December 2004 from 4.81% to 5.32%, and increased the assessment due to $351,007.23, raised SSI's estimated market share for January - March 2005 from 6.45% to 7.15%, and increased the assessment due to $472,017.47, and maintained SSI's estimated market share for April - June 2005 at 7.78%, but reduced the assessment demanded to $1,135,353.46.

On June 13, 2006, SSI sued the defendants. The defendants in turn filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). That motion is pending.

### III. QUESTIONS PRESENTED

1.     Is SSI entitled to summary judgment pursuant to Fed. R. Civ. P. 56, and to the relief authorized by 5 U.S.C. § 706(a)(2), on the grounds that the defendants acted in excess of their legal authority and violated 7 U.S.C. § 518d(e) in assessing SSI in excess of its pro rata share of gross domestic volume (i) by adopting an erroneous interpretation of the Reform Act for cigar companies which failed to assess cigar companies in relation to their market share; and (ii) by impermissibly failing to account for smuggled cigars in calculating SSI's assessable market share?

2.     Is SSI entitled to summary judgment pursuant to Fed. R. Civ. P. 56, and to the relief authorized by 5 U.S.C. § 706(a)(2), on the grounds that the defendants arbitrarily and capriciously denied SSI's appeal contrary to the preponderance of the record evidence, failed to answer facially legitimate objections to the USDA's assessments, and refused to disclose the statistical information the agency used to calculate SSI's obligation?

3.     Is SSI entitled to summary judgment pursuant to Fed. R. Civ. P. 56, and to the relief authorized by 5 U.S.C. § 706(a)(2), on the grounds that the defendants arbitrarily and

capriciously ignored SSI's Information Quality Act petition and request for reconsideration, in

violation of 44 U.S.C. § 3516 note and the USDA's own information quality guidelines?

## IV. ARGUMENT

**A.     THE STANDARD OF REVIEW**

Summary judgment is appropriate where the record shows that there is no genuine issue

as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(c).   Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Frito-Lay, Inc. v.

Willoughby, 863 F. 2d 1029, 1032 (D.C. Cir. 1988).   The primary issue in this case is the

USDA's improper interpretation of the Reform Act, and its wrongful allocation of TTPP

assessments based on the supposed equivalency of large and small cigars.  As SSI has previously

explained, the defendants' interpretation of the Reform Act is not entitled to deference under the

rule of Chevron U.S.A., Inc. v. Natural Re. Def. Council, Inc., 467 U.S. 837 (1984) for the

following reasons: (1) the USDA did not purport to exercise discretion in disposing of SSI's

Reform Act claim, therefore, Chevron does not apply, (2) the Reform Act is clear on its face, and

(3) the excision of gross domestic volume from the assessment calculus via an unadjusted stick

count assessment is inconsistent with the statute's purpose.  See Plaintiff's Reply to Defendant's

Motion to Dismiss at pp. 8-9 (September 11, 2006).[15]

---

[15] The defendants neither addressed the substance of these arguments in their Reply, nor
contested the authority or applicability of the cited authorities.  Instead, they asserted that the
Reform Act was either ambiguous or contains gaps (it is not clear which, for they never
identified the alleged ambiguities nor discussed the specific statutory gaps of concern), and then
reasoned with salutary circularity that the USDA is entitled to Chevron deference because there
are regulations, and because there are regulations, the USDA is entitled to Chevron deference.
See Reply Memorandum in Support of Defendants' Motion to Dismiss at pp. 3-4 (September 21,
2006)( the "Def. Reply Mem.").

**B.**     **THE DEFENDANTS VIOLATED THE REFORM ACT.**

The USDA's assessments of SSI violated the Reform Act in two respects. First, the USDA's failure to adjust stick count to reflect the volume of tobacco actually removed by SSI caused the USDA to assess SSI in excess of its pro rata share of gross domestic volume. Second, the USDA's failure to account for smuggled cigars in calculating SSI's market share caused the USDA to underestimate the number of cigars removed, and thereby overestimate SSI's market share.

