UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| SINGLE STICK, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 06-1077 (RWR) |
| ) | |
| v. ) | |
| ) | |
| MICHAEL JOHANNS and the UNITED ) | |
| STATES DEPARTMENT OF ) | |
| AGRICULTURE, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    I.    Summary Judgment Standard of Review and USDA's Opposition to Single Stick's Statement of Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    II.    By the Plain Terms of the Reform Act, It Is Correct for USDA to Use a Per-Stick Method of Calculating Single Stick's Assessment. . . . . . . . . . . . . . . . **7**

    III.    USDA Is Correct to Exclude Smuggled Cigars from the Calculations of the Reform Act Assessments on Manufacturers and Importers. . . . . . . . . . . . . . **9**

    IV.    If Any Ambiguity or Gap Exists in the Reform Act, Then Chevron Principles Apply, and USDA's Regulations Are Controlling. . . . . . . . . . . . . . . **10**

    V.    USDA Did Not Act Arbitrarily and Capriciously with Respect to its Treatment of the A.C. Nielsen Data at Single Stick's Administrative Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

    VI.    As a Matter of Law, Single Stick Cannot Recover for its Claims under the Information Quality Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

# INTRODUCTION

Single Stick has moved for summary judgment during the pendency of a fully briefed motion to dismiss filed by defendants Michael Johanns and the United States Department of Agriculture (collectively "USDA").  At the outset, USDA's motion to dismiss should be granted, without the need to reach Single Stick's summary judgment motion.  Nonetheless, the reasons that USDA articulated to dismiss this action apply with equal force to the rejection of Single Stick's summary judgment motion.  While the reasons presented in USDA's motion to dismiss papers (see Mot. to Dismiss (Docket # 8); Reply Mem. (Docket #10)) are fully sufficient to reject Single Stick's action and present motion, USDA takes this opportunity to highlight those reasons and to incorporate them by reference.

Briefly stated, Single Stick's attempt to alter the operation of the Tobacco Transition Payment Program through litigation fails in all respects.  Single Stick cannot recover because USDA's method of calculating assessments due under the Fair and Equitable Tobacco Reform Act of 2004 (the "Reform Act"), see Pub. L. No 108-357, 118 Stat. 1418, 1522 (Oct. 22, 2004) (codified at 7 U.S.C. § 518d et seq.), is the method prescribed by plain language of the Reform Act.  USDA correctly interprets the Reform Act so that the assessments within the cigar class are calculated on a per-stick basis (i.e., based on the number of cigars removed into commerce) and proportionally allocated among "manufacturers and importers" of "tobacco products" without accounting for smuggled cigars.  Even if there were an ambiguity in the Reform Act's terms, USDA's implementing regulations, which provide a per-stick method of assessment within the cigar class, reflect a reasonable interpretation of the statutory text and would therefore be entitled to controlling Chevron deference.  Single Stick similarly fails on its claim that USDA's denial of Single Stick's administrative appeal was arbitrary and capricious – USDA specifically considered

and rejected the applicability and significance of the A.C. Nielsen survey data that Single Stick presented. Finally, Single Stick does not have a cognizable claim under the Information Quality Act (the "IQA"), Pub. L. No. 106-554, Tit. V, § 515, 114 Stat. 2762A-153 (Dec. 21, 2000); see also 44 U.S.C. § 3516 (note), because the IQA does not create a legal right to the production or correction of agency information; the IQA does not provide judicially manageable standards for the production and correction of agency information and therefore cannot be pursued through an action under the Administrative Procedures Act (the "APA"), 5 U.S.C. § 701 et seq.; and the information sought by Single Stick comes from excise tax returns and cannot be disclosed to Single Stick. For these reasons, Single Stick's motion for summary judgment should be denied, and either judgment or dismissal in favor of USDA is appropriate.[1]

