USDA

FEB -8 2006

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service
Agency

1400 Independence
Ave, SW
Stop 0570
Washington, DC
20250-0570

Reed D. Rubinstein, Attorney at Law
Greenberg Taurig, LLP
Suite 500
800 Connecticut Avenue, NW
Washington, D.C. 20006

Dear Mr. Rubinstein:

On November 17, 2005, a hearing was convened regarding Single Stick, Inc.'s, (Appellant) Tobacco Transition Payment Program (TTPP) disputed first and second 3rd quarter Fiscal Year 2005 assessments. This is the final administrative determination with regard to this appeal.

**Background:**

The Fair and Equitable Tobacco Reform Act of 2004 (the 2004 Act) effectively ended the tobacco marketing quota and price support loan programs. The TTPP was introduced in a final rule published in the Federal Register on February 10, 2005, and amended on April 4, 2005, (7 CFR §1463) to provide a mechanism to effect the provisions of the 2004 Act.

The TTPP provides for payments over a 10-year period to eligible tobacco quota holders and producers to assist in a transition from Federally regulated tobacco programs. Funding for these payments is derived from quarterly assessments levied against certain tobacco manufacturers and importers of tobacco products that are placed in a trust fund and distributed by the Commodity Credit Corporation (CCC). The 2004 Act requires the total quarterly assessment for all manufacturers and importers to be sufficient to cover the contract payments and other expenditures from the trust fund during that period. These expenses include, but are not limited to, losses sustained by CCC under its loan agreements with the tobacco loan associations during the corresponding quarterly period.

The 2004 Act categorizes tobacco companies into six separate and distinct classes and requires manufacturers and importers of each of those classes to pay a specific percentage of the total quarterly assessment. For Fiscal Year 2005, the percentages are as follows:

1. Cigarette manufacturers and importers - 96.331 percent

2. Cigar manufacturers and importers - 2.783 percent

3. Snuff manufacturers and importers - 0.539 percent

4. Roll-your-own tobacco manufacturers and importers - 0.171 percent

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

5. Chewing tobacco manufacturers and importers - 0.111 percent

6. Pipe tobacco manufacturers and importers - 0.066 percent

For subsequent fiscal years, CCC has discretionary authority to adjust those percentages to reflect changes in the share of gross domestic volume held by that class of tobacco product.

Once the total quarterly assessment by class of tobacco manufacturer or importer is established, individual tobacco manufacturers and importers are assessed based on their respective individual market share of the gross domestic volume of tobacco placed in the market for each specific class of tobacco manufacturer or importer. The 2004 Act specifies that market share will be expressed as a decimal to the fourth place.
The 2004 Act defines "Gross Domestic Volume" as the volume of tobacco products removed (as defined by Section 5702 of the Internal Revenue Code of 1986, including ATF 5000.24 and United States Customs form 7501 under currently applicable regulations) and not exempt from tax (Chapter 52 of the Internal Revenue Code of 1986) at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

With respect to the six categories previously listed, excluding cigars, CCC determines a tobacco manufacturer's or importer's market share by simply dividing the amount of excise taxes it reported it paid for a specific class of tobacco by the total excise taxes paid by all manufacturers and importers for that specific class of tobacco during the previous fiscal year quarter. CCC then multiplies that market share by the total quarterly assessment for that specific class of tobacco to arrive at the assessment amount.

With regard to cigars, excise taxes paid are not used in computing the assessment associated with cigars because excise taxes paid are not consistent between large cigars and small cigars. The 2004 Act does not differentiate between large cigars and small cigars and Section 625(g)(3)(A) requires that assessments associated with cigars be computed on a per-stick basis. As a result, CCC computes a cigar manufacturer's or importer's market share based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in commerce. Then, as with other classes of tobacco, CCC multiplies each manufacturer's or importer's market share by the total quarterly assessment for cigars to arrive at the assessment amount.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

**Appellant's Position:**

Appellant challenges that CCC incorrectly classified small cigars in the same category as large cigars and unfairly assessed small cigars at the same rate as large cigars. Appellant challenges that the total amount of excise taxes paid by tobacco manufacturers and importers in a specific class of tobacco is incorrect insofar as the number does not include companies that did not report or did not pay the required excise taxes. Appellant argues that CCC's interpretation of the expression of market share unlawfully excluded small tobacco manufacturers and importers from TTPP assessment. Appellant contends that CCC used unreliable removal data when computing TTPP assessments which resulted in an overstatement of Appellant's market share. As a result, Appellant believes that the computation of the assessment is in error and Appellant is paying more than its proportional share of the TTPP assessment. Appellant challenges that CCC improperly incorporated tobacco loan pool stock liquidation losses into the third quarter Fiscal Year 2005 TTPP assessment which Appellant believes should have been amortized over the ten years of the TTPP. Appellant challenges that CCC erroneously included ineligible administrative expenses and related services in quarterly TTPP assessment amounts. Appellant believes that CCC's decisions regarding TTPP assessments are arbitrary, capricious, and contrary to the 2004; Act, therefore, Appellant believes it is entitled to relief.

**Issues:**

Did CCC incorrectly classify small cigars in the same class as large cigars and assess small cigars at the same rate as large cigars?

When computing TTPP assessments, did CCC erroneously fail to include tobacco companies that did not report production placed into commerce and excise tax information thereby causing Appellant to pay more than its proportional share of the total TTPP assessment?

Is CCC's computation of TTPP assessments predicated on accurate excise tax and tobacco product removal data and is that data available to the public?

Did CCC unlawfully exempt small manufacturers and importers from TTPP assessment?

Is CCC's decision to not retroactively charge tobacco companies that were previously considered *di minimus* and exempt from TTPP assessment, but would now owe a TTPP assessment as a result of the policy change regarding the expression of market share, factually correct and in accordance with the 2004 Act?

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

Did CCC erroneously include expenses for TTPP program outreach and related services in the total third quarter Fiscal Year 2005 TTPP assessment?

Did CCC improperly include tobacco loan pool losses in corresponding quarterly TTPP assessments rather than amortize these losses over the remaining years of TTPP?

**Analysis:**

**Did CCC incorrectly classify small cigars in the same class as large cigars and assess small cigars at the same rate as large cigars?**

Appellant pointed out that it takes many small cigars to equal the volume of one large cigar and argued that it is not equitable to assess small cigars at the same rate as large cigars. That argument may be philosophically well founded; however, it is not consistent with the statutory requirements regarding the computation of a tobacco company's "market share" and corresponding TTPP assessments.

Specifically, Section 625(c)(1) of the 2004 Act establishes the percentage of the total assessment amount that is attributable to each of the six separate and distinct classes of tobacco. Section 625(c)(1)(B) of the 2004 Act clearly does not differentiate between large cigars and small cigars nor does it establish separate classes for large and small cigars. Section 625(g)(3)(A) further requires the volume of domestic sales associated with cigars to be measured on a per-stick basis. Therefore, CCC correctly computed cigar manufacturers' or importers' market shares based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in domestic commerce, without regard to the size of the cigars as the law requires.

**When computing TTPP assessments, did CCC erroneously fail to include tobacco companies that did not report production placed into commerce and excise tax information thereby causing Appellant to pay more than its proportional share of the total TTPP assessment?**

Appellant's assertion that CCC did not include (in the total excise taxes paid) tobacco companies that failed to report production placed into commerce and excise tax information (non-reporting companies) when computing TTPP assessments is factually correct. CCC determined Appellant's market share by dividing Appellant's excise taxes by the total excise taxes paid by tobacco companies that did report production placed into commerce and excise tax information (reporting companies), not all tobacco companies.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

Because CCC did not include all tobacco companies in the total excise taxes paid, Appellant asserts that its market share was artificially inflated which caused its assessment amounts to be greater than Appellants proportional share of the TTPP assessment; these facts lend support to Appellant's argument that it is paying an amount greater than its proportional share of the total assessment. Appellant's position is further supported by Section 625(e)(2) of the 2004 Act, which limits a tobacco company's share of the TTPP assessment to its proportional share of domestic volume for each class of tobacco.

With regard to cigarettes, CCC does possess excise tax information for non-reporting cigarette tobacco companies that will allow CCC to accurately assess those non-reporting companies. CCC has determined to grant this portion of this appeal. Accordingly, CCC has determined that a reconciliation of cigarette manufacturers or importers Fiscal Year 2005 quarterly assessments is appropriate. CCC will redetermine each cigarette manufacturer or importer's 2005 Fiscal Year quarterly market shares and corresponding assessments. Specifically, the calculations will include previously omitted excise taxes paid by non-reporting companies in the total excise taxes paid by tobacco companies. In February 2006, affected cigarette tobacco companies will receive an invoice showing any Fiscal Year 2005 TTPP assessment adjustments. Any overpayments will be credited (including applicable interest).

With regard to cigars, information that CCC possesses regarding non-reporting cigar manufacturers or importers is again excise tax information. However, because cigar manufacturers' or importers' market share is computed on a per-stick basis and excise tax rates are not consistent between large cigars and small cigars, CCC is unable to use this information to accurately compute a non-reporting cigar manufacturer's or importer's market share. Unlike cigarettes, CCC has no access to any other non-reporting cigar tobacco company production information, nor has Appellant provided such data, that would allow CCC to accurately ascertain the number of cigars manufactured by non-reporting companies. As a result, CCC has no way to compute an accurate assessment amount with regard to non-reporting cigar companies and, therefore, cannot include the non-reporting companies in the assessment calculation.

Cigar tobacco companies that failed to report production and excise tax information, likewise, failed to pay a TTPP assessment. Including these companies in the TTPP assessment calculation would result in "insufficient amounts" in the Tobacco Trust Fund available to deliver the program and cover TTPP outlays. Section 625(c)(3) of the 2004 Act directs CCC to recover "insufficient amounts" and gives CCC broad latitude to increase assessment amounts to cover such shortages in the process of carrying out the program.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

Notwithstanding this point, CCC realizes that because additional cigar tobacco companies subject to the TTPP assessment have been found and have now reported and paid assessments after the fact, CCC has determined to partially grant this appeal with regard to cigars. Specifically, CCC has determined that a reconciliation of cigar manufacturers or importers Fiscal Year 2005 quarterly assessments to include these additional monies is appropriate. In February 2006, affected cigar tobacco companies will receive an invoice showing any Fiscal Year 2005 assessment adjustments. Any overpayments will be credited (including applicable interest).

**Is CCC's computation of TTPP assessments predicated on accurate excise tax and tobacco product removal data and is that data available to the public?**

Appellant contends that its market share is overstated because CCC used incorrect data in the computation of market shares. Appellant presented A.C. Nielsen marketing data to support its contention. Appellant believes that A.C. Nielsen sales data is more reliable than excise tax and removal data that CCC obtained, and is the only verifiable and testable market share evidence that should be used in the computation of tobacco companies market shares. Appellant's argument is not persuasive. A.C. Nielsen market data is across the counter "sales" data. Market shares (for TTPP purposes) are computed based on tobacco product "removal" data. Sales data and removal data are not (and will not be) synonymous. Section 625(g) and Section 625(h) of the 2004 Act specify that the volume of domestic sales used in calculating the TTPP assessment shall be made by CCC based on information provided by the manufacturers and importers (specifically, Federal excise tax information and removal data) as well as any other relevant information provided to or obtained by CCC. CCC worked closely with the U.S. Department of Homeland Security and the U.S. Department of the Treasury to establish a complete list of all tobacco manufacturers and importers that are subject to excise tax. Each of those companies was contacted and required to provide verifiable excise tax and tobacco product removal data which was used to compute Appellant's market share and subsequent TTPP assessment. The 2004 Act delegates the authority to CCC to determine what is the most reliable information available to compute the most accurate TTPP. In this case, CCC determined that Federal excise tax information and removal data was the most accurate. I find that the data used and the methodology applied in CCC's computation of market shares complies with the provisions of the 2004 Act.

Appellant also contends that CCC violated Appellant's due process rights by refusing to make available to the public the underlying data that CCC used to calculate market shares. Appellant requested the data and CCC's data sources through a Freedom of Information Act (FOIA) request. CCC denied Appellant's request pursuant to Exemption 3 of FOIA in conjunction with the Internal Revenue Code of 1986. Exemption 3 protects material that is specifically exempted from disclosure by Statute.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

This data is subject to the provisions of 26 U.S.C. 6103, which prohibits the disclosure of tax information to any party whose duties do not require access (CR App0228). The merits of the denial of Appellant's FOIA request are outside the scope of this review as it pertains to the appeal of the TTPP assessment. I do point out, however, that Appellant has failed to show that denial of Appellant's FOIA request has interfered with Appellant's due process rights or otherwise caused Appellant harm.

Appellant's burden to show error on the part of CCC is not satisfied, mitigated, or lessened as a result of Appellant's inability to produce documents or evidence that would substantiate Appellant's position. The fact that Appellant was unable to obtain, review, and scrutinize the underlying data used to calculate market shares does not mean Appellant's assertions are well founded nor does it render that data incorrect. Appellant has made no sustainable argument that the data relied on by CCC was incorrect or used improperly in the calculation of tobacco company's market shares; therefore, I must deny Appellant's appeal with regard to this issue.

**Did CCC unlawfully exempt small manufacturers and importers from TTPP assessment?**

Section 625(a)(3) of the 2004 Act specifies that a manufacturer's or importer's market share shall be "expressed as a decimal to the fourth place." Limiting the market share expressed as a decimal to the fourth place was <u>previously</u> interpreted by CCC to mean that in order to be subject to an assessment, a tobacco manufacturer or importer would have to have a calculated market share of .0001 or greater. Considering these facts, any manufacturer or importer with a market share of .000050 or greater would be subject to the TTPP assessment because generally applicable rules of rounding[1] would require CCC to consider the market share as .0001. Any market share of .000049 or less would be considered .0000 (zero) or, in other words, *di minimus*.

---

[1] CCC regulations found at 7 CFR §1405.2 (attached) set forth the generally applicable rules of fractions (rules of rounding) used in this case. These regulations adopt, by reference, regulations issued by the Farm Service Agency found at 7 CFR §718.5 (attached) that provide applicable rules of rounding for mathematical calculations. Specifically, the regulations require that all mathematical calculations be carried out to two decimal places beyond the number of decimal places required by the regulations governing each program. In rounding fractional digits of 49 or less beyond the required number of decimal places (in this case 4 places) shall be dropped. If the fractional digits beyond the required number of decimal places are 50 or more, the figure at the last required decimal place shall be increased by "1".

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

The manner in which "market share" should be viewed (when determining whether a tobacco manufacturer or importer is subject to the assessment) has been the subject of several administrative appeals. Various tobacco companies have asserted that CCC should interpret "market share" to mean each manufacturer's and importer's "percentage share" expressed as a whole number percentage rounded and carried to the fourth decimal place rather than expressed as a decimal rounded and carried to the fourth decimal place. For example, using that interpretation, a company could have a 17.4996 percent or .174996 market share instead of CCC's current expression of the same market share as 17.50 percent or .1750 market share. The determination whether a tobacco company is subject to the assessment would be based on market share expressed to the sixth decimal place (where previously the measure was four decimal places). If the market share of an entity is equal to or .000001, the entity would be subject to assessment. <u>It is CCC's position that either interpretation is possible under Section 625(b)(3) of the 2004 Act</u>.

After evaluating information submitted by several tobacco companies during the course of administrative hearings, CCC has determined that (for Fiscal Year 2006 and future years) expressing market share as a whole number percentage rounded and carried to the fourth decimal place provides a more accurate representation of an individual tobacco company's market share. This policy change will impact a number of sizable manufacturers or importers that previously were considered to have a *di minimus* market share and, therefore, were exempt from assessment. Including these additional companies will effectively reduce the burden on currently assessed companies.
A <u>Federal Register</u> Notice issued December, 8, 2005, (attached) explained the rationale for the policy change. The <u>Federal Register</u> Notice advises tobacco manufacturers and importers that, effective January 1, 2006, the determination whether a tobacco company is subject to the assessment will be based on the company's market share expressed to the sixth decimal place.

**Is CCC's decision to not retroactively charge tobacco companies that were previously considered *di minimus* and exempt from TTPP assessment, but would now owe a TTPP assessment as a result of the policy change regarding the expression of market share, factually correct and in accordance with the 2004 Act?**

Appellant asserts that this policy should be applied retroactively to tobacco companies that previously were considered exempt but would now owe an assessment based on the policy change. CCC's holds that it is inappropriate to retroactively implement a policy change that is more restrictive when both policies are factually correct and comply with the 2004 Act. As a result, Appellant's appeal with regard to this issue is denied.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

**Did CCC erroneously include expenses for TTPP program outreach and related services in the total third quarter Fiscal Year 2005 TTPP assessment?**

Appellants assert that expenses incurred by USDA for program outreach and related services are "administrative expenses," which the 2004 Act expressly prohibits from being paid out of the Tobacco Trust Fund. CCC has reviewed these expenditures and has determined that these expenses will not be included in TTPP assessment amounts. As a result, CCC has determined to grant Appellant's appeal to the extent that these expenditures will be appropriately credited during the aforementioned Fiscal Year 2005 TTPP assessment reconciliation process. In February 2006, affected tobacco companies will receive an invoice showing any Fiscal Year 2005 TTPP assessment adjustments and any overpayments will be credited (including applicable interest).

**Did CCC improperly include tobacco loan pool losses in corresponding quarterly TTPP assessments rather than amortize these losses over the remaining years of TTPP?**

The Third Quarter fiscal year 2005 total assessment was significantly higher than previous quarterly assessments due to the inclusion of CCC loan losses from the required disposal of loan pool stocks held by tobacco associations in the total quarterly assessment amount. Appellant asserts that these loan pool stock losses should be amortized over the remaining years of TTPP rather than included in the corresponding quarter TTPP assessment.

Section 641(c)(2) of the 2004 Act requires the Secretary to transfer funds to CCC from the Tobacco Trust Fund to reimburse CCC for any net losses that CCC may sustain under its loan agreements with the tobacco associations. Section 625(b)(2)(B) of the 2004 Act requires that these expenses be included in the TTPP assessment for the corresponding quarter base period. The 2004 Act does not provide CCC the latitude to amortize loan pool stock losses; therefore, Appellant's appeal with regard to this issue must be denied.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

**Determination:**

I conclude that the classification and assessment of small cigars and large cigars in the same specific class of tobacco is consistent with the 2004 Act. I further conclude that CCC correctly computed cigar manufacturers' or importers' market shares based on the actual number of cigars each manufacturer or importer placed in domestic commerce as compared to the total number of cigars placed in domestic commerce without regard to the size of the cigars. Accordingly, Appellant's appeal with regard to this issue is denied.

With respect to the manner in which Appellants' TTPP assessments have been determined, I grant Appellants' appeal to the extent CCC will include (for purposes of determining Appellants market share) production and excise tax information from all known manufacturers or importers when computing market shares, provided that such entities have submitted information as required by CCC or, if not, have submitted data to the U.S. Department of the Treasury or the U.S. Department of Homeland Security which CCC can rely upon in making such determinations.

With regard to Appellants assertion that it is paying more than its proportional share of the total assessment amount, I grant the appeal to the extent that CCC will perform a recalculation and reconciliation of Fiscal Year 2005 assessments.

With regard to CCC exempting from assessment manufacturers and importers with a *di minimus* market share, I find that CCC properly excluded from TTPP assessment tobacco companies with a market share of less than .0001. I also find that CCC's decision to not retroactively charge tobacco companies that were previously exempt from assessment, but would not owe a TTPP assessment as a result of the policy change in the expression of market share, is correct. Therefore, Appellant's appeal with regard to these issues is denied.

With regard to Appellant's contention that CCC used incorrect data in the computation of market shares, I deny Appellant's appeal.

With regard to CCC violating Appellant's due process rights, I deny Appellant's appeal.

With regard to TTPP program outreach and related services expenditures included in the third quarter Fiscal Year 2005 TTPP assessment, I grant Appellants' appeal to the extent that these expenditures will be appropriately credited during the Fiscal Year 2005 TTPP assessment reconciliation process.

I also find that because there are no provisions for relief in the 2004 Act or the controlling regulations, Appellant's request for relief must be denied.

Reed D. Rubinstein, Attorney at Law, Greenberg Taurig, LLP

This is the final administrative decision. If Appellant does not believe this determination is in accordance with the 2004 Act or the controlling regulations, Appellant may seek judicial review in the United States District Court for the District of Columbia or for the district in which the Appellant resides or has its principal place of business.

John A. Johnson
Deputy Administrator for Farm Programs
Designee of Executive Vice President,
Commodity Credit Corporation

Attachments

shall be liable in any suit if payment is made to the assignor without regard to the existence of any assignment, and the rate of interest applicable to the loans as of January 1 of any year shall be announced by CCC by press release or other means.

§ 1404.9 OMB Control Numbers assigned pursuant to the Paperwork Reduction Act.

The information collection requirements contained in this part have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 35 and have been assigned OMB control number 0560-0004.

## PART 1405—LOANS, PURCHASES, AND OTHER OPERATIONS

Sec.
1405.1 Interest.
1405.2 Basic rule of fractions.
1405.3 Effect of changes in regulations.
1405.4 Delegations of authority.
1405.5 Notice and comment.
1405.6 Crop insurance requirement.
1405.7 Uruguay Round Agreements Act.
1405.8 Disqualification due to Federal crop insurance fraud.

AUTHORITY: 7 U.S.C. 1515; 7 U.S.C. 7285(e); 15 U.S.C. 714b and 714c.

SOURCE: 61 FR 37575, July 18, 1996, unless otherwise noted.

§ 1405.1 Interest.

(a) Except as may otherwise be determined by CCC as provided in individual program regulations, the rate of interest on loans or other means as deemed appropriate by CCC for such other means shall be in effect until the loan is disbursed by CCC, plus 1 percent. This crop loan rate of interest shall be in effect until the maturity of the loan.

(b) The rate of interest applicable to all CCC loans that are outstanding as of January 1 of any year shall be adjusted as of such date to equal the rate determined by the U.S. Treasury. This rate shall be...

§ 1405.2 Basic rule of fractions.

Fractions shall be rounded in accordance with the provisions of 7 CFR part 718.

§ 1405.3 Effect of changes in regulations.

Unless otherwise indicated, the regulations in effect in this chapter as of April 4, 1996, shall continue to apply to the 1991 through 1995 crops of agricultural commodities, to milk produced before May 1, 1996, and to contracts entered into prior to any amendments to this chapter after that date.

§ 1405.4 Delegations of authority.

The delegations of authority relating to the CCC programs and activities are set forth in the by-laws of CCC and in dockets approved by the CCC Board of Directors. Copies of the By-laws and the dockets may be obtained from the Secretary of CCC.

§ 1405.5 Notice and comment.

The level of loans, purchases and payments made in accordance with the chapter set forth in this chapter shall be determined without regard to the notice and comment provisions of 5 U.S.C. 553.

§ 1405.6 Crop insurance requirement.

(a) To be eligible for any benefits or payments under 7 CFR part 1410, the producer must obtain at least the catastrophic level of insurance for each crop, if insurance is available for the crop, in the county for the crop. In meeting this requirement, the producer may:

(1) Obtain at least the catastrophic level of crop insurance in all counties in which the producer has an interest for each crop of economic significance; or

(2) Obtain at least the catastrophic...

[...not all crops of economic significance on the record, will be subject to one or more of the sanctions described in section 515(b)(3). In section 515(b)(3), the FCIA specifies that in the case of a violation committed by a producer, the producer may be disqualified for a period of up to 5 years from receiving any monetary or non-monetary benefits under a number of programs. The list includes, but is not limited to, benefits under:

(1) Title V of the FCIA.
(2) The Agricultural Market Transition Act (7 U.S.C. 7201 et seq.), including the Noninsured Crop Disaster Assistance Program under section 196 of that Act (7 U.S.C. 7333).
(3) The Agricultural Act of 1949 (7 U.S.C. 1421 et seq.).
(4) The Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.).
(5) The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.).
(6) Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 et seq.).
(7) Any law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in the prices of agricultural commodities.

(b) Violation determinations are made by FCIA. However, upon notice from FCIA to CCC that a producer has been found to have committed a violation to which paragraph (a) of this section applies, that person shall be considered ineligible for payments, the programs specified in paragraph (a) of this section that are funded by CCC for the same period of time for which, as determined by FCIA, the producer will be ineligible for crop insurance benefits of the kind referred to in paragraph (a)(1) of this section. Appeals of the determination of ineligibility will be administered under the rules set by FCIA.

(c) Other sanctions may also apply.

[68 FR 39448, July 3, 2003]

## PART 1407—DEBARMENT AND SUSPENSION

Sec.
1407.1 Purpose.
1407.2 Nonprocurement debarment.

347

## § 718.3

*Required inspection* means an examination by an authorized representative of FSA of a farm, specifically selected by application of prescribed selection rules, to determine adherence to production or to verify the determined acreage and/or production within which the reported acreage and/or production may differ from the determined acreage and/or correctly reported.

*Rice* means rice that follows the standard planting and harvesting practices of the area, excluding sweet, glutinous, or candy rice such as Mochi Gomi.

*Secretary* means the Secretary of Agriculture of the United States, or a designee.

*Sharecropper* means one who performs work, in connection with the production of a crop under the supervision of the operator and who receives a share of such crop for this labor.

*Skip-row or strip-crop planting* means a cultural practice in which strips or rows of the crop are alternated with strips of idle land or another crop.

*Staking and referencing* means determining an acreage before planting by:

(1) Measuring or computing a standard planting and delineating the area measurements, other than pure strain varieties of Barbadense species, any hybrid thereof, or any other variety of cotton in which one or more of these varieties predominate. For program purposes, brown lint cotton is considered extra long staple cotton, and that follows the standard planting and harvesting practices of the area; and is produced from other than pure strain varieties of the Barbadense species, any hybrid thereof, or any other variety of cotton in which one or more of these varieties predominate. For program purposes, brown lint cotton is considered extra long staple cotton, and that follows the standard planting and harvesting practices of the area.

*Standard deduction* means an acreage that is excluded from the gross acreage in a field because such acreage is considered as being used for farm equipment turn-areas. Such acreage is established by application of a prescribed percentage of the area planted to the crop in lieu of measuring the turn area.

*Staking and referencing the area, is grown.*

*State* means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands of the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or the Trust Territory of the Pacific Islands.

*Subdivision* means a part of a field that is separated from the balance of the field by temporary boundary, such as a cropline which could be easily moved or will likely disappear.

*Tenant* means:

(1) One who rents land from another in consideration of the payment of a specified amount of cash or amount of a commodity; or

(2) One other than a sharecropper who re

---

**7 CFR Ch. VII (1-1-05 Edition)**

consideration of the payment of a producer services or proceeds therefrom.

(4) Review county office rates for producer services to determine equity between counties;

(5) Determine, based on cost effectiveness, which counties will use aerial compliance methods and which counties and/or digital images;

(6) The State committee shall submit to the Deputy Administrator requests to deviate from deductions prescribed in § 718.108, or the error amount or percentage for refunds of redetermination costs as prescribed in § 718.111.

(7) Adjust the per acre rate for acreage in excess of 25 acres to reflect the actual cost involved when performing measurement service from aerial slides or digital images.

consideration of the payment of a producer services or proceeds therefrom.

*Tolerance* means a prescribed amount within which the reported acreage and/or production may differ from the determined acreage and/or production and still be considered as correctly reported.

*Tract* means a unit of contiguous land that is under one ownership, which is operated as a farm, or part of a farm.

*Tract combination* means the combining of two or more tracts if the tracts have common ownership and are contiguous.

*Tract division* means the dividing of a tract into two or more tracts because of a change in ownership or operation.

*Turn-area* means the area across the ends of crop rows which is used for operating equipment necessary to the production of a crop (also called turn row, headland, or end row).

*Upland cotton* means cotton planted and stubble cotton that is not considered extra long staple cotton, and that follows the standard planting and harvesting practices of the area; and is produced from other than pure strain varieties of the Barbadense species, any hybrid thereof, or any other variety of cotton in which one or more of these varieties predominate. For program purposes, brown lint cotton is considered upland cotton.

*Wheat* means wheat for, feed or dual purpose variety that follows the standard planting and harvesting practice of the area in which the wheat is grown.

[68 FR 16172, Apr. 3, 2003; 69 FR 250, Jan 5, 2004]

### § 718.3 State committees responsibilities.

(a) The State committee shall, with respect to county committees:

(1) Take any action required of the county committee, which the county committee fails to take in accordance with this part;

(2) Correct or require the county committee to correct any action taken by such committee, which is not in accordance with this part;

(3) Require the county committee to withhold taking any action which is not in accordance with this part.

### § 718.4 Authority for farm entry and providing information.

(a) This section applies to all farms that have a tobacco allotment or quota under part 723 of this chapter and all farms that are currently participating in programs administered by FSA.

(b) A representative of FSA may enter any farm that participates in an FSA or CCC program in order to conduct a farm inspection as defined in this part. A program participant may request that the FSA representative present written authorization for the farm inspection before granting access to the farm. If a farm inspection is not allowed within 30 days of written authorization:

(1) All FSA and CCC program benefits for that farm shall be denied;

(2) The person preventing the farm inspection shall pay all costs associated with the farm inspection;

(3) The entire crop production on the farm will be considered for the farm;

(4) For tobacco, the farm operator must furnish proof of disposition of:

(i) All tobacco which is in addition to the production shown on the marketing card issued with respect to such farm; and

(ii) No credit will be given for disposing of excess tobacco other than that identified by a marketing card under this part;

(iii) less disposed of in the presence of FSA in accordance with § 718.109 of this part.

### § 718.5 Rule of fractions.

(a) Fractions shall be rounded after completion of the entire associated computation. All mathematical calculations shall be carried to two decimal places beyond the number of decimal places required by the regulations governing each program. In rounding, fractional digits of 49 or less beyond the required number of decimal places shall be dropped; if the fractional digits are 50 or more, the figure at the last required decimal place shall be increased by "1" as follows:

| Required decimal | Computation | Result |
|---|---|---|
| Whole numbers ......... | 6.49 (or less) | 6 |
| | 6.50 (or more) | 7 |
| Tenths ......... | 7.849 (or less) | 7.8 |
| | 7.850 (or more) | 7.9 |
| Hundredths ......... | 8.8449 (or less) | 8.84 |
| | 8.8450 (or more) | 8.85 |
| Thousandths ......... | 9.63449 (or less) | 9.634 |
| | 9.63450 (or more) | 9.635 |
| Ten thousandths ......... | 10.998149 (or less) | 10.9981 |
| | 10.998150 (or more) | 10.9982 |

(b) The acreage of each field or subdivision computed for tobacco and CCC disaster assistance programs shall be recorded in acres and hundredths of an acre, dropping all thousandths of an acre. The acreage of each field or subdivision computed for crops, except tobacco, shall be recorded in acres and tenths of an acre, rounding all hundredths of an acre to the nearest tenth.

### § 718.6 Controlled substance.

(a) The following terms apply to this section:

(1) *USDA benefit* means the issuance of any grant, contract, loan, or payment of appropriated funds of the United States.

(2) *Person* means an individual.

(b) Notwithstanding any other provision of law, any person convicted under Federal or State law of:

Federal Register/Vol. 70, No. 235/Thursday, December 8, 2005/Notices       72979

# DEPARTMENT OF AGRICULTURE

## Commodity Credit Corporation

### Tobacco Transition Assessments

**AGENCY:** Commodity Credit Corporation, USDA.

**ACTION:** Notice.

**SUMMARY:** This notice sets forth the interpretation the Commodity Credit Corporation (CCC) will use in administering the regulations set forth at 7 CFR part 1463 with respect to the Tobacco Transition Assessments. Generally, under these regulations CCC must determine the market share of a tobacco product manufacturer or tobacco product importer as a percentage of six statutorily specified sectors of the tobacco trade. Based upon information provided to CCC in the conduct of administrative hearings held pursuant to 7 CFR 1463.11, CCC has determined that the manner in which it calculates this percentage is subject to more than one interpretation and, based upon the evidence provided at these hearings, has determined that changes to the calculation should be made beginning with assessments collected under 7 CFR part 1463 after January 1, 2006. However, this change will not apply to invoices issued February 1, 2006. These invoices will reflect corrections and other necessary adjustments associated with fiscal year 2005.

**FOR FURTHER INFORMATION CONTACT:** Misty Jones, Tobacco Division, Farm Service Agency (FSA), United States Department of Agriculture (USDA), Stop 0514, 1400 Independence Avenue, SW., Washington, DC 20250-0514. Phone: (202) 720-7413; e-mail: Misty.Jones@wdc.usda.gov. Persons with disabilities who require alternative means for communication (Braille, large print, audio tape, etc.) should contact the USDA Target Center at (202) 720-2600 (voice and TDD).

## Background

Title VI of the American Jobs Creation Act of 2004 (Pub. L. 108-357) (the 2004 Act) repealed the marketing quota and acreage allotment (marketing quota) and price support programs for tobacco that were authorized by the Agricultural Adjustment Act of 1938 and the Agricultural Act of 1949, effective with the 2005 and subsequent crops of tobacco. Sections 622 and 623 of the 2004 Act establish a 10-year transitional payment program for tobacco producers and owners of tobacco marketing quotas who were affected by the termination of the marketing quota and price support programs. Sections 625 through 627 of the 2004 Act established an assessment regime under which CCC collects assessments to fund the 10-year transitional payment program. Generally, these assessments are to be collected for 40 calendar quarters (2005-2014) and are based upon individual market shares of tobacco product manufacturers and importers within six sectors specified by the 2004 Act. The regulations issued by CCC with respect to these assessments were issued in a final rule published in the Federal Register on February 10, 2005 (70 FR 7007-7014). The purpose of this notice to advise tobacco product manufacturers and tobacco product importers that effective with assessment notices issued after January 1, 2006, CCC will determine such entities' market share within a sector as a percentage expressed to the sixth decimal point.

As explained below, section 625(a)(3) of the 2004 Act is ambiguous with respect to its directive in calculating entities' market shares. Section 625(b)(3) defines "market share" as follows:

*Market Share.*—The term "market share" means the share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product.

In implementing this provision, CCC construed "market share" to mean an entity's percentage of the market determined, for all products except cigars, by dividing the volume of gross taxable removals for the entity by the total removals for the sector for all entities reporting to CCC, and, for cigars, by dividing the excise taxes paid for each entity by the total excise taxes paid for all cigar manufacturers and importers. Accordingly, under CCC's initial interpretation, if there were 10 entities who equally comprised all of the market of a sector, each market share was expressed as 0.1000. CCC recognized that in using its initial method of calculating a market share of an entity that there could be a disproportionate impact on entities with market shares less than .0001 that reach the "cut-off point" in that entities with market shares from .00005 to .00009 would, due to rounding, each be deemed to have a .0001 market share. Thus, CCC provided that once this determination had been made as to which entities to include in the assessment, CCC would calculate the actual assessment for an entity to the ninth decimal point.

During the course of administrative hearings in which appellants contested the level of their assessments in the first two quarters, it was brought to CCC's attention that this was not the only interpretation that could be given to the concept of expressing a market share to the "fourth decimal point". Appellants argued that a "market share" of 10 percent is more properly referred to in this example as 10.0000 percent and not .1000. The following is the written submission in support of this interpretation presented jointly by six of the entities subject to the assessment:

FETRA (the Fair and Equitable Tobacco Reform Act) assessments should be allocated based on *percentage* market shares expressed as decimals to the fourth place.

FETRA defines market share as the "share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product." This language, properly read, means that market share is to be calculated as a *percentage* share expressed to four decimal places. Accordingly, under FETRA, a manufacturer or importer should be required to pay an assessment unless its market share rounds to less than 00.0001% (which can also be written as .000001).

The USDA's first three assessment notices did not adopt this approach. Instead, the agency has exempted from assessment liability any company whose market share rounds to less than 00.01% (which can also be written as .0001). Consequently, there is a two-decimal place difference between the two approaches, which means that a company exempted from FETRA assessments under the USDA approach could have a market share as much as 100 times larger than the largest company exempted under the correct percentage share approach.

Under the USDA's approach, manufacturers and importers selling substantial quantities of tobacco products would avoid paying assessments—in direct violation of the clear statutory mandate of FETRA. As is explained below, if the data for the most recent quarterly assessment (for the April-June 2005 quarter) are annualized, the portion of the cigarette market, for example, that would be excused from paying any assessment would collectively amount to more than 9.5 million packs of cigarettes, representing sales revenues of more than $33 million.

By contrast, the percentage share approach limits the exemption to companies that legitimately can be viewed as having *de minimis* market shares, thereby effectuating the legislative intent that all manufacturers and importers must pay assessments. As explained below, the percentage share approach is supported by the language of FETRA and by analogous precedents.

Defining market share as a percentage expressed to the fourth decimal place is necessary to effectuate the clear purposes of FETRA.

FETRA imposes the following clear mandate: "The Secretary, acting through the Commodity Credit Corporation, shall impose quarterly assessments * * * on *each* tobacco product manufacturer and tobacco products

**72980**   Federal Register / Vol. 70, No. 235 / Thursday, December 8, 2005 / Notices

importer that sells tobacco products in domestic commerce in the United States * * *." 7 U.S.C. 518d(b)(1) (emphasis added). This language provides no discretion to exempt any manufacturers or importers.

The approach taken by USDA in the initial assessments violates this statutory mandate because it allows companies with substantial sales of cigarettes to avoid FETRA assessments. This point can be illustrated with the following example:

Assume a manufacturer had revenues of $850,000 in the fourth quarter of 2004. There is no rational basis for defining this company as a *de minimis* seller of cigarettes and exempting it from assessment:
- Revenue—$850,000.
- No. of packs sold (assuming $3.50 per pack) = 242,857.
- Taxes owed (FET at .39 per pack) = $94,714.23.
- Market share: [94,714/1,949,053,653] = 0.00004859486.

Under the approach used in the initial assessments, this company would be exempt from the payment of assessments because its market share is .000049, which rounds to .0000 (00.00%). However, if the percentage share approach is applied, the company would have to pay an assessment, since its market share—00.0049%—exceeds the threshold of 00.0001%.

As noted above, the approach used in the initial assessments will allow a significant portion of the cigarette market to remain exempt from assessment. On a per-company basis, this means that an individual manufacturer or importer could have annual sales of as much as 900,000 packs per year and revenues in excess of $3 million per year and still escape the payment of assessments. In contrast, under the approach described in this paper, the exemption would apply only to companies with annual sales less than approximately 9,000 packs and revenues less than approximately $32,000 per year—which appropriately can be viewed as de minimis. *Id.*

More importantly, the percentage of the market that USDA is exempting from assessment has more than doubled from the first assessment for the fourth quarter of calendar 2004 (companies selling 1,040,638 packs of cigarettes in this quarter exempted from assessment) to the assessment for April–June 2005 (companies selling 2,376,331 packs of cigarettes in this quarter exempted from assessment). This means that millions of packs of cigarettes per year will not be subject to assessment. For example, if the figures from the second calendar quarter of 2005 are projected on an annual basis, USDA's approach to FETRA will result in over 9.5 million packs of cigarettes, representing more than $33 million in revenue, being exempted from FETRA assessment. This is clearly inconsistent with the congressional mandate that USDA impose quarterly assessments on each tobacco product manufacturer and importer that sells tobacco products domestically in the United States. 7 U.S.C. 518d(b)(1).

Adopting the percentage share approach, and thus limiting any exemption to companies with truly *de minimis* market shares, achieves a number of important objectives by—

- More closely effectuating the statutory mandate to assess all manufacturers and importers;
- Leveling the playing field among competitors since no company with substantial sales would have the unfair advantage of an exemption;
- Substantially reducing the USDA's exposure in the likely event that companies subject to assessment are successful in persuading a court that USDA cannot assess them in excess of their true market shares to cover the shares of companies exempted from assessment liability; and
- Perhaps, by reducing the amount at issue, facilitating a resolution of the current market share cap issue short of litigation.

The percentage share approach is supported by the language of FETRA.

In another section of FETRA, Congress clearly uses the word "share" to denote *percentage* share. Thus, in describing how assessments are to be allocated among different classes of tobacco products in subsequent years, FETRA states that:

The Secretary shall periodically adjust the *percentage* of the total amount required under subsection (b) to be assessed against, and paid by, the manufacturers and importers of each class of tobacco product * * * to reflect changes in the *share of gross domestic volume* held by that class of tobacco product.

7 U.S.C. 518d(c)(2) (emphasis added). In this context, it is explicitly clear that the "share" of gross domestic volume is a *percentage* share.

The same section of FETRA uses the same term—"share"—when it defines the term "market share" as each manufacturer's "share * * * of the total volume of domestic sales of the class of tobacco product." This use of the same term is significant because "[i]t is a settled principle of statutory construction that '(w)hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.'" *United States v. Nunez,* 573 F.2d 769, 771 (2d Cir.), *cert denied,* 436 U.S. 930 (1978), quoting *Meyer v. United States,* 175 F.2d 45, 47 (2d Cir. 1949), quoting *Lewellyn v. Harbison,* 31 F.2d 740, 742 (3d Cir.), *cert. denied,* 280 U.S. 560 (1929); *Arnold v. Eastern Air Lines, Inc.,* 712 F.2d 899, 904 (4th Cir. 1983).

Thus, when FETRA is read as a whole, the proper interpretation of "share" in section 518d(a)(3)—defining "market share"—is that it means a *percentage share* of the total market. Nothing in FETRA provides any basis for a different approach. Accordingly, when section 518d(a)(3) states that each manufacturer's or importer's "share" is to be expressed as a decimal to four places, it means that it should be expressed as a percentage share expressed to four decimal places.

Other federal agencies have interpreted statutory references to "market share" to mean a percentage share of the total market.

The Food, Drug and Cosmetic Act imposes limitations on the types of claims that can appear on food labels. Among other things, the labels on a food product cannot claim that it is low cholesterol unless "the level of cholesterol is substantially less than the level usually present in the food or in a food which substitutes for the food and which has a significant *market share* * * *." 21 U.S.C. § 343(r)(2)(A)(iii)(I) (emphasis added). The statute does not define market share. However, the FDA regulations define that term as a *percentage* of the total market:

If the product meets these conditions only as a result of special processing, alteration, formulation, or reformulation, the amount of cholesterol is reduced by 25 percent or more from the reference product it replaces as described in § 317.313(j)(1) and for which it substitutes as described in § 317.313(d) that has a *significant (e.g., 5 percent or more of a national or regional market) market share.*

9 CFR 317.362(d)(1)(v) (emphasis added). Clearly, the FDA interpreted the term market share using its ordinary and reasonable meaning of a percent of the total market.

The Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") requires EPA to re-register and assess fees for all pesticides initially registered prior to November 1, 1984. If more than one party sought to register the same active ingredient, the EPA would allocate the $150,000 fee based on each registrant's market share for that active ingredient. Specifically, FIFRA stated that:

[i]f two or more registrants are required to pay [a re-registration fee] with respect to a particular active ingredient, the fees for such an active ingredient shall be apportioned among such registrants on the basis of *market share* in United States sales of the active ingredient for the three calendar years preceding the payment of such fee.

7 U.S.C. 136a–1(i)(7) (emphasis added). The term "market share" is not explicitly defined in the statute or in the Agency's regulations. However, when EPA actually assessed each registrant's fee, it did so based upon its percentage share of the total market.

The courts have also interpreted the term "market share" to mean a percentage share. For example, under the "market share liability" theory used in mass tort cases, "causation and damages are apportioned to defendants based on the *percentage of the product sold by each defendant* within the entire production of the product." *Wood v. Eli Lilly & Co.,* 38 F.3d 510, 513 (10th Cir. 1994) (emphasis added), citing *Sindell v. Abbott Labs.,* 607 P.2d 924, 937, cert. denied, 449 U.S. 912 (1980); *Martin v. Abbott Lab.,* 689 P.2d 368, 380 (Wash. 1984). *See also Bateman v. Johns-Manville Sales Corp.,* 781 F.2d 1132, 1133 (5th Cir. 1986) ("Each defendant that could not make that exculpatory showing would then be held liable for a proportion of the judgment corresponding to its *percentage* share of the DES market") (emphasis added).

Similarly, in antitrust cases, when courts address market share, they are clearly viewing that term as a *percentage* of the total market at issue. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 213–14 (1993) (describing market share in terms of percentages); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 826 (6th Cir. 1982) ("Market strength is often indicated by market share. During the relevant period, Hilltop's market

share declined from approximately 40% to approximately 30%")."

As noted in the submission of the six appellants, the ambiguity in the 2004 Act stems from whether a "market share" refers to a "percentage share" determined to the fourth decimal point, e.g., is a 10 percent market share to be expressed as 10.000 or .10000?

Accordingly, under this approach the following "market shares" would be determined with respect to an entity comprising the following sizes of the sector:

| Size of sector | Market share in percent | Market share as fraction |
|---|---|---|
| Assessments Levied | | |
| All | 100.00000 | 1.0000000 |
| One tenth | 10.00000 | 0.1000000 |
| One hundredth | 1.00000 | 0.0100000 |
| One thousandth | 0.10000 | 0.0010000 |
| One ten-thousandths | 0.01000 | 0.0001000 |
| One hundred-thousandths | 0.00100 | 0.0000100 |
| One millionth | 0.00010 | 0.0000010 |
| Assessments Not Levied For All Shares Less Than Nine Ten-millionths | | |
| Nine ten-millionths | 0.00009 | 0.0000009 |

With respect to the assessments levied by CCC in a typical quarter with an assessment of $237.5 million, use of the interpretation set forth by these six appellants would likely produce the following changes for each sector:

ADDITIONAL COMPANIES ASSESSED UNDER THE NEW METHOD FOR A TYPICAL $237.5 MILLION ASSESSMENT

| Class | Cigarettes | Cigars | Snuff | Roll-own | Chew | Pipe | Total |
|---|---|---|---|---|---|---|---|
| Number of Additional Companies Paying an Assessment | 20 | 57 | 4 | 4 | 1 | 2 | 88 |
| Assessment Collected from Above Companies | $105,928 | $4,752 | $45 | $48 | $3 | $9 | $110,784 |

Use of the interpretation set forth by these six appellants would also produce the following changes for two different sized companies:

IMPACT OF CHANGE ON TWO DIFFERENT SIZED TOBACCO PRODUCT MANUFACTURERS

| Share | |
|---|---|
| Typical Quarterly Assessment: All kinds | $237,500,000 |
| Cigarettes' Share | 0.96331 |
| Typical Quarterly Assessment: Cigarettes | $228,786,125 |
| **Big Company Example** | |
| New Method[1] | |
| Big Company Share | 25.0000% |
| Big Company Quarterly Assessment | $57,196,653 |
| Previous Method[2] | |
| Big Company Share | 25.00% |
| Big Company Share recomputed after small companies dropped out | 25.00729% |
| Big Company Quarterly Assessment | $57,213,210 |
| Big Company Savings | |
| Big Company savings per quarter | −$16,557 |
| **Small Company Example** | |
| New Method[1] | |
| Small Company Share | 0.0040% |

IMPACT OF CHANGE ON TWO DIFFERENT SIZED TOBACCO PRODUCT MANUFACTURERS—Continued

| | |
|---|---|
| Small Company Quarterly Assessment | $9,151 |
| Previous Method[2] | |
| Small Company Share | 0.004% |
| Small Company Share Rounded Up | 0.000% |
| Small Company Share recomputed after small companies dropped out | — |
| Small Company Quarterly Assessment | $0 |
| Small Company Cost | |
| Small Company cost per quarter | $9,151 |

[1] Shares not recalculated after small companies drop out.
[2] Shares recalculated to 9 decimal places after small companies drop out.

### Interpretation

It is CCC's position that either interpretation is possible under section 625(b)(3) of the 2004 Act. But, in construing this section within the overall framework established by Congress, CCC has determined that use of the approach set forth by the six appellants provides a more accurate representation of an individual entity's share in each of the six statutorily-defined tobacco sectors. Accordingly, after January 1, 2006, when making determinations under 7 CFR parts 1463.1 through 1463.11 that relate to "market share", CCC will interpret such phrase to mean the percentage share of an entity's market position in one of the six individual tobacco product sectors specified in section 625(c) of the 2004 Act. In expressing this share to the fourth decimal point as provided in section 625(a)(3), for example, a market share of 1/10 of the market will be converted to 10.0000 percent and a market share of 1/10000 will be converted to .0100 percent. In addition, this approach is also consistent with the manner in which Congress has addressed the six sector segments of the tobacco industry. In section 625(c)(3) of the 2004 Act, for example, the share for manufacturers and importers of cigarettes of the overall tobacco industry for Fiscal Year 2005 is expressed as "96.331 percent" and not as .96331. As a result of this change, CCC will no longer further modify assessments to the ninth decimal point for individual companies within these six sectors.

Signed at Washington, DC November 30, 2005.

**Thomas B. Hofeller,**
*Executive Vice President, Commodity Credit Corporation.*
[FR Doc. E5–7030 Filed 12–7–05; 8:45 am]
BILLING CODE 3410–05–P