IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| SINGLE STICK, INC.<br>2046 W Rose Garden Lane<br>Phoenix, Arizona 85027<br><br> Plaintiff<br><br>v.<br><br>MICHAEL JOHANNS, Secretary of Agriculture,<br>and the UNITED STATES DEPARTMENT OF<br>AGRICULTURE<br>1400 Pennsylvania Avenue, S.W.<br>Stop 0506<br>Room 3621-S<br>Washington, D.C. 20250-0506<br><br> Defendants | )<br>)<br>)<br>)<br>)<br>) Case No. 1:06-CV-01077 (RWR)<br>)<br>) Judge Richard W. Roberts<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## SINGLE STICK, INC.'S REPLY TO DEFENDANTS' OPPOSITION TO SUMMARY JUDGMENT

Reed D. Rubinstein (DC 400153)
Donald Stein (DC 358903)
GREENBERG TRAURIG LLP
800 Connecticut Avenue, N.W.
Washington, D.C. 20006
(202) 331-3100

*Attorneys for Single Stick, Inc.*

## TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................1

II.  DISCUSSION......................................................................................1

    A.   THE DEFENDANTS HAVE VIOLATED THE REFORM ACT............1

    B.   THE DEFENDANTS ARE NOT ENTITLED TO <u>CHEVRON</u> DEFERENCE......................................................................................6

    C.   THE DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED SSI'S APPEAL.......................................................................7

    D.   SSI IS ENTITLED TO ENFORCEMENT OF ITS IQA RIGHTS..........................................................................................12

III. CONCLUSION ..................................................................................15

# I. INTRODUCTION

Upon careful review of the parties' arguments and authorities, it appears that there is no genuine issue of material fact in dispute and that plaintiff Single Stick, Inc. ("SSI") is entitled to judgment as a matter of law against the defendants Secretary of Agriculture Michael Johanns (the "Secretary") and the United States Department of Agriculture (the "USDA") for the following reasons.

# II. DISCUSSION

A.   THE DEFENDANTS HAVE VIOLATED THE REFORM ACT.

The parties agree that the Fair and Equitable Tobacco Reform Act (the "Reform Act"), 7 U.S.C. § 518 et seq. controls this case, is clear on its face, and should be applied as written. See Pl.'s Mem. in Sup. Mot. Summ. J. 10-15; Def.'s Mem. in Oppo'n Mot. Summ. J.7-10. However, the parties disagree concerning about the Reform Act's meaning and effect regarding Tobacco Transition Payment Program (the "TTPP") cigar assessments.

SSI argues that the defendants' policy of assessing cigar companies based only on the number of cigars "removed"[1] in a given quarter without equalizing the assessments to reflect the fact that "small cigars"[2] remove a much lower volume of tobacco than "large cigars" means that

---

[1] 26 U.S.C. § 5702(k) defines "removed" as: "[T]he removal of tobacco products or cigarette papers or tubes from the factory or from internal revenue bond under section 5704 as the Secretary shall by regulation prescribe, or release from customs custody, and shall also include the smuggling or other unlawful importation of such articles into the United States."

[2] "Cigar" is defined at 26 U.S.C. § 5702(a) to mean a "roll of tobacco wrapped in leaf tobacco or in any substance containing tobacco [other than cigarettes]…" Cigars are taxed and regulated based on the volume of tobacco contained in each unit or "stick." Cigars containing less than three pounds of tobacco per thousand units or "sticks" are classified as "small" or "little" cigars. 26 U.S.C. § 5701(a)(1). Cigars containing more than three pounds per thousand sticks are classified as "large cigars." 26 U.S.C. § 5701(a)(2). According to defendant United States Department of Agriculture (the "USDA") data, small cigars account for approximately 35% of all the cigars sold in the United States annually, but only for approximately 2% of the total volume of cigar tobacco actually removed. See 70 Fed. Reg. at 7008 (Table 1). As noted

1

SSI is assessed in excess of its pro rata share of "gross domestic volume"[3] in violation of 7 U.S.C. § 518d(e). As SSI has pointed out, the USDA capably distinguished between small and large cigars based on the volume of removals (calculated via the excise taxes paid by both categories) in calculating the total cigar class assessment. See Pl.'s Mem. in Supp. Mot. Summ. J. 4-5; R(FSA) - 30-31 (attached as Exhibit 1). SSI also argues that 7 U.S.C. § 518d(a)(2) explicitly requires the defendants to account for smuggled cigars when calculating the total size of the cigar market, which serves as the "denominator" used to determine its market share. See Pl's Mem. in Supp. Mot. Summ. J. 16 - 17.

The Secretary acknowledges both that "it takes many small cigars to equal the volume of one large cigar" and that SSI's contention it is inequitable to assess small cigars at the same rate as large cigars "may be philosophically well founded." See Ltr. to Rubinstein at 4 (Feb. 8, 2006). Similarly, the defendants do not deny that SSI has been assessed in excess of its pro rata share of gross domestic volume in violation of 7 U.S.C. § 518d(e), if the volume of cigar tobacco removed is used as the relevant benchmark for measurement. Finally, the defendants do not contest SSI's contention that the USDA could equalize cigar assessments to reflect relative removal volume. See Pl.'s Mem. in Sup. Mot. Summ. J. 4-5 (describing the USDA's equalization process).

---

*supra*, a cigar is "removed" when it is taken from a bonded warehouse - or smuggled or unlawfully imported into the United States - for sale or use. See 26 U.S.C. § 5702(k).

[3] "Gross domestic volume" is defined at 7 U.S.C. § 518d(a)(2) to mean:

> [T]he volume of tobacco products-- (A) removed (as defined by section 5702 of the Internal Revenue Code of 1986); and (B) not exempt from tax under chapter 52 of the Internal Revenue Code of 1986 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

2

Instead, the crux of the dispute is the defendants' claim that the Congress mandated a "stick count only" assessment policy for cigars in 7 U.S.C. § 518d(g)(3)(A), leaving the USDA without discretion to equalize cigar assessments to reflect volume of removals. See Ltr. to Rubinstein at 4; Def.'s Mem. in Oppo'n Mot. Summ. J. 7. 7 U.S.C. § 518d(g)(3)(A) does in fact state that for the purposes of calculating company domestic sales, the USDA is supposed to measure "the number of cigars." However, it seems that the defendants at once read this provision too narrowly, in isolation from other relevant Reform Act provisions, and apply it too broadly, inequitably assessing large cigars and small cigars (which are taxed at different rates and sold for vastly different amounts) as if each remove the same volume of tobacco without regard for the pro rata cap set in 7 U.S.C. § 518d(e).

On its face, the defendants' position is complicated by the fact that the Reform Act prohibits assessments from exceeding a company's pro rata share of domestic volume. 7 U.S.C. § 518d(e)(2). SSI sells small cigars containing a limited volume of tobacco. Therefore, assessing cigars on an un-equalized "stick count" basis necessarily results in SSI being assessed in excess of its pro rata share of the removed volume of tobacco, thereby violating the Reform Act. As SSI has previously argued, assessments of all other tobacco companies do not depend on the number of packages, as if it were; instead, all other tobacco assessments are equalized based on volume (i.e. the weight of the tobacco). See Pl.'s Mem. in Sup. of Mot. Summ. J. 4-5.

To cure this violation, and to justify explain the USDA's programmatic determination to treat assess cigars based solely on the number of "packages" sold, the defendants argue that when the Congress used the term "volume of tobacco products" in 7 U.S.C. § 518d(a)(2), it meant the "number of cigars". See Def.'s Mem. in Oppo'n Mot. Summ. J. 9. However,

changing "volume" to "number," as the defendants suggest, requires an interpretative alchemy that is simply not supported by relevant precedent.

The plain meaning of the phrase "volume of tobacco products" is precisely that - the volume, not the number, of such products. Internal statutory sources support this plain meaning interpretation. For example, the defendants cite 26 U.S.C. § 5702(c) as proof-text for their claim that the phrase "volume of tobacco products" as used in 7 U.S.C. § 518d(a)(2)(A) actually means "number of cigars." See Def. Reply Mem. in Sup. of Mot. Dis. 7. Section 5702(c) defines "tobacco products" to mean "cigars, cigarettes, smokeless tobacco, pipe tobacco, and roll-your-own tobacco," as the defendants state. However, the word "cigar" as used in 26 U.S.C. § 5702(c) is specially defined at 26 U.S.C. § 5702(a) as a "roll of tobacco wrapped in leaf tobacco or in any substance containing tobacco (other than any roll of tobacco which is a cigarette…)." Therefore, the term "gross domestic volume" as used in 7 U.S.C. § 518d(a)(2)(A) in relation to cigars means "the volume of rolls of tobacco wrapped in leaf tobacco or in any substance containing tobacco [other than cigarettes]" - not the "number of rolls." In other words, gross domestic volume, as used in the Reform Act, means nothing more or less than the volume of tobacco removed.

The defendants also contend that the USDA was not obligated to account for smuggled cigars when calculating market size. Def.'s Mem. in Oppo'n Mot. Summ. J. 9-10. Their primary argument is that the Reform Act specifically authorizes the USDA to assess only cigar "manufacturers" and cigar "importers", not cigar "smugglers." Id.. In other words, the USDA believes that it is rational and appropriate to make SSI and other cigar companies that have complied with the law pay the "orphan share" of those persons that ignore their obligations.

4

The defendants' contention is problematic for at least two reasons. First, the Reform Act defines "gross domestic volume" to mean all cigars, including those smuggled or unlawfully imported into the United States. See 7 U.S.C. § 518d(a)(2). Second, the defendants' assertion that the Reform Act excludes "smugglers" does not hold up under analysis. Cigar smugglers must, in the first instance, obtain cigars. These cigars must either be made domestically by manufacturers, who are then expressly subject to the Reform Act, or made outside the United States and imported into the United States by importers, who are also expressly subject to the Reform Act. The fact that cigar smugglers (or others) are not reporting their illegal cigar manufacturing or importation to the USDA does not mean that the USDA may inflate SSI's market share by simply ignoring such cigars when calculating SSI's market share. Nothing in the Reform Act authorizes the USDA to make SSI pay for another's failure to comply with the law. See 7 U.S.C. § 518d(e)(1). [4]

Neither the defendants' "stick count only" assessment method, nor its refusal to account for smuggled cigars when calculating gross domestic volume, are authorized by the Reform Act. By implementing these policies, the defendants' have assessed SSI in excess of its pro rata share of gross domestic volume, and violated 7 U.S.C. § 518d(e). Consequently, the USDA should

---

[4] SSI's appeal was granted in part subject to the USDA's recalculation and reconciliation of the FY 2005 assessments. This recalculation was deemed necessary because the USDA had assessed SSI without accounting for the failure of some 300 tobacco companies subject to Reform Act reporting and payment obligations, thereby inflating SSI's market share. Ltr. to Rubinstein at 5. Surprisingly, after including data from these additional 300 companies, the USDA actually increased SSI's assessment. This is mathematically absurd. Also, although the Secretary claims "broad authority" to force SSI and other small cigar companies to subsidize the non-compliance of bad actors (see, e.g., Ltr. to Rubinstein at 5 claiming "broad latitude" to increase assessments to "cover such shortages") the Reform Act actually confers very limited authority. The statute obligates the Secretary to first make a finding that the assessments imposed will be insufficient to cover TTPP obligations, and then to reassess **all** tobacco companies - cigar and non-cigar alike - in accordance with the statutorily mandated allocation formula. 7 U.S.C. § 518d(c)(3).

equalize assessments to reflect the disparate volume of tobacco removed by large and small cigars, and adjust estimated cigar market size to reflect the volume of smuggled cigars, and then recalculate SSI assessments.

B.  THE DEFENDANTS ARE NOT ENTITLED TO <u>CHEVRON</u> DEFERENCE.

The parties agree that this is not a <u>Chevron</u> deference case. As the defendants point out, the <u>Chevron</u> deference issue is "implicated only if there is some legitimate ambiguity or gap in the Reform Act as to the method of calculating assessments for cigar manufacturers and importers [but here] (no such ambiguity exists)." Def.'s Mem. in Oppo'n Mot. Summ. J. 11. Nevertheless, the defendants assert <u>Chevron</u> deference prophylactically because the USDA issued regulations that "resolved any ambiguity that could exist in the Reform Act as to the appropriateness of a per-stick method or its non-applicability to smugglers" should some unidentified "ambiguity" in the Reform Act be discovered. <u>Id.</u> citing 7 CFR 1463.7(b).

The defendants' claim to <u>Chevron</u> deference is meritless. <u>Chevron</u> directs courts to accord deference to an agency's reasonable policy choices, reflected in statutory or regulatory interpretation, if Congress delegated to the agency the discretion to make such choices, and then provides a two-step test for courts to use in evaluating an agency's interpretation and implementation of a statute. <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984). Only if a statute is unclear, and Congress has not directly spoken to the issue, may a court defer to an agency's interpretation of the statute, and even then, only so long as that interpretation is reasonable and not "manifestly contrary to the statute." <u>Id.</u> at 844-45.

The defendants have never contested the legal authorities cited by SSI that hold an agency's statutory interpretation is only appropriate when the agency has exercised its own judgment, not - as here - when it believes an interpretation is compelled by Congress. Because

the defendants do not purport to exercise discretion, instead claiming the USDA's programmatic choices are compelled by statutory command, deference is inappropriate. State of Ariz. et al., v. Tommy G. Thompson, 281 F.3d 248, 253-4 (D.C. Cir. 2002) citing Chevron, 467 U.S. at 843 n.9; see also Transitional Hosps. Corp. v. Shalala, 222 F. 3d 1019, 1026 (D.C. Cir. 2000).

Furthermore, the defendants have never addressed SSI's arguments and authorities demonstrating that the agency fails Chevron because the Reform Act specifically forbids the agency's assessment of SSI in excess of its pro rata share of gross domestic volume, and that the "per stick" method for assessing cigars is inconsistent with the statute's purpose, specifically, the fair and equitable assessment of SSI and other tobacco companies based on their pro rata share of gross domestic volume. See 7 U.S.C. §§ 518d(e), 518d(g)(2). Consequently, the defendants' claim to deference should be rejected.

C.    THE DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED SSI'S APPEAL.

SSI has argued that the USDA arbitrarily and capriciously denied SSI's administrative appeal contrary to the preponderance of the evidence, that the USDA wrongfully failed to consider or respond to A.C. Nielsen point of sale data demonstrating that the USDA had substantially overestimated SSI's market share, and finally, that the USDA wrongfully withheld information from SSI, thereby preventing SSI from having a fair and open hearing. See Pl.'s Mem. in Sup. Mot. Summ. J. 17-20. The defendants argue in response that the USDA in fact considered the A.C. Nielsen data and determined that the data was "not appropriate" for TTPP calculations, and that SSI was not entitled to the information that the USDA relied upon to calculate its assessment. See Def.'s Mem. in Oppo'n Mot. Summ. J. 12-14.

The defendants do not challenge the legal authorities cited by SSI that stand for the proposition that an agency must base its decision on facts in the record. See National Treasury

Employees Union v. Federal Labor Relations Authority, 404 F.3d 454, 458 (D.C. Cir. 2005) (agency must make decisions "based on the record before it," and failure to do so was grounds for remand); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971) (holding that a court reviewing an informal adjudication must consider whether the [agency] decision was based on a consideration of the relevant factors and the facts in the record); PSC of Ky. v. FERC, 397 F.3d 1004, 1008 (D.C. Cir. 2005) (agency must respond meaningfully to the arguments raised before it); Canadian Ass'n of Petroleum Producers v. FERC, 254 F.3d 289, 299 (D.C. Cir. 2001) (unless an agency answers objections that appear on their face to be legitimate, its decision can hardly be said to be reasoned). These authorities require the Court to determine whether the agency's determination in this case was based on the information in the record.

As a result, the defendants are in extremis, for the preponderance of the information in the record demonstrates that it is more probable than not that the USDA over-assessed SSI, and that SSI's appeal should have been granted.

The evidence in the record demonstrates that SSI appealed its TTPP assessment in part because it believed the USDA had grossly overestimated SSI's market share. The evidence in the record reflects that this belief was based upon SSI's analysis of the best available commercially available market survey data, and upon SSI's own sales data. The evidence in the record further demonstrates that SSI's efforts to verify the accuracy of the USDA's TTPP assessment calculation were rebuffed, for the USDA repeatedly denied SSI access to the raw data the agency used to calculate SSI's obligation. Consequently, SSI was unable to independently confirm the accuracy of the USDA's TTPP demand.

8

In support of its appeal, and as authorized by 7 U.S.C. § 518d(i)(2), SSI introduced commercial industry and individual company sales data into the record, along with uncontroverted evidence establishing that data's accuracy and reliability. See R (App.) 0241-2. The data showed that the USDA had over-estimated SSI's market share, as measured by the number of cigar sticks sold during the relevant time period, by several orders of magnitude. R. (App.) 0028 - 0143; see also R (App.) 0241-2. By contrast, the USDA did not offer evidence into the record demonstrating that its estimate of SSI's market share was accurate, based on complete information, or otherwise reliable.[5]

Although the Congress had specifically authorized SSI to challenge the TTPP assessment using "third party data on industry or individual company sales", the Secretary effectively eviscerated SSI's right to rely on such data by ruling that "sales data and removal data are not (and will not be) synonymous" and that "Federal excise tax information and removal data was the most (sic) accurate." See Ltr. to Rubinstein at 6. Simultaneously, the Secretary ruled that SSI could not review, obtain, or verify the raw data that the USDA relied upon to calculate market size, market share, and SSI's TTPP assessment. Id. at 6-7. Although the Secretary found "the data used and the methodology applied in…computation of market shares complies with the provisions of the 2004 Act," the USDA submitted no evidence that a trier of fact could appropriately use to determine whether the USDA's assessments of SSI were correct. Instead, the Secretary ruled that SSI (and by extension any reviewing court) was obligated to take the

---

[5] In fact, the inherent unreliability of the USDA's calculations is highlighted by the fact that after having granted SSI's appeal in part, due to the fact that the USDA unlawfully inflated SSI's market share by excluding over 300 tobacco companies from the market share analysis, the USDA added in the wrongfully excluded companies, recalculated, and then actually increased SSI's assessment for two of the contested quarters.

9

USDA's word regarding the size of the cigar market and the proper amount of the assessments, and let it go at that.

The defendants' conduct in this case is arbitrary and capricious in a number of respects. First, although the Secretary concluded that SSI had "made no sustainable argument that the data relied on by the USDA was incorrect," the record is utterly bare of any evidence demonstrating either that the USDA's TTPP assessment was accurate or that the commercial sales data submitted by SSI, data that the Congress specifically permitted SSI to use as the basis for a TTPP assessment challenge, was inaccurate or unreliable. Consequently, the Secretary's decision to simply dismiss such data out of hand on the grounds that it was not "synonymous" with removal data is contrary to law, and his failure to account for the gross disparity between the sales data and SSI's substantially higher TTPP assessment means that his decision is not "reasoned," as required by the Administrative Procedure Act. Canadian Ass'n, 254 F.3d at 299.

Second, the authorities SSI has previously cited to this Court (authorities the defendants have left unchallenged) demonstrate that the defendants' refusal to either make available the raw data used to calculate SSI's TTPP assessment or to give the commercially available sales data its Congressionally-mandated weight renders meaningless the "inexorable safeguard" of a fair and open hearing. Consequently, the defendants' conduct in this case is contrary to both the relevant statutes and to the Supreme Court's admonition that agency decisions must be based on substantial, record evidence. See Ohio Bell Telephone Co. v. Public Utilities Comm'n of Ohio, 301 U.S. 292, 304 (1937); Citizens to Preserve Overton Park, 401 U.S. at 416.

In Ohio Bell, as bases for an order, the administrative agency relied on evidence of which the commission took judicial notice but which it withheld from its records and refused to reveal.

The Court held that the agency's refusal to reveal this critical information denied the telephone company plaintiff due process of law. According to Justice Cardozo:

> What the Supreme Court of Ohio did was to take the word of the Commission as to the outcome of a secret investigation, and let it go at that....Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law...Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' of a fair and open hearing be maintained in its integrity."

301 U.S. at 304 (citations omitted).

Here too, the defendants made a "secret investigation" and as a result, SSI was left without effective appeal or remedy. Therefore, the Court should grant SSI the relief authorized by 5 U.S.C. § 706(2), and remand this matter to the USDA for a new hearing with specific instructions requiring information disclosure and compliance with the relevant provisions of the Reform Act, including 7 U.S.C. § 518d(i)(2).

Third, the Secretary here determined that SSI had no right to the "secret" data the USDA used to calculate TTPP assessments, concluded in spite of the Reform Act's plain language that the verified commercially available sales data was not "synonymous" with the secret data and hence insufficient grounds to successfully challenge a TTPP assessment, and then ruled that the "fact that Appellant was unable to obtain, review, and scrutinize the underlying data used to calculate market shares does not mean Appellant's assertions are well-founded nor does it render that data incorrect [and] Appellant has made no sustainable argument that the data relied on by the USDA was incorrect…" Ltr. to Rubinstein at 7. In other words, the defendants rendered SSI's appeal nothing more than a "heads I win, tails you lose" game, with the defendants making the rules and flipping the coin, in violation of SSI's statutory and due process rights. The defendants' actions in this case makes it very difficult to imagine any plausible set of

circumstances under which SSI or any other tobacco company could ever demonstrate that a TTPP assessment was incorrect and prevail on appeal.

The Congress could not have intended that the appeal process it created in 7 U.S.C. § 518d(i) and 518d(j) (a process that specifically contemplated the use of third party sales data to challenge assessments) would be rendered futile by agency fiat, as the defendants have done in this case. SSI is entitled to its requested relief.

D.     SSI IS ENTITLED TO ENFORCEMENT OF ITS IQA RIGHTS.

The defendants' principal theory to support their denial of SSI's Information Quality Act ("IQA") rights seems to be that if the Court does not address the words of the statute, the Office of Management and Budget's ("OMB") Guidelines or the Administrative Procedure Act ("APA"), then it is readily concluded that Single Stick enjoys no IQA rights and may not obtain judicial relief. The IQA, the OMB Guidelines, the APA and the relevant jurisprudence prove that the defendants' theory is more wishful thinking than good law.

The parties agree that "rights creating language" in favor of SSI is a prerequisite to judicial enforcement. Alexander v. Sandoval, 532 U.S. 275, 289 (2001). The IQA requires each covered agency to "[e]stablish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with their OMB Guidelines." 44 U.S.C. § 3516(b)(2)(B), note. The ordinary meaning of these words suggests with some clarity that particular persons (affected persons) have a right to "seek and obtain" a remedy, fully satisfying the Supreme Court's demand for rights creating

language. The defendants' response is to ignore the words, an approach that is neither logically compelling nor a correct method of statutory interpretation.[6]

Furthermore, this Court should apply the words according to their plain meaning in conjunction with the APA's mandate establishing a right to review of agency action. The defendants' contention that APA review is not authorized because IQA decisions by agencies are exempt from judicial review suffers from the same sort of aversion to plain language as the defendants' principal argument. If an agency declines to disclose statistical or other data or declines to make a requested correction, there is no reason why ordinary APA review cannot be conducted. Courts regularly decide whether agency action is arbitrary, capricious or not in accordance with law and there is no reason why a court cannot do so under the IQA. See 5 U.S.C. § 706. Indeed, the APA contemplates circumstances like the IQA setting where there is no specific statutory judicial review procedure. Id. § 703.

Moreover, in this case reference to the explicit criteria in OMB's Guidelines for review of a correction request is not necessary. Here, the USDA simply ignored SSI's request and thus, the action falls within the APA authorization for review of "action unlawfully withheld." Id. § 706(1). There are abundant and meaningful standards to guide judicial review in this case and

---

[6] The USDA again notes that all courts have refused to find a private right of review under the IQA. "All courts" are three courts addressing two cases. Neither the Eighth Circuit nor the Minnesota District Court In Re: Operation of the Missouri River Systems, 363 F. Supp. 2nd 1145, 1174, 1175 (D. Minn. 2004) vacated in part in part aff'd in part on other grounds, 421 F.3d 618 (8th Cir. 2005), addressed the Sandoval question and neither court provided any analysis of the District Court's cursory conclusion that there was no workable standard of review. The District Court in Salt Inst. v. Thompson 345 F. Supp. 2nd 589, 601 (E.D. VA. 2004) staked out the untenable position that informational rights do not confer standing. The view has been rejected many times by the Supreme Court and was not adopted by the Fourth Circuit in affirming the lower court's judgment. Instead, the Fourth Circuit concluded that the IQA, conferred no rights but the issue was neither raised nor briefed in the case. Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006). The fact is that the issues raised by SSI in this case have not had a comprehensive judicial review by any measure.

the defendants cannot make it otherwise by simply denying over and over the plain language of the APA and the IQA.

The defendants' complaint that SSI's request must be denied as a matter of law because it is protected excise tax information is specious at best. SSI seeks the cumulative data relied upon by the USDA that it has already compiled. No individualized tax information is requested or even relevant. To the extent that any of the aggregated data might include protected tax information, the identifying details may be redacted. The USDA has made no offer to do anything that would allow SSI to its rights and obligations. No law authorizes the USDA to make assessment decisions in the dark away from the scrutiny of the affected persons and courts.

Finally, USDA resorts to the "Catch 22" argument that the IQA applies only to information "maintained and disseminated" by the Agency. And, since USDA may not disseminate tax information, the IQA does not apply. The argument is too cute and factually untenable On September 24, 2005, plaintiff sent an IQA "disclosure and correction" petition regarding CCC Tobacco Transition Payment Program Information. SSI sought correction of "influential statistical and financial information, specifically, information regarding market share, total volume, company volume, and gross sales statistics disseminated by USDA through quarterly TTPP assessments" to SSI and other cigar companies. The IQA request pointed out that the USDA's own IQA guidelines provide "In all cases, USDA agencies and offices must disclose the specific data sources, quantitative methods, and assumptions used in the analysis" and that the USDA failed to comply with IQA because: (a) specific data sources, methods, and assumptions had not been disclosed, (b) transparent documentation of data sources, methods, and sources of error had not been provided, (c) data verification methods and results were not disclosed, (d) the USDA's data was not reproducible, (e) the USDA's estimation of market share

was not consistent with sound statistical methods, and (f) the disparity between the USDA estimate and commercial survey data had not been explained. The Petition requested disclosure of all data sources, methods, and assumptions so that SSI could test and reproduce the estimate, pointed out that the USDA had knowingly disseminated inaccurate information, and wrongly failed to develop a statistical model that would have adjusted assessments to reflect missing sales data (which, in turn, was used to calculate market share). However narrowly one may define "dissemination," USDA's use of statistical information through the TTPP quarterly assessment should be sufficient to meet the definition. It is hard to know how USDA would otherwise define the term, but it is stated without restriction in the IQA and no reason to restrict the plain broad meaning of the word is suggested. The data in question has been disseminated and tax privacy can be respected. Consequently, the USDA should be ordered to comply with the IQA.

### III. CONCLUSION

For the reasons set forth above, summary judgment for SSI should be granted, and SSI is entitled to the following relief:

1.   An order holding unlawful and setting aside the defendants' illegal over-assessments of SSI (invoices CR0510007A, CR05200005A, and CR050300004A) in their entirety, and remand with instructions to the defendants that the USDA assess SSI based on the removed volume of cigar tobacco and in accordance with 7 U.S.C. § 518d(e), and calculate SSI's volume of domestic sales based solely on data that accounts for all removed tobacco, including cigars smuggled or unlawfully imported into the United States.

2.   Alternatively, an order restraining collection of the excessive portions of invoices CR0510007A, CR05200005A, and CR050300004A, specifically, all sums in excess of the amounts appropriately allocable to Single Stick based on its market share of between 1.05% and

2.05%, as established by the evidence in the record at R-20, ¶¶ 7-9, R (App.) 0028, 0032, 0039, 0053, 0103, 0166, 0241, and as authorized by 7 U.S.C. § 518d(j)(3).

3.   An order compelling the defendants to comply with the Information Quality Act, and to disclose and correct information in accordance with Single Stick's petition.

Respectfully submitted,
SINGLE STICK


          /s/ Reed D. Rubinstein
Reed D. Rubinstein (DC 400153)
Donald Stein (DC 358903)
GREENBERG TRAURIG LLP
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
(202) 331-3100

*Attorneys for Single Stick, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 27th day of April, 2007 to:

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044