UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
SINGLE STICK, INC.,            )
                               )
          Plaintiff,           )
                               )
     v.                        )     Civil Action No. 06-1077 (RWR)
                               )
MICHAEL JOHANNS, et al.,       )
                               )
          Defendants.          )
_____)
```

## MEMORANDUM OPINION

Plaintiff Single Stick, Inc. brought this action against the Secretary of Agriculture, and the United States Department of Agriculture (collectively "USDA") challenging the USDA's interpretation of The Fair and Equitable Tobacco Reform Act ("Tobacco Reform Act"), 7 U.S.C. §§ 518-519a, and alleging that the USDA violated the Information Quality Act ("IQA"), 44 U.S.C. § 3516 note.  The USDA has moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim and Single Stick has moved under Rule 56 for summary judgment. Because the USDA's interpretation of the Tobacco Reform Act comports with congressional intent and is entitled to deference, and because the IQA does not create any individual right to the production or correction of information, the USDA's motion to dismiss, treated in part as a motion for summary judgment, will be granted and Single Stick's motion for summary judgment will be denied as moot.

-2-

BACKGROUND

Single Stick manufactures and sells "small" cigars -- those that weigh less than three pounds per thousand cigars. (See Compl. ¶ 5.)  Under the Tobacco Reform Act, Single Stick, as a tobacco manufacturer, must pay assessments to the Tobacco Transition Payment Program ("Payment Program").  The funds obtained through the Payment Program are used to subsidize domestic tobacco farmers. (See id. ¶¶ 12-13.)  The Tobacco Reform Act identifies six classes of tobacco products, including cigarettes, cigars, snuff, roll-your-own tobacco, chewing tobacco, and pipe tobacco.  See 7 U.S.C. § 518d(c)(1).  The Commodity Credit Corporation ("CCC"), an agency within the USDA, determines the annual assessments for which each class of tobacco product will be responsible.  See 7 U.S.C. § 518d(c)(1).

The Tobacco Reform Act sets forth how assessments are to be calculated.  "The assessment for each class of tobacco product . . . shall be allocated on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume."[1]  7 U.S.C. § 518d(e)(1).  "The amount of the assessment for each class of tobacco product . . . to be paid

---

[1]  Gross domestic volume is determined by "the volume of tobacco products . . . removed[.]"  7 U.S.C. § 518d(a)(2)(A). Removed tobacco consists of "the removal of tobacco products . . . from internal revenue bond . . . and shall also include the smuggling or other unlawful importation of such articles into the United States."  26 U.S.C. § 5702(j).

-3-

by each manufacturer or importer of that class of tobacco product
shall be determined . . . by multiplying -- (1) the market share
of the manufacturer or importer . . .; by (2) the total amount of
the assessment . . . for the class of tobacco product." 7 U.S.C.
§ 518d(f). "The term 'market share' means the share of each
manufacturer or importer of a class of tobacco product . . . of
the total volume of domestic sales of the class of tobacco
product[.]" 7 U.S.C. § 518d(a)(3). For cigars, a manufacturer's
or importer's "volume[] of domestic sales shall be measured by
. . . the number of . . . cigars" it places into the domestic
market. 7 U.S.C. § 518d(g)(3). Implementing these rules, the
CCC derives the total number of cigars placed in the domestic
market from excise tax reports provided to the CCC by
manufacturers and importers. (Defs.' Mem. in Opp'n to Summ. J.
("Defs.' Opp'n") at 3.) See 7 U.S.C. § 518d(h); 7 C.F.R.
§ 1463.7. The CCC then determines an individual manufacturer or
importer's pro rata share "by dividing the number of cigars from
[the] particular manufacturer or importer by the total number of
cigars [placed] in the domestic market [("per-stick method")]."
(Defs.' Opp'n at 3.)

Using the per-stick method, the CCC assessed Single Stick
$339,719 for the period of October to December 2004 based on a
market share of 4.81 percent, $455,373 for the period of January
to March 2005 based on a market share of 6.45 percent, and

-4-

$1,152,530 for the period of April to June 2005 based on a market
share of 7.78 percent.[2]  (See Compl. ¶ 20.)  Single Stick timely
appealed these assessments, alleging that the USDA "substantially
overstated [its] 'stick count' market share and improperly
inflated [its] Payment Program obligation" because the per-stick
method resulted in an assessment "far in excess of Single Stick's
pro rata share of the removed volume of cigar tobacco."  (Id.
¶¶ 21, 23-24.)  Single Stick also filed a Freedom of Information
Act ("FOIA") request seeking the CCC's primary data sources
underlying the CCC's calculations and an IQA petition seeking
both data source disclosure and information correction.  (Id.
¶¶ 26-27.)  The USDA denied Single Stick's FOIA request[3] and did
not respond to the IQA petition.[4]  (Id.)

Single Stick filed this action challenging the calculation
methods used by the USDA to determine Single Stick's Payment

_____

[2]  On administrative appeal, the USDA determined that Single
Stick was paying more than its proportional share because of "the
CCC's admitted failure to meet [the Tobacco] Reform Act
requirements when it issued an initial round of assessments."
(Compl. ¶ 35.)  The USDA has since recalculated Single Stick's
assessments, and, as a result, raised Single Stick's October to
December 2004 assessment to $351,007.23 based on a market share
of 5.32 percent, raised its January to March 2005 assessment to
$472,017.47 based on a market share of 7.15 percent, and reduced
its April to June 2005 assessment to $1,135,353.46 based on a
market share of 7.78 percent.  (See id. ¶ 38.)

[3]Single Stick does not challenge the FOIA request denial in
this action.

[4]Single Stick also filed an IQA Request for Reconsideration
that went unanswered.

-5-

Program assessments.  Specifically, Single Stick argues that the USDA violated the Tobacco Reform Act by assessing Single Stick in excess of its pro rata share of removed tobacco product, by assessing Single Stick without regard to its share of gross domestic volume, by calculating market share without regard to tobacco that was smuggled or unlawfully imported, and by calculating Single Stick's volume of domestic sales on a per-stick basis.  (See id. ¶ 44(a).)  As a result, Single Stick contends that the USDA over-estimated Single Stick's market share.  (See id. ¶ 44(b).)  Single Stick also alleges that the USDA violated the IQA by "refus[ing] to respond or otherwise acknowledge Single Stick's IQA Petition and Request for Reconsideration" and "by failing to correct influential information [publicly] disseminated . . . and/or to make available data and data sources Single Stick needed and requested to test and reproduce the [USDA's] estimate of market share." (Id. ¶¶ 44(c)-(d).)  Finally, Single Stick contends that, because the USDA failed to disclose the data underlying its market share calculations, Single Stick's due process right to a full and fair administrative hearing was denied.  (Id. ¶¶ 29, 44(e).)

    The USDA has moved under Rule 12(b)(6) to dismiss Single Stick's claims, arguing that the USDA's method of calculating assessments was permitted under the Tobacco Reform Act, the IQA did not create a right to production or correction of data, and

the APA does not provide a remedy because "IQA production and correction of data is 'committed to agency discretion.'"[5]  (See Defs.' Mem. in Support of Its Mot. to Dismiss ("Defs.' Mem.") at 2-3 (citing 5 U.S.C. § 701(a)(2) and Heckler v. Chaney, 470 U.S. 821, 830 (1985)).)  Single Stick has moved for summary judgment in its favor under Rule 56.  In its opposition to Single Stick's summary judgment motion, the USDA suggests without opposition that its motion to dismiss be converted to a motion for summary judgment.  (Defs.' Opp'n at 2 n.1.)

## DISCUSSION

I.   TOBACCO REFORM ACT

Summary judgment may be granted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The relevant inquiry "is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact

---

[5] The USDA also argued that the USDA was statutorily prohibited from releasing the information that Single Stick requested.  However, the USDA withdrew this argument in light of a recent Federal Register notice, see Tobacco Transition Payment Program; Release of Records, 73 Fed. Reg. 23,065 (Apr. 29, 2008), explaining that the market share information reported to the CCC by manufacturers and importers is not confidential tax information.  (Defs.' Notice of Withdrawal of Argument at 2.)

because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  In considering a motion for summary judgment, all evidence and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1985).  The first question is "whether Congress has directly spoken to the precise question at issue." Id.  If it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43.  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843.  In these circumstances, a court "'must defer to the agency's interpretation of the ambiguous statutory term if it represents a reasonable accommodation of the conflicting policies that were committed to the agency's care by statute.'" Back Country Horsemen of Am. v. Johanns, 424 F. Supp. 2d 89, 95 (D.D.C. 2006) (quoting New York v. EPA, 413 F.3d 3, 23 (D.C. Cir. 2005)

-8-

(internal quotation marks omitted)).  The agency's construction of the statute is given deference when "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  <u>Chevron</u>, 467 U.S. at 843-44.

Congress expressly delegated authority under the Tobacco Reform Act to the Secretary of the USDA to "promulgate such regulations as are necessary to implement" the statute.  7 U.S.C. § 519a(a).  Single Stick's claims that the USDA's implementation of the Tobacco Reform Act is impermissible amount to assertions that: (1) the USDA was not authorized to assess Single Stick on a per-stick basis, but rather was required by the statute to consider "the disparity in gross domestic volume between small and large cigars," and (2) the USDA should have accounted for smuggled or unlawfully imported tobacco in calculating market share.  (<u>See</u> Compl. ¶ 44(a)(iii)-(iv).)

A.   <u>Per-stick method of calculating assessments</u>

The USDA contends that the Tobacco Reform Act "dictates that . . . assessments are based on the number of cigars, and not on the weight of tobacco in the cigars."  (Defs.' Mem. at 13.)  They ground their argument in support of a per-stick measurement of a manufacturer's volume of domestic sales in the plain language of the Tobacco Reform Act, which provides that "volumes of domestic sales shall be measured by -- in the case of cigarettes and

-9-

cigars, the number of cigarettes and cigars[.]"  7 U.S.C.
§ 518d(g)(3)(A).  Single Stick contends that such a reading of
the Tobacco Reform Act fails to take into account the requirement
that volume of domestic sales be measured by gross domestic
volume, see 7 U.S.C. § 518d(g)(2), which considers the amount of
tobacco products removed, see 7 U.S.C. § 518d(a)(2)(A), and that
each manufacturer is to be assessed its pro rata share of gross
domestic volume.  See 7 U.S.C. § 518d(e)(1).  Even if ambiguity
exists as to whether the Tobacco Reform Act requires a per-stick
calculation method, the USDA's method is a permissible
construction of that Act given the clear support for it in the
directive of 7 U.S.C. § 518d(g)(3)(A).

    The USDA further maintains that by using a per-stick
calculation method, Single Stick is not being assessed in excess
of its pro rata share of gross domestic volume.  (See Defs.' Mem.
at 13-14.)  Instead, the USDA argues that Single Stick's pro rata
share of gross domestic volume is determined by calculating
Single Stick's volume of domestic sales, and that such a
calculation, utilizing the per-stick method, is warranted under
the Tobacco Reform Act.  (See id.)  The Tobacco Reform Act
requires that each class of tobacco product be assessed under the
Payment Program.  See 7 U.S.C. § 518d(c)(1).  The statute does
not differentiate between small and large cigars, but groups all
cigars into a class of tobacco product from which assessments are

-10-

to be obtained.  See 7 U.S.C. § 518d(c)(1)(B).  With respect to individual manufacturers, the Tobacco Reform Act specifies that assessments are to be made based in part on that manufacturer's market share, see 7 U.S.C. § 518d(f), which is measured using the manufacturer's volume of domestic sales.  See 7 U.S.C. § 518d(a)(3).  The statute explains that volume of domestic sales for cigar manufacturers is measured by the number of cigars.  See 7 U.S.C. § 518d(g)(3)(A).  Additional support for the per-stick method of calculating cigar manufacturer's assessments is found in the language of the Tobacco Reform Act that separates cigars and cigarettes from other classes of tobacco products whose volume of domestic sales is measured "in terms of pounds[.]"  7 U.S.C. § 518d(g)(3)(B).  Thus, the USDA's interpretation of the Tobacco Reform Act to allow for a per-stick calculation method is not contrary to clear congressional intent, but is a permissible construction of the statute and will be accorded deference.

     B.   Smuggled or unlawfully imported tobacco

     Single Stick alleges that the USDA violated the Tobacco Reform Act by calculating volume of domestic sales based solely on information submitted to the agency, and not taking into consideration cigars smuggled or unlawfully imported.  (See Compl. ¶ 44(a)(iii).)  In response, the USDA argues that the Tobacco Reform Act does not require that smuggled or unlawfully

-11-

imported cigars be considered in calculating market share.  (See Defs.' Mem. at 14-15.)

Although Single Stick cites the definition of gross domestic volume in support of its contention that the Tobacco Reform Act dictated that smuggled and unlawfully imported cigars be included in the USDA's calculation of market share (see Pl.'s Opp'n at 14), market share is not measured by gross domestic volume, but by the volume of domestic sales.  See 7 U.S.C. § 518d(a)(3).  The Tobacco Reform Act provides that "the calculation of the volume of domestic sales . . . shall be . . . based on information provided by the manufacturers and importers . . ., as well as any other relevant information provided to or obtained by the Secretary."  7 U.S.C. § 518d(g)(1).  Tobacco manufacturers and importers are asked to submit information relating to "the removal of tobacco products into domestic commerce," 7 U.S.C. § 518d(h)(2), which includes "the removal of tobacco products . . . from internal revenue bond . . . and shall also include the smuggling or unlawful importation of such articles into the United States."  26 U.S.C. § 5702(j).  The Tobacco Reform Act does not specify whether the Secretary is required to affirmatively seek information about smuggled or unlawfully imported tobacco products in determining the volume of domestic sales, or whether the Secretary is simply required to incorporate this information if it is available.  The Tobacco Reform Act's

-12-

implementing guidelines state that the calculation is to be based on "reports filed by domestic manufacturers and importers of tobacco with the Department of Treasury and the Department of Homeland Security and shall correspond to the quantity of the tobacco product that is removed into domestic commerce by each such entity[.]"  7 C.F.R. § 1463.7(b).  As such, the USDA's decision to calculate market share based on information submitted does not contradict clear congressional intent.

The plain language of the Tobacco Reform Act and its implementing guidelines support the reasonableness of the USDA's interpretation that the statute did not require incorporation of smuggled or unlawfully imported cigars in the USDA's calculation of volume of domestic sales where that information had not been provided by manufacturers or importers.  While an interpretation of the Tobacco Reform Act to require a calculation based on amount of removed tobacco volume -- both reported and smuggled or unlawfully imported -- may also be reasonable, the USDA need not prove that the "agency construction was the only one it permissibly could have adopted [for a court] to uphold the construction, or even the reading the court would have reached if the question initially had arisen in judicial proceeding."  Chevron, 467 U.S. at 844 n.11.  Thus, the USDA's interpretation of the Tobacco Reform Act as not requiring inclusion of all smuggled or unlawfully imported cigars in calculating volume of

-13-

domestic sales constitutes a permissible construction of the statute and will be given deference.

C.   Administrative hearing

Single Stick claims that its "due process right[] to a full and fair hearing" was impaired by the USDA's failure to disclose the market share data underlying its assessments.  (Compl. ¶ 9.) This claim must fail because Single Stick has not shown any prejudice resulting from the USDA's lack of disclosure.  See Throckmorton v. Nat'l Transp. Safety Bd., 963 F.2d 441, 446 (D.C. Cir. 1992) (finding no due process violation where plaintiff failed to show prejudice caused by alleged errors in the administrative proceeding).  To the extent Single Stick challenged the CCC's calculation methodology, access to the market share data for the per-stick method was irrelevant and, for the reasons already stated, the administrative law judge correctly concluded that the CCC's per-stick calculation method was a permissible interpretation of the Tobacco Reform Act.

Single Stick advanced on appeal two other arguments that, under the per-stick method, CCC's assessments were incorrect. The first argument was the CCC did not include tobacco companies that failed to report production data to the CCC in the total market calculation, but such companies' excise tax information was available and should have been used.  (Pl.'s Mot. for Summ. J., Ex. 7 at 4-6.)   However, the CCC conceded that it should

-14-

have used unreported but accessible data and recalculated its
assessments.  (Id. at 5-6.)  The second argument was the CCC
unlawfully exempted small manufacturers and importers with a
market share of .000049 or less.  (Id. at 7-8.)  The Tobacco
Reform Act states that market share must be "expressed as a
decimal to the fourth place."  7 U.S.C. § 518d(a)(3).  The
statute does not discuss when or how the CCC may round
calculation figures to reach the market share figure.  The CCC's
practice at the time of the challenged assessments was to round
up fractional digits of 50 or more after the fourth decimal place
by adding one to the fourth decimal place and dropping fractional
digits of 49 or less beyond the required four decimal places to
result in the exclusion of manufacturers and importers with
market shares of .000049 or less.  (Pl.'s Ex. 7 at 8.)  Because
the statute does not instruct the CCC how to reach the final
four-decimal market share figure and the CCC's rounding rule is a
permissible interpretation, it will be accorded deference.  As
Single Stick has not alleged that access to the market share data
information would have altered the outcome of its administrative
claim, there is no showing of any prejudice caused by the USDA's
failure to disclose its data.  Thus, Single Stick has neither
alleged nor shown a due process violation.

-15-

II.  IQA

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6).  "On review of a 12(b)(6) motion a court 'must treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions . . . ."  Bell Atl. Corp. v. Twombly, 550 U.S. 545, 555 (2007) (citations and internal quotations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true . . . ."  Id.

Single Stick alleges that the USDA violated the IQA by failing to correct or disclose its data sources underlying its market share calculations and by failing to respond to Single Stick's petition and request for reconsideration.  To allow a plaintiff to seek review of an agency's violation of a statute, the court must examine "whether or not Congress intended to

-16-

confer individual rights upon a class of beneficiaries" in enacting the statute. Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002). "The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." California v. Sierra Club, 451 U.S. 287, 294 (1981). To make this determination, a court should focus on whether the statute contains "rights-creating language," see Gonzaga Univ., 536 U.S. at 287, which is language that emphasizes the individuals protected rather than simply dictating the actions an agency should take. See Alexander v. Sandoval, 532 U.S. 275, 289 (2001) (holding that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons'" (quoting Sierra Club, 451 U.S. at 294)).

The IQA "creates no legal rights in any third party," and "does not create a legal right to access to information or to correctness." Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006). Both the actual text of the statute and its implementing guidelines dictate the actions that agencies must take and do not contain "individually focused terminology." Gonzaga Univ., 536 U.S. at 287; see 44 U.S.C. § 3516 note ("The Director [of the Office of Management and Budget ("OMB")] shall . . . issue guidelines . . . that provide policy and procedural guidance to Federal agencies . . . "); see also Guidelines for Ensuring and

Maximizing the Quality, Objectivity, Utility, and Integrity of
Information Disseminated by Federal Agencies, 67 Fed. Reg. 8452,
8458 (Feb. 22, 2002) (republication) (ordering that agencies
should "[i]ssue their own information quality guidelines[,] . . .
[e]stablish administrative mechanisms[, and] . . . report to the
Director of OMB the number and nature of complaints").  The focus
of the IQA is the communication between agencies and the
development of internal procedures for ensuring quality of
information.  While the statute obligates agencies to establish a
process by which individuals can alert an agency to a need for
information correction to improve information quality, the
statute does contain any indication that individuals choosing to
participate in such a process have a right to seek or correct
information.  <u>See</u> 67 Fed. Reg. at 8458-59.  Because the IQA lacks
any rights-creating language, Single Stick has no right under
that statute to seek review of the USDA's actions.

In addition, Single Stick's challenge under the APA to the
USDA's failure to respond to its IQA petition and request for
reconsideration cannot stand because there was no final agency
action.  An agency action is reviewable under the APA only if the
action is a final agency action.  <u>Norton v. S. Utah Wilderness
Alliance</u>, 542 U.S. 55, 61-62 (2004).  A final agency action is
one where "'rights or obligations have been determined,' or from
which 'legal consequences will flow[.]'"  <u>Bennett v. Spear</u>, 520

-18-

U.S. 154, 178 (1997) (quoting <u>Port of Boston Marine Terminal</u>
<u>Ass'n v. Rederiaktiebolaget Transatlantic</u>, 400 U.S. 62, 71
(1970)).  Because the IQA does not vest any party with a right to
information or to correction of information, <u>see</u> <u>Salt Inst.</u>, 440
F.3d at 159, the USDA's actions under the IQA did not determine
Single Stick's rights or cause any legal consequence.  <u>See</u> <u>Ams.</u>
<u>for Safe Access v. HHS</u>, No. C 07-01049 WHA, 2007 WL 2141289, at
*4 (N.D. Cal. July 24, 2007) (holding that because the IQA does
not grant any legal rights, there was no legal consequence
flowing from the defendant's response to the plaintiff's IQA
petition).  Accordingly, the USDA's lack of response was not a
final agency action and cannot be reviewed under the APA.  <u>See</u>
<u>id.</u>

CONCLUSION

The USDA's interpretations of the Tobacco Reform Act are
entitled to <u>Chevron</u> deference and the USDA's failure to provide
the market share data underlying its assessments did not alter
the outcome of Single Stick's administrative action.  Since no
material facts are in dispute regarding Single Stick's claims
under the Tobacco Reform Act and the USDA is entitled to
judgment, the defendants' motion to dismiss this claim, treated
as a motion for summary judgment, will be granted.  Because the
IQA does not confer any rights to individuals, the defendants'

-19-

motion to dismiss plaintiff's IQA claims will be granted.  Single

Stick's motion for summary judgment will be denied as moot.

A final, appealable Order accompanies this Memorandum

Opinion.

SIGNED this 10th day of March, 2009.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge