**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PRIME TIME INTERNATIONAL CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 06-1077 (RCL)[1] |
| | ) |
| THOMAS J. VILSACK, Secretary | ) |
| U.S. Department of Agriculture, *et al.*, | ) |
| | ) |
| Defendants. | ) |

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 12-910 (RCL) |
| | ) |
| PRIME TIME INTERNATIONAL CO., | ) |
| Formerly known as | ) |
| SINGLE STICK, INC., | ) |
| | ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION**</u>

This case concerns the proper method to calculate assessments under the Tobacco

Transition Payment Program. To phase out the old system of price supports and marketing caps,

---

[1] For case management purposes, the Court consolidated the two cases. *See* Order, Civil No. 12-910, Sept. 19, 2012, ECF No. 14. The Court administratively closed the later filed case, Civil No. 12-910, and directed the parties to file all subsequent filings in the lead case, Civil No. 06-1077.

In the Order accompanying this Memorandum Opinion, the Court will administratively close Civil Action 06-1077, reopen Civil Action 12-910, deem Prime Time's cross-motion as if it were filed in Civil Action 12-910, and enter judgment for the United States and against Prime Time in Civil Action 12-910.

this transitional program collects assessments from tobacco manufacturers and importers and distributes these funds to eligible tobacco growers.  Prime Time International Co., formerly known as "Single Stick, Inc.," [2] has long disputed how the U.S. Department of Agriculture ("USDA") calculates cigar companies' assessments.  Prime Time primarily makes "small" cigars, which may contain significantly less tobacco per cigar than "large" cigars.  USDA determines each cigar company's market share—and, in turn, each company's proportional responsibility to pay into the fund—by a "stick count" or "per-stick" method.  This method relies on the number of cigars, not the weight of tobacco contained in each cigar, to determine each company's market share.  Prime Time maintains that this method—which treats large and small cigars alike—is patently unfair and violates a statutory mandate that each company pay no more than its "pro rata" share.  USDA had argued that the governing statute mandated this "per-stick" method.  After Prime Time challenged USDA's methodology, and USDA obtained summary judgment at the district court, the court of appeals reversed the district court in part.  Upon remand, USDA reaffirmed its per-stick rule after notice and comment rulemaking.

The parties' cross-motions for summary judgment concern the nature and scope of the court of appeals' administrative remand, whether USDA's interpretation deserves *Chevron* deference, and whether USDA's interpretation is reasonable.  Since this Court finds that USDA's per-stick rule is a reasonable interpretation of ambiguous statutory language, it will uphold USDA's assessment calculation method.  Therefore, the Court will grant the United States' Motion for Summary Judgment, Civil No. 12-910, Sept. 14, 2012, ECF No. 13; deny Prime Time's Cross-Motion for Summary Judgment, Civil No. 06-1077, Oct. 19, 2012, ECF No. 44; and enter judgment for the United States in the amount of $11,679,006.05, plus any additional unpaid assessments and interest accrued since September 14, 2012.

---

[2] For simplicity's sake, the Court will refer to the company, generally, as "Prime Time."

I.      **BACKGROUND**

A.      **Statutory & Regulatory History**

Prior to 2004, the government had implemented tobacco price support programs and marketing quotas for tobacco growers to aid domestic tobacco farmers.  In order to gradually end such programs, Congress passed the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA").  Pub. L. No. 108–357 §§ 601–43, 118 Stat. 1418, 1522–36 (Oct. 22, 2004).  This Act created the Tobacco Transition Payment Program ("TTPP"), a ten-year program to provide transitional payments to certain tobacco producers and farm owners while the government phased out the old system of price support and marketing quotas.  FETRA designated USDA to administer the program in conjunction with the Commodities Credit Corporation ("CCC") and the Farm Services Agency ("FSA"), two bodies under the umbrella of the Department of Agriculture.[3]  7 U.S.C. §§ 518–19a.

Per FETRA, USDA issues quarterly Tobacco Transition Assessments ("TTA") on tobacco manufacturers and importers, and then distributes those funds to eligible tobacco quota holders and growers.  7 U.S.C. §§ 518a–b.  In determining each company's assessment, USDA follows several steps.  The preliminary step is determining the total annual amount of the national assessment.  The Act specifies that the assessments cannot exceed $10.14 billion over ten years, 7 U.S.C. § 518f, and the average annual total assessment is about $1 billion, 76 Fed. Reg. 15859, 15860 (Mar. 22, 2011) (*available at* Prime Time Administrative Record ("AR") 12, Civ. No. 12-910, Sept. 12, 2012, ECF No. 12).

Once USDA calculates the total annual assessment, it undertakes a two-step process to determine each company's assessment amount.  Under "Step A," USDA divides the annual

---

[3] For simplicity's sake, the Court will refer to USDA as the administering agency, as CCC and FSA (bodies within USDA) have varying responsibilities for implementing different parts of FETRA.

assessment liability among six statutorily-enumerated classes of tobacco products: cigarettes, cigars, snuff, roll-your-own tobacco, chewing tobacco, and pipe tobacco.  7 U.S.C. § 518d(c)(1); 7 C.F.R. §§ 1463.3, 1463.5.  Congress set the initial apportionment percentages for each class in FETRA—for example, Congress made the cigarette class responsible for 96.331% of the total assessment, and the cigar class responsible for 2.783%.  7 U.S.C. § 518d(c)(1).  Congress directed USDA to adjust the Step A assessment percentages periodically "to reflect changes in the share of gross domestic volume held by that class of tobacco product."  7 U.S.C. § 518d(c)(2).  To made these adjustments:

> Each year USDA uses data from the U.S. Department of the Treasury (Treasury) and the U.S. Department of Homeland Security Bureau of Customs and Border Security (Customs)—the new volume figures (units for cigars and cigarettes)—and multiplies them by the 2004 tax rates to adjust the Step A allotments using the calculation Congress was determined to have used for the initial Step A allotments,  Those former tax rates (not the [ ] revised rates) are used so that the adjustments to the Step A category allotments are for changes in volume (units and weights) only, not changes in tax rates.

76 Fed. Reg. at 15860 (AR 12).

After USDA determines the proportional liability of each class of tobacco product, it must divide that amount among manufacturers and importers within that category.  This is known as "Step B," and it is at issue in this case.  FETRA sets forth how USDA should calculate these Step B assessments.  "The assessment for each class of tobacco product…shall be allocated on a pro-rata-basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume," with "[n]o manufacturer or importer…required to pay an assessment that is based on a share that is in excess of [its] share of domestic volume."  7 U.S.C. §§ 518d(e)(1)–(2).  "The amount of the assessment for each class of tobacco product…to be paid by each manufacturer or importer of that class of tobacco product shall be determined…by multiplying—(1) the market share of the manufacturer or importer…; by (2) the

total amount of the assessment…for the class of tobacco product." 7 U.S.C. § 518d(f). "The term 'market share' means the share of each manufacturer or importer of a class of tobacco product…of the total volume of domestic sales of the class of tobacco product[.]" 7 U.S.C. § 518d(a)(3).

Key to this case, FETRA states, "For purposes of calculations under this subsection…the volumes of domestic sales shall be measured by—[ ] in the case of cigarettes and cigars, the number of cigarettes and cigars." 7 U.S.C. § 518d(g)(3). Implementing this statute, USDA derives the total number of cigars placed in the domestic market from excise tax reports provided to USDA by manufacturers and importers. *See* 7 U.S.C. § 518d(h); 7 C.F.R. § 1463.7. USDA then determines an individual manufacturer or importer's pro rata share by dividing the number of cigars from a particular manufacturer or importer by the total number of cigars placed in the domestic market. *See* 7 C.F.R. § 1463.7. This is known as the "per-stick" or "stick count" method; this method of determining each cigar company's market share does not differentiate between small and large cigars.

A manufacturer or importer may appeal its assessment to the Secretary of Agriculture, using "any information that is available, including third party data on industry or individual company sales volumes," and the Secretary "must make any revisions necessary to ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources." 7 U.S.C. §§ 518d(i)(2), (i)(4)(B).

## B.    Procedural History

Prime Time predominately manufactures "small" cigars, which weigh less than three pounds per thousand cigars. *Cf.* 26 U.S.C. § 5701(a)(1) (defining "small cigars" for tax purposes). In 2005, Prime Time's predecessor company, Single Stick, Inc., filed an

administrative appeal pursuant to 7 U.S.C. § 518d(i), arguing that USDA's per-stick approach improperly treated differently sized cigars similarly.  In addition, Single Stick submitted third party industry sales data from A.C. Nielsen as an alternative source for calculating its market share.   The Secretary, acting through the Deputy Administrator for Farm Programs, acknowledged that Single Stick's objection to assessing large and small cigars equally was "philosophically well founded," but took the position that section 518d(g)(3)(A) of FETRA mandated the per-stick method.  The Secretary also took the position that A.C. Nielsen data, which measures across-the-counter sales of tobacco products, did not conform to the requirement that USDA base market share calculations on the amount of product "removed."[4]  The Secretary agreed, however, that Single Stick correctly challenged both the exclusion of non-reporting manufacturers and importers in apportioning assessments and the inclusion of certain expenses in calculating assessments under the transition payment program.  The Secretary adjusted Single Stick's assessments amount after considering these issues.  The Secretary rejected Single Stick's claim that it was entitled as a matter of due process to examine the industry-wide tax and customs data USDA used to calculate the assessments because such information about other companies was made confidential by statute, per 26 U.S.C. § 6103.  *See generally Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 681 (D.C. Cir. 2010) (describing history of case).

After the Secretary made his determination, Single Stick petitioned for review in the district court per FETRA's judicial review provision.  *See* 7 U.S.C. § 518d(j).  The district court granted summary judgment to the Secretary and USDA.  *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307 (D.D.C. 2009).  The district court deferred to USDA's interpretation that FETRA mandated the per-stick method as not contrary to congressional intent and as a permissible

---

[4] The distinction between FETRA's definition of "removed into commerce" and third party sales data's "across-the-counter" metric is not material to this case, as Prime Time does not challenge USDA's failure to rely on the A.C. Nielsen data in the motions before the Court.

interpretation of the statute under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Single Stick*, 601 F. Supp. 2d at 314. It rejected Single Stick's due process claim regarding access to the data underlying the Secretary's assessments because Single Stick failed to demonstrate prejudice. *Id*. at 315. Finally, the district court dismissed Single Stick's claim that USDA's failure to respond to requests for disclosure and "correction" of the data underlying the assessments violated the Information Quality Act ("IQA"), 44 U.S.C. § 3516, ruling that the IQA did not vest any party with the right to disclosure and correction and that USDA's failure to respond did not constitute final agency action subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 704. *Single Stick,* 601 F. Supp. 2d at 316–17.

Single Stick appealed, and while appeal was pending changed its corporate name to Prime Time International. *See Prime Time v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010). The D.C. Circuit reversed in part and affirmed in part the judgment of the district court. The court of appeals reversed the grant of summary judgment to USDA on Prime Time's FETRA claims, avoided reaching Prime Time's due process claims as USDA represented that they may become moot, and affirmed the dismissal of the IQA challenge. *Prime Time*, 599 F.3d at 686.

The nature and scope of the D.C. Circuit's remand on the FETRA issue is hotly contested among the parties, and will be discussed in more detail *infra*. Prime Time's basic argument on appeal was that USDA's two-step method:

> [S]kips a necessary step…[b]ecause FETRA requires that the allocation within a tobacco class be "on a pro rata basis" with "[n]o manufacturer or importer…required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume." 7 U.S.C. § 518d(e). Therefore, [Prime Time] argues, after allocating the assessment by class of tobacco products, USDA should divide the cigar class assessment into sub-classes of large and small cigars, with the relative allocation determined by total weight, and then divide the assessments among individual large and small cigar manufacturers and importers on a per-stick basis from the subdivided assessments, satisfying subsection (g)(3)(A).

7

*Id*. at 420.  The relevant, and contested, portion of the Circuit's opinion is as follows:

> The plain text of FETRA does not self-evidently vindicate USDA's two step assessment method.  Under FETRA, the "volume of domestic sales" and "market share" are not synonymous with "gross domestic volume."  FETRA provides, for example, that "[t]he volume of domestic sales shall be calculated based on gross domestic volume," 7 U.S.C. § 518d(g)(2) (emphasis added), indicating two different meanings for the terms.  And section 518d(g)(3)(A) does not, on its face, require that a compound number of large and small cigars serve as the denominator when calculating a manufacturer's or importer's volume of domestic sales on a per-stick basis.  Most critically, USDA's interpretation appears to ignore the pro-rata-basis limitation Congress imposed on assessments within a tobacco class in subsection (e).  As interpreted by USDA, it is irrelevant that one large cigar consumes far more tobacco than a small cigar, and so accounts for a far larger segment of the market than its per-stick contribution would indicate.  Yet the text and structure of the statute titled the Fair and Equitable Tobacco Reform Act suggests an easy counting metric for cigarettes and cigars may not override a statutory mandate that assessments be "allocated on a pro rata basis" within each class of tobacco product, *id*. § 518d(e)(1).    Prime Time's interpretation suggests that there is at least one way to interpret FETRA's provisions consistently and in harmony, with none made superfluous or insignificant. *See Corley v. United States*, 556 U.S. 303, 129 S. Ct. 1558, 1566, (2009); *City of Anaheim, Cal. v. FERC*, 558 F.3d 521, 522 (D.C. Cir. 2009).

> For the purpose of this appeal, the court need only observe that USDA's present interpretation is not mandated by the plain text of FETRA.  USDA does not maintain that its interpretation of FETRA is a permissible view of an ambiguous statute entitled to deference under *Chevron* step 2, 467 U.S. at 843.  Given that FETRA does not appear to be susceptible of only a single interpretation, we reverse and remand to the district court with instructions to remand Prime Time's FETRA claims to the USDA for further proceedings. *See PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 797–98 (D.C. Cir. 2004).

*Id*. at 422.

On remand, USDA commenced notice and comment rulemaking on its Step B calculation method.  *See* 76 Fed. Reg. 15859 (AR 11–16).  The USDA received five sets of comments in response to its notice, and issued a final determination on November 6, 2011 concluding that the existing Step B method will remain in place.  Bruce Nelson, *Determination of the Administrator of the Farm Services Agency and Executive Vice President of the Commodity Credit Corporation*

*Regarding the Current "Step A" and "Step B" Assessment Methods in the Tobacco Transition Payment Program* ("*Final Determination*"), Nov. 16. 2011, AR 57–96.

USDA then intended to adjudicate three factual issues specific to Prime Time: (1) the reliability of the A.C. Nielsen data for determining market share; (2) Prime Time's request for information concerning the market shares of other tobacco companies; and (3) the basis for USDA's adjustment to Prime Time's assessment at the end of the first year of the program. *See* United States' Mot. Summ. J. 7; Letter from Scott Sanford to James Deer, Jan. 26. 2012, AR 118–22. Prime Time, however, took the position that "there are no remaining factual issues for the agency to adjudicate" and wished to expedite judicial review of USDA's Step B methodology. Letter from John Wertheim to Scott Sanford, Dec. 27, 2011, AR 117.

Before the USDA's final determination came in, Prime Time moved for summary judgment in the original district court action, Civil No. 06-1077. Prime Time's Mot. for Summ. J., Civ. No. 06-1077, Oct. 17, 2011, ECF No. 29. The district court denied this motion without prejudice. Minute Order, Civ. No. 06-1077, Sept. 19, 2012.

On a separate track, the United States initiated a new civil case, Civil No. 12-910, as an enforcement action against Prime Time for failing to make millions of dollars in tobacco assessment payments. *See* Complaint, Civ. No. 12-290, Jun. 5, 2012, ECF No. 1. In the interest of judicial economy, the Court consolidated Civil Actions 06-1077 and 12-290, with all subsequent filings to be made in 06-1077. Order Consolidating Cases, Civ. No. 06-1077, Sept. 19, 2012, ECF No. 42. Prime Time then filed a cross-motion for summary judgment in 06-1077, seeking an adjudication that USDA's Step B assessment method is invalid. Prime Time's Cross-Mot. Summ. J., Civ. No. 06-1077, Oct. 19. 2012, ECF No. 44. Both motions for summary judgment are ripe for adjudication, and the Court resolves both herein.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In cases involving final agency action, the Rule 56 applies differently, as the court has a limited role in reviewing the administrative record.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006).  The court should focus on the administrative record compiled by the agency, "not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Envtl. Def. Fund., Inc. v. Costle*, 657 F.2d 275, 322 (D.C. Cir. 1981) ("It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made.").  The agency's role "is to resolve factual issues to reach a decision supported by the administrative record, while 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision as it did.'"  *Burmeister v. Pension Ben. Guar. Corp*, __ F. Supp. 2d __, 2013 WL 1869171, *3 (D.D.C. May 6, 2013) (*quoting Mainella*, 458 F. Supp. at 90).  These record-review principles apply to FETRA enforcement actions brought by the government.  *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 250 (2d Cir. 1977) ("In an enforcement action, we must rely exclusively on the record made before the agency to determine the validity of the regulation."); *United States v. Native Wholesale Supply Corp.*, 822 F. Supp. 2d 326, 338 (W.D.N.Y. 2011) (considering administrative record in granting summary judgment in FETRA lawsuit).

B.    *Chevron* Deference

The court reviews an agency's interpretation of a statute under the framework articulated in *Chevron v. N.R.D.C.*, 467 U.S. 837 (1984).    The threshold inquiry—sometimes called *Chevron* "step zero"—is determining whether Congress has delegated interpretive authority to the agency in question.   *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); Cass R. Sunstein, *Chevron Step Zero*, 92 VA. L. REV. 187, 190–92 (2006).   If so, the court turns to *Chevron* "step 1."   The *Chevron* framework requires "that both the agency and the courts give effect to Congress's unambiguously expressed intent if the underlying statute speaks directly to the precise question at issue."   *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003).   Therefore, under *Chevron* step 1, the court uses the "traditional tools of statutory interpretation—text, structure, purpose, and legislative history," to determine whether the statute speaks directly to the question at issue.   *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001).   If the statute is clear, then the unambiguous intent of Congress must control and the *Chevron* inquiry is over.   However, if the statute is "'silent or ambiguous with respect to the specific issue' the court must defer to the agency's interpretation if it is reasonable."   *Citizens Coal*, 330 F.3d at 481 (*quoting Chevron*, 467 U.S. at 843).   In *Chevron* step 2, the court must determine whether the agency's interpretation of ambiguous statutory language is reasonable, and the reviewing court's inquiry is limited thusly.   The reviewing court may not "substitute [its] preferred interpretation for an agency's reasonable interpretation when that agency is the entity authorized to administer the statute in question."   *Id*. at 482.

III.    DISCUSSION

The proper interpretation of the D.C. Circuit's remand opinion is at the center of the parties' dispute.   May USDA readopt its Step B method after remand?   Has the Circuit already

decided that USDA's existing rule would be an unreasonable interpretation of the statute?  How much deference should this Court give to USDA's interpretation of FETRA?

The court of appeals did not find either that USDA's Step B method was necessarily unreasonable or that Prime Time's interpretation was mandated.  The court of appeals said FETRA was susceptible to more than one reasonable interpretation, and USDA erred when it concluded that the statute *mandated* its Step B method.  Since USDA did not recognize that the statute was ambiguous, its determination was not due *Chevron* deference, and the Circuit remanded to allow USDA to exercise its agency expertise in interpreting FETRA.

USDA revisited its Step B methodology through notice and comment rulemaking, addressed all relevant concerns and comments, and came to a reasonable interpretation of the statute.  Thus, the Court owes USDA's reaffirmed per-stick rule *Chevron* deference.  Under *Chevron* Step 2, it does not matter whether Prime Time's proffered alternative is a "better" reading of the statute.  USDA's interpretation is reasonable and it, along with assessments made pursuant thereto, will stand.

### A.      Interpreting the D.C. Circuit's Opinion Ordering Administrative Remand

The district court originally granted USDA summary judgment, finding that its use of a per-stick calculation method combining small and large cigars was a permissible interpretation of FETRA entitled to *Chevron* deference.  *Single Stick*, 601 F. Supp. 2d at 313–14.  The court of appeals reversed this grant of summary judgment, and remanded Prime Time's FETRA claims to USDA for further proceedings.  *Prime Time*, 599 F.3d at 683.

The parties disagree about the reasons for, and the nature of, this remand.  The government argues the Circuit remanded because USDA's conclusion that FETRA mandated its per-stick method was not, in fact, an interpretation of an ambiguous statute, but an erroneous

conclusion that there was no ambiguity at all.  The court of appeals did not necessarily agree with Prime Time's interpretation, but used it to show that the statute was reasonably susceptible to more than one interpretation.  The Circuit remanded to allow USDA to engage in the type of *Chevron* step 2 analysis that USDA did not attempt in the first instance.  As USDA stated in its final determination reaffirming its Step B method:

> USDA does not perceive that the remand compels changes in Step B procedures, but rather, that USDA must address the D.C. Circuit's concerns, such as resolving the ambiguity that it identified in the statute.  USDA also perceives the remand as requiring it to give full and fair consideration to Prime Time's alternative methodologies and  any theories of calculation that are presented.

*Final Determination* 18 (AR 71).

Prime Time argues that this is a *Chevron* step 1 case, arguing that "Congress has spoken directly to the issue of how the portion of total TTPP assessment attributable (in Step A) to the class of cigar products shall be allocated (in Step B) among manufacturers and importers[.]" Prime Time's Cross-Mot. Summ. J. 18.  As interpreted by Prime Time, the D.C. Circuit found that any rule that did not account for the differences in the amount of tobacco between large and small cigars would violate FETRA's statutory mandate that assessments be allocated in a pro-rata-basis within each class of tobacco product.  *Id*. at 18–20.  Since "pro rata" means "proportionate," a pro-rata-basis allocation "cannot be one that that measures cigars by sticks…*regardless* of the varying volumes of tobacco in each cigar."  *Id*. at 19 (emphasis in original).  Prime Time argues that "[t]he allocation method must be 'proportionate' to volume, and thus must *account for* the different tobacco volumes between large and small cigars."  *Id*. (emphasis in original).  Prime Time claims that "to the extent the D.C. Circuit found FETRA ambiguous, it was not because that court fount the interpretations by Prime Time and USDA to be equally reasonable."  *Id*. at 21–22.  In Prime Time's eyes, the D.C. Circuit rejected USDA's

interpretation and endorsed Prime Time's.  The statute is ambiguous inasmuch as the Circuit was unwilling, at that time, to say that Prime Time's interpretation was the *only* way to give full weight to all of FETRA's provisions.  On remand, USDA was to consider how to harmonize FETRA's provisions; USDA could not, Prime Time argues, readopt a discredited rule the D.C. Circuit found to clearly violate the statutory language.  *Id*. at 22–23.

On this question, USDA is correct and Prime Time is wrong.  The court of appeals did not find, as Prime Time suggests, that Prime Time's interpretation of the statute was correct and binding on remand.  Nor did the D.C. Circuit find that failing to differentiate between small and large cigars would be an unreasonable interpretation of the statute.  Instead, the court of appeals found that FETRA was ambiguous—that it "does not appear to be susceptible to a single interpretation."  599 F.3d at 683.  Prime Time repeats other, cherry-picked excerpts of the D.C. Circuit's opinion but gives this crucial language short shrift.  The Circuit found that the statute was indeed ambiguous and USDA could not simply say that the plain text of FETRA mandated the per-stick method.  The Circuit noted that the USDA did not endeavor to interpret an ambiguous statute—at the time, the "USDA d[id] not maintain that its interpretation of FETRA is a permissible view of an ambiguous statute entitled to deference under *Chevron* step 2."  *Id*. The court of appeals limited its holding to "observ[ing] that USDA's present interpretation is not mandated by the plain text of FETRA," *id*., and did not say whether such an interpretation could be reasonable after the agency has exercised its expertise.

In other words, the district court's error was not finding that a per-stick method could be a reasonable interpretation of the statute; the district court's error was finding that USDA, when it said the statute mandated the per-stick method, had exercised delegated authority to interpret an ambiguous statute.  When USDA said FETRA mandated its Step B method, it wrongly

concluded that Congress had spoken directly on the issue.  Courts give *Chevron* deference to

agency interpretations of ambiguous statutory language.  Courts do not defer to agency

determinations of whether or not the statute is ambiguous—they address *Chevron* step 1

independently, using the normal tools of statutory construction to determine whether language is

susceptible to more than one reasonable interpretation.  *See Chevron*, 467 U.S. at 842–43 & n.9.

The D.C. Circuit's *Prime Time* decision falls within the long "line of circuit decisions

which hold that 'deference to an agency's interpretation of a statute is not appropriate when the

agency wrongly believes that interpretation is compelled by Congress.'"  *Peter Pan Bus Lines,*

*Inc. v. Federal Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (*quoting*

*PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004)) (other internal quotation

marks and citations omitted).[5]  In *Peter Pan*, the D.C. Circuit continued:

> As we explained in *PDK, Chevron* step 2 deference is reserved for those instances
> when an agency recognizes that the Congress's intent is not plain from the
> statute's face.  "In precisely those kinds of cases, it is incumbent upon the agency
> not to rest simply on its parsing of the statutory language"—"[i]t must bring its
> experience and expertise to bear in light of competing interests at
> stake."  *PDK,* 362 F.3d at 797–98 (citing *Chevron,* 467 U.S. at 865–66 (footnote
> omitted).  "When it does so it is entitled to deference, so long as its reading of the
> statute is reasonable."  *Id.* at 798.  But here, as in *PDK Labs*, the Agency has not
> done so and "at this stage it is not for the court 'to choose between competing
> meanings.'"  *Id.* (quoting *Alarm Indus. Commc'ns Comm.,* 131 F.3d at
> 1072) (citing *Prill,* 755 F.2d at 956–57; *Transitional Hosps. Corp.,* 222 F.3d at
> 1028–29; *ITT Indus., Inc.,* 251 F.3d at 1004; *Arizona v. Thompson,* 281 F.3d at
> 254).  We must therefore remand for the [agency] to interpret the statutory
> language anew.  *See id.* ("The law of this circuit requires in those circumstances
> that we withhold *Chevron* deference and remand to the agency so that it can fill in
> the gap.").

*Peter Pan*, 471 F.3d at 1354.  In that case, the court of appeals discussed Peter Pan's alternative

interpretation—not to show that Peter Pan's interpretation was correct, but to show that the

---

[5] For other cases in this line of D.C. Circuit precedent, see:  *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002); *ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 1004 (D.C. Cir. 2001); *Transitional Hosps. Corp. v. Shalala*, 222 F.3d 1019, 1028–29 (D.C. Cir. 2000); *Alarm Indus. Commc'ns Corp. v. FCC*, 131 F.3d 1066, 1072 (D.C. Cir. 1997); *Prill v. NLRB*, 755 F.2d 941, 956–57 (D.C. Cir. 1985).

statutory language was susceptible to more than one reasonable interpretation. *Id*. at 1353. The D.C. Circuit remanded that case to the agency for further proceedings, but did not offer any opinion on whether the agency's prior interpretation would be permissible under *Chevron* step 2. *Id*. at 1354–55.

The court of appeals' remand in *Prime Time* is precisely the kind of administrative remand seen in *Peter Pan* and *PDK Labs*. USDA found the statute to be unambiguous and did not engage in the kind of interpretation that would be due deference under *Chevron* step 2. Since Prime Time's proffered interpretation shows that the statute did not mandate USDA's rule, the court owed USDA's interpretation no *Chevron* deference. The D.C. Circuit remanded the case to USDA so it could properly exercise agency expertise, and took no position on whether the current per-stick rule could be permissible under *Chevron* step 2. *Prime Time,* 599 F.3d at 683. Tellingly, when the D.C. Circuit remanded for further proceedings in *Prime Time*, the Court immediately cited *PDK Labs*. *See Id*. (*citing PDK Labs,* 362 F.3d at 797–98).

Certainly, the court of appeals' opinion was sympathetic to Prime Time's interpretation; the Circuit thought Prime Time offered "at least one way to interpret FETRA's provisions consistently and in harmony, with none made superfluous or insignificant." *Id*. However, just because the Circuit found Prime Time's interpretation reasonable does *not* turn an ambiguous statute unambiguous, or deprive USDA the opportunity on remand to offer a reasonable interpretation that differs from Prime Time's. If the court of appeals found that subdividing the cigar class was not only reasonable, but mandated by the plain text, it would have said so clearly. If it thought that USDA's rule plainly violated FETRA, it would not have hedged and stated that "the court need only observe that USDA's present interpretation is not mandated by the plain text of FETRA." *Id*. Instead, the court of appeals' decision resembles *Peter Pan Bus Lines*, 471

F.3d 1350; *PDK Labs*, 362 F.3d 786; and the litany of other Circuit decisions where remand was appropriate when the agency incorrectly concluded that the controlling statute spoke directly to the issue.  The persuasiveness of the challenger's alternative interpretation only goes to show that the statute is not unambiguous, and does not ensure that the challenger's interpretation must win out after the agency properly exercises its delegated interpretive authority.

### B.      USDA's Step B Calculation is a Reasonable Interpretation of FETRA

The court of appeals has already decided the first few *Chevron* questions.  Under *Chevron* step "zero," Congress has explicitly delegated authority to USDA to interpret and implement FETRA.  *See Single Stick*, 601 F. Supp. 2d at 313; *Prime Time*, 599 F.3d at 686; 7 U.S.C. §§ 518(g)(1), (b)(1), (c)(3); 7 U.S.C. § 519a.  Under *Chevron* step 1, the court of appeals has found the relevant provisions of FETRA are ambiguous and susceptible to more than one interpretation.  *Prime Time*, 599 F.3d at 683.  The Court now looks at the per-stick calculation method under *Chevron* step 2 to determine whether it is a reasonable interpretation of the statute. The Court finds that it is, and thus defers to the agency's interpretation of FETRA.

#### 1.      *The Circuit's Decision Did Not Foreclose a Per-Stick Method*

The Court should reiterate that the court of appeals did *not* find that using a per-stick method, or not differentiating between small and large cigars, was necessarily contrary to the plain text of the statute.  Instead, it limited its holding to finding that such a rule is "not mandated by the plain text of FETRA."  *Prime Time*, 599 F.3d at 683.  Thus, despite Prime Time's repeated and strenuous arguments to the contrary, the D.C. Circuit did *not* forbid USDA from adopting a per-stick or combined cigar class calculation on remand.  Nothing in the Circuit's opinion prohibited USDA from deciding—after exercising its agency expertise under *Chevron* step 2—that its prior per-stick method is still the best interpretation of the ambiguous statutory

language.  Administrative remands frequently allow the agency to come to the same conclusion after the agency has properly considered the matter.  *See*, *e.g.*, *Holder v. Martinez Guttierrez*, 132 S. Ct.. 2011, 2017 (2012); *Negusie v. Holder*, 555 U.S. 511, 523 (2009); *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

Prime Time bases its argument largely on select language from the court of appeals' decision.  In *Prime Time*, the D.C. Circuit found that under FETRA, the "volume of gross domestic sales" and "market share" are not synonymous with "gross domestic volume."  599 F.3d at 683.  The D.C. Circuit continued:

> [S]ection 518d(g)(3)(A) does not, on its face, require that a compound number of large and small cigars serve as the denominator when calculating a manufacturer's or importer's volume of domestic sales on a per-stick basis.  Most critically, USDA's interpretation appears to ignore the pro-rata-basis limitation Congress imposed on assessments within a tobacco class in subsection (e)….Prime Time's interpretation suggests that there is at least one way to interpret FETRA's provisions consistently and in harmony, with none made superfluous or insignificant.

*Id*.  This language does not, as Prime Time contends, mean that the D.C. Circuit "adopted" Prime Time's interpretation and "discredited" USDA's interpretation.  *Cf.* Prime Time's Cross-Mot. Summ. J. 22–23.  The Circuit clearly stated that the relevant statutory language is ambiguous, and explicitly limited its holding to saying only that FETRA did not *mandate* the per-stick rule. *Prime Time*, 599 F.3d at 683.

On the other hand, an interpretation by USDA that does not adequately address these concerns might not be reasonable.  USDA must endeavor to harmonize the pro-rata-basis limitation with per-stick metric in a way that minimizes surplus language.  USDA does not have to come to the same conclusion as Prime Time, but it must treat the D.C. Circuit's interpretive concerns as relevant considerations.

### 2.       *USDA Undertook Notice and Comment Rulemaking on Remand*

USDA came to a deeply-considered conclusion in reaffirming its Step B methodology. Despite not being required to do so under the controlling statute, *see* 7 U.S.C. § 519a(b)(1), USDA opened its Step B methodology to notice and comment rulemaking.  In its request for comments and notice of proposed rulemaking, USDA stated it was reviewing its "per unit calculation that treats all cigars, large and small, the same" as a result of *Prime Time v. Vilsack*, 499 F.3d 678.  76 Fed. Reg. 15859 (AR 11).  USDA detailed the issues regarding the "per-stick" method of calculating individual cigar-class assessments, quoted at length from the D.C. Circuit's *Prime Time* decision, considered alternative Step B methods suggested by Prime Time and the D.C. Circuit, outlined the practical challenges to those approaches, stated why it thought the per-stick method was the best reading of the statute, and explained why the rule resulted in fair assessments in line with Congressional intent.  76 Fed. Reg. 15859–64 (AR 11–16).

USDA received comments from several interested parties, both supporting and opposing the per-stick rule.  Prime Time submitted comments contesting certain claims made by USDA in its notice and strenuously opposing a per-stick rule.  Prime Time's first comment contested predictions made in USDA's notice about the impact that adopting Prime Time's preferred rule would have on large cigar manufacturers.  Comment from James Deer, Prime Time Int'l, Apr. 19, 2011, AR 17–18.  The same comment also strenuously objected to any retroactive application of a newly-adopted rule.  *Id.*

A later comment from Prime Time's outside counsel repeated these charges of inaccuracy, argued that the D.C. Circuit mandate forbade USDA from keeping the status quo, and championed a three-step assessment process that would calculate large and small cigar

assessments separately.   Comment from Donald Stein, Greenberg Traurig LLP, May 23, 2011,

AR 47–50.  This three-step assessment process would have worked as follows:

> Step A – Allocate the amount of total assessment among the six classes based on the Federal excise taxes paid by each class, with separate figures for large and small cigars, as currently done by CCC.

> Step B – Divide the class assessment for cigars into large and small cigar segments.  This will divide the market share of cigars along the lines of overall size and weight (and coincidentally, market value) of the products removed.

> Step C – For large cigars, divide the amount of the total cigar assessments attributable to large cigars by the stick count number of the large cigars removed by each company to establish a company assessment for the large cigar segment of its sales.  For small cigars, divide the amount of the total cigar assessment attributed to small cigars by the number of small cigars each company removed to establish the company assessment for the small cigar segment of its sales.

*Id*. at AR 48–49.

Aston Distributers, an importer and distributor of premium cigars, supported continuing the per-stick rule, stating that any change would be unfair and "would result in greater burden to a tobacco category [large, premium cigars] that never benefited from the federal subsidy program for which the assessment is designed to eliminate."   Comment from Nadia Trowbridge, CFO, Ashton Distributers, May 19, 2011, AR 19–20.  The comment also stated that it was "difficult to believe that USDA would change the assessment calculation on a program that is more than half way through its life cycle."  *Id*. at AR 20.

Altria Client Services, the regulatory arm of Altria Group (the parent company of Phillip Morris and a manufacturer of cigarettes) submitted a comment in favor of continuing the per-stick rule.  Comment from Neil Simmons, Vice President, Altria Client Services, May 20, 2011, AR 21–23.  Altria argued that Prime Time's alternative Step B method would be contrary to FETRA's statutory language, and that any discrepancies between the CCC's market share figures

and those offered by A.C. Nielsen is inconsequential, as FETRA and Nielsen calculate market share differently for different purposes. *Id*. at AR 21–22.

A group of cigar manufacturers, "represent[ing] a diverse cross-section of cigar manufacturers and importers with product lines including virtually all cigar varieties, shapes and sizes" including small cigars, submitted a comment in favor of keeping the per-stick rule. Comment, May 20, 2011, AR 24–46. This coalition of cigar companies argued: (1) creating two separate categories for large and small cigars would be contrary to Congressional intent, as FETRA plainly created one cigar class and never spoke of treating large and small cigars differently; (2) Prime Time's proposed alternative method would be arbitrary and impractical, as weight data for cigars is not as available and reliable as stick count data, and cigar companies can manipulate product weight to fall into the "small cigar" category; and (3) any change to the methodology must be prospective only. *Id*. at AR 24–28.

After considering these public comments, USDA decided not to make any changes to the existing Step A and Step B assessment methods.[6] *See generally Final Determination* (AR 54–95). USDA's final determination was detailed and responded comprehensively to Prime Time's stated concerns. The USDA began with explaining and defending its Step B methodology, stating that its determination is "grounded in the text of FETRA." *Id.* at 10 (AR 63). USDA started with subsection (e)(1) of FETRA, which states that "[t]he assessment for each class of tobacco product…shall be allocated on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume." 7 U.S.C. § 518d(e)(1). USDA stated that the terms "gross domestic volume" and "share of gross domestic

---

[6] USDA addressed challenges to both steps in this final determination, although only the Step B assessment method is at issue in this case. Altria, the parent company of cigarette manufacturer Phillip Morris, challenged the Step A assessment method that made cigarette manufacturers and importers responsible for more than 90% of the total assessment fund. *See Final Determination* 31–40 (AR 84–93).

volume" lack a common metric among different classes of tobacco products: "One manufacturer may have a "share of gross domestic volume" that is composed of numbers of cigarettes; another may have a "share of gross domestic volume" that is measured in pounds of roll-your-own tobacco." *Final Determination* 10 (AR 63). USDA then examines how FETRA's concepts of "gross domestic volume," "market share," and "volume of domestic sales" inform and depend on one another in calculating within-class assessments. *Id*. at 11–14 (AR 64–67).

USDA relied on its expertise and experience to determine that the "volumes" of different types of tobacco products are typically "measured" by different units—cigars and cigarettes typically measured by stick count, roll-your-own and pipe tobacco by weight. *Id*. at 10–16, 20–24 (AR 63–69, 73–77). USDA expressed the difficulties of calculating cigar volume and market share by reference to cigar weight. USDA claimed that "data are non-existent for specific cigar weights." *Id*. at 20 (AR 73). While the government differentiates between small and large cigars for some excise tax purposes, the division may not be as clean and significant as Prime Time would suggest. Often the differences between smaller "large" cigars and larger "small" cigars are slight, and manufacturers may undertake small alterations to make their "large" cigars "small"—and vice versa—depending on which class currently enjoys preferential tax treatment. *See id*. at 19–21 (AR 72–74). Within the "large" cigar group, there are vast size differences for which Prime Time's proposed method could not account. *Id*. Prime Time proposes separating out large and small cigars to correct for the perceived inequity of measuring all cigars by stick. However, USDA claims Prime Time's proposed method creates other inequities:

> But any per-stick measurement fails to account for weight differences within a class – even within the subcategories Prime Time proposes. For instance, within the proposed large cigar category, heavy "large" cigars and very light "large" cigars (those that barely qualify as "large") would pay the same per-stick amount. This result contradicts Prime Time's premise, that in the interest of equity, cigars weighing less should pay a smaller share of the assessments.

*Id*. at 24 (AR 77).   Therefore, it is not practical—or necessarily equitable—to impose Prime Time's desired cigar subclasses.

USDA also points out that nothing in the statute indicates that "volume,"—as it is used in "gross domestic volume" or otherwise—necessarily means "weight," or would contemplate disaggregating or measuring cigars by weight.   *Id*. at 20 (AR 73).   USDA finds support for this position in the text of FETRA:

> [O]ther provisions of FETRA contemplate the term "volume" as having a meaning that corresponds to the relevant metric for tobacco products and not a pre-set meaning as either weight or stick count.  For instance, in subsection (g)(3), FETRA provides that "*volume* of domestic sales" shall be measured by stick count for cigarettes and cigars and by pounds for all other classes of tobacco products.  Thus, subsection (g)(3) incorporates the concept that the term "volume" as generally used in FETRA does not refer to a fixed unit of measurement, but one that varies, depending on the product measured.  That is why subsection (g)(3) explicitly defines which unit of measure shall apply to volumes for different classes of tobacco product.

*Id*. at 22 (AR 75).   Therefore, FETRA's text indicates that stick count is the proper metric for calculating the volume of cigars.

However, Prime Time's comments do not suggest doing away with stick count entirely. Instead, it suggests that USDA treat large and small cigars differently when determining market share using the per-stick method.   *See*, *e.g.*, Comment from Donald Stein, AR 47–50.   As described earlier, Prime Time argues that

> after allocating the assessment by class of tobacco products, USDA should divide the cigar class assessment into sub-classes of large and small cigars, with the relative allocation determined by total weight, and then divide the assessments among individual large and small cigar manufacturers and importers on a per-stick basis from the subdivided assessments.

*Prime Time*, 599 F.3d at 420.

USDA's final determination rejected this "sub-classing" as not the best interpretation of plain text or Congressional intent.  USDA emphasized that Congress, knowing how to create subclasses for different sizes of cigars in other contexts, "pointedly, combined the small and large cigar tallies [taken from excise tax data] and made them one class."  *Id.* at 21 (AR 74).  USDA notes that "Prime Time's method," since it requires separate class apportionments and market share calculations for small and large cigars, "is no different than having seven classes of products instead of six."  *Id.* at 23 (AR 76).  USDA sees such a move as contrary to the plain text of FETRA—which clearly creates six tobacco classes, and does not speak of subclasses; and contrary to Congressional intent—Congress, "despite knowing of the differences between small cigars and large cigars, and having demonstrated the ability to account for those differences in a statutory assessment program" chose to create only one cigar class.  *Id.*

The final determination also addressed Prime Time and the D.C. Circuit's concerns over giving effect to subsection (e)'s pro-rata-basis limitation, which directs that "no manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer or importer's share of domestic volume."  7 U.S.C. § 518d(e)(2).  USDA stated:

> Pursuant to subsection (e)(2), USDA ensures that no manufacturer or importer pays an assessment greater than an amount based on its "share of" [gross domestic volume ("GDV")].  For instance, if a manufacturer had a "share of" of GDV that was 100 cigars, that manufacturer would not pay more than the amount of a Step B assessment that is calculated using 100 cigars.  Also, by operation of subsection (e)(2), USDA does not reassign any unpaid part of the class assessment (by a delinquent manufacturer or importer) to a paying manufacturer or importer.
>
> *                    *                    *
>
> USDA understands subsection (e)(2) to mean that liability for any unpaid part of the class assessment (by a delinquent manufacturer or importer) is not transferred to a paying manufacturer.  Otherwise, the assessment for the paying parties could exceed the amount that can be attributed to their actual share or contribution to the GDV.  In a sense, USDA reads subsection (e)(2) as preventing joint and several liability among manufacturers and importers in a class or tobacco product.

24

> Accordingly, USDA reads subsection (e)(2) to mean that no manufacturer or importer pays an assessment greater than the amount calculated on the basis of its "share of" GDV, however GDV is measured.

*Final Determination* 12, 25–26 (AR 65, 78–79).  Under this interpretation, USDA gives effect to the pro-rata-basis limitation without requiring a differentiation between small and large cigars.

The final determination also addressed other of Prime Time's challenges—involving, for instance, the A.C. Nielsen data—not at issue in this case.  It also addressed a challenge by Phillip Morris to the Step A calculation method.  The final determination concluded by reaffirming the existing Step A and Step B calculation methods.  *See id.* at 27–42 (AR 80–95).

### 3.    *USDA's Interpretation is Reasonable under* Chevron *Step 2*

USDA's rulemaking relied on agency expertise and responded to all significant comments.  USDA's procedures demonstrate a rigorous and thorough interpretive process.  USDA's rulemaking process shows that the pre-stick rule is a substantively reasonable interpretation of the statutory ambiguities in FETRA, and the Court owes USDA's interpretation deference under *Chevron* step 2.  In addressing how USDA reaffirmed the per-stick rule in its final determination, the Court discussed the interpretive and practical issues USDA considered.  *See supra* Part III.B.2.  The full administrative record goes into even greater detail than the Court's prior discussion.  The Court will not repeat everything here.  However, when considering the reasonableness of USDA's interpretation, it is important to consider the main interpretive issues raised by the court of appeals and Prime Time.

The D.C. Circuit expressed serious concerns over whether USDA's per-stick rule could give proper weight to "the pro-rata-basis limitation Congress imposed on assessments within a tobacco class in subsection (e)" of FETRA.  *Prime Time*, 599 F.3d at 683.  Subsection (e)(2) of FETRA states that "no manufacturer or importer shall be required to pay an assessment that is

based on a share that is in excess of the manufacturer or importer's share of domestic volume."

7 U.S.C. § 518d(e)(2).  Prime Time argues that no rule that treats small and large cigars alike

could comport with this pro rata limitation.  Prime Time's Cross-Mot. Summ. J. 18–22.

Therefore, it is incumbent on USDA to explain how it "interpret[s] FETRA's provisions

consistently and in harmony, with none made superfluous or insignificant," *Prime Time,* 599

F.3d at 683, with a particular emphasis on giving effect to the statute's pro-rata-basis limitation.

USDA's interpretation adequately harmonizes FETRA's provisions without making any

clause dead letter.  As explained in greater detail *supra*, USDA's final determination explained

how its rule gives effect to subsection (e)'s pro-rata-basis limitation—the subsection ensures that

no company would be forced to make up any shortfall caused by delinquent manufacturer or

importers.  *See Final Determination* 12 (AR 65).  This interpretation certainly prevents

subsection (e) from being inoperative or superfluous, although it might give the clause less

"effect" than Prime Time would like.

The Court agrees with Prime Time that the canon against surplus language is very

important.  *See* Prime Time's Cross-Mot. Summ. J. 16–17, 20–27.  Certainly, [i]t is a

fundamental principal of statutory construction that 'effect must be given, if possible, to every

word, clause and sentence of a statute…so that no part will be inoperative or superfluous, void or

insignificant."  *In re Surface Mining Regulation Litig.*, 627 F.2d 1346, 1362 (D.C. Cir. 1980)

(*quoting* 2A SUTHERLAND, STATUTORY CONSTRUCTION § 46.06 (4th ed. 1973) (internal

quotations omitted)).  However, Prime Time treats this canon as if it were an absolute mandate.

USDA *must* give the pro-rata-basis limitation its fullest possible expression, even if this means

essentially rewriting the statute to "create" cigar subclasses that are never explicitly mentioned in

the statute.  The government is correct to point out that the  "'preference for avoiding surplusage

constructions is not absolute.'"   United States' Opp'n to Prime Time's Cross-Mot. 7, Civ. No. 06-1077, Nov. 19, 2012, ECF No. 45) (*quoting Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004)).  *See also Adirondack Med. Ctr. v. Sebelius,* 891 F. Supp. 2d 36, 46–47 (D.D.C. 2012) ("The canon of construction regarding superfluities…is not a mandate.  The canon merely provides that 'if possible' a court should construe a statute to give effect to every word and clause and should avoid a construction that renders a word or clause surplusage.").

As noted *supra*, USDA's interpretation of the pro-rata-basis limitation does not render that clause totally meaningless.  This interpretation might leave Prime Time with a less "robust" reading of the clause than it might have hoped, but the interpretation does not reduce it to nothing.  In interpreting the pro-rata-basis limitation, USDA had to weigh the canon of avoiding superfluities against the canon that specific terms in a statute should govern more general ones. "To resolve a contradiction within a statute, courts often find that a specific provision that conflicts with a general provision controls."  *Id.* at 46 (*citing Edmond v. United State*s, 520 U.S. 651, 657 (1997); *Varity Corp. v. Howe*, 516 U.S. 489, 51 (1996)).  In this case, the general statement that "[t]he assessment for each class of tobacco product…shall be allocated on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume,"  7 U.S.C. § 518d(e)(1), may come into conflict with the more specific statement that, "[f]or purposes of calculations under this subsection…the volumes of domestic sales shall be measured by—[ ] in the case of cigarettes and cigars, the number of cigarettes and cigars,"  7 U.S.C. § 518d(g)(3).[7]  USDA might be put in the position of either giving "more" meaning to the general pro rata provision—at the expense of giving "less"

---

[7] Prime Time's proffered interpretation does not *necessarily* make subsection (g)(3) dead letter either—after subdividing the cigar class into small and large cigar classes, the USDA would determine market share by stick count for each subclass.  Therefore, the provisions do not *directly* conflict, in the sense that it would be *impossible* to follow both.  However, it is clear that it is not easy to square the two provisions—the tension between their mandates is at the core of this dispute.

meaning to the specific cigar counting provision—or vice versa.  Recognizing this tough decision, USDA may choose an interpretation that gives fuller meaning to the specific provision. This a defensible, reasonable interpretation of FETRA's statutory ambiguity.[8]

The fact that FETRA plainly lists six—not seven—tobacco product classes strongly supports USDA's decision to assess all cigars using a uniform methodology.  Prime Time's proffered interpretation would require USDA to treat small and large cigars differently for the purposes of assigning assessments. Prime Time argues that this is clearly mandated by the pro-rata-basis limitation of FETRA, but this Court thinks that such differential treatment is not required by the statute.  USDA offers compelling arguments that dividing the cigar class into small and large cigar subclasses (or doing the functional equivalent thereof) may undercut a carefully constructed statutory scheme that intentionally created only one cigar class.

USDA first points to the plain text.  FETRA consistently treats large and small cigars as part of the same class.  It speaks of "cigars" generally, and does not differentiate between cigars based on their size.  *See* 7 U.S.C. § 518d(c)(1); *see also* 7 C.F.R. § 1463.3.  The law consistently speaks in terms of "classes," and never once mentions "subclasses" within the six enumerated tobacco product classes.  *See* 7 U.S.C. §§ 518d(a)(2), (e)–(g).  Congress knows how to distinguish between small and large cigars when it wants to; for example, Congress assesses excise taxes on small and large cigars at different rates.  *See* 26 U.S.C. §§ 5701(a)(1)–(2).

Congress did *not* treat large and small cigars as two different classes under FETRA. Draft legislation would have created an assessment, administered by the Food and Drug

---

[8] When a general provision is allowed to trump a more specific provision, the specific provision may be greatly diminished, as that provision had a narrower reach to begin with.  But when a general provision is abrogated to give meaning to a specific provision, the general provision is in less danger of being gutted, as it applies more broadly. *See RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ("The general/specific canon…has full application…to statutes…in which a general authorization and a more limited, specific authorization exist side-by-side.  There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one[.]").

Administration, based on seven classes of tobacco products, with small and large cigars constituting separate classes. *See* 150 Cong. Rec. 8389 (July 16, 2003); *see also* 76 Fed. Reg. at 15862 (AR 14).   This same draft legislation would have created another assessment, administered by USDA, on five product classes, excluding cigars altogether. *See* 150 Cong. Rec. 8397 (July 16, 2004); *see also* 76 Fed. Reg. at 15862 (AR 14).  Instead, the final legislation created an assessment, administered by USDA only, on six classes of tobacco products— including cigars as a class, but not subdividing large and small cigars into separate classes. *See* 7 U.S.C. §§ 518d(b)–(c).   As the government contends, "[b]y rejecting those proposals to subdivide or omit the cigar class, the legislative history strongly suggests that Congress intended to treat large and small cigars as a single, undivided class."   United States' Mot. Summ. J. 21.  This position has support from how the Supreme Court has treated similar types of legislative history. *See Immigration & Naturalization Serv. v. Cardoza–Fonseca*, 480 U.S. 421, 422–23 (1987) ("'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it had earlier discarded in favor of other language.'" (*quoting Nachman Corp. v. Pension Benefit Guar. Corp*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)).

And as discussed *supra*, it might do violence to the text to allow the broad "pro rata" language of subsection (e)(2) to fundamentally alter the many specific provisions in FETRA that consistently speak of only one cigar class.   When the court allows general language to trump conflicting specific terms in this way, there is a big risk of creating surplus statutory language. *Cf. RadLAX Gateway*, 132 S. Ct. at 2071.

USDA thought that "add[ing] a size element now or subcategories" to treat small and large cigars differently "would seem to legislate rather than interpret the legislation."  76 Fed.

Reg. 15862 (AR 14).  This Court takes no position on whether differentiating between small and large cigars would go beyond the power of USDA in implementing FETRA.  Nonetheless, it seems clear to this Court that FETRA does not require any such size element or subclassing, and an interpretation that treats small and large cigars the same is not an unreasonable interpretation of FETRA.

### 4. *It is Irrelevant whether Prime Time's Interpretation is "Better"*

Since this Court has determined that USDA's interpretation is reasonable and deserves deference, the Court will not address the merits of Prime Time's rival interpretation.  As the court of appeals stated, the relevant language in FETRA is not "susceptible to a single interpretation" and is ambiguous.  *Prime Time*, 599 F.3d at 683.  As long as the agency's interpretation of that ambiguous language is reasonable, it does not matter whether Prime Time's interpretation is "more" reasonable.  Rejecting a reasonable agency interpretation because the Court prefers an alternative accords no deference whatsoever.  The Court's role at *Chevron* step 2 is not to pick between possible interpretations of the statute.  It is to determine whether the agency's interpretation is reasonable, and if so, defer to that reasonable interpretation.  *See*, *e.g.*, *Brand X*, 545 U.S. at 980 ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."); *Am. Council on Educ. v. F.C.C.*, 451 F.3d 226, 234 (D.C. Cir. 2006) ("We cannot set aside the Commission's reasonable interpretation of the Act in favor of an alternatively plausible (or an even better) one."); *Bush–Quayle '92 Primary Comm., Inc. v. Fed. Election Comm'n*, 104 F.3d 448, 453 (D.C. Cir. 1997) ("When confronted

with alternative sensible readings of an ambiguous statute the court is directed by *Chevron* to adopt the one the agency presents.").

USDA, on remand, has offered a reasonable interpretation of the ambiguous statutory language.  It has recognized that FETRA does not, in fact, mandate its per-stick method and has exercised its delegated power and agency expertise in offering a reasonable interpretation. USDA has gone above and beyond on remand, subjecting its Step B method to notice and comment rulemaking even though FETRA exempts this kind of rule from that process. USDA's rulemaking solicited and responded to comments from Prime Time and other interested parties.  USDA considered the court of appeals' concerns about harmonizing its per-stick method with FETRA's pro-rata-basis limitation.  USDA has thoroughly addressed why it thinks its rule is a proper interpretation of the ambiguous statutory language.  Having made this finding, the Court need not—and *should* not—address whether Prime Time's interpretation is "better."  Since USDA's rule is a reasonable interpretation of ambiguous language, *Chevron* requires this Court to defer to USDA's interpretation.

### C.     Prime Time Had No Legal Basis to Withhold Assessment Payments

It is clear from Prime Time's briefs that it adamantly disagrees with USDA's Step B calculations.  It fervently feels that USDA has improperly calculated Prime Time's market share using statutorily-infirm methods, leading to USDA levying excessive assessment charges against Prime Time.  What isn't clear is the legal authority Prime Time claims for completely failing to make *any* payments for over three years.  Prime Time did not pay the assessments then sue to recover any over-charged amounts, plus interest.  *See* 7 U.S.C. § 518d(j)(3).  It did not place the disputed amounts in an interest-bearing escrow account, as provided by USDA regulations.  *See*

31

7 C.F.R. § 1463.9(e). Instead, Prime Time unilaterally decided that it would not pay a cent until a court decided on the legitimacy of USDA's Step B methodology.

Prime Time had previously challenged other aspects of USDA's Step B calculations, including discrepancies between USDA's market share calculations and market share figures offered by private tracking company A.C. Nielsen. At this point in the litigation, Prime Time does not address these challenges, and focuses on its general challenge to USDA's Step B methodology. *See*, *e.g.*, Letter from Scott Sanford to James Deer, AR 118–12 (stating that USDA intends to complete fact-specific adjudication on these questions); Letter from John Wertheim to Scott Sanford, AR 117–18 (stating that no such factual adjudication is needed; Prime Time is eager to proceed to federal court without having A.C. Nielsen issues administratively adjudicated).

Prime Time does not seem to otherwise dispute that, if the Court upholds USDA's Step B methodology, it would owe the amounts indicated in the quarterly assessments. In its pending motion for summary judgment, Prime Time does not allege that USDA misapplied the Step B methodology or otherwise made a calculation error in determining the amounts of the assessments (other than, of course, using the "wrong" methodology). *See generally* Prime Time's Cross-Mot. Summ. J. As this Court has upheld USDA's Step B methodology as a reasonable interpretation of an ambiguous statute, and the assessment amounts are otherwise undisputed, the Court will enter judgment in favor of the United States in the amount of $11,679,006.05—the amount owed as of September 14, 2012 (AR 288)—plus any amounts of unpaid assessments and interest accrued between September 14, 2012, and this date.

**IV.      CONCLUSION**

When the court of appeals overturned the district court's grant of summary judgment, it was because the district court erred in giving *Chevron* deference to USDA's conclusion that the statute mandated its "Step B" assessment methodology.  A line of cases in this Circuit hold that when an agency concludes that a law speaks clearly on a particular issue, this is not the kind of agency "interpretation" that is due *Chevron* deference.  If a reviewing court finds, under *Chevron* Step 1, that the language in question is in fact unclear, then it is appropriate to remand to allow the agency to exercise its delegated authority to resolve statutory ambiguities.  The reviewing court typically takes no position on whether what the agency thought the statute "mandated" could be a reasonable interpretation under *Chevron* step 2.

In this case, the court of appeals issued this kind of administrative remand.  USDA then opened its rule to notice and comment rulemaking and, after considering all relevant factors, readopted its prior rule as the best interpretation of the statute.  Since USDA's interpretation is reasonable, this Court affords it deference under *Chevron* step 2 and will not displace it in favor of Prime Time's preferred interpretation.  Therefore, the Court will deny Prime Time's cross-motion for summary judgment in Civil Action No. 06-1077.  Since the past due assessment amounts are otherwise uncontested, the Court will enter summary judgment in favor of the United States in Civil Action No. 12-910 in the amount of $11,679,006.05, plus any amounts of unpaid assessments and interest accrued between September 14, 2012, and this date.

A separate Order accompanying this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on June 10, 2013.