**1.**     **The USDA Unlawfully Assessed SSI In Excess Of Its Pro Rata Share Of Gross Domestic Volume.**

The Reform Act explicitly limits the amount individual companies can be lawfully assessed by the USDA. It provides in 7 U.S.C. § 518d(e) that: "The assessment for each class of tobacco product...shall be allocated on a pro rata basis...based on each manufacturer's or importer's share of gross domestic volume." The Reform Act further provides in 7 U.S.C. § 518d(e)(2) that: "No [company] shall be required to pay an assessment that is based on a share that is in excess of the [company's] share of domestic volume." The USDA's assessments of tobacco companies in all of the other tobacco classes were based on each company's pro rata share of gross domestic volume, and complied with the Reform Act. See Cigar Policy, supra (explaining use of excise rates). The USDA, however, denied SSI equal treatment.

As the USDA was well aware, small cigars and large cigars are taxed at different rates, and priced differently, precisely because each stick contains a substantially different volume of tobacco. Treating the two products identically for assessment purposes was contrary to settled law (see 26 U.S.C. § 5701(a)) and inherently irrational, given the absence of any logical basis for assessing one large cigar and one small cigar as if they were the same product, and removed the same amount of tobacco. Nevertheless, the USDA arbitrarily and capriciously collapsed the

distinction between large and small cigars, assessed solely on the basis of the number of cigar sticks sold without adjusting for the volume of tobacco removed, and thereby ran afoul of the Reform Act's requirement that tobacco companies be assessed no more than their pro rata share of gross domestic volume.

In papers previously filed in support of the defendants' Motion to Dismiss, the defendants cite 7 U.S.C. § 518d(g)(3)(A), which provides the "volume of domestic sales" shall be measured by the "number of cigars," to justify the USDA's interpretation in this case. The defendants claim that the Reform Act "dictates that…assessments are based on the number of cigars, and not on the weight of the tobacco in the cigars." In other words, they claim the Congress must be blamed for the USDA's determination that assessments must be based solely on the number of sticks sold in a given quarter. See Def. Reply Mem. at p. 13; accord Johnson Letter at p. 4 (SSI's arguments "philosophically well founded," but assessment outcome mandated by the Congress).

However, the USDA's assessment in this case can be justified only if 7 U.S.C. § 518d(a)(2)(A)'s definition of "gross domestic volume," which refers to the "volume of tobacco products," is interpreted to mean the "number of tobacco products," and 7 U.S.C. § 518d(e), which mandates pro rata allocation based solely on a company's share of removed volume, is interpreted to mean pro rata allocation must occur based solely on the "number of tobacco products" removed. The defendants assert:

> As defined by § 518d(a)(2), "gross domestic volume" means "the volume of tobacco products"….Thus, "gross domestic volume" is not premised on "volume of tobacco" as Single Stick recites, but rather on the "volume of tobacco products," with the term "tobacco products" referring to "cigars" -  not to the weight of tobacco in cigars. See 26 U.S.C. § 5702(c).

Def. Reply Mem. at 6 (citations omitted).[16]

The Reform Act cannot be agnostic to the defendants' efforts to vary the statute's plain language. Cigar assessments have a statutory context and historical context, and both support SSI's uniform and precise interpretation. The Reform Act's interpretative touchstone is the volume of tobacco products removed, not the number of cigars sold.[17] Cigar and other tobacco

---

[16] The defendants rely on 26 U.S.C. § 5702(c) as proof-text for their claim that the phrase "volume of tobacco products" used in 7 U.S.C. § 518d(a)(2)(A) actually means "number of cigars." <u>See</u> Def. Reply Mem. at p. 7. Their reliance is misplaced. Section 5702(c) defines "tobacco products" to mean "cigars, cigarettes, smokeless tobacco, pipe tobacco, and roll-your-own tobacco," as the defendants state. However, the word "cigar" as used in 26 U.S.C. § 5702(c) is specially defined at 26 U.S.C. § 5702(a) as a "roll of tobacco wrapped in leaf tobacco or in any substance containing tobacco (other than any roll of tobacco which is a cigarette...)." Therefore, the phrase "gross domestic volume" as used in 7 U.S.C. § 518d(a)(2)(A) in relation to cigars actually means: "the volume of rolls of tobacco wrapped in leaf tobacco or in any substance containing tobacco [other than cigarettes]" - in other words, even under the defendants' approach to statutory interpretation, gross domestic volume means nothing more or less than the volume of tobacco, just as SSI contends.

[17] Interpretation of the Reform Act should be based upon on three plainly defined terms: "gross domestic volume," "removed," and "market share." "Gross domestic volume," defined at 7 U.S.C. § 518d(a)(2), means:

> [T]he volume of tobacco products-- (A) removed (as defined by section 5702 of the Internal Revenue Code of 1986); and  (B) not exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

"Removed," defined at 26 U.S.C. § 5702(k), means:

> [T]he removal of tobacco products or cigarette papers or tubes from the factory or from internal revenue bond under section 5704 as the Secretary shall by regulation prescribe, or release from customs custody, and shall also include the smuggling or other unlawful importation of such articles into the United States.

"Market Share," defined at 7 U.S.C. § 518d(a)(3), means:

> [T]he share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment under this section.

has long been taxed and regulated based on the removed "volume" - that is, the weight - of tobacco. See 26 U.S.C. § 5701(a) (tax rate based on weight for cigars); 26 U.S.C. § 5701(b) (tax rate based on weight for cigarettes); 26 U.S.C. § 5701 (e) - (g) (tax rate based on weight for smokeless tobacco, pipe tobacco, and roll your own tobacco); accord 7 U.S.C. § 518d(a) (defining gross domestic volume based on removed volume). The Congress is presumed to have been aware of how the word "volume" had been used in relation to the regulation of the tobacco industry at the time it enacted the Reform Act, and to have used the word in the same manner here. See Bragdon v. Abbot, 524 U.S. 624, 625 (1998).

Furthermore, the defendants' interpretation of the phrase "volume of tobacco products" to mean "number of cigars" cannot be squared with either 7 U.S.C. § 518d(g)(2), which explicitly provides that the volume of domestic sales "shall be calculated based on gross domestic volume," or with 7 U.S.C. § 518d(a)(2) which defines "gross domestic volume" by reference to the "volume of tobacco products removed," or with 7 U.S.C. § 518d(e), which prohibits the USDA from levying assessments in excess of a company's pro rata share of gross domestic volume. Consequently, the phrase "gross domestic volume" cannot be read to mean "gross domestic number" as the defendants suggest.[18]

---

The Reform Act provides that the "volume of domestic sales" shall be calculated based on "gross domestic volume." 7 U.S.C. § 518d(g)(2).

[18] The Congress used the word "volume" repeatedly in 7 U.S.C. § 518d(a) to define key terms, and in 7 U.S.C. § 518d(e) to cap cigar manufacturer assessment liability, but used "number" only once, and then for the limited purpose of subsections 7 U.S.C. § 518d(g)(3)(A) and (h). The plain meaning of words used in a statute must be given effect. The ordinary meaning of "volume" is amount or mass. See RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (Unabridged) (1971). The ordinary meaning of "number" means the sum, total, count or aggregate of a collection of units. Id. These words do not mean the same thing. Consequently, the defendants are left with the unworkable argument that because 7 U.S.C. § 518d(g)(3)(A) provides that "for the purpose of calculation under this subsection" the "volume of domestic sales" for cigars shall be measured by "the number of…cigars," the Reform Act

Finally, the USDA's erroneous interpretation of the Reform Act produces an absurd and inequitable result - small and large cigars are assessed as if each contain the same amount of tobacco - and causes entirely unnecessary internal conflicts in the Reform Act. A comparison of the USDA's treatment of cigars with its treatment of cigarette and pipe tobaccos, both of which are sold by weight in varying size packages, is instructive. Cigarette and pipe tobacco are commonly available in six ounce and sixteen ounce sizes, with European imports being sold by the gram (usually in 150 and 300 gram packages). The Reform Act does not allow the USDA to treat these different size packages as single equivalent units to be assessed at the same amount, regardless of whether the package in question contains 150 grams or 16 ounces, or any amount in between. Instead, the Reform Act mandates that the USDA's assessment must be based on volume (weight) of the tobacco in the package, and not on the size of the package itself.[19]

The USDA, however, apparently believes that the Reform Act specifically provides that cigars and cigars alone should be assessed based on the size of the package, and not the volume of the tobacco contained therein. Therefore, the agency has consciously refused to equalize assessments between large cigars (i.e. "large packages") and small cigars (i.e. "small packages"). It is patently irrational to believe that the Congress sanctioned the USDA to discriminate against

---

explicitly defines "volume" to mean "number," and thus 7 U.S.C. § 518d(a) and 7 U.S.C. § 518d(e) really do not mean what they say.

[19] If the word "volume" really means "number" as the USDA claims, then the pro rata assessments and market share calculations of pipe tobacco companies (for example) would have to be based on the "number" of pipe tobacco products removed - a plainly absurd result. Critically, the defendants do not even pretend to justify interpreting two different words as if they mean precisely the same thing, and utterly fail to address or resolve the interpretative problems created when the USDA improperly collapsed the distinction between two distinct terms. Instead, the defendants make the Delphic argument that they have simply "placed those subsections [that are in conflict as a result of the USDA's interpretation] in their proper perspective and does not elevate them beyond their significance." Def. Reply Mem. at 7.

smaller volume packages of cigar tobacco, while requiring the agency to equalize assessments for the other five categories on a weight/excise tax basis. Indeed, such an interpretation is contrary to historic practice, as well as to the Reform Act's clear admonition that no company may be assessed in excess of its pro rata share of gross domestic volume. See 7 U.S.C. § 518d(e)(2).

The USDA could have avoided creating internal conflict within the Reform Act, complied with 7 U.S.C. § 518d(e) and maintained the integrity of the statutory scheme simply by first acknowledging the existing legal distinction between large and small cigars, then determining each sector's relative share of gross domestic volume within the cigar class, precisely as it did when calculating the cigar class' share of gross domestic volume, and only then assessing market share between the companies in each sector based on stick count, as required for the purposes of the calculations required under subsection 7 U.S.C. § 518d(g)(3). This approach would have preserved the Reform Act's consistency and integrity, ensured compliance with 7 U.S.C. § 518d(e), and guaranteed SSI and other cigar companies the same treatment as all other tobacco companies.

2.    **The USDA Should Have Counted Smuggled Cigars.**

The Reform Act states assessments shall be allocated on a pro rata basis based on each company's share of gross domestic volume. 7 U.S.C. § 518d(e). "Gross domestic volume" expressly includes all cigars, including those smuggled or unlawfully imported into the United States. See 7 U.S.C. § 518d(a)(2). Therefore, the USDA was specifically obligated to count smuggled cigars when determining the total size of the cigar market and, by extension, SSI's

assessment. The USDA, however, failed to account for smuggled cigars, underestimated the size

of the domestic cigar market, over-estimated SSI's market share, and violated the Reform Act.[20]

## C.    THE DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED SSI'S APPEAL.

### 1.    The Defendants Arbitrarily and Capriciously Denied SSI's Appeal Contrary To The Preponderance of the Evidence.

Judicial review of the USDA's assessments is authorized by 7 U.S.C. § 518d(j)(1), and 7

U.S.C. § 518d(j)(3) directs the Court to restrain collection of any assessment "not supported by a

preponderance of the information available to the Secretary."[21]  7 U.S.C. § 518d(i)(2) explicitly

authorizes the Secretary to consider, and the Court to review, "any information [on market share]

that is available, including third party data on industry or individual sales volumes."

The preponderance of the information available to the Secretary suggests it is more

probable than not that the USDA over-assessed SSI.    The Nielsen point of sale survey data -

information Congress specifically authorized SSI to present before the Secretary - demonstrates

that the USDA over-estimated SSI's market share, as measured by the number of cigars sold

---

[20] The defendants argue that: (1)  the law authorized assessments only of "manufacturers or importers," not smugglers, so the USDA did not need to count smuggled cigars; (2) 7 U.S.C. §518d(g)(1) demonstrates that the "structure" of the Reform Act is devoid of any Congressional intent to require inclusion of smuggled cigars, despite the fact that 7 U.S.C. § 518d(g)(1) explicitly requires the USDA to use information "provided by the manufacturers and importers…as well as any other relevant information provided to or obtained by the Secretary," and (3) the USDA had the authority to ignore the plain language of the Reform Act by promulgating a regulation that omitted any reference to the inclusion of smuggled cigar data. See Def. Reply Mem. at 12-13.   All of these arguments fail: (1) as the USDA has previously acknowledged, assessments may not exceed a tobacco company's pro rata share of the cigar market under any circumstances; (2) the Reform Act's "structure" is no different than its plain language; and (3) agencies lack the power to do away with statutory obligations by regulatory decree.

[21] The "preponderance of the information" standard is analogous to the "preponderance of the evidence standard," the most common standard in the civil law, which simply requires the court to find that the existence of a fact is more probable than not.  See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 622 (1993).

during the relevant time period, by several orders of magnitude. R. (App.) 0028 - 0143; see also R (App.) 0241-2. Additionally, SSI provided the Secretary with uncontroverted information establishing the Nielsen survey's accuracy and reliability. See R (App.) 0241-2. By contrast, the USDA did not place any information into the record demonstrating that its estimate of SSI's market share is accurate, based on complete information, or otherwise reliable.[22]

An agency must base its decision on facts in the record. See National Treasury Employees Union v. Federal Labor Relations Authority, 404 F. 3d 454, 458 (D.C. Cir. 2005) (agency must make decisions "based on the record before it," and failure to do so was grounds for remand); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989). The record in this case (or, at least, the record as made available to SSI) is absolutely bare of any evidence that either refutes the Nielsen data, or that independently verifies the USDA's assessments. Consequently, the Secretary erred, and SSI is entitled to an order restraining collection of all sums in excess of those justified by the Nielsen survey data, the only reliable evidence of market share in the record. 7 U.S.C. § 518d(j)(3).

## 2. The Defendants' Wrongfully Failed To Consider Or Respond To The Nielsen Data.

The Secretary was obligated to consider and respond meaningfully to the Nielsen survey data demonstrating that the USDA had substantially over-estimated SSI's market share. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971) (holding that a court reviewing an informal adjudication must consider whether the [agency] decision was based on a consideration of the relevant factors and the facts in the record); PSC of Ky. v. FERC, 397

---

[22]  In fact, the inherent unreliability of the USDA's calculations is highlighted by the fact that after having granted SSI's appeal in part, due to the fact that the USDA unlawfully inflated SSI's market share by excluding over 300 tobacco companies from the market share analysis, the USDA added in the wrongfully excluded companies, recalculated, and then actually increased SSI's assessment for two of the contested quarters.

F. 3d 1004, 1008 (D.C. Cir. 2005) (agency must respond meaningfully to the arguments raised before it);  Canadian Ass'n of Petroleum Producers v. FERC, 254 F. 3d 289, 299 (D.C. Cir. 2001) (unless an agency answers objections that appear on their face to be legitimate, its decision can hardly be said to be reasoned).   He did not do so.  Instead he concluded SSI had "made no sustainable argument that the data relied on by the USDA was incorrect" without mentioning - much less evaluating - the Nielsen data.  The Secretary's decision therefore can hardly be said to be reasoned, as required by the APA, and remand for further proceedings is appropriate. Canadian Ass'n, 254 F.3d at 299.

### 3.    The USDA Wrongfully Withheld Information From SSI.

The USDA calculated SSI's assessment by dividing the number of cigars SSI removed by the USDA's estimate of the total number of cigars removed domestically during a given quarter. SSI appealed the USDA's assessment, and requested that the USDA disclose the data it used to calculate the size of the cigar market. The USDA  refused to do so.  It would not share either the data it used to estimate total removals with SSI, even in redacted form, nor disclose the statistical methods it employed to test the data for accuracy.

SSI presented evidence during its administrative appeal demonstrating that the USDA's estimate was inaccurate and that the USDA's failure to make the requested data available prevented SSI from effectively challenging the USDA's assessment.   See R. (App.) 0242.  In response, the defendants offered no evidence, and made no record.  Rather, the Secretary first determined SSI "had made no sustainable argument" that the data it had never seen and could not cross-examine was incorrect, and then ordered SSI to pay money upon the strength of a dubious and disputed market estimate that was, in turn, based on undisclosed and unverified data.  See Johnson Letter at 10-11.

To rule for the defendants in this case, this court must take the defendants' word as to the size of the cigar market and let it go at that.    Such a ruling would render meaningless the "inexorable safeguard" of a fair and open hearing, and be contrary to both the relevant statutes and the Supreme Court's admonition that agency decisions must be based on substantial, record evidence. See Ohio Bell Telephone Co. v. Public Utilities Comm'n of Ohio, 301 U.S. 292, 304 (1937);[23] Citizens to Preserve Overton Park, 401 U.S. at 416.  The Court should grant SSI the relief authorized by 5 U.S.C. § 706(2), and remand this matter to the USDA for a new hearing with specific instructions to disclose the requested data to SSI.

**D.**     **THE USDA VIOLATED SSI'S RIGHT TO A CORRECTION UNDER THE INFORMATION QUALITY ACT AND SSI IS ENTITLED TO JUDICIAL ENFORCEMENT OF THESE RIGHTS AS A MATTER OF LAW.**

Congress mandated that agencies establish a procedure for "affected persons" to "seek and obtain correction of information maintained and disseminated by the agency that does not comply with [IQA guidelines]."[24]  An undeniably affected person, SSI has been deprived of any

---

[23] In Ohio Bell, as bases for an order, the administrative agency relied on evidence of which the commission took judicial notice but which it withheld from its records and refused to reveal.  The Court held that the agency's refusal to reveal this critical information denied the telephone company due process of law.  According to Justice Cardozo:

> What the Supreme Court of Ohio did was to take the word of the Commission as to the outcome of a secret investigation, and let it go at that....Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law...Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed.  All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' of a fair and open hearing be maintained in its integrity."

Ohio Bell, 301 U.S. at 304 (citations omitted).

[24] The IQA, 44 U.S.C. § 3516 note, provides, in relevant part:

> [E]ach Federal Agency to which the [IQA applies shall]: (A) issue guidelines ensuring and maximizing the quality, objectivity, utility and integrity of

opportunity to seek or obtain a correction by the USDA's conduct.  If SSI has rights under the IQA they have been violated per se and a judicial remedy is appropriate.

### 1.    The IQA Confers Rights On Affected Persons Like SSI.

Private rights are conferred if Congress intended to do so and Congress' intent is reflected in "rights creating" language.  Alexander v. Sandoval, 532 U.S. 275, 288 (2001); see also Gonzaga Univ v. Doe,  536 U.S. 273, 288-91 (2002).[25]  Although the IQA surely assigns duties and obligations to agencies, it also has an unmistakable focus on a specific benefit ("correction") for a specific group of individuals (persons who are affected by a federal agency's use or dissemination of incorrect scientific or statistical information).[26]  It makes no sense to construe the IQA to allow an agency to ignore an IQA request with impunity, and even less sense to suggest that the mandated correction mechanism is optional, given the Congress' clear

---

information (including substantial information disseminated by the agency, by no later than one year after the date of issuance of the guidelines under subsection (a);  (B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a)

[25] The defendants correctly note that the Fourth Circuit previously has held that the IQA creates no private rights.  Salt Institute v. Leavitt, 440 F.3d 156, 159 (4th Cir 2006).  Salt is neither controlling in this Court nor persuasive authority.  In Salt, the Fourth Circuit - not the parties - raised the rights creating issue and held that the IQA created no rights.  The question was neither briefed nor argued, nor does the Fourth Circuit engage in any focused analysis of the language of the IQA nor does the Court  note the relevant authorities.  The Fourth Circuit declared instead that the Article III standing question that was briefed by both parties and that formed the principal basis for the District Court's decision need not be reached. Id. at 159.  Indeed the Fourth Circuit cited none of the relevant cases and neither applied nor mentioned the tests articulated by the Supreme Court for identifying rights creating language.  The question surely merits a more careful examination.

[26] In its brief the USDA betrays the weakness of its position by repeatedly misquoting the statute to exclude the language allowing an affected person to "obtain" a correction.  See e.g. Defendant's Memorandum in Support of Motion to Dismiss at 17.

statutory direction.[27]  By any reasonable test, the IQA's plain language demonstrates Congress created rights for affected persons like SSI to obtain a benefit (correction), and that those IQA rights were violated by the USDA.

A contextual analysis reinforces the text.  The IQA was enacted only after the Congress's repeated admonitions to the Executive Branch to create an informal correction process were ignored.[28]  House Report No. 105-5092, ultimately enacted as a non-binding part of the FY 1999 Omnibus Appropriations Act (Pub. Law No. 105-277) urged OMB to develop "with public and Federal agency involvement" rules providing policy and procedural guidance to Federal agencies for:

> [E]nsuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies, and information disseminated by non-Federal entities with financial support from the Federal government, in fulfillment of the purposes and provision of the Paperwork Reduction Act of 1995 (P.L. 104-13)...*The OMB and agency rules shall contain administrative mechanisms allowing affected persons to petition for correction of information which does not comply with such rules...*

---

[27] No agency is accorded deference for its interpretation of a generic statute like the APA or IQA that applies to all agencies.  See Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 139 n.4 (1991).

[28] By the 1990s, the Congress had become concerned by the bureaucracy's growing practice of using science generated by third-party researchers to make policy, and its reliance on the Internet, and non-regulatory methods of communicating rather than on formal APA rulemaking or adjudication, to announce policy and influence private behavior.  This "regulation by information" allowed agencies, for the most part, to evade judicial review, and effectively sidestep the APA. In 1995, Congress enacted the Paperwork Reduction Act ("PRA").  44 U.S.C. § 3501 et seq., directing the Office of Management and Budget ("OMB") to implement "policies, principles, standards and guidelines" to ensure the quality of the information used and disseminated by federal agencies, and to promote public access to that information.  See 44 U.S.C. § 3504(d). The OMB, however, did not comply.

See H.R. Rep. No. 105-5092, at 49-50 (1998) (emphasis added).  The OMB did not comply, [29]

and the Congress responded swiftly.  On December 14, 2000, the FY 2001 Treasury General

Government Appropriations Act (H.R. 5658) was reported in the House.  This time, Congress

made the information quality and correction provisions mandatory.

This context buttresses the conclusion, independently supported by the text, that rights

were intended under the IQA.  See Alexander, 532 U.S. at 288.  Congress enacted the IQA to

remedy agency indifference to information quality.  It makes no sense to construe the IQA to

perpetuate this regime of indifference; the far more plausible conclusion is that Congress

intended to create rights for affected persons and surely did so in the IQA.[30]

### 2.    The Denial Of An IQA Request Is Reviewable Under The APA.

If the IQA establishes informational rights then there is no doubt that the requirements of

Article III standing to sue are firmly established.  Federal Election Comm'n v. Akins, 524 U.S.

11, 25 (1998)(recognizing the Constitutional status of informational rights).  The APA in turn

mandates a remedy for the abridgment of these informational rights.  5 U.S.C. §§ 701-706.

---

[29] In 1999, Representative Thomas Bliley (R-VA), Chairman of the House Commerce Committee sent a letter to OMB reiterating the need to comply with the law and reminding it of the previous year's House report language.  Bliley expressed frustration over the OMB's failure to act, stating: "I am concerned about OMB's performance in this matter, because the Paperwork Reduction Act of 1995 required OMB to issue such regulations on data quality, and OMB seems to have accomplished little over the last nearly four years."  (www.thecre.com/quality/letter-bliley-lew.html)  In May 1999 and March 2000, Rep. Jo Ann Emerson (R-MO), a primary IQA sponsor, also sent letters reminding the OMB of its obligations.  (www.thecre.com/quality/letter-emerson-lew.html, and www.thecre.com/quality/EmersonLetter20000320.html).  In April 2000, OMB responded to Representative Emerson's inquiries, declining to issue the required guidelines. (www.thecre.com/quality/20041012_letter.htm).

[30] The Congress is well aware that "agency action" is reviewable under the APA, and therefore would not have put the agencies in a position of taking such "action" unless judicial review was contemplated.  See 5 U.S.C. §§ 551 (13) (defining reviewable agency action).  Only the very narrow exceptions in 5 U.S.C. § 702 immunize agency action from judicial review. Consequently, where the Congress requires an agency to act, it is fair to conclude the Congress intended that an affected person may seek APA judicial review of such agency action.

There is no doubt that a denial of an IQA request or, as here, an agency's utter indifference to the request, constitutes "agency action." 5 U.S.C. §§ 551(13). Where agency action has occurred, and there is no expressly precluded remedy, the APA affords a fully adequate remedy unless one of the two very narrow exceptions applies. The only two exceptions are: 1) where a statute expressly precludes judicial review and 2) where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

The IQA does not expressly preclude review and thus, the only exception possibly applicable here is the discretionary function exception. The USDA argues that it applies to a denial of IQA rights. This argument is contrary to relevant authority.

Ignoring the Supreme Court's mandate that the APA's promise of judicial review is generous, liberally construed and readily available in the absence of persuasive authority to the contrary, and the "strong presumption that Congress intends judicial review" Bowen v. Mich Acad. of Family Physicians 476 U.S. 67, 70 (1986), the USDA argues that the IQA's quality mandate is too general and unclear to permit judicial review. The argument is preposterous. The IQA's standards are every bit as clear and specific as the APA's generic standard requiring a reviewing Court to determine whether an agency action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706.[31]

But even if it is appropriate to go beyond the APA's generic standard of review to the IQA's standards for determining whether disseminated information is of adequate quality, the USDA's argument is supported only by wishful thinking. The IQA as amplified by the OMB

---

[31] In this case, however, one need not even consult the IQA's standards. Because the USDA denied SSI access to the IQA, by refusing to acknowledge its petitions, this was agency "action unlawfully withheld" and is reviewable independent of the IQA under 5 U.S.C. § 706 (a)(1). The USDA cannot credibly claim that § 706 standards are insufficient to guide judicial review.

Guidelines provides extensive guidance on the criteria to be applied in determining whether science based or statistical information is of sufficient quality for public dissemination, 67 Fed. Reg. 8452, 8459-60 (February 22, 2002).  It is not credible to argue, as the USDA does, that a Court has no standards to apply to determine whether a correction request has merit. Consequently, the USDA has not come close to rebutting the APA's strong presumption of reviewability.  See Bowen, 476 U.S. at 70.[32]

### V. CONCLUSION

For the reasons set forth above, summary judgment for SSI should be granted.

Respectfully submitted,
SINGLE STICK


_____ /s/ Reed D. Rubinstein _____
Reed D. Rubinstein (DC 400153)
Donald Stein (DC 358903)
GREENBERG TRAURIG LLP
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
(202) 331-3100

_Attorneys for Single Stick, Inc._

---

[32] The USDA assumes apparently that courts will avoid the IQA, but that is not a response that is in keeping with the APA. The scientific and statistical principles that ensure data quality are well known and clearly stated in OMB's Guidelines, and courts apply similar principles every day in determining the admissibility of scientific, technological and statistical evidence.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 5th day of

February, 2007 to:

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044

Reed D. Rubinstein