## BACKGROUND

The Reform Act terminated tobacco price support programs and marketing quotas for tobacco growers. See Pub. L. No 108-357, 118 Stat. 1418, 1522 (Oct. 22, 2004). In place of those programs, the Reform Act created the Tobacco Transition Payment Program (the "TTPP"), under which eligible tobacco quota holders and growers receive payments for ten years, not to exceed a total of $10.14 billion, from the Commodity Credit Corporation (the "CCC"), an agency within USDA. See generally 7 U.S.C. § 518a (providing for payments for tobacco quota holders), § 518b (providing for payments for producers of quota tobacco), § 518f (limiting the total amount of the expenditure to $10.14 billion). The TTPP works by reimbursing the CCC for these payments from the funds collected through assessments on manufacturers and importers of

---

[1] While USDA has moved for dismissal under Federal Rule of Civil Procedure 12(b)(6) (see Docket #8), if the Court, as a matter of procedure, prefers to convert that motion into a motion for summary judgment and to enter summary judgment in USDA's favor, USDA would have no objection.

tobacco products, which are made to the CCC and then deposited in the Tobacco Trust Fund. See 7 U.S.C. § 518d(d)(1); 7 C.F.R. § 1463.9. In essence, through these assessments, manufacturers and importers of tobacco products provide the funding for the transition assistance that USDA, through the CCC, provides to former tobacco quota holders and growers.

  Under the Reform Act, the amounts of assessments on tobacco manufacturers and importers are determined through a two-step process. Under the first step ("Step A"), the CCC apportions the annual payment to former tobacco quota holders and growers among the six classes of tobacco products. See 7 U.S.C. § 518d(c)(1)-(2); § 518d(f); 7 C.F.R. §§ 1463.4, 1463.5. Those six classes are (i) cigarettes; (ii) cigars; (iii) snuff; (iv) roll-your-own tobacco; (v) chewing tobacco; and (vi) pipe tobacco. See 7 U.S.C. § 518d(c)(1); 7 C.F.R. § 1464.5. For example, the cigar class was responsible for 2.783 per cent of the total assessment in 2005. See 7 U.S.C. § 518d(c)(1)(B). After determining the liability for each of the six classes of tobacco products, the second step ("Step B") is to pro rate each class's assessment among the manufacturers and importers in that class, so that each manufacturer or importer's assessment is proportional to its market share for that class. See 7 U.S.C. § 518d(e)(1); 7 C.F.R. § 1463.7. For the cigar class, that pro-ration is done based on the number of cigars "removed" into commerce, see 7 U.S.C. § 518d(g)(3)(A), 7 C.F.R. § 1463.7(b)(1), with the data for the number of cigars derived from excise tax reports of the manufacturers and importers, see 7 U.S.C. § 518d(h); 7 C.F.R. § 1463.7(b)(1). The pro-rated share is essentially a market share determination, calculated to the fourth decimal place by dividing the number of cigars from a particular manufacturer or importer by the total number of cigars removed or imported into the domestic market. See 7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(c); see also 7 U.S.C. § 518d(a)(3) (providing that market share is to be determined to the fourth decimal place); *Tobacco Transition*

3

*Assessments*, 70 Fed. Reg. 7279-81 (Dec. 8, 2005) (interpreting "fourth decimal place" to mean fourth decimal place when expressed as a percentage). The resulting percentage of market share is then multiplied by the total assessment due for the cigar class to determine each manufacturer's or importer's assessment. See 7 U.S.C. § 518d(f); 7 C.F.R. § 1463.7(a)-(b).

If a manufacturer or importer disputes the amount of its assessment, the Reform Act and the implementing regulations provide an administrative mechanism to challenge an assessment. Within 30 days of receiving notice of the assessment, a manufacturer or importer may submit a written statement to the CCC that sets forth the basis for the disputed assessment. See 7 U.S.C. § 518d(i)(1); 7 C.F.R. § 1463.11(a). Following the written submission, an informal hearing takes place wherein a hearing officer develops an administrative record through oral and written evidence sufficient to render a final determination on the disputed matter. See 7 C.F.R. § 1463.11(b). After the hearing, the CCC then issues a final administrative decision. See 7 C.F.R. § 1463.11(c). If the manufacturer or importer disagrees with the results of that hearing, it may seek review of the determination in United States District Court. See 7 U.S.C. § 518d(j)(1); 7 C.F.R. § 1463.11(d).

Single Stick initiated administrative proceedings with USDA regarding its March 1, 2005, and June 1, 2005, assessments due under the Reform Act. (See Compl. (Docket #1), Ex. 4.) On November 17, 2005, a hearing was held with regard to those assessments, and a final administrative determination issued on February 8, 2006. See Ltr. to Rubinstein at 1 (Feb. 8, 2006) (emphasis added) (copy attached as Ex. 1) (copy also attached to Complaint as Ex. 9). That final administrative decision addressed several questions raised in this litigation. USDA answered whether all assessments in the cigar class should be determined on a per-stick basis (i.e., by counting the number of cigars removed into commerce) or whether large cigars and

4

small cigars should be treated differently. After examining the relevant law, the USDA hearing officer concluded that the Reform Act directs that all cigars, both large cigars and small cigars, should be assessed on a per-stick basis. See id., at 2-4. The USDA hearing officer also concluded that USDA's calculation of Single Stick's market share was correct, and that Single Stick's assessment did not exceed its market share. See id., at 4-7.

Single Stick also tried to gain access to USDA's primary source data used to calculate the total number of cigars removed into commerce. Single Stick sought that information, which, as noted above, comes from excise tax returns, by requests under the Freedom of Information Act ("FOIA") and under the Information Quality Act (the "IQA"), both dated September 13, 2005. (See Compl., Ex. 7 (denying the FOIA request); id., Ex. 8.) USDA denied Single Stick's FOIA request explaining that the information Single Stick sought was protected by statute, which prohibits disclosure of excise tax return information. (See id., Ex. 7 (citing to 26 U.S.C. § 6103).) Having informed Single Stick of the statutory prohibition on releasing the excise-tax data, USDA did not separately respond to Single Stick's IQA petition, which sought production and correction of the underlying primary source data. Single Stick did not pursue its FOIA request further, but Single Stick interpreted the lack of a specific response to its IQA request as a denial of that request. (See id., Ex. 8.)

Single Stick then proceeded to file the present action challenging USDA's reading of the Reform Act, as upheld by the hearing officer, and USDA's denial of its IQA request for production and correction of primary source data from excise tax returns.

# ARGUMENT

I.  **Summary Judgment Standard of Review and USDA's Opposition to Single Stick's Statement of Material Facts.**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In accordance with those principles, Local Civil Rule 56.1 states that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." D.D.C. Civ. R. 56.1.

Under these standards, Single Stick's motion for summary judgment must be denied. Single Stick has not established that it is entitled to a judgment as a matter of law. To the contrary, as demonstrated by USDA in support of its motion to dismiss, Single Stick's claims are without legal merit, and judgment should instead be entered for USDA. As to the facts, Single Stick's statement of material facts alleges many facts or characterizations of facts without the requisite references to parts of the record. See Opp. to Statement of Material Facts (copy attached as Ex. 2). Moreover many of Single Stick's 'facts' are simply legal conclusions dressed up as facts. See id. Finally, several of the facts or characterizations of facts are immaterial or are disputed by USDA. See id. Due to those deficiencies explained further below, Single Stick's motion for summary judgment should be denied, and the complaint should be dismissed for failure to state a claim for relief.

**II.     By the Plain Terms of the Reform Act, It Is Correct for USDA to Use a Per-Stick Method of Calculating Single Stick's Assessment.**

Single Stick argues that as a matter of statutory interpretation, USDA has used the wrong method for determining the amount of Single Stick's Reform Act assessment. Specifically, Single Stick contends that because USDA did not determine Single Stick's assessment based on the volume of tobacco in each cigar, USDA erred. (Mot. for S.J. at 11-16 (Docket #11).) Single Stick's statutory reading which favors 'a volume of tobacco in each cigar' approach over a per-stick method is wrong for many reasons, which USDA has already presented to the Court. (Mot. to Dismiss at 10-14 (Docket #8); Reply Mem. at 4-11 (Docket #10).)

Through a series of interlocking definitions, the Reform Act dictates that assessments on cigar manufacturers be calculated based on the number of cigars removed into commerce. The amount of an assessment on a cigar manufacturer or importer is determined based on its "market share," see 7 U.S.C. § 518d(f), which is expressly defined by the Reform Act to mean the manufacturer's or importer's share of "volume of domestic sales," see 7 U.S.C. § 518d(a)(3), which for cigars is measured by "the number of . . . cigars," see 7 U.S.C. § 518d(g)(3). Thus, through this series of definitions, the market share for a cigar manufacturer or importer is a function of the "number of" cigars, and not the volume of tobacco in those cigars. For that reason, USDA was correct to calculate Single Stick's assessment based on the number of cigars that Single Stick removes into commerce.

Single Stick attempts to avoid the result of the Reform Act's plain language through an implausible reading of another subsection of the Reform Act, 7 U.S.C. § 518d(e)(2). That subsection states that "No manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume,"

7

7 U.S.C. § 518d(e)(2). From that, Single Stick argues that a per-stick calculation method results in an assessment that is in excess of its share of domestic volume.

At the most basic level, this argument should be rejected because the Reform Act plainly states that for calculating cigar assessments, "volume" shall be measured by the number of cigars and not the weight of the tobacco in the cigars, see 7 U.S.C. § 518d(g)(3). Hence, Single Stick is not assessed an excessive amount since assessments are, by that statutory definition, determined on a per-stick basis.

Rather than accept this reality, which is internally consistent with the entire Reform Act (see Reply Mem. at 5-8), Single Stick seeks recourse to dictionary definitions and the excise tax statutes. (Mot. for S.J. at 15.) Neither of those sources takes precedence over the plain language of the Reform Act, which requires a per-stick method of apportioning assessments among cigar manufacturers and importers. See United States v. Smith, 155 F.3d 1051, 1057 (9th Cir. 1998) ("When, as here, the meaning of a word is clearly explained in a statute, courts are not at liberty to look beyond the statutory definition."); see also Stenberg v. Carhart, 530 U.S. 914, 943 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); Meese v. Keene, 481 U.S. 465, 484-85 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term.").

Single Stick's efforts also ignore additional relevant language in the Reform Act. Section 518d(a)(2) defines "gross domestic volume" as "the volume of tobacco ***products*** . . . removed . . . and not exempt from tax." 7 U.S.C. § 518d(a)(2) (emphasis added). If Single Stick's reasoning were correct that cigar assessments be apportioned by volume of tobacco, then § 518d(a)(2) would have had to define "gross domestic volume" in terms of only "volume of tobacco," and not by the terms "volume of tobacco ***products***." By specifying a measure of the

8

volume of tobacco *products*, the Reform Act requires that cigar assessments be apportioned based on the volume of cigars.  See 26 U.S.C. § 5702(c) (defining "tobacco products" as inclusive of cigars, not the volume of tobacco in cigars).  And, as described above, the volume of cigars is measured on a per-stick method, see 7 U.S.C. § 518d(g)(3).  Accordingly, when § 518d(e)(2) prescribes that a manufacturer or importer shall not be assessed in excess of its share of "domestic volume," the term "domestic volume," when referring to cigars, must be understood as the number of cigars and not as the weight of tobacco in those cigars.  Thus, the plain text of the Reform Act operates as a total rejection of Single Stick's argument.

Nor is this result absurd as Single Stick contends (Mot. for S.J. at 15) – a per-stick method is easily discerned from the excise tax reports that cigar manufacturers and importers submit, see 7 U.S.C. § 518d(h)(1)-(2), and it is the method that Congress specified for calculating Reform Act assessments, see 7 U.S.C. § 518d(g)(3).  For these reasons, as well as those provided in USDA's motion to dismiss papers, Single Stick's claims fail as a matter of law.

III.    **USDA Is Correct to Exclude Smuggled Cigars from the Calculations of the Reform Act Assessments on Manufacturers and Importers.**

Single Stick also argues that USDA erred in calculating its assessment by not counting smuggled cigars when determining the total size of the cigar market.  The lone reason that Single Stick advances for its position is that smuggled cigars are included in the definition of "gross domestic volume," see 7 U.S.C. § 518d(a)(2)(A) (incorporating the definition of "removal" under 26 U.S.C. § 5702(j)).  (Mot. for S.J. at 16-17).  That argument fails for several reasons already before the Court.  (Mot. to Dismiss at 14-15; Reply Mem. at 11-14.)  Most basically, the Reform Act calls for an allocation of the assessment for each class of tobacco products among the manufacturers and importers (not smugglers) of that class based on the "market share" of each,

9

see 7 U.S.C. § 518d(f)(1), which is defined as each manufacturer's or importer's share of "volume of domestic sales," of the class, see 7 U.S.C. § 518d(a)(3). The Reform Act confirms that smuggled cigars do not enter the assessment calculation by requiring a proportional distribution of assessments "among the manufacturers and importers" of each class of tobacco products – again, without mention of smugglers. See 7 U.S.C. § 518d(e)(1); see also 7 U.S.C. § 518d(f)(1). Moreover, in determining the amount of the assessments, the Reform Act requires USDA to rely on excise tax return information provided only by the manufacturers and importers – without any attempt to include smuggled tobacco products (which are not reported on excise tax returns). See 7 U.S.C. § 518d(g)(1) (calculation of volume of domestic sales will be based on data from manufacturers and importers); 7 U.S.C. § 518d(h)(1) (requiring each manufacturer or importer to submit certified copies of excise tax returns). Finally, even if smuggled cigars were to be included, Single Stick offers no evidence that the amount of smuggled cigars would have any effect on its "market share," which is measured only to the fourth decimal place, see 7 U.S.C. § 518d(a)(3). In sum, USDA is correct to exclude smuggled cigars from its calculations of Reform Act assessments.

**IV.   If Any Ambiguity or Gap Exists in the Reform Act, Then <u>Chevron</u> Principles Apply, and USDA's Regulations Are Controlling.**

Single Stick continues to misconstrue principles of Chevron deference. Single Stick contends that Chevron deference does not apply here because the Reform Act is clear on its face and because USDA does not purport to exercise discretion in disposing of Single Stick's Reform Act claim. (Mot. for S.J. at 10).[2] These arguments misunderstand USDA's position and

---

[2] Single Stick also states (without citation) that Chevron deference does not apply because the per-stick method is inconsistent with the purposes of the Reform Act. (Mot. for S.J. at 10). This undeveloped argument has no force because as described above, the Reform Act

10

misapply principles of Chevron deference.

First, USDA's reference to Chevron deference is an argument in the alternative – Chevron principles are implicated only if there is some legitimate ambiguity or gap in the Reform Act as to the method of calculating assessments for cigar manufacturers and importers (no such ambiguity exists). See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984). Second, if such ambiguity does exist, then it is within USDA's authority (and expertise) to fashion reasonable implementing regulations, see 7 U.S.C. § 519a (authorizing USDA to make regulations for the Reform Act), which are entitled to controlling deference. See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005); United States v. Mead Corp., 533 U.S. 218, 226-29 (2001); Chevron, 467 U.S. at 843-44.

Those USDA implementing regulations make clear that a per-stick method of calculating tobacco assessments is proper, and that the assessments do not include smuggled cigars. Under the regulations, tobacco product manufacturers and importers are required to pay their proportionate share of the assessment, see 7 C.F.R. § 1463.6(a), see also 7 C.F.R. § 1463.7(b), based on data contained in excise tax reports, see 7 C.F.R. § 1463.6(b)(1)(ii). Within each class of tobacco product, the amount of the assessment will be determined by multiplying the manufacturer's or importer's market share (determined by the immediately preceding calendar year quarter) by the total amount of the assessment for that class of tobacco product. See 7 C.F.R. § 1463.7(a). The term "market share" is defined to mean "the share of each domestic manufacturer and importer of a class of tobacco products, to the fourth decimal place, of the total volume of domestic sales of a class of tobacco product . . . ." 7 C.F.R. § 1463.3. The regulations

---

requires a per-stick method of calculating assessments on cigar manufacturers and importers and, at a minimum, can be read to permit such a method.

then specify that the number of cigars reported on the excise tax form is the controlling quantity for determining assessments within the cigar class:

> For purposes of determining the volume of domestic sales of each class of tobacco products and for each entity, such sales shall be based upon the reports filed by domestic manufacturers and importers of tobacco with the Department of Treasury and the Department of Homeland Security and shall correspond to the quantity of the tobacco product that is removed into domestic commerce by each such entity:  (1) ***For cigarettes and cigars, on the number of cigarettes and cigars reported on such forms*** . . . .

7 C.F.R. § 1463.7(b) (emphasis added).  Accordingly, § 1463.7(b) resolves any ambiguity that could exist in the Reform Act as to the appropriateness of a per-stick method or its non-applicability to smugglers.  Finally, the clarity of § 1463.7(b) receives controlling weight because it is a reasonable elaboration of the Reform Act's per-stick method of determining the "volume of domestic sales," see 7 U.S.C. § 518d(g)(3).

**V.    USDA Did Not Act Arbitrarily and Capriciously with Respect to its Treatment of the A.C. Nielsen Data at Single Stick's Administrative Appeal.**

Single Stick next argues that its administrative appeal was wrongfully denied because USDA did not consider A.C. Nielsen 'point of sale' survey data that Single Stick put into the administrative record.  Specifically, Single Stick contends that (i) USDA denied Single Stick's administrative appeal contrary to the weight of the evidence, i.e., the A.C. Nielsen data; (ii) USDA failed to consider the A.C. Nielsen data; and (iii) USDA wrongfully withheld information from Single Stick regarding the calculation of the size of the cigar market.  (Mot. for S.J. at 17-20.)  Each of those arguments fails.

The first two arguments fail for a common reason: USDA considered the A.C. Nielsen data and determined that they were not appropriate data for the TTPP calculations.  Rather, the excise tax data regarding removal of cigars into commerce, which USDA relied on, were found

to be more topical and reliable – as explained in the hearing officer's decision:

> Appellant [Single Stick] contends that its market share is overstated because CCC [the Commodity Credit Corporation] used incorrect data in the computation of market shares. Appellant presented A.C. Nielsen marketing data to support its contention. Appellant believes that A.C. Nielsen sales data is more reliable than excise tax and removal data that CCC obtained, and is the only verifiable and testable market share evidence that should be used in the computation of tobacco companies market shares. Appellant's argument is not persuasive. ***A.C. Nielsen market data is across the counter "sales" data. Market shares (for TTPP purposes) are computed based on tobacco product "removal" data. Sales data and removal data are not (and will not be) synonymous.*** Section 625(g) and Section 625(h) of the 2004 Act specify that the volume of domestic sales used in calculating the TTPP assessment shall be made by CCC based on information provided by the manufacturers and importers (specifically, Federal excise tax information and removal data) as well as any other relevant information provided to or obtained by CCC. CCC worked closely with the U.S. Department of Homeland Security and the U.S. Department of Treasury to establish a complete list of all tobacco manufacturers and importers that are subject to excise tax. Each of those companies was contacted and required to provide verifiable excise tax and tobacco product removal data which was used to compute Appellant's market share and subsequent TTPP assessment. ***The 2004 Act delegates the authority to CCC to determine what is the most reliable information available to compute the most accurate TTPP. In this case, CCC determined that Federal excise tax information and removal data was the most accurate.*** I find that the data used and the methodology applied in CCC's computation of market shares complies with the provisions of the 2004 Act.

Ltr. to Rubinstein at 6 (Feb. 8, 2006) (emphasis added) (copy attached as Ex. 1) (copy also attached to complaint as Ex. 9 at 6). As can be seen, the USDA hearing officer's explanation plainly evidences his consideration of the A.C. Nielsen data and his determination that the data were not reliable for TTPP assessment purposes because as sales data, and not tobacco product removal data, they did not measure the relevant quantity for determining TTPP assessments.

      This determination easily survives the arbitrary and capricious standard for several reasons. For instance, nothing in the Reform Act suggests that the A.C. Nielsen survey data should provide the operative data set for USDA to determine assessments, especially since the A.C. Nielsen survey data does not measure the appropriate quantities for Reform Act assessment

13

purposes. To the contrary, the Reform Act provides that the calculation of assessments shall be done by submitting certified copies of excise tax returns to USDA based on number of cigars. 7 U.S.C. § 518d(g)(3)(A); 7 U.S.C. § 518d(h)(1)-(2). Furthermore, the Reform Act regulations, entitled to Chevron deference, provide that excise tax data, not A.C. Nielsen survey results, are the operative data set. See 7 C.F.R. § 1463.6(b)(1)(ii).

Similarly, Single Stick fails in its claim that it was wrongfully denied data. Most basically, Single Stick has no right to that excise tax data because as excise tax return information, it cannot be disclosed by operation of statute. See 26 U.S.C. § 6103(a). Moreover, as explained above, the hearing officer already confirmed that USDA's method of acquiring data was the most accurate method, see Ltr. to Rubinstein at 6 (Feb. 8, 2006) (copy attached as Ex. 1), and Single Stick was already provided statements of the number of cigars that it removed into commerce and the total number of cigars removed into commerce by all manufacturers and importers, see 7 C.F.R. § 1463.8(6)-(7). Consequently, it was not arbitrary and capricious for USDA to conclude that Single Stick provided no legitimate reason for disputing accuracy of the removal data that USDA relied on.

**VI.   As a Matter of Law, Single Stick Cannot Recover for its Claims under the Information Quality Act.**

Single Stick also moves for summary judgment on its IQA claims. (Mot. for S.J. at 20-25.) Single Stick has no legal basis for a claim under the IQA, as explained in detail in USDA's motion to dismiss briefing. (Mot. to Dismiss at 16-26; Reply Mem. at 14-21). Put simply, the IQA, Pub. L. No. 106-554, Tit. V, § 515, 114 Stat. 2762A-153 (Dec. 21, 2000); see also 44 U.S.C. § 3516 (note), does not create a private right to information, and even if it did, such an IQA action would not be subject to judicial review. Even more, Single Stick would not have a

14

claim here in any event because the information it seeks is made confidential under the excise tax statutes, see 26 U.S.C. § 6103(a); 26 U.S.C. § 7213(a).

First, contrary to Single Stick's assertion that the IQA creates a right to information, every court to consider the issue has concluded that the IQA does not create any rights. See Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006) ("By its terms, [the IQA] creates no legal rights in any third parties."); Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 601 (E.D. Va. 2004); In re Operation of the Missouri River Sys., 363 F. Supp. 2d 1145, 1174-75 (D. Minn. 2004), *vacated in part and aff'd in part on other grounds*, 421 F.3d 618 (8th Cir. 2005). This result is not surprising because the IQA does not contain any rights-creating language for individuals, as required under Supreme Court jurisprudence, see Alexander v. Sandoval, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981))); Gonzaga Univ. v. Doe, 536 U.S. 273, 287-88 (2002) (finding no legal right where the statutory terms focused on institutional policy and practice). Rather, the IQA focuses on regulating the conduct of federal agencies in three respects: to issue guidelines regarding information quality, to establish administrative mechanisms for correction of the information, and to make periodic reports to the Office of Management and Budget ("OMB"). See Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154. For that reason, the IQA creates no private right to information or its correctness.

Even if the IQA did create rights to seek the production and correction of information maintained and disseminated by an agency, those rights would not be actionable here under the APA. That is so because the APA does not permit judicial review of matters committed to agency discretion by law, see 5 U.S.C. § 701(a)(2), which occurs when the governing law "is

15

drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985); see also Steenholdt v. Fed. Aviation Admin., 314 F.3d 633, 638 (D.C. Cir. 2003); Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 579 (3d Cir. 1979).  Here, the IQA and the ensuing OMB guidance leave the information quality decisions to an agency's own discretion – and thus outside of judicial review under the APA.  The text of the IQA is devoid of any judicially manageable standards for a court to evaluate the quality of agency information.  See Pub. L. No. 106-554, Tit. V, § 515(b)(2), 114 Stat. 2762A-154.  Nor does the OMB guidance for the IQA provide judicially manageable standards; rather, that guidance instructs that information quality "is to be ensured and established at levels *appropriate* to the nature and timeliness of the information to be disseminated."  67 Fed. Reg. at 8459 (emphasis added).  As can be seen, the IQA and the OMB guidance are highly deferential to an agency's conclusions as to the "appropriate" response and do not prescribe standards for determining what constitutes an "appropriate" level of information quality.  See Salt Inst., 345 F. Supp. 2d at 602-03 ("Neither the IQA nor the OMB guidelines provide judicially manageable standards that would allow meaningful judicial review to determine whether an agency properly exercised its discretion in deciding a request to correct a prior communication.").

      Moreover, even if Single Stick could theoretically bring an action to enforce the IQA under the APA, Single Stick has no claim here where the information it seeks is expressly confidential by the excise tax statutes.  It is undisputed that Single Stick has already received statements of the number of cigars it removed into commerce and the total number of cigars removed into commerce by all manufacturers and importers.  See 7 C.F.R. § 1463.8(6)-(7).  Nonetheless, Single Stick seeks additional data, which comes from the excise tax returns of other

cigar manufacturers and importers.  See 7 U.S.C. § 518d(h)(1)-(2); 7 C.F.R. § 1463.7(b)(1); see also 26 U.S.C. § 5703(b)(1).  USDA cannot satisfy Single Stick's additional request for the excise tax return information from other cigar manufacturers and importers because such excise tax information is made confidential by statute.  See 26 U.S.C. § 6103(a) ("No officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise under the provisions of this section."); 26 U.S.C. § 7213 ("It shall be unlawful for any officer or employee  of the United States . . . willfully to disclose to any person, except as authorized in this title, any return or return information."); see also Church of Scientology of Cal. v. I.R.S., 484 U.S. 9, 18 (1987) (holding that § 6103 precludes disclosure of individualized tax return information); King v. I.R.S., 688 F.2d 488, 490-94 (7th Cir. 1982) (same).  Thus, regardless of the viability of the Single Stick's ability to sue under IQA, the confidentiality provisions of Title 26 of the United States Code preclude Single Stick from receiving its requested information.

Finally, Single Stick cannot recover under the IQA because the IQA applies only to information that is "maintained *and disseminated*" by an agency.  See Pub. L. No. 106-554, Tit. V, § 515(b)(2)(B), 114 Stat. 2762A-154 (emphasis added), see also *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002) (explaining that dissemination means "agency initiated or sponsored distribution of information to the public").  But here, as explained above, USDA is prohibited from disseminating the confidential excise tax return information that Single Stick seeks.  For that reason, the IQA, by its own terms, cannot apply here.

17

**CONCLUSION**

For the foregoing reasons, as well as those presented in USDA's motion to dismiss briefing, Single Stick's motion for summary judgment fails, and this matter should be dismissed or judgment should be entered for USDA.

Dated: April 23, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JAMES J. GILLIGAN
Assistant Branch Director

   /s/ Peter J. Phipps
PETER J. PHIPPS
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants